**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X
JOEL RICH and MARY RICH,               :    Civil Action No. 1:18-cv-02223

                         :

           Plaintiffs,        :

                         :

           v.           :

                         :

FOX NEWS NETWORK, LLC, MALIA    :
ZIMMERMAN in her individual and professional  :
capacities, and ED BUTOWSKY, in his individual  :
and professional capacities,        :

                         :

           Defendants.      :
-------------------------------------------------------------- X

# PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES  ................................................................................... ii

INTRODUCTION  ..................................................................................................1

BACKGROUND  ....................................................................................................4

ARGUMENT ..........................................................................................................9

    I.       The Riches Have Sufficiently Alleged Intentional Infliction of Emotional Distress. ........................................................................10

           A.       Joel and Mary Have Sufficiently Alleged that Defendants' Conduct was Extreme and Outrageous. ...................................11

                1.      Zimmerman's and Butowsky's Conduct Toward Joel and Mary Was "Utterly Intolerable" and "Far Beyond the Reasonable Bounds of News Gathering"..............................13

                2.      Plaintiffs' IIED Claim Is Not Premised on the Elements of Defamation .......................................................15

                3.      The First Amendment Does Not Shield Defendants' Tortious Conduct .......................................................19

           B.       Joel and Mary Sufficiently Allege Intent and Causation as to Butowsky. ..............................................................22

           C.       Joel and Mary Sufficiently Allege Fox's Vicarious Liability for IIED............................................................23

    II.     The Riches Have Plausibly Alleged Aiding and Abetting and Conspiracy. ..............................................................26

    III.    Joel and Mary Sufficiently Allege that Defendants Tortiously Interfered with the Contract with Wheeler. ............................28

           A.       The Complaint Sufficiently Alleges Zimmerman's and Butowsky's Improper Conduct in Procuring a Breach Without Justification. ......................................................28

           B.       The Complaint Alleges that Zimmerman Was Aware of the Wheeler Contract and Its Confidentiality Obligations.............................30

           C.       Butowsky's Inevitable Breach Argument Fails. ........................31

D.     The Riches Have Sufficiently Pleaded Economic Damages from the Contract Breach. ..........................................................32

E.     The Contract's Confidentiality Obligations Were Not "Terminable at Will." ..................................................................33

IV.    The Complaint Sufficiently Alleges that Fox Negligently Supervised Zimmerman and Wheeler. ........................................................35

V.     Butowsky's Motion to Dismiss for Lack of Personal Jurisdiction Should Be Denied. .................................................................37

A.     Butowsky "Transacted Business" in New York. .......................................37

B.     At Worst, Joel and Mary Should Be Granted Jurisdictional Discovery. ...................................................................39

CERTIFICATE OF SERVICE  ..................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIM Int'l Trading LLC v. Valcucine S.p.A.*,
   No. 02 Civ. 1363 (PKL), 2003 WL 21203503 (S.D.N.Y. May 22, 2003)..............................33

*Am. Credit Card Processing Corp. v. Fairchild*,
   11 Misc. 3d 972 (N.Y. Sup. Ct. 2006) ................................................................................15

*Am. Online Latino v. Am. Online, Inc.*,
   250 F. Supp. 2d 351 (S.D.N.Y. 2003) (emphasis added), *op. clarified*, No. 02
   CIV 4796 (LAK), 2003 WL 1842874 (S.D.N.Y. Apr. 2, 2003)............................................29

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)................................................................................................25

*Armstrong v. H & C Commc'ns, Inc.*,
   575 So.2d 280 (Fl. Dist. Ct. App. 1991) .............................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................9

*Balderman v. Am. Broad. Cos., Inc.*,
   292 A.D.2d 67 (N.Y. App. Div. 2002) ............................................................................18, 19

*Baugh v. CBS, Inc.*,
   828 F. Supp. 745 (N.D. Cal. 1993) .....................................................................................12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................9

*Bender v. City of New York*,
   78 F.3d 787 (2d Cir. 1996)..................................................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016), *reconsideration denied sub nom. Sec.
   Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789
   (SMB), 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016) ................................................24

*Biro v. Conde Nast*,
   807 F.3d 541 (2d Cir. 2015)................................................................................................21

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*,
   No. 07 Civ. 7998 (HB), 2008 WL 1710910 (S.D.N.Y. Apr. 10, 2008)...................................29

*Chaiken v. VV Pub. Corp.*,
   119 F.3d 1018 (2d Cir. 1997) ....................................................................................3, 20

*Chanko v. Am. Broad. Cos. Inc.*,
   49 N.E.3d 1171 (N.Y. 2016) ....................................................................................15, 22

*Charles Schwab Corp. v. Bank of America Corp.*,
   883 F.3d 68 (2d Cir. 2018) ..............................................................................................39

*City of Almaty v. Ablyazov*,
   278 F. Supp. 3d 776 (S.D.N.Y. 2017) .......................................................................37, 40

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991) ...........................................................................................2, 19, 30

*Conboy v. AT&T Corp.*,
   84 F. Supp. 2d 492 (S.D.N.Y. 2000) .............................................................................15

*Connell v. Hayden*,
   83 A.D.2d 30 (N.Y. App. Div. 1981) .............................................................................35

*Conradt v. NBC Universal, Inc.*,
   536 F. Supp. 2d 380 (S.D.N.Y. 2008) ...........................................................................12

*Costlow v. Cusimano*,
   34 A.D.2d 196 (1970) ......................................................................................................22

*Courtroom Television Network v. Focus Media, Inc.*,
   264 A.D.2d 351 (N.Y. App. Div. 1999) ...................................................................38, 39

*Dalbec v. Gentleman's Companion, Inc.*,
   828 F.2d 921 (2d Cir. 1987) ...........................................................................................21

*Diamond v. Stratton*,
   95 F.R.D. 503 (S.D.N.Y. 1982) .....................................................................................22

*Dowd v. Calabrese*,
   589 F. Supp. 1206 (D.D.C. 1984) ..................................................................................27

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015) ...........................................................................................39

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...........................................................................28

*Esposito-Hilder v. SFX Broad. Inc.*,
   236 A.D.2d 186 (N.Y. App. Div. 1997) .........................................................................16

*Estate of Duckett ex rel. Calvert v. Cable News Network LLLP*,
  No. 5:06-CV-444-OC-10GRJ, 2008 WL 2959753 (M.D. Fla. Jul. 31, 2008) ........................12

*Flamm v. Van Nierop*,
  59 Misc. 2d 1059 (N.Y. Sup. Ct. 1968) ...................................................................................11

*Flatley v. Hartmann*,
  138 A.D.2d 345 (N.Y. App. Div. 1988) .............................................................................10, 11

*Flynn v. Higham*,
  197 Cal. Rptr. 145 (Cal Ct. App. 1983) ..................................................................................17

*Freihofer v. Hearst Corp.*,
  480 N.E.2d 349 (N.Y. 1985) .....................................................................................................15

*Funk v. Belneftekhim*,
  No. 14-CV-0376 (BMC), 2017 WL 5592676 (E.D.N.Y. Nov. 20, 2017) ..............................37

*Galella v. Onassis*,
  487 F.2d 986 (2d Cir. 1973) ........................................................................................2, 12, 19

*Goldberg v. UBS AG*,
  690 F. Supp. 2d 92 (E.D.N.Y. 2010) .......................................................................................27

*Greene v. Tinker*,
  332 P.3d 21 (Alaska 2014) .................................................................................................20, 30

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
  406 N.E.2d 445 (N.Y. 1980) ...............................................................................................33, 34

*Halio v. Lurie*,
  15 A.D.2d 62 (N.Y. App. Div. 1961) ..................................................................................10, 11

*Harper v. N.Y.C. Housing Auth.*,
  673 F. Supp. 2d 174 (S.D.N.Y. 2009) ......................................................................................33

*Hartwig v. NBC*,
  863 F. Supp. 558 (N.D. Ohio 1994) .........................................................................................17

*Holloway v. Am. Media, Inc.*,
  947 F. Supp. 2d 1252 (N.D. Ala. 2013) ..............................................................................12, 16

*Howell v. New York Post Co.*,
  612 N.E.2d 699 (N.Y. 1993) ..........................................................................................10, 15, 16

*Hudson v. Delta Kew Holding Corp.*,
  43 Misc.3d 1223(A), 2014 WL 1924324 (N.Y. Sup. Ct. 2014) ...............................................26

*Huggins v. Povitch*,
 No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996)..........................................29

*Hustler Magazine, Inc. v. Falwell*,
 485 U.S. 46 (1988) ...................................................................................................15, 16, 21

*Hwang v. Grace Rd. Church (in New York)*,
 No. 14-CV-7187, 2016 WL 1060247 (E.D.N.Y. Mar. 14, 2016).....................................35, 36

*Kleeman v. Rheingold*,
 614 N.E.2d 712 (N.Y. 1993)...............................................................................................24

*KOVR-TV, Inc. v. Superior Court*,
 37 Cal. Rptr. 2d 431 (Cal. Ct. App. 1995) ...........................................................................12

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*,
 35 A.D.3d 317 (N.Y. App. Div. 2006) ............................................................................3, 29

*Krystal G. v. Roman Catholic Diocese of Brooklyn*,
 34 Misc. 3d 531 (N.Y. Sup. Ct. 2011) ..................................................................................35

*Leeds v. D.B.D. Servs., Inc.*,
 309 A.D.2d 666 (N.Y. App. Div. 2003) ...........................................................................8, 36

*Long v. Beneficial Fin. Co. of New York*,
 39 A.D.2d 11 (N.Y. App. Div. 1972) ...................................................................................22

*McNamee v. Clemens*,
 762 F. Supp. 2d 584 (E.D.N.Y. 2011) ..................................................................................38

*McSpedon v. Levine*,
 158 A.D.3d 618 (N.Y. App. Div. 2018) ...............................................................................27

*Medtech Prods. Inc. v. Ranir, LLC*,
 596 F. Supp. 2d 778 (S.D.N.Y. 2008)...................................................................................29

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
 609 F.3d 30 (2d Cir. 2010)...................................................................................................37

*Phillips v. Reed Grp., Ltd.*,
 955 F. Supp. 2d 201 (S.D.N.Y. 2013)...................................................................................10

*Pilates, Inc. v. Pilates Inst., Inc.*,
 891 F. Supp. 175 (S.D.N.Y. 1995) .......................................................................................37

*Plasticware, LLC v. Flint Hills Res., LP*,
 852 F. Supp. 2d 398 (S.D.N.Y. 2012)...................................................................................28

*Posner v. Lewis*,
    965 N.E.2d 949 (N.Y. 2012) ........................................................................20

*Press v. Chem. Inv. Svcs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ...............................................................22, 28

*Quick v. Short*,
    No. 87 CIV. 695(CSH), 1990 WL 29427 (S.D.N.Y. Mar. 15, 1990) ...................11

*Roach v. Stern*,
    252 A.D.2d 488 (N.Y. App. Div. 1998) ...........................................2, 10

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) .................31

*Saini v. Tonju Assocs.*,
    299 A.D.2d 244 (N.Y. App. Div. 2002) ...........................................24, 25

*Schafer v. Hicksville Union Free Sch. Dist.*,
    No. 06-CV-2531 JS ARL, 2011 WL 1322903 (E.D.N.Y. Mar. 31, 2011) ...............26, 28

*Singer v. Jefferies & Co.*,
    160 A.D.2d 216 (N.Y. App. Div. 1990) ...........................................18, 19

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..................................................................19, 20

*Stratagem Dev. Corp. v. Heron Int'l N.V.*,
    153 F.R.D. 535 (S.D.N.Y. 1994) ....................................................39

*Sylvester v. City of New York*,
    385 F. Supp. 2d 431 (S.D.N.Y. 2005) ............................................10, 17

*In re Terrorist Attacks on Sept. 11, 2001*,
    No. 03-MDL-1570(GBD), 2018 WL 1626255 (S.D.N.Y. Mar. 28, 2018) ...............23

*Thomas v. Ashcroft*,
    470 F.3d 491 (2d Cir. 2006) .......................................................37, 39

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014) .......................................................25

*Uebler v. Boss Media, AB*,
    363 F. Supp. 2d 499 (E.D.N.Y. 2005) ...........................................40

*Vasarhelyi v. New Sch. for Soc. Research*,
    230 A.D.2d 658 (N.Y. App. Div. 1996) ...........................................10

*Watts v. Jackson Hewitt Tax Serv., Inc.*,
   675 F. Supp. 2d 274 (E.D.N.Y. 2009) .................................................................34

*World Wrestling Fed'n Entm't, Inc. v. Bozell*,
   142 F. Supp. 2d 514 (S.D.N.Y. 2001) ..................................................................38

*Young Bai Choi v. D & D Novelties, Inc.*,
   157 A.D.2d 777 (N.Y. App. Div. 1990) ...............................................................26

**Rules**

N.Y. C.P.L.R. § 302(a) ...............................................................................................37

**Other Authorities**

Restatement (Second) of Torts § 46 (1965) .................................................................11

**INTRODUCTION**

No parent wants to imagine, let alone experience, outliving a child. Plaintiffs Joel Rich and Mary Rich had to endure that nightmare in 2016 when their 27-year-old son, Seth, was murdered in the streets of Washington, D.C. But what came next was unthinkable. Defendants, who attempt to portray themselves as honest "newsgatherers" and "journalists," engaged in a deliberate scheme to smear Joel and Mary's dead son as a traitor to everything in which he believed, and deceptively engaged them in the Defendants' nefarious effort—all for political gain and Fox's ratings and profits.

The pending Motions to Dismiss filed by Fox News Network, LLC ("Fox"), its reporter Malia Zimmerman ("Zimmerman," and with Fox the "Fox Defendants"), and their contributor and co-conspirator Ed Butowsky ("Butowsky") barely mention the litany of facts that underscores their egregious conduct. For example: just months after the Riches buried their son, Defendants schemed to "induce[] Joel and Mary . . . to hire Rod Wheeler, a purportedly independent investigator" who was really a Fox contributor, ¶ 3;[1] went so far as to prey on the family's Judaism to gain their trust, ¶¶ 25, 27, 50; orchestrated the signing of a sham confidentiality agreement between the family and Wheeler that Defendants intended to, and did, violate repeatedly, ¶¶ 51, 54–56; abused Wheeler's position as a representative of the family to muckrake for an article without Joel and Mary's knowledge, while any real leads evaporated, ¶¶ 65–69; published a baseless story worldwide placing the blame on Seth Rich for Russia's DNC email hack; and worse, claimed that this story was confirmed by the "investigator" "hired by the Rich family," making the grieving family a mouthpiece for their own deceased son's guilt.

---

[1] All citations to "¶ __" are to the allegations in the Complaint (ECF No. 1). All citations to "Fox Mem." are to the Memorandum in Support of Fox and Zimmerman's Motion to Dismiss for Failure to State a Claim (No. 36). All citations to "Butowsky Mem." are to Butowsky's Memorandum in Support of His Motion to Dismiss (No. 53).

As one magazine put it after the article's publication and retraction, Fox "is responsible for the beginning, middle, and end of this entire cruelly exploitative debacle." ¶ 118. Even after the Fox Defendants retracted the story, Fox continue to propagate the smear on the air and on its website. As Joel and Mary described the experience, "with every phone call you hope that it's the police, calling to tell you that there has been a break in the case," but "instead, every call that comes in is a reporter asking what you think of a series of lies or conspiracies"—lies that Defendants explicitly and repeatedly linked to Joel and Mary. ¶¶ 120–21. It was akin to "burying [their son] all over again." ¶ 119.

The Riches have alleged more than sufficient facts to state a claim for intentional infliction of emotional distress ("IIED"). Complaints since the dawn of IIED have been upheld with far less extreme allegations. *See infra* at 10–13 (collecting cases). Defendants argue that their conduct is immunized by the First Amendment. But their assertions defy long-standing constitutional principles recognizing "no such scope to the First Amendment right. Crimes and torts committed in news gathering are not protected." *Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973). The Supreme Court has repeatedly reminded the press that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) (collecting cases substantiating this "well-established line of decisions"). Even in the news context, IIED claims may be sustained—especially at the pleadings stage. *See*, *e.g.*, *Roach v. Stern*, 252 A.D.2d 488, 492 (N.Y. App. Div. 1998) ("[A] jury might reasonably conclude that the manner in which [plaintiffs' family member's] remains were handled, for entertainment purposes and ***against the express wishes of her family***, went beyond the bounds of decent behavior." (emphasis added)).

2

Defendants also try to reframe Joel and Mary's IIED claim as an attempt to circumvent the limitations on defamation claims. But this is ***not*** a case ***solely*** about a false publication; it is also about a scheme involving a series of deceptive actions against Joel and Mary that began long before the article in question was written or published and continued long afterward—after Fox's retraction and even to this day. In any event, even Defendants acknowledge that IIED claims remain viable when the writings in question are published in a "grossly irresponsible" or reckless manner, which the Complaint plainly alleges and which Fox's retraction confirms. *See, e.g.*, *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1035 (2d Cir. 1997).

There is also no doubt that Defendants tortiously interfered with Joel and Mary's contract with Wheeler's private investigation firm. Indeed, violating that contract was an integral part of the Defendants' scheme. While Defendants contend their actions were not "for the sole purpose of harming" Joel and Mary, Defendants' mental state is, of course, a fact issue that cannot be resolved at the pleadings stage. Defendants are also wrong on the law, as New York courts have made clear that "it is not necessary to allege that defendant used improper means or that its conduct was for the sole purpose of harming plaintiff," where the claim at issue involves interference with an existing contract. *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318 (N.Y. App. Div. 2006).

Finally, Butowsky's personal jurisdiction challenge ignores the close ties between his egregious conduct and the state of New York, where he worked directly with Fox News executives, producers, and on-air talent in New York to "put[] this [article] together," as well as directing Fox News on how to spin the article. ¶¶ 8, 12, 82. It also ignores that Butowsky is a co-conspirator of Fox News, which operated in New York to advance Defendants' conspiracy.

Defendants' motions seek legal immunity from the torts they committed because they assert they were gathering news. That is not and should not be the law. Defendants' motions to dismiss should be denied and the stay on discovery removed.

## BACKGROUND

Joel and Mary's Complaint alleges that Defendants "intentionally exploited" the tragedy of Seth Rich's death with a deliberate scheme to smear Joel and Mary's dead son, and deceptively targeted and enlisted Joel and Mary in their nefarious effort. ¶ 2. All Defendants "induced Joel and Mary . . . to hire Rod Wheeler, a purportedly independent investigator, to help 'solve' their son's murder." ¶ 3. And all Defendants "intentionally made it appear that Joel and Mary were involved in and confirmed the substance of this smear campaign." ¶ 4. Each Defendant played a key role in the tortious conduct against Joel and Mary.

To execute on Defendants' scheme, Butowsky, who began as a stranger to Joel and Mary, used the family's Jewish heritage and community ties to gain an introduction. ¶¶ 25–27. With Defendants' knowledge and approval, he relentlessly pursued Joel and Mary's trust. ¶ 29. Immediately following a meeting Butowsky organized between himself, Wheeler, and Zimmerman, Butowsky contacted Joel and suggested he hire Wheeler on the Rich family's behalf. ¶ 41. Knowing Joel and Mary would refuse to hire an investigator tied to Fox, Butowsky instructed Wheeler to hide his connections to the Fox Defendants when he met with Joel and Mary. ¶ 42. Butowsky then convinced Joel and Mary to engage Wheeler with the promise, among others, that Joel and Mary would have control over any and all of Wheeler's public comments. ¶¶ 45–58. This conduct, which occurred behind the scenes with Fox and Zimmerman's knowledge and assistance, is extreme and outrageous, just like the publication tying Joel and Mary to the falsified investigation smearing their son.

Zimmerman's role likewise went far beyond newsgathering and speech; she played a pivotal role in Defendants' scheme from its inception. Just days before Butowsky persuaded Joel and Mary to retain Wheeler—"Wheeler met with Butowsky *and Fox's Zimmerman* at a restaurant." ¶ 37 (emphasis added).[2] Butowsky, Zimmerman, and Fox's shared purpose was "to have Wheeler plausibly corroborate the sham story" using Joel and Mary's name and connections—a fiction that Zimmerman and Butowsky were already planning to publicize *despite* its lack of evidence. ¶ 39.

Zimmerman, Butowsky, and Wheeler were laboring to concoct the sensationalist Fox story. Contrary to Fox's mischaracterization, Joel and Mary do not allege that Zimmerman was simply exchanging information with Wheeler regarding their "parallel investigations." She was instead *feeding information to Wheeler* to "help" him, for example, "prepare for a meeting with police." Fox Mem. at 13 (citing ¶ 68). That meeting was, of course, possible only because Defendants swindled Joel and Mary into agreeing that Wheeler could have the same "rights and privileges *as that of immediate family members*" to discuss Seth's murder "with investigating agencies, i.e. Metropolitan Police Department and the FBI." Fox Mem., Ex. 4 (emphasis added); *see also* ¶ 66.

Butowsky's comments to Wheeler and Zimmerman before that meeting confirm that the "findings" of Wheeler's so-called "investigation" were predetermined. Butowsky told Zimmerman and Wheeler that Detective "Della camera is either helping us or we will go after him as being part of the coverup." ¶ 67. When the detective refused to corroborate Defendants' predetermined narrative that Seth was the source of the WikiLeaks, Defendants persisted

---

[2] During oral argument in *Wheeler v. Twenty-First Century Fox, Inc. et al.*, No. 1:17-cv-05807-GBD ("the *Wheeler* litigation"), Butowsky's own counsel admitted that Butowsky had worked with Zimmerman and "people at Fox in the past and . . . as a result of that he made an introduction [to Wheeler]." 2/28 *Wheeler* MTD Tr. at 40:20–24, Ex. 4 to the Declaration of Eli J. Kay-Oliphant ("Kay-Oliphant Decl.").

undeterred. Butowsky and Zimmerman called Wheeler and again fed him information, this time, that they had developed an FBI source confirming that Seth and WikiLeaks had exchanged emails. ¶ 69. But that "FBI source" was fictional. Wheeler's supposed "findings" merely repeated what the Defendants had fed him, and his former counsel has confirmed as much in open court. *See* 2/28 *Wheeler* MTD Tr. at 75:16–18 ("The source that's at issue here, as Butowsky and Zimmerman at Fox knew and know, is a source that -- is Butowsky.").

Knowing that there was no FBI source, and certainly that Wheeler had no FBI source, Fox published not one, but three sensationalist articles (the "Fox Articles") asserting that Wheeler and an unnamed (and, it turns out, non-existent) FBI agent had hard evidence that Seth was WikiLeaks's source. *See* Fox Mem., Exs. 1–3. Critically, in the first Fox Article, Fox attributed these findings to an investigator "***hired by Rich's family***." ¶ 88 (emphasis added). In the follow-up articles, Fox doubled down on Wheeler's statements, on the family's connection to Wheeler, and on the falsehood that Wheeler's findings were corroborated by a federal investigator. *See* Fox Mem., Ex. 3 ("Rod Wheeler, a retired Washington homicide detective and Fox News contributor investigating the case on behalf of the Rich family, made the WikiLeaks claim, which was corroborated by a federal investigator who spoke to Fox News."); *id.*, Ex. 2 ("The revelation [of the federal investigator] is consistent with the findings of Rod Wheeler, a former DC homicide detective and Fox News contributor and whose private investigation firm was hired by Rich's family to probe the case.").

Even before discovery from Fox it is clear that Zimmerman, Butowsky, and Wheeler acted with the approval and constant guidance of higher-ups at Fox. On May 15, 2017, the day before the Fox Articles aired, Zimmerman told Wheeler that the "bosses at Fox want her to go" with the Fox Article the next day. ¶ 74. Wheeler has stated that, when a reporter from Fox's local

D.C. affiliate asked to speak with Wheeler about his story, he said he needed to check first with Fox's producers. ¶ 76. Zimmerman further corroborated Fox's involvement from the outset when she told Wheeler, this "could be really bad if the Fox News channel thinks you fed an exclusive **we invested a lot of time and money into** to a local channel just hours before we were going to publish." ¶ 85 (emphasis added).

Just one day after the Fox Articles were published, it was publicly revealed what Fox already knew: Defendants had orchestrated the story, and it lacked any valid source. Specifically, on May 17, 2017, Wheeler told *Newsweek* that the Fox Articles were wrong and that his "information" from the unnamed "federal investigator" was mere repetition of what Butowsky and Zimmerman had told him. ¶ 93. Wheeler wrote: "I've never, ever seen Seth Rich's computer, nor have I talked with the federal investigator." *Id.* The same day, an FBI spokesperson stated that the FBI had played no part in the investigation of Seth Rich's homicide and had never received Seth's laptop. ¶ 97.

Fox amplified its coverage of the Articles' fictional narrative. From May 16 to May 23, 2017, Fox's Sean Hannity repeatedly asserted that Seth passed on DNC emails to WikiLeaks on Fox News TV. ¶ 104. Other Fox agents continued to pump the false narrative connecting Seth to WikiLeaks. *Id.* Some or all of these individuals knew, or had reason to know, that the Fox Articles were a sham contrived in part by Butowsky. *See*, *e.g.*, ¶ 82.

Finally, a week after the public learned what Fox knew all along, *i.e.*, that the Articles were politically motivated and unsubstantiated, Fox issued a retraction of the first Article. Fox simply stated that the "article was not initially subjected to the high degree of editorial scrutiny

we require for all our reporting. Upon appropriate review, the article was found not to meet those standards and has since been removed." ¶ 107.[3]

Even more, **to this day,** Fox's websites continue to publish statements the Complaint alleges are both false and causing emotional distress. For example, in a currently available video entitled "Report: Slain DNC Staffer Had Contact with WikiLeaks," Fox says there is "evidence . . . suggest[ing] [Seth Rich] was in communications with WikiLeaks," and "according to a parallel investigation . . . by Fox News Contributor Rod Wheeler, there is evidence that Rich had contact with WikiLeaks, that evidence on a laptop belonging to Seth Rich, showing he was talking with WikiLeaks," Kay-Oliphant Decl., ¶ 2. In another video, Sean Hannity states on his Fox News program that "Wheeler . . . says Mr. Rich was communicating with WikiLeaks before he was killed," and Wheeler states "there was a federal investigator that was involved on the inside of the case, a person that is very credible . . . this person, we checked him out . . . he said he laid eyes on the computer and he laid eyes on the case file." *Id.* ¶ 3. In yet another video, Lou Dobbs states on his Fox Business program that "a federal investigator [is] telling Fox News that an FBI forensic report of Rich's computer showed he made contact with WikiLeaks," and "[Wheeler] says there is some degree of exchange between Rich and WikiLeaks that occurred before his death." *Id.* ¶ 4. These videos are available via traditional internet search and play with no disclaimer, no mention of the retraction, and no explanation.

Outside of the Fox orbit, the outcry over how the Rich family was treated was nearly universal. The D.C. Metropolitan Police Department ("MPD") wrote a letter to the local Fox D.C. affiliate excoriating it for the parallel story published on May 15, 2017, reporting on the

---

[3] Fox attempts to distance itself from the fictions it continued to telecast after its retraction by characterizing the statements as coming from "guests." The self-serving implication that Fox is not responsible for the content it broadcast awaits discovery, including as to Fox's control and pre-publication coordination with its so-called "guests." *See, e.g., Leeds v. D.B.D. Servs., Inc.,* 309 A.D.2d 666, 667 (N.Y. App. Div. 2003) (denying summary judgment because fact questions remained over defendant's oversight and control of independent contractor's work).

falsified Wheeler investigation created by Zimmerman and Butowsky.  The MPD stated that the story "has caused national outrage" and that it was "evident [] that [the local Fox affiliate reporter] exploited the grief of the Rich family." ¶ 102. Following the retraction, one magazine highlighted that "[t]he damage is done" because "Fox News has perfected the art of poisoning public discourse with shoddy journalism at best and outright lies at worst." ¶ 118.

Joel and Mary have been irreparably harmed not only by the publication of the false Fox Articles but also by Defendants' cruel scheme to implicate them in the lies they disseminated. "[W]hatever opportunity that existed to investigate and find closure with regard to their son's murder was taken away" by this scheme. ¶ 124. Joel and Mary have been "deprived of the time and space they need to mourn the death of their son" and to "facilitate the criminal investigation" of his murder by the barrage of "new headlines, new lies, new factual errors, new people approaching [them] to take advantage of [them] and Seth's legacy." ¶¶ 125, 127, 123. They fear being present in public for they may be interrogated about Seth's connection to WikiLeaks, so much so that Mary has been unable to work and support her family as the principal breadwinner that she has always been. ¶¶ 131, 132(B), 133. Defendants' inexcusable conduct has taken a devastating toll on Joel and Mary's physical, mental, financial, and social well-being.

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The Court "must accept all factual allegations in the

complaint as true, while also drawing all reasonable inferences in favor of the nonmoving party." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 215 (S.D.N.Y. 2013).

## I.    THE RICHES HAVE SUFFICIENTLY ALLEGED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

An IIED claim requires: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). New York's highest court has recognized that the tort is "as limitless as the human capacity for cruelty."[4] *Id.*

At the motion to dismiss stage, the court's initial assessment of outrageousness is to "filter[] out *petty and trivial* complaints that do not belong in court" and to ensure that the alleged "claim of severe emotional distress is genuine." *Id.* at 702 (emphasis added). As to the extreme and outrageous element—the only element the Fox Defendants contest—the Court must deny the motion to dismiss the IIED claim if "a reasonable jury could find [the conduct in question] 'utterly intolerable in a civilized society.'" *Sylvester v. City of New York*, 385 F. Supp. 2d 431, 443 (S.D.N.Y. 2005) (quoting *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996)).[5] At the 12(b)(6) stage, courts have sustained claims that allege less egregious conduct. *See, e.g.*, *Flatley v. Hartmann*, 138 A.D.2d 345, 346 (N.Y. App. Div. 1988) (repeated "hang-up" telephone calls in a neighborhood property boundary dispute); *Halio v. Lurie*, 15 A.D.2d at 66

---

[4] Fox Defendants' attempt to belittle IIED as an "arriviste" claim because New York's Court of Appeals formally adopted the Restatement's formulation for IIED in 1978 (four decades ago) is irrelevant—but also misleading. *See* Fox Mem. at 5. New York courts actually recognized the claim almost two decades earlier in *Halio v. Lurie*, 15 A.D.2d 62, 66 (N.Y. App. Div. 1961) (holding that intentional infliction of serious mental distress without physical impact "can constitute an *independent* tort which is actionable per se" (emphasis added)).

[5] *Accord Vasarhelyi v. New Sch. for Soc. Research*, 230 A.D.2d 658, 661–62 (N.Y. App. Div. 1996) (dismissal was error where "the acts complained of could be found by a trier of fact to amount to extreme and outrageous conduct which cannot be tolerated in a civilized community"); *Roach*, 252 A.D.2d at 492 (IIED claim cannot be dismissed where jury could reasonably conclude that conduct "went beyond the bounds of decent behavior").

(former boyfriend's taunting letter boasting of marriage); *Flamm v. Van Nierop*, 59 Misc. 2d 1059, 1060 (N.Y. Sup. Ct. 1968) (harassment by driving too closely, making threatening looks, and making repeated "hang-up" phone calls).

### A. Joel and Mary Have Sufficiently Alleged that Defendants' Conduct was Extreme and Outrageous.

Defendants' scheme included befriending Joel and Mary and securing their trust through their religion under false pretenses; planting Wheeler—a Fox contributor—purportedly as Joel and Mary's own, seemingly independent investigator; orchestrating a sham confidentiality agreement that would provide Defendants access to inside information; intentionally breaching that agreement to further Defendants' political and economic objectives; publishing a false tale complete with invented confirmation from the FBI and from a purportedly parallel investigation by Wheeler; and shrouding the falsehoods in legitimacy by highlighting that Wheeler had been hired "by the Rich family." The scheme also included touting the fiction on Fox not only for the eight days between the Fox Articles' publication and later retraction, but also thereafter— through and including the present.  *See* Kay-Oliphant Decl., ¶¶ 2–4. There is no legitimate question that the Complaint alleges "extreme" and "outrageous" conduct.[6]

Conduct is extreme and outrageous when "the recitation of the facts to an average member of the community would arouse his resentment against the action, and lead him to exclaim, 'Outrageous!'" *Quick v. Short*, No. 87 CIV. 695(CSH), 1990 WL 29427, at *11 (S.D.N.Y. Mar. 15, 1990) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). On far less egregious facts, courts adjudicating IIED claims under New York law have denied motions to dismiss. *See supra* page 10–11 (citing *Flatley*, *Halio*, and *Flamm*). Courts across the country

---

[6] Defendants' awareness that Joel and Mary were grieving parents who were particularly susceptible to the distress caused by the dissemination of "unproven and harmful theories about Seth's murder," ¶ 23, further underscores the "heartless, flagrant, and outrageous" nature of their actions, Restatement (Second) of Torts § 46, cmt. f (1965).

have recognized cognizable IIED claims even where publications on matters of public concern were involved, where the conduct in furtherance of publication was "unwarranted and unreasonable." *Galella*, 487 F.2d at 995; *see also*, *e.g.*, *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 396 (S.D.N.Y. 2008) (denying motion to dismiss IIED claim brought against NBC's "To Catch a Predator" where "NBC intruded into a law enforcement operation . . . solely for the sake of creating a more dramatic television show," and "NBC was in a position of power, both with its ability to disseminate information to the public and with its apparent influence over the police, and NBC knew or should have known that [subject] was peculiarly susceptible to emotional distress"); *KOVR-TV, Inc. v. Superior Court*, 37 Cal. Rptr. 2d 431, 435 (Cal. Ct. App. 1995) (holding that IIED claim survived summary judgment where reporter voluntarily disclosed facts of murder and suicide to young children to capture an emotional reaction on videotape because reporter "deliberately manipulate[d] the emotions of" vulnerable persons in order to gain "some perceived journalistic advantage"); *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 758 (N.D. Cal. 1993) (holding that IIED claim against broadcaster survived motion to dismiss where news personnel "misrepresented their identity in order to gain [plaintiff's] consent to videotaping, all at a time of extreme emotional vulnerability" to obtain broadcast footage about domestic violence incident even though material was "newsworthy"); *Armstrong v. H & C Commc'ns, Inc.*, 575 So.2d 280, 280–82 (Fl. Dist. Ct. App. 1991) (allowing IIED claim to proceed where reporter videotaped remains of corpse at police station for news broadcast about a missing child's death); *Holloway v. Am. Media, Inc.*, 947 F. Supp. 2d 1252, 1262 (N.D. Ala. 2013) (denying motion to dismiss IIED claims because "the First Amendment protection . . . does not extend to speech that is not 'honestly' believed, or that is used as a weapon simply to mount a personal attack against someone over a private matter"); *Estate of Duckett ex rel. Calvert v.*

*Cable News Network LLLP*, No. 5:06-CV-444-OC-10GRJ, 2008 WL 2959753, at *5–6 (M.D. Fla. Jul. 31, 2008) (denying motion to dismiss IIED claim by family members after CNN and Nancy Grace repeatedly aired telephone interview with deceased family member).

> 1.    *Zimmerman's and Butowsky's Conduct Toward Joel and Mary Was "Utterly Intolerable" and "Far Beyond the Reasonable Bounds of News Gathering"*

Defendants downplay the severity of their misconduct, mischaracterizing it as honest newsgathering. But that is a straw man. Among other things, the Complaint makes clear that Zimmerman and Butowsky were involved in a scheme to induce Joel and Mary to hire Wheeler, ¶ 37, with the nefarious objective to access confidential information through them, ¶ 66, and to thereafter "have Wheeler plausibly corroborate the sham story" that Zimmerman and Butowsky were already planning to write *despite* the absence of any reliable source, ¶ 39. In executing this scheme, Butowsky told Wheeler to hide his connections to the Fox Defendants from Joel and Mary: "[make] sure you play down Fox News, don't mention you know [Zimmerman]." ¶ 42.

Zimmerman was involved not in newsgathering but rather in *feeding* Wheeler, a supposedly independent investigator, information *about the WikiLeaks theory*, for example "to help Wheeler prepare for a meeting with police," Fox Mem. at 13 (citing ¶¶ 60, 68)—a meeting made possible only by Defendants' exploitation of Joel and Mary. *See* Fox Mem. Ex. 4; ¶ 66. And when the D.C. Metropolitan Police Department refused to corroborate Defendants' premeditated narrative that Seth Rich was WikiLeaks's source, Butowsky and Zimmerman simply *manufactured* a source and told Wheeler that an FBI agent had confirmed that Seth and WikiLeaks exchanged emails. ¶ 69. Zimmerman then relied on the fabricated FBI source as one of the "multiple sources" corroborating the sham story. The other "source" was Wheeler, the

private investigator hired by the Rich family and whom Defendants knew parroted the lie they had fed him.[7]

These facts belie the Fox Defendants' characterization of Zimmerman's and Wheeler's "investigations" as "parallel." Fox Mem. at 13. They similarly betray Butowsky's self-serving assertion that he merely "assisted [Joel and Mary] in hiring a private investigator" and "encouraged them to reach out to a reporter who may have had additional information about their son's death." Butowsky Mem. at 13. Similarly absurd is the suggestion that Zimmerman engaged in responsible news gathering simply because she may have *also* engaged in seemingly legitimate contact with Joel and Mary on top of Defendants' underhanded plot to implicate the Rich family. Notably, Zimmerman, during her contacts with Joel and Mary, failed to disclose that she was relying on information that she herself had fed to Wheeler, who Zimmerman knew was not permitted to speak to the press without the Riches' authorization. ¶¶ 81, 174.

The Fox Defendants' factual assertion that "no reasonable reader would understand the article to imply that Joel and Mary were involved in establishing that their son passed documents to WikiLeaks," is flat wrong. *See* Fox Mem. at 9 (alteration omitted). Viewing the Complaint in the light most favorable to Plaintiffs, the Fox Article's reference that Joel had "*previously* denied that 'his son would leak the emails,'" followed by noting that the WikiLeaks "revelation is consistent with the findings of Rod Wheeler . . .whose private investigation firm was **hired by Rich's family** to probe the case," Fox Mem. at 9; Fox Mem., Ex. 1; ¶ 88, constitutes sensationalism: Though the family first thought their son was innocent, look what **their own**

---

[7] The Fox Defendants seem to suggest that the "unnamed federal investigator" actually existed and had in fact "reviewed a forensic report of Riches' computer." Fox Mem. at 3. Joel and Mary's allegations, which are based on statements by the FBI and Wheeler, directly refute what Defendants seem to imply.

private investigator found! That was the object of Defendants' elaborate scheme to have Joel and Mary hire Wheeler in the first instance.

Finally, the Fox Defendants argue that Joel and Mary's claim fails because some might have found the Fox Articles' false portrayal of Seth's conduct to be heroic. This argument is absurd. A defendant may not escape liability for falsely accusing a plaintiff of being a Nazi by invoking the argument that Skinheads in the audience would regard the accusation as an accolade. This argument also ignores that Defendants' liability arises not merely from the four corners of the Fox Articles but also from their entire course of conduct, replete with deceptions and other intentional actions that predate the Articles' publication and postdate the retraction.[8]

### 2.    *Plaintiffs' IIED Claim Is Not Premised on the Elements of Defamation*

Defendants assert that a plaintiff who cannot bring a defamation claim is also precluded from maintaining an IIED claim on the same facts. They are wrong. As an initial matter, their reliance on cases like *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), is misplaced because the conduct and injuries claimed here extend to Defendants' scheme beyond the publication of a defamatory article. *See* ¶¶ 24–58. The Fox Articles could only have been written the way they were because Defendants tricked Joel and Mary into engaging Wheeler—who

---

[8] Butowsky's analogy to *Chanko v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1179 (N.Y. 2016), fails. There, ABC broadcast a patient's medical treatment and death in a hospital emergency room without consent. The court found this conduct insufficiently outrageous or extreme because the (truthful) footage "was edited so that it did not include decedent's name, his image was blurred, and the episode included less than three minutes devoted to decedent and his circumstances." *Id.* at 57–58. Those facts diverge from Defendants' conduct here, where Fox not only failed to take steps to shield Joel and Mary's privacy but rather capitalized on their identities and status as Seth Rich's family members to further their cruel scheme. Nor can Butowsky find help in the facts of *Howell v. New York Post Co.*, 612 N.E.2d 699 (N.Y. 1993). In *Howell*, apart from trespassing onto a hospital property and photographing a patient outdoors and from a distance, defendant engaged in no misconduct beyond publishing a newsworthy photograph. *Id.* at 705. Butowsky's other cases likewise bear no similarity to the facts here. *See* Butowsky Mem. at 11–12 (citing *Conboy v. AT&T Corp.*, 84 F. Supp. 2d 492, 507 (S.D.N.Y. 2000) (finding conduct insufficiently outrageous where defendant "repeatedly called plaintiffs at unusual hours in an attempt to collect their daughter-in-law's debt"); *Am. Credit Card Processing Corp. v. Fairchild*, 11 Misc. 3d 972, 979 (N.Y. Sup. Ct. 2006) (finding a few debt collection calls to be "rash, rude, callous, unprofessional and improper" but insufficiently outrageous); *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 351, 355 (N.Y. 1985) (addressing factual publications based on court records about "charges and countercharges of mental and physical cruelty and adultery which formed the legal basis for the matrimonial action")).

could thus be characterized as a credible source. Fox Defendants recognizes this problem with their argument, Fox Mem. at 9, and all they can say is that "no reasonable reader" would think that Joel and Mary were involved in establishing that their son passed documents to WikiLeaks. That is ridiculous; that was ***precisely*** the implication that Defendants wanted readers to draw, because Defendants knew if readers saw that the revelation came from an investigator hired by Seth's own family, it would be believable. In any event, this is clearly a fact question that cannot be resolved at the pleadings stage.

Further, courts in the Second Circuit and New York confirm that speech alone may form the basis for an IIED claim. *See*, *e.g.*, *Esposito-Hilder v. SFX Broad. Inc.*, 236 A.D.2d 186, 188 (N.Y. App. Div. 1997) (explaining that "if plaintiff's claim was in fact for defamation, it would fail" but holding that her IIED claim "arising out of the same conduct" could proceed); *cf. Howell*, 612 N.E.2d at 702 (recognizing that IIED is a tort that "by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful" but dismissing IIED claim in that instant case as insufficiently outrageous); *Hustler Magazine, Inc.*, 485 U.S. at 56 (holding that IIED claim premised ***entirely*** on published statements may proceed, as long as it clears First Amendment hurdles for entirely speech-based tort claims like libel and defamation).

The Fox Defendants' attempt to import defamation's "of and concerning" requirement into the elements of IIED, Fox Mem. at 7, 9, likewise fails legally and factually. First, courts have rejected that argument in recognition of the central difference between the two torts: "A cause of action for defamation is rooted in the injury to one's reputation . . . thereby injuring the victim in the eyes of others. A cause of action for outrage, however, is rooted in the injury to one's own mental or emotional well-being." *Holloway*, 947 F. Supp. 2d at 1264 (rejecting defendants' argument that "the 'of and concerning' element of a defamation claim also applies as

16

a First Amendment limitation to a claim of intentional infliction of emotional distress"); *see also Hartwig v. NBC*, 863 F. Supp. 558, 562–63 (N.D. Ohio 1994) (rejecting defendant NBC's argument that plaintiffs' IIED claim is a defamation claim in disguise where plaintiffs themselves were not the subject of defamation but rather "complain of infliction of emotional distress through broadcasts concerning a family member"). Moreover, the Fox Articles did implicate Joel and Mary because they specifically included the falsified account of ***the Rich family***'s investigator.

The very cases on which Defendants rely demonstrate why Joel and Mary's claims here may proceed under the law of IIED. *Sylvester v. City of New York*, 385 F. Supp. 2d 431 (S.D.N.Y. 2005), held that "alleged false statements of [police] do not ***alone*** give rise to a claim of IIED." *Id.* at 442 (emphasis added). Importantly, the court ***allowed*** IIED claims premised on the false statements, ***plus*** the defendants' conduct implicating the family of the deceased in those false statements by eliciting false corroboration of them from the family. *See id.* at 443. Eliciting false statements from the family was a significant reason that the *Sylvester* court allowed the IIED claim, just as it is a key part of Joel and Mary's claim here. If anything, the situation here is more egregious because of Defendants' premeditated efforts to deceive Joel and Mary.

*Sylvester* shows why *Flynn v. Higham*, 197 Cal. Rptr. 145 (Cal Ct. App. 1983), on which Defendants also rely, is readily distinguished. In *Flynn*, plaintiffs Rory and Deirdre Flynn, brought an IIED claim alleging that a publisher falsely stated that their deceased father was a Nazi spy. That statement ***alone*** was found insufficient to support an IIED claim. *Id.* at 148–49. But—unlike this case—*Flynn* lacked any allegation that the publisher had tricked the Flynns into providing information that would support that their father was a Nazi spy or that the publisher

had implicated the Flynns in helping reveal their father's past. Unlike the Flynns' IIED claim, Joel and Mary's claim here does not rest on a false statement alone.

Defendants' reliance on *Balderman v. Am. Broad. Cos., Inc.*, 292 A.D.2d 67 (N.Y. App. Div. 2002) is also misplaced. In *Balderman*, the court dismissed an IIED claim as duplicative of defamation where "plaintiff s[ought] damages ***only for injury to his reputation***." *Id.* at 76 (emphasis added). Defendants seize on a single reference in the Complaint to Seth's "good name and reputation," ¶ 132(C), but ignore twelve paragraphs of the Complaint that have nothing to do with Seth's reputation and instead detail the severe emotional distress that *Joel and Mary*, not Seth, experienced because of Defendants' conduct.[9] In sum, the Fox Article, "***together with the Defendants' dealings with Joel and Mary leading up to it***" (and after) caused them severe emotional distress. ¶ 128 (emphasis added).

*Balderman* itself pointed with a "cf." or "contrast" citation to *Singer v. Jefferies & Co.*, 160 A.D.2d 216 (N.Y. App. Div. 1990). In *Singer*, the defendant argued that the plaintiff's claim solely concerned injury to reputation and was therefore barred by the applicable one-year statute of limitations. *Id.* at 216. The *Singer* court rejected the argument "that plaintiff's claim should be narrowly construed as one for defamation" because, like this case, "the plaintiff herein is not seeking recovery for damages solely because of injury to his reputation." *Id.* at 218. The *Singer* court recognized that, even though there was a "defamation-type" element to the claim, "[a]s a matter of policy, justice and fairness, plaintiff should not be precluded from having his day in court simply because the hornbook index does not list the tortious acts herein involved." *Id.* at

---

[9] These include many unique harms to Joel and Mary, such as those based on (i) being deprived their opportunity to learn the truth about their son, (ii) being prevented from coming to terms with their loss because they repeatedly have to relive it, (iii) losing the opportunity to properly mourn, (iv) additional unique traumas atypical to normal bereavement, and (v) Defendants' actions constituting an overwhelming assault which has manifested in post-traumatic stress disorder, obsessive compulsive behavior, and social anxiety disorder. ¶¶ 124–31.

219. Finally, *Balderman* was a summary judgment decision, made after discovery in the case had been taken. It provides no support for dismissal of this case at the pleadings stage.

*Balderman* and *Singer*, taken together, confirm that Joel and Mary's IIED allegations do *not* duplicate a defamation claim and should not be dismissed at the pleadings stage because of a reference to reputational harm.

### 3. The First Amendment Does Not Shield Defendants' Tortious Conduct

The upshot of Defendants' unbounded reliance on the First Amendment is that the Constitution somehow immunizes all conduct—no matter how egregious—if committed in the name of "newsgathering." Not surprisingly, the law is otherwise. In *Galella*, the Second Circuit admonished that "torts committed in news gathering are not protected," as "[t]here is no threat to a free press in requiring its agents to act within the law." 487 F.2d at 995–96; *see also Cohen*, 501 U.S. at 669 ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.").

The fact that the Fox Articles' content contributed to Joel and Mary's harm does not bar their claims. *Snyder v. Phelps*, 562 U.S. 443 (2011), does not hold otherwise. The U.S. Supreme Court's holding in *Snyder* was based on the fact that the Westboro Baptist Church complied with the time, place, and manner restrictions established for picketing the funeral and, as such, "any distress . . . turned on the content and viewpoint of the message conveyed, rather than any **interference with the funeral** itself." *Id.* at 457 (emphasis added). Here, however, while the content of the Fox Articles contributed to Joel and Mary's distress, the "speech" was predated, postdated, and accompanied by significant independent tortious conduct on the part of Butowsky, Wheeler (neither of whom are journalists), and Zimmerman. In fact, Justice Breyer's

concurrence in *Snyder* makes clear that tortious conduct that facilitates protected speech is not itself shielded by the First Amendment:

> [S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means.

*Id.* at 461 (Breyer, J., concurring). Courts that have explored the boundaries of *Snyder* have concluded that the "First Amendment is not an all-purpose tort shield, and *Snyder* did not change this." *Greene v. Tinker*, 332 P.3d 21, 35 (Alaska 2014). The emotional distress inflicted by Defendants' scheme is not immunized by the First Amendment even though the content of the Fox Articles was one factor causing Joel and Mary's distress.

Moreover, even if speech is implicated in part in the Riches' IIED claim, Defendants are again wrong that the First Amendment ends the inquiry. The First Amendment does not protect publications—even on matters of "public concern"—where the defendant "acted with gross irresponsibility in publishing [the] article." *Chaiken*, 119 F.3d at 1035; *accord Posner v. Lewis*, 965 N.E.2d 949, 955 (N.Y. 2012). As pleaded in the Complaint, the Fox Defendants' conduct in publishing the Fox Articles is the very definition of "gross irresponsibility." In assessing gross irresponsibility, courts consider whether the Defendant "(1) followed 'sound journalistic practices' in preparing the . . . article; (2) followed 'normal procedures,' including editorial review of the copy; (3) had any reason to doubt the accuracy of the source relied upon and thus a duty to make further inquiry to verify the information; and (4) could easily verify the truth." *Chaiken*, 119 F.3d at 1032.

Joel and Mary allege that Defendants had a tale they planned to publicize regardless of its veracity, that they fabricated sources, and that they defrauded Joel and Mary to further their goal and lend credibility and intrigue to their story. There can be no serious dispute that these are not

sound journalistic practices. Fox admitted as much in its retraction, acknowledging that the article was "not initially subjected to the high degree of editorial scrutiny we require for all our reporting." ¶ 107.

*Hustler Magazine, Inc.*, 485 U.S. at 56, is much the same. Its requirement that IIED claims premised on speech ***alone*** and about ***public figures*** must allege malice and falsity does not apply, as Joel and Mary are not public figures and their claim arises from a scheme that includes a variety of tortious *conduct*. But even if the *Hustler* standard applied, the Complaint sufficiently alleges both falsity and actual malice. As to falsity, the Complaint alleges, and Wheeler and the FBI have already confirmed, that no federal investigator ever reviewed Seth's emails or otherwise suggested that he was the source of WikiLeaks. ¶ 87. And Wheeler has confirmed he had no personal knowledge supporting the contention that Seth Rich was the source of the WikiLeaks; he merely regurgitated what Butowsky and Zimmerman told him. ¶ 93.

The Complaint also sufficiently alleges that the publication was issued with actual malice. As set forth in the Complaint, Zimmerman and Butowsky knew with 100% certainty that they had not talked to any federal investigator and that Wheeler was merely repeating what they had told him. *See supra.* In sum, even if actual malice is required, Joel and Mary have adequately alleged it. *See, e.g., Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (recognizing that "reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice" especially when (i) the publication is based "wholly" on "unverified and anonymous sources" and (ii) there are facts that would have prompted "defendants to question the reliability of any of the named or unnamed sources"); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987) (noting that malice was present where "[t]he

magazine explicitly labeled [party] a fraud while admittedly knowing that she did not submit the May statement or sign the consent form").

Joel and Mary's IIED claims survive Defendants' motions to dismiss even if the Court applied the First Amendment protections granted to *entirely* speech-based claims: Plaintiffs' claims meet those standards—they have alleged gross irresponsibility, falsity, *and* malice.

### B.  Joel and Mary Sufficiently Allege Intent and Causation as to Butowsky.

Butowsky also challenges whether the Complaint alleges that his conduct was carried out with the "intent to harm" Joel and Mary. First and foremost, "[w]hether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *Press v. Chem. Inv. Svcs. Corp.,* 166 F.3d 529, 538 (2d Cir. 1999). To the extent that Butowsky points to allegations in the Complaint that his motive was to advance and publicize the story connecting Seth to WikiLeaks, these allegations do not shield Butowsky from liability.

Even if Butowsky had a "legitimate motive" for his conduct—the Complaint alleges just the opposite—the "existence of a legitimate motive for defendant's actions does not defeat" an IIED claim when the infliction of mental distress was "a significant part of the chosen plan" to achieve the justifiable objective. *Long v. Beneficial Fin. Co. of New York*, 39 A.D.2d 11, 15 (N.Y. App. Div. 1972) (distinguishing *Costlow v. Cusimano*, 34 A.D.2d 196, 199 (1970) (cited in Butowsky Mem. at 14)); *accord Diamond v. Stratton*, 95 F.R.D. 503, 506 (S.D.N.Y. 1982). As Butowsky's own authority recognizes, IIED plaintiffs can allege *either* (a) intent to cause severe emotional distress *or* (b) "disregard of a substantial probability of causing" such harm. *Chanko*, 49 N.E.3d at 1178. Butowsky Mem. at 13–14. Suffice it to say, Joel and Mary have alleged that Butowsky disregarded the "substantial probability" that his actions would cause them such distress. A reasonable jury could find Butowsky's knowledge that Joel and Mary were the grieving parents of a tragically murdered child sufficient to provide notice of a "substantial

probability" that tricking them into helping spread harmful theories about their son's murder would cause extreme emotional harm. Joel and Mary publicly stated, nine months before the publication of the Fox Articles, that attempts to politicize the tragedy "are actually causing more harm than good," and they pleaded for people to stop "for the sake of giving the family the space they need at this terrible time." ¶ 23.

Butowsky also argues he cannot be held liable because he simply worked with Fox to publish the sham story and thus Joel and Mary's harm cannot be attributed to him, as he is not a journalist and is not employed by or meaningfully associated with Fox. Butowsky's disregard of his own admittedly non-newsgathering conduct alleged in the Complaint, and attempt to shift the blame to Zimmerman and Fox, is remarkable. Joel and Mary's allegations include Butowsky's manipulation of their trust to implicate them in a scheme to smear their son.  *See* ¶¶ 25–58. Nor can Butowsky disavow his role in the publication of the sham story. By his own assertion he was "actually the one who's been putting this [story] together." ¶ 82.   This, at a bare minimum, creates a fact question over whether Butowsky caused Joel and Mary's harm.

### C.  Joel and Mary Sufficiently Allege Fox's Vicarious Liability for IIED.

"[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570(GBD), 2018 WL 1626255, at *7 (S.D.N.Y. Mar. 28, 2018) (citation omitted). The only element of agency the Fox Defendants dispute is Fox's control over Butowsky and Wheeler.

*Wheeler*: The Complaint's allegations regarding Wheeler's agency are more than sufficient at the pleadings stage. He was a paid contributor who, by written contract, agreed to provide on-air *and* "*off-air* assistance, *as requested by Fox*." Wheeler/Fox Contract at 1–2 n.1,

(Wheeler ECF No. 40-1).[10] Wheeler asked Fox News's **permission** about key decisions—including whether he could provide information to the local Fox D.C. affiliate. ¶¶ 76–77. Zimmerman's threat to Wheeler that "[t]his could be really bad if the Fox News channel thinks you fed an exclusive we invested a lot of time and money into" makes sense only if Fox News exercised control over Wheeler. ¶ 85. Even more notably, Fox itself has argued in the *Wheeler* litigation that Wheeler acted within the scope of his role as a Fox News contributor and pursuant to his agreement with Fox. *See* 2/28 *Wheeler* MTD Tr. at 5:13–16 ("[Fox] did not go to [Wheeler] and say we'd like to employ you to do this investigation for us. But they did identify him in the article as a Fox News contributor."); *see also id.* at 6:11–15.

That Wheeler was paid only a per-appearance fee does not vitiate his status as Fox's agent. *See*, *e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89, 117 (Bankr. S.D.N.Y. 2016) (recognizing an agency relationship "even where the agent is acting as a volunteer" (citation omitted)), *reconsideration denied sub nom. Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789 (SMB), 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016). Nor does the general rule that a principal is not liable for the torts of an independent contractor require a finding of no agency. There are numerous exceptions to the general rule that independent contractors are not agents, including where the employer is negligent in selecting, instructing or supervising the independent contractor, precisely what is alleged in this case. *See*, *e.g.*, *Kleeman v. Rheingold*, 614 N.E.2d 712, 715 (N.Y. 1993).

In *Saini v. Tonju Assocs.*, 299 A.D.2d 244 (N.Y. App. Div. 2002), cited by Fox Defendants, Fox Mem. at 17, the court granted summary judgment where there was no issue of fact as to whether the principal "supervised or controlled" the independent contractor's work.

---

[10] In the *Wheeler* litigation, Wheeler's former counsel stated during oral argument that Wheeler had been a Fox contributor for **ten years**. 2/28 *Wheeler* MTD Tr. at 174:1-2.

299 A.D.2d at 245. Here, by contrast, the Complaint's allegations regarding Wheeler's relationship with Fox are more than sufficient to permit discovery into their relationship—an issue that is "peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). That discovery is particularly appropriate given Fox's own assertion that Wheeler's claims against it should be arbitrated because of their contractual relationship. *See, e.g.*, 2/28 *Wheeler* MTD Tr. at 5:3–6.[11]

**Butowsky:** The Riches have likewise alleged a sufficient agency relationship between Fox and Butowsky. The Fox Defendants ignore allegations in the Complaint that "Fox directed its employees and agents Zimmerman and Wheeler to pursue the sham story, [and] *worked with Butowsky to develop the same*." ¶ 138 (emphasis added). Even though the full gamut of communications within Fox and between Fox and Butowsky are within Defendants' control, the Complaint pleads (based in part on information from Wheeler) that Fox producers knew of—and invested in—the development of the Rich story. *See, e.g.*, ¶¶ 59, 85. The extent to which Fox was aware of or directed Butowsky's actions should be adjudicated after discovery.

Although Fox claims it did not control Butowsky's "tweets or post-publication attempts to contact the Rich family," Fox Mem. at 17, Joel and Mary need not allege that Fox directed every single action that Butowsky took in order to establish agency. Butowsky has already admitted that he does "a lot of work [for Fox], (unpaid) helping to uncover certain stories." ¶ 34; *see also* Kay-Oliphant Decl., ¶¶ 5–9. The principal "need not have foreseen the precise act or

---

[11] The Fox Defendants also argue that the theoretical availability of a claim for breach of contract against a non-party to this case, Wheeler, should foreclose any claim for IIED against the Fox Defendants. In support, they cite *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 160 (2d Cir. 2014). But *Turley* actually upheld claims of IIED against the defendants. While *Turley* observed that some New York courts have relied on *dictum* from a 1978 New York Court of Appeals decision to exclude IIED claims against a defendant where a defamation claim was available against that same defendant, 774 F.3d at 159, nothing in *Turley* remotely suggests that a party like Fox can avoid liability for its own wrongdoing because the Riches might have a claim against *another* party (Wheeler). If anything, *Turley* supports a right to relief in this case, where Joel and Mary do not bring a defamation claim against Fox.

manner of the injury as long as the general type of conduct may have been reasonably expected." *Schafer v. Hicksville Union Free Sch. Dist.*, No. 06-CV-2531 JS ARL, 2011 WL 1322903, at *13 (E.D.N.Y. Mar. 31, 2011). That is certainly the case here, given the Complaint's allegations that Butowsky was actively engaged in purported "newsgathering" for Fox and was even in touch with Fox producers concerning his findings. ¶ 82. And, whether specific conduct "was within the scope of the servant's employment is so heavily dependent on factual considerations" that the question is "ordinarily one for the jury." *Young Bai Choi v. D & D Novelties, Inc.*, 157 A.D.2d 777, 778 (N.Y. App. Div. 1990).[12]

## II.   THE RICHES HAVE PLAUSIBLY ALLEGED AIDING AND ABETTING AND CONSPIRACY.

Defendants advance three arguments to contest Joel and Mary's concerted action claims. None withstands scrutiny. First, Defendants argue that Joel and Mary's claims for aiding and abetting liability (Count II) and conspiracy (Count III) should be dismissed because the underlying IIED claim fails. For the reasons above, the Complaint sufficiently alleges IIED.

Second, the Fox Defendants argue that they cannot legally aid and abet the publication of their own news story, or conspire to publish it. Once again, the Defendants ignore the Complaint's allegations of the broader scheme—that Butowsky, Zimmerman, and Wheeler tricked Joel and Mary into hiring Wheeler, improperly received and used confidential information through Wheeler's status as the Rich family's investigator, and more. These actions by the different actors aided and abetted each other's wrongful acts. *See Hudson v. Delta Kew*

---

[12] Fox improperly asks the Court to view the Complaint in the light most favorable to *it,* rather than to Joel and Mary, when it asserts that Fox "had no idea Butowsky was a source" because of the following statement from Butowsky to Fox News producers and on-air talent: "If you have any questions about the story or more information needed, call me… I'm actually the one who's been putting this together." Fox Mem. at 16 (quoting ¶ 82). On the contrary, while Butowsky's statement could show that some Fox personnel did not already know about his involvement, this single communication allows for a different, more reasonable inference: that Butowsky had been "putting this together" with Fox's knowledge and with its employees, and was now bringing others within Fox into the loop. Taking the inferences in Joel and Mary's favor, taking into account the Complaint's allegations as a whole, and where no discovery has yet taken place, the Complaint has adequate pleaded that Butowsky is Fox's agent.

*Holding Corp.*, 43 Misc.3d 1223(A), 2014 WL 1924324, at *4 (N.Y. Sup. Ct. 2014) (elements of aiding and abetting are "[(1)] the existence of the underlying tort, [(2)] knowledge thereof by the aider and abettor, and [(3)] substantial assistance by the aider and abettor in the achievement of the tortious act").[13]

As for conspiracy, New York law requires "a cognizable tort, coupled with an agreement between the conspirators regarding the tort, and an overt action in furtherance of the agreement." *McSpedon v. Levine*, 158 A.D.3d 618, 621 (N.Y. App. Div. 2018). Here, Joel and Mary have alleged that Defendants (1) reached an agreement; (2) to intentionally inflict emotional distress on them, including by deceiving them, by using confidential information they improperly elicited and received, and by implicating them in the Fox Articles; and that (3) each played a key role in carrying out that agreement. Fox's ***admission*** that it played a key role—publishing the Fox Articles—does not relieve it of liability as co-conspirator.

Third, Fox once again invokes the First Amendment to argue that a common effort to produce a news story cannot form the basis for an actionable conspiracy. But once again, it is the totality of Joel and Mary's allegations that is relevant, and those go far beyond an "individual with an axe to grind and reporters eager for a story." Fox Mem. at 19 (citing *Dowd v. Calabrese*, 589 F. Supp. 1206, 1213 (D.D.C. 1984)). *Dowd* found that collaboration toward publication of a story could not establish controversy ***absent*** an "improper object or purpose." *Id.* at 1213. Joel and Mary make that very allegation—that Defendants conspired "to develop[] a sham story ***using an investigation that Joel and Mary purportedly commissioned***." ¶ 148 (emphasis added). And each defendant, with awareness of this shared improper purpose, provided

---

[13] Defendants do not address aiding and abetting other than to argue that the "underlying tort" element is not satisfied. They have thus waived any challenge to the other elements. *See Goldberg v. UBS AG,* 690 F. Supp. 2d 92, 98 (E.D.N.Y. 2010) ("[B]y failing to timely raise such an argument during the briefing of its motion to dismiss, defendant waived its right to seek reconsideration on this point.").

substantial assistance. *See* ¶¶ 148 (Fox), 152 (Butowsky), 156 (Zimmerman). These allegations suffice to survive the motions to dismiss. "Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact." *Press*, 166 F.3d at 538 (citation omitted). This is true even when there is "very little in the . . . record suggesting that Defendants' conduct was intended to cause . . . emotional harm." *Schafer*, 2011 WL 1322903, at *15.[14]

Finally, that Defendants may have had different underlying motivations for their joint conduct in no way undermines the conspiracy claim. *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012) (recognizing that different defendants may "have had different motivations for joining the conspiracy, [or were] involved in only a portion of it, does not undermine the existence of the conspiracy itself or [the individual's] role as a participant").

## III. JOEL AND MARY SUFFICIENTLY ALLEGE THAT DEFENDANTS TORTIOUSLY INTERFERED WITH THE CONTRACT WITH WHEELER.

The elements of tortious interference with contract are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Plasticware, LLC v. Flint Hills Res., LP*, 852 F. Supp. 2d 398, 404 (S.D.N.Y. 2012). All Defendants challenge are the third and fifth elements. Butowsky also contends that the contract was at-will and thus cannot support a tortious interference claim.

### A. The Complaint Sufficiently Alleges Zimmerman's and Butowsky's Improper Conduct in Procuring a Breach Without Justification.

Defendants wrongly insist that, to incur liability, their "sole purpose" in publishing the Fox Article must have been to harm the Riches. This position is wrong. Where "the cause of

---

[14] Note that the Fox Defendants do not challenge the intent element of the IIED claim on their motion to dismiss. They challenge only the "shared intent" element of the conspiracy claim.

action is for interference with an existing contract, rather than a prospective economic relationship . . . ***it is not necessary to allege that defendant used improper means or that its conduct was for the sole purpose of harming plaintiff***." *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318 (N.Y. App. Div. 2006) (emphasis added) (collecting cases); *see also Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797–98 (S.D.N.Y. 2008) ("Where a plaintiff alleges interference with a valid, enforceable contract . . . there is legal authority establishing that it is ***not necessary to allege that the interference was malicious or done through wrongful means***." (emphasis added)).[15]

To determine whether interference was "improper" or "without justification," which "are indistinguishable in the case law," courts applying New York law balance "the factors set forth in *Restatement (Second) of the Law of Torts* (1979), § 767," which include the following:

> the nature of the conduct of the person who interferes, the interest of the party being interfered with, the relationship between the parties, the motive and interests sought to be advanced by the one who interferes, the social interests in protecting the freedom of action of that person, the contractual interests of the party interfered with and the proximity or remoteness to the interference of the conduct complained of.

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998 (HB), 2008 WL 1710910, at *4 (S.D.N.Y. Apr. 10, 2008). These are issues of fact that cannot be resolved at the pleadings stage; given the facts as alleged in the Complaint, a factfinder could of course find that Defendants' course of conduct with respect to Joel and Mary's contract with Wheeler was "improper" or "without justification." *See supra* pages 4–9.

---

[15] Even for a claim of tortious interference with prospective contractual relations, plaintiffs must allege only that "the defendant acted with the sole purpose of harming the plaintiff ***or*** used dishonest, unfair, or improper means." *Am. Online Latino v. Am. Online, Inc.*, 250 F. Supp. 2d 351, 363 (S.D.N.Y. 2003) (emphasis added), *op. clarified*, No. 02 CIV 4796 (LAK), 2003 WL 1842874 (S.D.N.Y. Apr. 2, 2003). Improper means include "fraud" and "misrepresentation." *Id.* The Riches' Complaint meets even this higher standard. Defendants' citation to *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996), an unreported 1996 New York Supreme Court case, is not to the contrary. There, the court dismissed the claim where the broadcaster "lack[ed] ***any*** motive to harm the plaintiff." *Id.* at *9 (emphasis added).

Finally, the Fox Defendants yet again retreat to the First Amendment to insist that Zimmerman was engaged in "newsgathering" and, therefore, cannot have been acting "without justification." As Joel and Mary have already demonstrated in detail, *see supra* pages 19–22, the "First Amendment is not an all-purpose tort shield," *Greene*, 332 P.3d at 35, and decades of caselaw make clear that "newsgathering" does not immunize the media from abiding by the laws that apply to everyone else: "It is therefore, beyond dispute that '[t]he publisher of a newspaper has no special immunity from the application of general laws. ***He has no special privilege to invade the rights and liberties of others***.'" *Cohen*, 501 U.S. at 670 (emphasis added) (citation omitted). Just as Fox's talismanic invocation of the First Amendment cannot save it against Joel and Mary's IIED claims, it cannot save it against the tortious interference claim.

### B. The Complaint Alleges that Zimmerman Was Aware of the Wheeler Contract and Its Confidentiality Obligations.

The Fox Defendants wrongly assert that Zimmerman could not have intentionally procured Wheeler's breach of his contract with Joel and Mary because she did not know that Wheeler lacked consent when he revealed confidential information to her. Of course, the question of Zimmerman's knowledge is within Defendants' control and will be the subject of discovery. The Complaint plainly pleads a sufficient basis to proceed with the claim against Zimmerman and Fox at the pleadings stage.

The Complaint alleges that Fox's agent, Zimmerman, was well-aware of the contractual relationship between Wheeler and the Riches. ¶ 173. In fact, the Fox Articles that Zimmerman herself authored identify Wheeler as the private investigator "hired by Rich's family," ¶ 88, and Zimmerman's articles specifically reference the contract between the Riches and Wheeler's firm and even who signed it. Fox Mem., Ex. 3, at 2. The Complaint further alleges that Zimmerman collaborated with Wheeler and Butowsky to induce Joel and Mary to enter into the Wheeler

contract in the first place, *see* ¶¶ 42–43, and that, in doing so, Zimmerman hid crucial facts about her relationship with Wheeler. Specifically as to the confidentiality provision of Joel and Mary's contract with Wheeler, the Complaint alleges that Zimmerman wrote to Wheeler by text on May 15, 2017, informing him that "Butowsky was 'supposed to get more info on Seth rich [sic] today' because '[i]f he [Butowsky] does ***we need to figure out what you [Wheeler] can say on the record***.'" ¶ 81 (emphasis added). This paragraph alone sufficiently alleges that Zimmerman knew about Wheeler's confidentiality obligations under his contract with Joel and Mary, and that Zimmerman nonetheless induced Wheeler to break those obligations.

### C. Butowsky's Inevitable Breach Argument Fails.

Butowsky contends that Joel and Mary cannot state a tortious interference claim against him because Wheeler "exhibited a predisposition toward breaching the Agreement independent of" Butowsky's involvement when he disclosed Butowsky and Zimmerman's fraudulent investigation results to a Fox D.C. affiliate. Butowsky Mem. at 20. Butowsky recognizes, however, as he must, that the chain of causation is broken only if "[t]he third-party was predisposed toward breaching the contract ***even in the absence of the alleged interference***." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009) (emphasis added), *aff'd*, 387 F. App'x 72 (2d Cir. 2010). The Complaint alleges, by contrast, that the interference had already taken place by then, as Wheeler had already improperly breached his obligations to Joel and Mary by providing confidential information to Zimmerman and Butowsky. *See*, *e.g.*, ¶¶ 66–68 (detailing Butowsky's, Zimmerman's, and Wheeler's coordination and communication related to Wheeler's meeting with Della-Camera); ¶¶ 174–75 (detailing Zimmerman and Butowsky improperly seeking and receiving information from Wheeler).

Butowsky's predisposition argument also ignores that he and the Fox Defendants orchestrated the entire relationship, including the very confidentiality and publicity terms on

which Joel and Mary insisted and that Butowsky and the Fox Defendants always intended Wheeler to breach the contract. ¶¶ 51–52. Butowsky's conduct in orchestrating the relationship between Wheeler and Joel and Mary was the but-for cause of each and every breach *including* the disclosure to the Fox D.C. affiliate. Having created the very relationship at issue, Butowsky cannot now claim that the mole Zimmerman and he planted "would have breached the contract anyway." Not surprisingly, Butowsky cites no authority to support this remarkable position.

### D. The Riches Have Sufficiently Pleaded Economic Damages from the Contract Breach.

Equally unavailing is Defendants' attempt to dismiss the tortious interference claim by asserting that Joel and Mary lack economic damages. The Complaint alleges a wide range of economic damages that Joel and Mary suffered as a result of Wheeler's breach of contract and cooperation with Defendants to publish the Fox Article. Among others, (i) Mary, the principal breadwinner of her family, became unable to accept her job with "National Write Your Congressman," ¶ 133; (ii) Joel and Mary have been forced to expend time and energy responding to the baseless allegations in the Fox Article, ¶¶ 120–23; and (iii) they were forced to incur the costs of installing video cameras outside their home to detect unwanted visitors, ¶ 132(B). Mary's lost wages and these other costs constitute allegations of economic damages sufficient to defeat Defendants' motions to dismiss.

The Fox Defendants also make **fact-based** arguments against the economic damages that Joel and Mary have suffered. *See* Fox Mem. at 24 n.7 (arguing that the Riches' damages "cannot be attributed to the alleged breach of Wheeler's confidentiality agreement because, wholly apart from Wheeler, Fox News had *an independent source*—the federal investigator—who claimed to 'have seen and read the emails between Seth Rich and WikiLeaks.'"). But, the Court may not consider such unsubstantiated factual assertions from the *Defendants* in support of a Rule

12(b)(6) motion to dismiss. "On a motion to dismiss, a court's 'consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.'" *Harper v. N.Y.C. Housing Auth.*, 673 F. Supp. 2d 174, 178 & n.1 (S.D.N.Y. 2009) (citation omitted) (refusing to consider additional documents submitted by the defendant in deciding the 12(b)(6) motion and noting that "the Court has considered only the Amended Complaint").

Even more, the Fox Defendants "factual" claim simply assumes the veracity of what the Complaint alleges is a lie—that Fox News actually had such a source, which it did not. Defendants' assertions directly contradict the factual allegations of the Complaint, which again must be taken as true. *See* ¶¶ 96–97. It is Civil Procedure 101 that Defendants may not rely on their own factual assertions to contradict Joel and Mary's well-pleaded allegations to seek dismissal of the Complaint.  Joel and Mary are entitled to discovery on the existence of this fictional federal investigator who the Fox Defendants insist is an "independent source."

### E.  The Contract's Confidentiality Obligations Were Not "Terminable at Will."

Butowsky also contends that a contract terminable at will cannot support a tortious interference claim. Notably, co-defendants Fox and Zimmerman do not make this argument.

The cases on which Butowsky relies are inapposite. They involve exclusive distributorship contracts between business partners, where the "interference" alleged is a third party's inducing termination of the contract. *See AIM Int'l Trading LLC v. Valcucine S.p.A.*, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *2 (S.D.N.Y. May 22, 2003) (exclusive U.S. distributor of Italian manufacturer's products alleging tortious interference against competitors that sought to take over plaintiff's role); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 447 (N.Y. 1980) (exclusive U.S. distributor of Japanese manufacturer's products alleging that competitors interfered with that exclusive relationship). Here, by contrast,

the confidentiality provision that Wheeler breached has nothing to do with continued employment or the economics of the deal, but rather with a discrete, categorical agreement to maintain the confidences of the Riches.

Moreover, *Guard-Life*, one of the cases that Butowsky himself cites, makes clear that even "[w]here contracts terminable at will have been involved," New York courts have "***upheld*** complaints and recoveries in actions seeking damages for interference ***when the alleged means employed by the one interfering were wrongful as consisting of fraudulent representations***." 406 N.E.2d at 451 (emphasis added) (citations omitted). Indeed, "[only] [a]bsent some such misconduct" has no tortious interference liability resulted from a contract terminable at will. *Id.* Defendants' conduct falls squarely within this exception articulated in *Guard-Life*.[16]

Finally, Wheeler did not breach a clause that he could unilaterally terminate at will. Joel and Mary do not allege that Wheeler breached by terminating the relationship. In this case, the Agreement contained a ***separate*** confidentiality term prohibiting Wheeler from "releas[ing] any information regarding the investigation, including but not limited to findings, working theories or path forward to any third party without prior authorization by Client." Fox Mem., Ex. 4, at 2. As a ***private*** investigator, Wheeler's confidentiality obligation plainly continued even if he stopped providing investigative services.[17] Indeed, the contract makes clear, ***following*** the provision concerning termination of the agreement generally (which has not happened even to this day),

---

[16] Butowsky cites one case that he contends involved the breach of a confidentiality clause, *Watts v. Jackson Hewitt Tax Serv., Inc.*, 675 F. Supp. 2d 274, 281 (E.D.N.Y. 2009). This case is unpersuasive. First, nothing in *Watts* suggests that their employees' confidentiality obligations survived termination of their employment, which plainly was the intent in the Wheeler-Rich agreement. Second, *Watts*'s analysis based on the employees' at-will status was *dicta*. The court ultimately concluded that the claim failed because of a failure to adequately plead causation and damages. *Id.* at 282. This is significant because the court in *Watts* did not have to, and in fact did not, directly address whether the cases relied on by Butowsky have any application outside of claims relating to the termination of an at-will contract.

[17] Any dispute about the parties' intent over whether confidentiality survived termination would, of course, be a question of fact.

that Joel and Mary may "take actions against Capitol Investigations and/or its agents or employees for representations made to the media in violation of this agreement." *Id.* at 1.

## IV.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT FOX NEGLIGENTLY SUPERVISED ZIMMERMAN AND WHEELER.

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship;[18] (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Hwang v. Grace Rd. Church (in New York)*, No. 14-CV-7187, 2016 WL 1060247, at *15 (E.D.N.Y. Mar. 14, 2016) (citation omitted).

The Fox Defendants' briefing focuses solely on the second element, wrongly suggesting that Joel and Mary must prove Fox knew of some "past wrongdoing" that was wholly independent of their injurious conduct at issue. Not so. In *Hwang*, the court found a plaintiff adequately pleaded that defendants knew about their church members' propensities for tortious conduct based on one campaign of tortious conduct that spanned less than three weeks. *See id.* at *15, *1–2. More specifically, the plaintiff in *Hwang*, who "has a history of severe mental illness," sued two churches for negligent supervision, alleging that the churches' members "forcibly prevented him from taking his medications" on or around September 25–26, 2012, and that they forcibly restrained him for two days on or around October 10–12, 2012. *Id.* at *1–2. Based on these allegations, the Court found that by the time the plaintiff was allegedly restrained

---

[18] Courts applying New York law have recognized the viability of imposing negligent supervision liability even absent an employer-employee relationship. *See Krystal G. v. Roman Catholic Diocese of Brooklyn*, 34 Misc. 3d 531, 537 (N.Y. Sup. Ct. 2011) (citing *Connell v. Hayden*, 83 A.D.2d 30, 50 (N.Y. App. Div. 1981)). Indeed, "a co-employee could be liable for the torts of a co-employee: '(1) where one [co-employee] is charged with negligent supervision of the other or (2) where neither is a supervisor but both combined to cause plaintiff's injury.'" *Id.* (alteration in original) (quoting *Connell*, 83 A.D.2d at 50).

in October, the churches were "on notice" "of the tortious propensities of the church members" based on their conduct from two weeks prior. *Id.* at *15.

So too here. Zimmerman and Wheeler undertook an at least five months long campaign of injurious conduct against Joel and Mary. *See* ¶¶ 27–90 (alleging that Zimmerman first contacted the Riches on January 3, 2017 and continued her liable conduct at least until the publication of the Fox Articles in the middle of May 2017). As for supervising Wheeler, Fox, through Zimmerman, clearly knew about his actions, as Zimmerman was intimately involved in the scheme. As for supervising Zimmerman, Fox should have been on notice about her tortious conduct months before the Fox Articles were published, much as the *Hwang* defendants should have been on notice about their church members' tortious conduct two weeks earlier. The Complaint is replete with detailed factual allegations that suggest that Fox not only knew about but also ***actively encouraged*** Zimmerman's and Wheeler's ongoing injurious conduct against the Riches. For instance, Zimmerman informed Wheeler that her "bosses at Fox would like the Article published the next day." ¶ 74. Zimmerman then confirmed to Wheeler that the "Fox News channel . . . invested a lot of time and money into" the development of the Article. ¶ 85. She later admitted to Wheeler that "she was instructed by her bosses at Fox News to leave [Wheeler's] false quote in the story." ¶ 92. When Wheeler confronted Zimmerman about her email to Joel Rich that much of the information in the Fox Article had come from Wheeler, Zimmerman responded "that's the email that Fox asked me to send [Joel]. They wrote it for me and they told me to send it to him." ¶ 101. These allegations are more than sufficient to raise at least a fact question regarding the extent to which Fox actively knew of and managed Zimmerman's and Wheeler's conduct that resulted in Joel and Mary's injuries. *See Leeds*, 309 A.D.2d at 667.

## V.   BUTOWSKY'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION SHOULD BE DENIED.

Butowsky also moves to dismiss for lack of personal jurisdiction. That motion should be denied. Where no discovery and evidentiary hearing have occurred, a plaintiff need make only a *prima facie* showing of personal jurisdiction to defeat a Rule 12(b)(2) motion. *See*, *e.g.*, *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). All pleadings and affidavits are construed in the light most favorable to the plaintiff, and all doubts resolved in their favor. *See*, *e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). Further "[j]urisdictional discovery is warranted where, ***even if plaintiff has 'not made a* prima facie *showing, [they have] made a sufficient start toward establishing personal jurisdiction*.'" *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 809 (S.D.N.Y. 2017) (emphasis added) (citation omitted).

### A.  Butowsky "Transacted Business" in New York.

Under New York's long-arm statute, jurisdiction is permitted over an out-of-state defendant who personally, or through an agent, "transacts any business within" New York. N.Y. C.P.L.R. § 302(a)(1).[19] New York's C.P.L.R. § 302(a)(1) is a "single-act" statute so that "proof that one transaction occurred in New York is sufficient to invoke jurisdiction, provided that the defendant's activities were purposeful, and that there was a substantial relationship between the transaction and the claim asserted." *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 179 (S.D.N.Y. 1995). Section 302(a)(1) "may [] apply to actions in tort when there is a sufficient factual showing that the tort arose out of the relevant transaction." *Funk v. Belneftekhim*, No. 14-CV-0376 (BMC), 2017 WL 5592676, at *9 (E.D.N.Y. Nov. 20, 2017).

---

[19] Butowsky invokes the defamation exception to § 302(a)(2), Butowsky Mem. at 8, but for the reasons explained in Part I.A.2, *supra*, Joel and Mary do not assert defamation claims in this case.

Here, the Complaint alleges, *inter alia*, that Butowsky, a frequent Fox contributor, orchestrated a scheme with Fox, a New York corporation with headquarters and broadcast facilities in New York, and its agents Wheeler and Zimmerman, including to broadcast and publish a false news story from New York. The Complaint further alleges that Butowsky communicated not only with Zimmerman and Wheeler but also with others, including by emailing "Fox News producers and on-air talent in New York" to discuss specifically what "conclusions" "we"—*i.e.* Butowsky and the New York Fox employees with whom he was communicating—"need to draw from" the Articles they were concocting. ¶ 82. Finally, and in addition to the Complaint's detailed allegations, the public record makes clear Butowsky's frequent presence in New York and close contacts with Fox News. *See* Kay-Oliphant Decl., ¶¶ 5–9.

It is no mere coincidence that Butowsky's activity was directed at Fox **in New York**. "New York courts have held that a 'nondomiciliary which takes advantage of New York's unique resources in the entertainment industry has purposefully availed itself of the benefits of conducting business in the State, such that long-arm jurisdiction may be asserted where the cause of action arises out of that transaction.'" *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 533 (S.D.N.Y. 2001) (citation omitted); *accord McNamee v. Clemens*, 762 F. Supp. 2d 584, 597–98 (E.D.N.Y. 2011).

As a result, in *Courtroom Television Network v. Focus Media, Inc.*, 264 A.D.2d 351 (N.Y. App. Div. 1999), a nondomiciliary defendant "created tapes of advertisements to be broadcast from a New York studio and sent them to plaintiff in New York and intended the performance of the contract to occur in New York." *Id.* at 19. These actions rendered the defendant "more than a passive buyer of a New York product or service; it played a 'crucial role'

in creating the substance of the transaction, amounting to doing business in New York." *Id.* (citation omitted). Likewise, Butowsky worked to lure Joel and Mary into hiring Wheeler to ultimately generate a false story to be broadcast through Fox News in New York, and he maintained communication with Fox employees in New York to accomplish the scheme. Confirmation of his "crucial role" comes from Butowsky himself: "I'm actually the one who's been putting this together." ¶ 82.

These allegations satisfy Joel and Mary's burden at this stage to defeat a Rule 12(b)(2) motion. *See Thomas*, 470 F.3d at 495 (plaintiff need make only a "prima facie showing that jurisdiction exists"); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) ("mailing one debt collection notice to [plaintiff in New York], engaging in one debt collection phone call with [plaintiff in New York], and mailing a summons and complaint to both Plaintiffs," even where defendant never enters the state, sufficient to establish personal jurisdiction where such contact was "a major aspect of [defendant's alleged] mission").

Finally, jurisdiction is unquestionably proper absent minimum contacts by Butowsky himself over any claim of conspiracy. *See, e.g.*, *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (jurisdiction over defendant with respect to conspiracy claim proper where "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state").

### B.  At Worst, Joel and Mary Should Be Granted Jurisdictional Discovery.

If this Court finds it necessary, wide discretion exists "to order further discovery on the jurisdictional issue, provided that plaintiffs make a threshold showing of jurisdiction and establish that their position is not frivolous." *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994). As elaborated above, *see* Part V.A *supra*, the allegations in

Joel and Mary's Complaint and the Kay-Oliphant Declaration suffice to make that threshold showing.

The case for permitting jurisdictional discovery in this case "is bolstered by the fact that the facts necessary to establish personal jurisdiction lie within [Butowsky's] exclusive knowledge." *Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y. 2005). Indeed, the question of what communications Butowsky had; the extent to which he schemed and collaborated with individuals in New York; his knowledge concerning the article's publishing from New York; and his whereabouts while carrying out the scheme are all peculiarly within Butowsky's knowledge. Under these circumstances, Butowsky cannot avoid jurisdictional discovery by coyly asserting that the Complaint is "silent" on his own whereabouts, especially where he himself neglected to submit an affidavit declaring his whereabouts.[20] Butowsky Mem. at 8. As Joel and Mary have "made a sufficient start toward establishing personal jurisdiction," they should be given "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *City of Almaty*, 278 F. Supp. 3d at 809 (citation omitted).

Dated: June 4, 2018                     Respectfully submitted,

                                        By:      */s/ Arun Subramanian*

                                        MASSEY & GAIL L.L.P.
                                        Leonard A. Gail (*pro hac vice*)
                                        Eli J. Kay-Oliphant (EK8030)
                                        Suyash Agrawal (SA2189)
                                        50 East Washington Street, Suite 400
                                        Chicago, IL 60602
                                        Telephone: (312) 283-1590
                                        lgail@masseygail.com

---

[20] Notably, confirming Butowsky's vital role and activity in New York, Wheeler has stated that Butowsky was "regularly" in contact with Fox executives in New York and that he met with Fox executives in New York "to discuss the substance and content" of the Fox Articles. Wheeler Amended Compl. (*Wheeler* ECF No. 56), at ¶¶ 56–58.

ekay-oliphant@masseygail.com
sagrawal@masseygail.com

SUSMAN GODFREY LLP
Arun Subramanian (AS2096)
Elisha Barron (EB6850)
Gloria Park (GP0913)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
asubramanian@susmangodfrey.com
ebarron@susmangodfrey.com
gpark@susmangodfrey.com

*Attorneys for Plaintiffs Joel and Mary Rich*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify this 4th day of June, 2018, that I caused a true and correct copy of the

foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF

system which will send notification to the attorneys of record.

*s/ Elisha Barron*
Elisha Barron
