LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

JOSEPH M. TERRY
(202) 434-5320
jterry@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

July 10, 2018

<u>VIA ECF</u>

Hon. George B. Daniels
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  *Rich et al. v. Fox News Network, LLC et al.*, No. 18-cv-02223, Response to
> Plaintiffs' Letter Brief on Motion to Dismiss

Dear Judge Daniels:

At oral argument on the motion to dismiss, Plaintiffs sought, and the Court granted, leave to submit a brief "no longer than five pages" on the limited question of how Defendants could have induced Rod Wheeler to breach a confidentiality clause that he allegedly intended to disregard from the outset.  *See* Ex. A, pp. 148–49.  Plaintiffs' letter brief neither adheres to the page limit nor answers the question on which they requested supplemental briefing.  Plaintiffs instead retread the same ground covered in their response brief.

**I.      Plaintiffs' Claim for Tortious Interference with Contract Cannot Survive, Because They Allege No Facts that Wheeler Was Induced to Breach His Contract**

Plaintiffs' supplement fails to address the central question on which they requested post-hearing briefing:  How could Wheeler have been induced to breach a contract that Plaintiffs claim he planned to breach all along?  As put by the Court to Plaintiffs' counsel:

> THE COURT:  You give me a scenario where Wheeler even long before the contract was even entered into signed a contract that he never intended to perform. He didn't not perform this because Zimmerman said, in April of 2017, don't perform this contract that you were getting ready to perform.  They knew before the contract was ever signed that he was never going to perform this contract.
>
> * * *
>
> So nothing Zimmerman did after the contract was signed on the facts that you have given me that made Wheeler change his mind and decide, I am not going to perform

1

WILLIAMS & CONNOLLY LLP

July 10, 2018
Page 2

the contract that I otherwise was going to perform if it hadn't been for Zimmerman talking me out of it . . . Your argument on this point is not grounded in law.

Ex. A, pp. 146–47.

The Court's question correctly reflects the law:  one cannot be liable for tortious interference where the breaching party needed no inducement to breach the contract and, in fact, never intended to perform.  For example, in *Huggins v. Povich*, the court granted the defendants' motion to dismiss a claim for tortious interference with contract, in part because the interviewee, who spoke despite a confidentiality provision, "needed no inducement from defendant to breach the confidentiality agreement.  She initiated an all-out media blitz, including local and international newspapers, radio and television with the assistance of a press agent.  Her actions were willful and intentional and done with complete and knowing disregard of the confidentiality provision and the Court's restraining order."  No. 131164/94, 1996 WL 515498, at *9 (N.Y. Sup. Ct. Apr. 19, 1996).

That conduct is similar to that alleged here:  Plaintiffs allege that Wheeler entered into the agreement with the Riches planning to breach the confidentiality provision from the outset, *see* Compl. ¶ 59, Ex. A, p. 132 ("The Court: And Wheeler had already agreed with Zimmerman that he was never going to perform that contract, right? [A]: Right."), and thus had no intention of ever performing.  Furthermore, Plaintiffs allege that Wheeler voluntarily talked on camera to a local media outlet about the story, *over the objections of Zimmerman and Fox*, Compl. ¶¶ 75–77, before the publication of the Fox News story at issue.   When Plaintiffs themselves allege that Wheeler intended to breach the agreement—and did so independently prior to the Fox News story—they cannot claim that Fox induced the breach.  *See RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 410 (S.D.N.Y. 2009) ("If a defendant can demonstrate that the third-party was predisposed toward breaching the contract even in the absence of the alleged interference, a plaintiff cannot establish 'but for' causation.")

The case cited by Plaintiffs is not the contrary.  In *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc*., 100 F. Supp. 2d 178 (S.D.N.Y. 2000), there was no allegation that the allegedly induced party entered into the agreement intending to breach it or breached it independently, but simply that the defendant and the induced party *subsequently* colluded to breach the contract.  *Id.* at 186–87.  Plaintiffs cite no authority that would support a claim for tortious interference where the breaching party never intended to carry out the contractual obligations.

Plaintiffs completely fail to address another deficiency in their interference claim:  the absence of any allegation that Zimmerman or Fox knew that Wheeler did not have authorization from the Rich family to speak with Zimmerman.  Because Wheeler's contract permitted him to talk to the media with approval from the family, Compl. ¶ 57, Plaintiffs cannot allege that Zimmerman and Fox intentionally procured a breach absent an allegation that they knew his comments were made without that approval.  *See Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) ("[I]t is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the

WILLIAMS & CONNOLLY LLP

July 10, 2018
Page 3

plaintiff; instead, the evidence must show that the defendant's objective was to procure such a breach. . . . [A] defendant must specifically intend to interfere with the relevant contract.").

## II.     Plaintiffs Failed to Allege Outrageous Conduct

The Fox Defendants argued in their motion that the intentional infliction claim should be dismissed because Fox's reporting did not concern the Plaintiffs and, in the alternative, Plaintiffs failed to allege any extreme or outrageous conduct. Plaintiffs attack that alternative argument on the ground that outrageousness is a "fact-intensive" question that cannot be decided "before a page of discovery has been turned over." Supp. Br. 1. Not so. "Whether the alleged conduct is sufficiently outrageous to satisfy the first element is a matter of law for the courts to decide." *Thai v. Cayre Group*, 726 F. Supp. 2d 323, 331 (S.D.N.Y. 2010); *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 345–46 (S.D.N.Y. 2000) (same). As a matter of law, Plaintiffs' allegations fail to satisfy New York's stringent standard for such a claim.

Plaintiffs assert that they have sufficiently pled outrageousness because "the complaint alleges a *campaign* of harassment by Defendants." Supp. Br. 3. But this supposed campaign consisted of allegedly planting Wheeler with the Rich family in order to serve as Fox's source for *a single news story*—a story that Fox updated hours after publication to reflect that the Rich family repudiated Wheeler's remarks. This conduct falls far short of the sustained, malicious conduct necessary to satisfy New York's stringent outrageousness standard. *Cf. Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 161 (2d Cir. 2014) (upholding intentional infliction claim where defendant permitted "hate-ridden and menacing environment to persist for more than three years").

Indeed, the timeline that Plaintiffs distributed at oral argument makes plain that neither Fox nor its reporter, Malia Zimmerman, engaged in any campaign of harassment. The sum total of Zimmerman's alleged conduct included: emailing Joel Rich seeking information that would "bring further attention" to his son's case; meeting in person with Wheeler and Butowsky *one time*; exchanging emails with Wheeler and Butowsky about the police investigation into Seth Rich's murder; emailing Wheeler to tell him publication was imminent and that Fox producers in New York would not be pleased he gave the story to a local Fox affiliate; and telling Joel Rich that much of the information in Fox's article came from Wheeler. This conduct, consisting almost entirely of garden-variety newsgathering activity and involving only limited contact with the Plaintiffs, hardly amounts to a "campaign" to harass Joel and Mary Rich.

Plaintiffs also now argue that Defendants' outrageous conduct included "trick[ing]" them "into hiring an investigator *with the goal of aborting the legitimate investigation of their son's murder*." Supp. Br. 4 (emphasis added). That assertion is preposterous. Their complaint nowhere alleges that *Fox* in any way tricked the Plaintiffs,[1] much less that any defendant either intended to

---

[1] Plaintiffs allege instead that *Butowsky* persuaded them to hire Wheeler, but they can hardly contend that Butowsky "tricked" them, Supp. Br. 4, when he told them *before they hired Wheeler* that he had reason to believe Seth Rich had passed DNC emails to Wikileaks. Compl. ¶¶ 26, 31.

WILLIAMS & CONNOLLY LLP

July 10, 2018
Page 4

or did impede the police investigation into their son's murder.  Not a single allegation in the complaint suggests that law enforcement agencies were affected one way or the other by Fox's reporting—much less that this was Fox's intent.  Indeed, the Complaint alleges that law enforcement believed that Mr. Rich was murdered in a botched robbery and were not swayed by Mr. Wheeler's views.  Compl. ¶¶ 2, 17, 21, 96–97, 102.

Plaintiffs rely principally on a case from the Northern District of Alabama, *Holloway v. American Media, Inc.*, 947 F. Supp. 2d 1252 (N.D. Ala. 2013), involving circumstances not present here.  In that case, a magistrate judge held that a plaintiff could state a claim for intentional infliction only if the speech at issue was "motivated by *a specific intent* to cause emotional harm *to a particular person*."  *Id.* at 1263 (emphasis added).  The magistrate allowed the claim to proceed because plaintiff had plausibly alleged that she had "a pre-existing relationship" with the *National Enquirer*, such that "the newspaper articles at issue were . . . motivated by some desire to attack her or cause her pain."  *Id.* at 1262; *see also id.* at 1264 n.18.  Plaintiffs argue that they had a relationship with Fox News, but that developed in the course of reporting the article at issue in this case.  Supp. Br. 4.  Unlike in *Holloway*, there is no allegation here the Fox had a *preexisting* relationship with the Rich family that drove the reporting in the first place with a specific intent to cause them harm. [2]

Plaintiffs next rely on *164 Mulberry Street Corp. v. Columbia University*, 771 N.Y.S.2d 16 (App. Div. 2004), in which the court permitted plaintiff restaurant owners to bring an intentional infliction claim against a university professor who had sent them letters falsely claiming his wife had suffered food poisoning in order to document the restaurants' response for an academic study.  That case is distinguishable, because the court there found that the professor had waged a "campaign" that resulted in "financial crisis" for numerous restaurants, which had to destroy thousands of dollars' worth of food and subject their employees to intrusive stool sampling in response to defendant's letters.  This case involves no such campaign—much less one that subjected Plaintiffs to the ruinous financial loss or humiliating physical invasions at issue in *Mulberry*. Notably, *164 Mulberry* preceded the Supreme Court's decision in *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), which held that speech on a matter of public concern cannot satisfy the outrageousness standard as a matter of law.

---

[2] The magistrate judge in *Holloway* separately erred in holding that the "of and concerning" requirement does not apply to speech-based IIED claims.  The court reasoned that, because the tort arose out of law involving improper burial or mishandling of corpses, those claims by their very nature could be brought by surviving family.  *Id.* at 1264.  Of course the First Amendment's "of and concerning" requirement would not apply in improper burial cases because *they do not involve speech*.  The Fox Defendants are aware of no other case suggesting that this constitutionally imposed limit does not apply in speech-based intentional infliction cases.

WILLIAMS & CONNOLLY LLP

July 10, 2018
Page 5

Finally, plaintiffs point to the section of Justice Breyer's concurring opinion in *Snyder*, where he concluded that the state is not "powerless" to protect individuals in the hypothetical situation "where A (in order to draw attention to his views on a public matter) might launch a verbal assault upon B, *a private person*, publicly revealing the most intimate details of B's *private life*." 562 U.S. at 462 (emphasis added). Justice Breyer's hypothetical served to highlight the difference between speech on matters of public concern—which "is entitled to special protection," *id.* at 452—and speech on matters of private concern, which can more readily be regulated by the state. That hypothetical does little to advance Plaintiffs' case because the speech at issue here indisputably addresses a matter of public concern.

## III.   Concerted Action Claims

Plaintiffs contend that they can maintain their concerted action claims without showing that any defendant engaged in acts that were independently tortious; they argue instead that the conduct of all defendants *in the aggregate* may give rise to an intentional infliction claim. Supp. Br. 5–6. New York courts have specifically rejected this position, holding that conspiracy and aiding and abetting liability both require "tortious conduct by each defendant." *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998).

Both the aiding and abetting and conspiracy claims also fail because Plaintiffs failed to plead the requisite intent. Contrary to Plaintiffs' assertion, Fox plainly *did* argue that Plaintiffs failed to plead the *separate* intent element of their conspiracy and aiding and abetting claims. Fox Br. 19. It is not enough to say that the Defendants agreed to publish the article and they did so with reckless indifference to the effect on the Rich family. Both the conspiracy and aiding and abetting counts require allegations of a "*specific intent*" to commit the underlying tort. *Singh v. NYCTL 2009-A Trust*, No. 14 Civ. 2558, 2016 WL 3962009, at *10 (S.D.N.Y. July 10, 2016) (emphasis added); *see also Grayson*, 149 F.3d at 123 ("In order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct."); *In re Food Mgmt. Group, LLC*, 380 B.R. 677, 704 (Bankr. S.D.N.Y. 2008) ("Under New York law, malice and intent . . . to injure the plaintiff are essential elements in conspiracy actions."). Not a single allegation in this complaint would permit the Court to conclude that Fox published its article with the *specific intent* of inflicting emotional harm on the Plaintiffs. Plaintiff's own allegation that they are "*collateral damage* in a political war to which they are *innocent bystanders*," Compl. ¶ 1 (emphasis added), defeats their conspiracy and aiding abetting claims as a matter of law.

Respectfully submitted,

*s/ Joseph M. Terry*
Joseph M. Terry (*pro hac vice*)
*Counsel for Fox News Network, LLC*

*With Consent,*

WILLIAMS & CONNOLLY LLP

July 10, 2018
Page 6


                                    DECHERT LLP
                                    David H. Stern (*pro hac vice*)
                                    *Counsel for Malia Zimmerman*

cc:     Counsel of Record (via ECF)

# EXHIBIT A

I6KMRIC0

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     JOEL RICH and MARY RICH,
 3
                 Plaintiffs,
 4
                 v.                        18 Civ. 2223 (GBD)
 5
     FOX NEWS NETWORK LLC, MALIA
 6   ZIMMERMAN, and ED BUTOWSKY,
                                           Oral Argument
 7               Defendants.
     ------------------------------x
 8                                         New York, N.Y.
                                           June 20, 2018
 9                                         10:30 a.m.

10   Before:

11                    HON. GEORGE B. DANIELS,

12                                         District Judge

13                          APPEARANCES

14   MASSEY & GAIL LLP
          Attorneys for Plaintiffs
15   BY:  LEONARD A. GAIL
          SUYASH AGRAWAL
16        ELI KAY-OLIPHANT
              -and-
17   SUSMAN GODFREY LLP
     BY:  ARUN SUBRAMANIAN
18        ELISHA B. BARRON

19   WILLIAMS & CONNOLLY LLP
          Attorneys for Defendant Fox News Network LLC
20   BY:  JOSEPH M. TERRY
          KEVIN T. BAINE
21        KATHERINE A. PETTI

22   DECHERT LLP
          Attorneys for Defendant Malia Zimmerman
23   BY:  DAVID H. STERN

24   SPIRO HARRISON
          Attorneys for Defendant Ed Butowsky
25   BY:  DAVID B. HARRISON
          KATHERINE M. WYMAN
```

1              (Case called)

2              MS. GAIL:  Hello, your Honor, Lenny Gail, along with

3     Suyash Agrawal and Eli Kay-Oliphant of Massey & Gail.  Our

4     colleagues will introduce themselves.  We are also joined by

5     the plaintiffs, Joel and Mary Rich.

6              MR. SUBRAMANIAN:  Good morning, your Honor.  For the

7     plaintiffs, Mary and Joel Rich, from Susman Godfrey, Arun

8     Subramanian, and I'm joined here with my colleague, Elisha

9     Barron.

10             THE COURT:  Good morning.

11             MR. TERRY:  Good morning, your Honor, Joe Terry with

12    Williams & Connolly for defendant Fox News.

13             THE COURT:  Good morning, Mr. Terry.

14             MR. BAINE:  Good morning, your Honor, Kevin Baine,

15    also for defendant Fox News.

16             THE COURT:  Good morning, Mr. Baine.

17             MS. PETTI:  Good morning, your Honor, Katherine Petti,

18    also from Williams & Connolly, also on behalf of Fox News.

19             MR. STERN:  Good morning, your Honor, David Stern,

20    Dechert, on behalf of Malia Zimmerman, with my colleague,

21    Katherine Wyman.

22             MR. HARRISON:  Good morning, your Honor, David

23    Harrison from Spiro Harrison on behalf of defendant Ed

24    Butowsky.

25             THE COURT:  Who wants to be heard first from the

1    defense on the motion?

2            MR. TERRY:  Your Honor, that would be me on behalf of

3    Fox.

4            THE COURT:  Yes.

5            MR. TERRY:  Would you prefer I argue from here?

6            THE COURT:  Probably be easier from the podium.

7            MR. TERRY:  Your Honor, plaintiffs' claim for

8    intentional infliction of emotional distress, no matter how

9    styled, is, at its core, a claim for defamation.  We know that

10   because of what the plaintiffs themselves have said.  They have

11   described a scheme to smear Joel and Mary Rich's dead son.

12   They contend that, quote, the scurrilous allegations about

13   their son and his murder were causing them severe emotional

14   harm, and they allege that they are distraught not only because

15   their son has been killed, but also because his good name and

16   reputation have been irrevocably harmed.  No matter what they

17   call their claim, their claim is, in essence, a claim for

18   defamation.  And no matter how deep their pain is as parents,

19   the law says that they cannot state a claim for the defamation

20   of their son.

21            Courts uniformly have rejected defamation claims

22   arising from statements made about another, living or dead, and

23   courts recognize that family members may suffer significant

24   emotional harm from defamatory statements made about their

25   relatives, yet still there is no cause of action for

1    defamation.

2            For that same reason courts in New York and throughout

3    the country have held that an intentional infliction of

4    emotional distress claim cannot be brought based on statements

5    made about another, even if you suffer or allege to have

6    suffered emotional harm as a result.  That's made clear in the

7    appellate division's decision in the *Sylvester* case.  It's made

8    clear in this Court's decision in the Asaro v. Connamas case,

9    and it's clear in a case very much like this one, the *Flynn*

10   case in California, where the survivors brought a case based on

11   the alleged defamation of their father that they claimed gave

12   them emotional injury and defamed their father's name.  The

13   Court in all of those cases dismissed both defamation claims

14   and intentional infliction of emotional distress claims.

15           And the reason for that limitation is based partially

16   on hundreds of years of development of the common law of

17   defamation and intentional infliction, but also because of a

18   constitutional requirement.  The Supreme Court said in *New York*

19   *Times v. Sullivan* that the Constitution requires for a

20   defamation claim to proceed that it be of and concerning the

21   plaintiff.  That's not just a common law requirement; that is a

22   constitutional requirement.

23           For that reason courts, including this Court, have

24   held that intentional infliction claims are constitutionally

25   barred where they are based on statements made about another.

1   And that's made clear in the *Diaz* case, *Diaz v. NBC Universal*.

2   Judge McMahon first dismissed the defamation claim on the

3   grounds that it was not of and concerning the plaintiff, and

4   then proceeded to dismiss the intentional infliction claim

5   saying, you cannot use an intentional infliction claim to plead

6   defamation where it is not of and concerning it.  And the Court

7   did that based on the Supreme Court's decision in *Hustler* which

8   said, again, you cannot base an intentional infliction of

9   emotional distress claim where you have not met the

10  constitutional requirements for a defamation claim.

11          In *Hustler*, it was a failure to allege actual malice.

12  In *Diaz*, it was the same failure here, the failure to allege

13  that the defamatory statements were of and concerning the

14  plaintiff, and that is an absolute bar to this claim.

15          The statements at issue, even by the plaintiffs' own

16  description, are with the plaintiffs' son, not about them, and

17  there is no cause of action for an intentional infliction or

18  defamation based on that.  This limitation makes sense because

19  defamation is a narrow exception to what is otherwise

20  uninhibited free speech, and it's a carefully crafted exception

21  with a number of requirements the Supreme Court has spent at

22  least five decades honing.  One of those requirements is that

23  it be of and concerning, and failure of the statements to be of

24  and concerning Joel and Mary Rich mean that they cannot, under

25  the Constitution, bring a claim.

1           The intentional infliction claims also fails because

2     it fails to satisfy New York stringent common law requirements

3     for such a claim.  The New York Court of Appeals, in the *Howell*

4     case, explained that this tort is disfavored among torts and

5     that the showing is incredibly high.  Liability, the Court

6     said, has only been found where the conduct has been so

7     outrageous in character and so extreme in degree to go beyond

8     all possible bounds of decency and to be regarded as atrocious

9     and utterly intolerable in civilized society.  The appellate

10    division in the *Doe* case said, you need to show a campaign of

11    harassment and intimidation.  So in the *Doe* case the Court

12    found that there could be no cause of action for intentional

13    infliction of emotional distress where the allegation was that

14    rape victims were lied to about whether or not their identities

15    would be concealed on television broadcasts.  They were lied to

16    repeatedly about that.  Their identities were shown and they

17    claimed emotional harm.  The Court said, that is not enough to

18    satisfy this tort because there was no campaign of harassment

19    and intimidation.

20          THE COURT:  How do you characterize what statement is

21    at issue and how do you characterize what conduct is at issue?

22          MR. TERRY:  The core of the plaintiffs' case is the

23    statements made about Seth Rich.  They have no complete tort

24    without that statement.

25          THE COURT:  Which statement?

1          MR. TERRY:   It was the statement in the article that a

2     federal investigator revealed that Seth Rich had exchanged

3     e-mails with WikiLeaks, and I believe also the statement by Rod

4     Wheeler that he believed there was a connection between Seth

5     Rich and WikiLeaks and that the secret of solving the case lies

6     on his computer.

7          I believe they also allege that Rod Wheeler's

8     statement that was not published by Fox News, but by a local

9     affiliate, Fox 5, a different company, the night before, where

10    he said it's confirmed that a federal source has said that Seth

11    Rich communicated with WikiLeaks, that is the crux of their

12    claim, that we falsely alleged through the statements of

13    Wheeler and the statement regarding the federal investigator

14    that Seth Rich had in fact communicated with WikiLeaks and was

15    the source of certain DNC e-mails to WikiLeaks.

16         THE COURT:   What do you claim is the conduct that's at

17    issue?

18         MR. TERRY:   The conduct that they allege is at issue

19    is the publication.   They claim a host of conduct by

20    Mr. Butowsky, Tweets and various things.   They appear to

21    allege --

22         THE COURT:   When you say Tweets and various things, I

23    understand what you mean by the publication of the article, I

24    understand that.   What else --

25         MR. TERRY:   As for Mr. Butowsky, they allege that he

1   had direct communications with Joel and Mary Rich after the

2   story ran, which inflicted emotional distress.

3        THE COURT:  Again, you said they had direct

4   communication.  That statement doesn't tell me anything about

5   the nature of the conversation.

6        MR. TERRY:  Sorry.  I believe the direct statement he

7   is alleged to have made to the Riches is that Malia Zimmerman

8   has information about who owned the gun that was killed to use

9   your son.  You should contact Malia Zimmerman.  She has

10  information for you.  That's one of the statements attributed

11  not to Fox directly, but to Ed Butowsky.

12       As for Fox, the only conduct that we are alleged to

13  have directly engaged in is publishing the article, asking

14  Mr. Wheeler to provide us with information, which they allege

15  tortiously interfered with the confidentiality provision of the

16  employment contract.  They allege that Malia Zimmerman gave

17  Mr. Wheeler information in advance of his meeting with a D.C.

18  detective.  They don't describe what that information is, but

19  they allege that that is somehow wrongful to have prepared them

20  for a meeting with a D.C. Police Department detective, and they

21  allege that she was aware that Ed Butowsky had made false

22  representations about the nature of his interest in the case.

23       They allege that he wasn't motivated by sympathy.  He

24  was motivated by a desire to establish some sort of political

25  agenda, and I believe they allege that Malia Zimmerman should

1    have known that Rod Wheeler was going to provide information to

2    her and that he had entered into a contract that precluded him

3    from doing that without the authorization of the Riches.

4              THE COURT:  You are conflating two different claims.

5    I was specifically asking about the intentional infliction of

6    emotional distress.  When you were discussing the requirement

7    of outrageous conduct, I am trying to understand what you say

8    that the allegations in the complaint are that they claim is

9    supposed to satisfy the definition of outrageous conduct.

10             MR. TERRY:  Yes.  I believe that that is the conduct

11   that they actually allege, that she met with Wheeler and

12   Butowsky.  That's the first direct allegation about Fox.

13             THE COURT:  Again, the way you say it doesn't advance

14   my consideration.  The fact that somebody meets with somebody

15   is not a definition of outrageous conduct.  So if they met at

16   Starbucks, no one is going to say in the abstract that that's

17   outrageous conduct.

18             MR. TERRY:  I couldn't agree more.  The allegation is

19   that they met and that this was part of their scheme to put

20   together a false story implicating Seth Rich.  But the actual

21   conduct that's alleged is that she met with Butowsky and

22   Wheeler.  That's the first thing.

23             The second thing is that she fed Wheeler information

24   before he met with the police department.  They don't allege

25   that she gave him false information before he met with the

1    police.  They don't allege that feeding information to him

2    before he met with the police is tortious or that it's anything

3    other than a reporter attempting to get more information from a

4    source.  Here, where Rod Wheeler was meeting with a police

5    detective, it seems like a pretty good way to get pretty good

6    information about what the D.C. Police did.

7          THE COURT:  The nature of the relationship is a little

8    different than the standard relationship of a reporter trying

9    to get information from a source.  Their allegation is, and I

10   am not sure you dispute it, that there was already a

11   relationship and connection between Wheeler, Zimmerman, Fox

12   News, Butowsky before this even began.  It's not as if she is

13   going out there trying to find sources.  They are claiming that

14   this relationship was established even before Wheeler met the

15   Riches.

16         MR. TERRY:  They don't allege and I don't believe it

17   would be accurate to say that Zimmerman and Wheeler had any

18   relationship prior to the first meeting they described in their

19   complaint.  Wheeler's relationship was with Fox News as an

20   occasional paid contributor.  He would come on and talk about

21   current events and be paid.

22         THE COURT:  That's more than that.  Wheeler's

23   relationship was with Fox News.  Butowsky arranged to have

24   Wheeler work for the Riches and in fact was paying Wheeler, and

25   Zimmerman was a reporter for Fox News who is obviously going to

1    write the story and was going to write the story unless you

2    tell me she was ignorant of what Butowsky and what Fox News was

3    doing with regard to the story and is off on her own, that she

4    was totally aware that Butowsky had set up Wheeler to represent

5    the Riches, was paying Wheeler to represent the Riches, and the

6    purpose of that would ultimately be to benefit a story that she

7    was going to write for Fox News.

8         MR. TERRY:  I don't believe they directly allege that

9    she knew that Butowsky was paying for Wheeler --

10        THE COURT:  Is that in any way in dispute?

11        MR. TERRY:  It's not relevant for the purposes of this

12   motion, whether it's accurate or not.

13        THE COURT:  For her to have some liability with regard

14   to some of the activities, if not most of the activities that

15   we were just discussing, she would have to be aware and

16   participate.  Whether or not it constitutes an aiding and

17   abetting claim or a conspiracy claim or just an independent

18   claim itself, they have got to connect her.  She can't just be

19   a reporter who walks off the street and decides that she later

20   found out that there was some guy who was hired by the Riches,

21   and she just happened to find that out the way all the other

22   reporters found out, and she decided she wanted to go interview

23   the guy.  That's not what happened.

24        MR. TERRY:  That's correct.  Ms. Zimmerman wrote her

25   first article about Seth Rich in January, significantly before

1    she interacted with Mr. Wheeler.  Subsequently, we don't

2    dispute that Mr. Butowsky introduced her to Mr. Wheeler, and

3    Mr. Wheeler became a source for the story.

4            THE COURT:  And everybody knew that.  At the time

5    there is no reason to believe that everyone wasn't aware that

6    Butowsky was going to pay Wheeler to do an investigation for

7    the Riches and that the result of that relationship and that

8    work would be an article that was generated for Fox News by

9    Zimmerman.

10           MR. TERRY:  There is no question that Zimmerman's hope

11   was that her interactions with Butowsky and Wheeler would

12   assist her in writing an article about the --

13           THE COURT:  It was more than a hope.  That was

14   everyone's intent.

15           MR. TERRY:  That is certainly why she was meeting with

16   Wheeler.

17           THE COURT:  I'm asking.  I don't know if it's relevant

18   or not.  But from my understanding of the circumstances that

19   are alleged and not denied is that that was her intent.  She

20   didn't just wish it.  They all planned it that way, right?

21   That doesn't necessarily make out a claim, but we are not

22   talking about a situation where she was hoping that was going

23   to happen; everybody planned it that way.

24           MR. TERRY:  It was certainly her plan to use Wheeler

25   as a source for the story.

1          THE COURT:  That plan was accompanied by knowledge

2     that Butowsky was going to pay Wheeler to be an investigator

3     for the Riches and the results of that investigation were going

4     to be a significant part of her source for the article.

5          MR. TERRY:  Plaintiffs will correct me if I'm wrong,

6     but I don't believe they allege directly that Zimmerman knew

7     that Butowsky was paying for Wheeler's work for the Riches as

8     opposed to serving as a conduit between her and Wheeler, and I

9     don't know.  It's something I have not focused on because it's

10    not relevant to the outcome of any of the claims.

11         When you talk about what conduct is at issue by Fox

12    and what could possibly be described as outrageous, the only

13    things that they identified that was actual conduct by Fox or

14    its reporter is the publication of the story, giving Wheeler

15    information, they don't describe what or say that it's false,

16    before he met with the detective, meeting initially with

17    Butowsky and Wheeler, allegedly for the purpose of creating a

18    story where they would defame Seth Rich, but that's it.  None

19    of that conduct comes close to meeting the standard in New York

20    for intentional infliction of emotional distress.

21         In particular, there is a case *Balderman*, which is a

22    New York Appellate Division case, I believe, from the Fourth

23    Department, which explains that even tricking somebody into

24    appearing on television, deceptively editing their statements

25    to make it appear that they said things that portrayed them in

1    a poor light when they didn't, isn't enough to state a claim

2    for intentional infliction.

3         Notably, they cite no cases in New York at all since

4    the *Howell* decision that permitted any intentional infliction

5    claims to proceed based on conduct anywhere close to this.  No

6    New York claims based on any news gathering since *Howell*, no

7    cases based on anything close to the type of allegations at

8    issue here.

9         There is also a constitutional bar to the suggestion

10   that the publication of the story about Seth Rich was itself

11   outrageous.  There is no dispute that the story was about a

12   matter of public concern.  It was about who leaked e-mails to

13   WikiLeaks that became an important issue in the election and

14   the question of Russian interference and everything that's

15   happened since.  The murder of Seth Rich was a high-profile

16   issue in Washington, D.C. and around the world as soon as it

17   happened.  They don't dispute that it was not a matter of

18   public concern.

19        The Supreme Court's decision in *Snyder* makes clear

20   that commentary on an issue of public concern cannot be called

21   outrageous as a matter of law, and the reason for that is

22   because outrageousness, as it applies to an intentional

23   infliction of emotional distress claim is so incredibly

24   subjective and so incredibly vague.

25        And speech on a matter of public concern, the Supreme

1    Court said in *Snyder* is the most protected type of speech.  It

2    is the heart of the First Amendment.  It deserves the highest

3    tier of protection.  And because of that, even incredibly

4    hurtful speech cannot be labeled as outrageous, and the danger

5    the Court pointed out is that when you allow outrage to be the

6    standard that the jury used to decide something, you are

7    inviting viewpoint discrimination.  You are inviting the jury

8    to say that the message made by the article is itself

9    outrageous and that invites discrimination.

10               The complaint itself or the way it frames this case,

11   it describes exactly what could happen.  The complaint in many

12   parts is an attack on the institution of Fox News or the

13   political point of view they ascribe to.

14               THE COURT:  You are absolutely right.  The political

15   point of view can't be the issue.  But clearly the statute does

16   not intend to protect.  It protects commentary and reporting on

17   issues of public concern, but it wouldn't protect just making

18   up a story, a false story.

19               MR. TERRY:  I think there are two answers to that.

20   The first is that the tort of outrage, which is what an

21   intentional infliction tort used to be called, is an improper

22   tool to try to remedy that.  If you make a false statement

23   about somebody, there is a cause of action for it for

24   defamation.

25               THE COURT:  You already said there is not a cause of

1    action for defamation because it is not made about them.

2              MR. TERRY:  That's exactly right.

3              THE COURT:  You can't have it both ways.  You can't

4    say, we apply the defamation standard, but at the same time

5    say, this is not a defamation case because it doesn't meet the

6    definition of defamation because it's not about that.

7              MR. TERRY:  Defamation is itself, as I said, a narrow

8    exception to what is otherwise uninhibited speech.

9              THE COURT:  In what way would defamation apply to this

10   circumstance?  In what way would the rules about defamation

11   apply to this circumstance when it doesn't even meet the

12   elements of that?

13             MR. TERRY:  In this case there is no defamation claim.

14   To answer your broader question, what is the protection against

15   false statements on issues of public concern?  The answer to

16   that is defamation.

17             THE COURT:  The answer is not defamation if it's about

18   somebody else.

19             MR. TERRY:  That's right.  And the reason why there is

20   no remedy for that is because defamation is the result of a

21   judicial balance between the private interest in protecting

22   your reputation versus the public interest in having free and

23   uninhibited speech.  That's the essential balance in all of

24   these cases.

25             When there is no damage to a living person's

16KMRICO

reputation, that interest is diminished and the same level of

protection doesn't apply to that private interest, so the

balance has been shifted.  This is actually reflected in some

of the cases that they rely on, that they permit the tort of

intentional infliction to proceed based on speech-based claims.

There is a case about Howard Stern and his radio show.  There

is another case about another shock jock who had an ugliest

bride competition on television.  And the Court said here there

are very significant private interests and no countervailing

public interest because they are not on issues of public

concern.

        That balance is flipped here.  You don't have the same

private interest because you don't have the particularized

interest of a living person in defending their reputation,

which is why the defamation claim exists as a carve-out as to

what is otherwise free speech.

        When that balance is changed, the answer is, there is

not a remedy through an intentional infliction claim.  And the

danger is, if you were to allow these intentional infliction

claims to proceed, it would be inviting the jury to make

decisions about outrage based on their own political point of

views.

        You can even see it in the briefing.  The viewpoint as

to whether or not leaking, and leaking in this particular

instance makes you a hero nor a villain, depends on your

1   political point of view.  Whether or not people would look to

2   the article and conclusion that Seth Rich leaked information to

3   WikiLeaks and view that as outrageous, depends on their

4   preexisting political views, whether republican or democrats,

5   Sanders or Clinton, all of those things.

6          THE COURT:  That's not necessarily so because if you

7   made up a story about an individual and made what at least the

8   plaintiff would claim is an outrageous lie, it doesn't

9   necessarily -- in many circumstances, even ones similar to

10  this, where one can analyze whether or not what you did was

11  outrageous, regardless of what your political feelings were.

12         Whether you are conservative or liberal or democrat or

13  republican, no one would want someone to come to you and walk

14  into this courtroom and say to you, you know what, your mother

15  just died.  And then you run out and you called home and no,

16  that wasn't true, and they just did it to hurt you.  One may

17  disagree about whether or not that is or isn't outrageous

18  conduct that would merit intentional infliction of emotional

19  distress, but a jury could analyze that, regardless of what

20  their political feelings are.

21         MR. TERRY:  That's exactly right and that's why this

22  doesn't apply to matters of private concern.  That is a private

23  concern, like your example.  You don't have that same type of

24  risk.

25         Here, it's indisputably a matter of massive public

1    concern and that risk exists.  And the line is not drawn in a

2    way because there might be instances in which jurors' biases

3    would not be used to stifle speech.  It's designed to protect

4    speech and to prevent against the possibility that there are

5    situations where the jurors' preexisting political beliefs will

6    be what guides their judgment and outrage.

7           Because the tort of outrage is so inherently subjective

8    subjective and creates that risk, when you are talking about

9    matters of public concern, the tort cannot apply.  In your

10   example it clearly can because it's a matter of private concern

11   and the private public balance is shifted.  Again, here, it's

12   the complete opposite.

13          THE COURT:  That's why I'm trying to understand from

14   your perspective, in terms of your argument, whether you are

15   characterizing the outrageous conduct at issue as the content

16   of the article or the activities of the individuals.

17          MR. TERRY:  Your Honor, their complaint alleges that

18   it is both.  Their injury that they allege flows solely from

19   the article.  They articulate in great deal about how they were

20   injured by the effect on the reputation of their son and the

21   public inquiries that had started.  They don't articulate any

22   injury whatsoever that comes from the other activity aside from

23   publication.

24          The only complete tort they can allege requires a

25   focus on the publication and what it said about Seth Rich.  If

I6JMRIC0

 1    they want to amend their complaint and try to pass a motion to

 2    dismiss just based on the claims about the conduct and not

 3    based on the publication, they could try to do that.  It would

 4    not come close to the level of conduct that New York courts

 5    require for the tort of intentional infliction of emotional

 6    distress, but they could try it.

 7         What they cannot do is take the content of the

 8    broadcast or the content of the report, particularly because

 9    it's a matter of public concern, and use it as a basis for

10    their intentional infliction claim.

11         I think whether or not you look to the constitutional

12    limit or even the allegations itself, there is absolutely no

13    basis to shoehorn this case into an intentional infliction of

14    emotional distress claim.

15         If you look at the New York court cases that have

16    found conduct that constituted intentional infliction of

17    emotional distress, it is far greater than anything that is

18    alleged here, and there is a completely different balance of

19    private and public interests.

20         I think it is notable in their briefs, when they talk

21    about the low standard that is required to show this type of

22    claim and the different cases where courts have found lesser

23    conduct to constitute intentional infliction of emotional

24    distress, those cases all predated the New York Court of

25    Appeals decision in *Howell*.  And the Southern District

1    subsequently said, they are no longer good law on the matter

2    because they don't reflect the heightened standard of *Howell*.

3          Here you have a tort that is disfavored as a matter of

4    common law in New York.  It's an incredibly high burden to meet

5    and significant constitutional impediments for proceeding.  It

6    should be dismissed.  Their claim is essentially a defamation

7    claim.  They have no defamation claim and for that same reason

8    they have no intentional infliction claim, whether because it

9    is not of and concerning the plaintiffs or because the conduct

10   alleged itself is not outrageous.

11         Unless you have more questions about that, I'll turn

12   to tortious interference, unless you want to hear argument

13   completely on the first claim.

14         THE COURT:  No.  Go ahead.

15         MR. TERRY:  The tortious interference claim fails for

16   two pretty clear reasons that are distinct.

17         The first is that the complaint doesn't actually

18   allege that Malia Zimmerman knew that Rod Wheeler did not have

19   authorization to talk to her.  The contract at issue, which

20   they allege that she read, said that Rod Wheeler can't talk to

21   the press unless he gets authorization from the Rich family.

22         They don't allege that Rod Wheeler ever told her that

23   he didn't have authorization to talk to her.  They allege that

24   Malia Zimmerman presented the Rich family or called the Rich

25   family and asked for a comment on her story.

1          They don't allege that the Rich family ever called her

2    back to say, are you talking to Rod Wheeler?  You shouldn't be

3    talking to Rod Wheeler.  There is not even a boilerplate

4    allegation that she knew that the Rich family hadn't provided

5    authorization to talk to her.

6          If she didn't know that Rod Wheeler didn't have

7    authorization to talk to her, there simply can't be a tortious

8    interference claim.  It's a critical element and it's

9    completely missing from the complaint.  Even in their

10   opposition they don't attempt to articulate any allegations

11   showing Zimmerman knew that Rod Wheeler didn't have

12   authorization to talk to her.

13         Even if she did, even if she did know that Rod Wheeler

14   was bound by a confidentiality agreement, that can't state a

15   claim for tortious interference for two reasons.

16         First of all, New York courts have repeatedly said

17   that a claim even for interference with an existing contract

18   requires a showing that the sole purpose of the interference

19   was to cause the damage and that it was done through wrongful

20   means.  There is no allegation that the sole purpose of her

21   conduct was to harm the Riches.

22         To the contrary.  The complaint makes clear that the

23   sole purpose was to create a new story.

24         There is also no allegation that it was done through

25   wrongful means.  No allegation that she induced Rod Wheeler

1    through wrongful means to breach his contract.  It alleges that

2    she simply asked him for the information, and he provided it to

3    her.

4         The plaintiff's case had a different test to apply

5    instead of sole purpose, that they simply need to show that

6    Malia Zimmerman acted without justification in getting Rod

7    Wheeler to provide her with that information.  But they can't

8    even meet that test.

9         The justification for getting Rod Wheeler to provide

10   information about his work is that he was the detective who had

11   been given the job to try to find out what happened with Seth

12   Rich.  Getting information from him, whatever it was, was

13   valuable, particularly given how significant of a public topic

14   this was.  To suggest that a reporter could be liable for

15   tortious interference simply for asking a source for

16   information, when they might be bound by a confidentiality

17   agreement, would eliminate entire categories of news gathering.

18        If that were the case, we would never know about all

19   kinds of purported malfeasance because employees are bound by

20   confidential agreements all the time.  There have been all

21   these things in the news lately about sexual harassment, Harvey

22   Weinstein, all kinds of other cases.  All of those people had

23   settlements that had confidentiality provisions.

24        The reporters are not liable for tortious interference

25   for getting those sources to talk to them despite those

I6JKMRIC0

1    confidentiality provisions.  People in the White House have

2    confidentiality provisions.  Sources still talk to them to get

3    information.

4         Those leaks are not a cause of action for tortious

5    interference and no case that plaintiffs cite or that we are

6    aware of has imposed liability for that.  Quite to the

7    contrary, we cite the *Huggins v. Povich* case where Povich knew

8    that Huggins was bound by a confidentiality agreement;

9    nevertheless, induced her to breach it on his show.  It was a

10   matter of substantially less public concern and the Court said

11   that is not without justification.  It's not without

12   justification to get somebody to provide you with information

13   that they have when you're a journalist, regardless of the

14   significance of it.

15        Here, where you have a highly significant public

16   matter, asking Rod Wheeler to provide the information that he

17   had is not the type of wrongful conduct that can give rise to a

18   tortious interference claim.

19        You had asked me earlier about vicarious liability, or

20   at least alluded to it to some extent, and to what extent can

21   Fox be vicariously liable for the conduct of Butowsky and

22   Wheeler.  The answer is they can't, and they can't because the

23   test for vicarious liability is about control, whether or not

24   they had control over the methods, means, or if it was

25   permitted by Butowsky and Wheeler.  There are no allegations in

1   the complaint that come even close to establishing that Fox had

2   control over those two people.

3          THE COURT:  At least on the surface, superficially,

4   one would argue that Butowsky and Zimmerman were doing Fox's

5   bidding.  It's not like they were independent of Fox.

6          MR. TERRY:  There is no allegation that Butowsky was

7   acting because Fox asked him.

8          THE COURT:  Butowsky wasn't acting in his own

9   interest.  He was acting on behalf of uncovering a story for

10  Fox News.  He didn't have a personal interest in this.

11         MR. TERRY:  I believe he did.  He had an independent

12  interest in doing this.

13         THE COURT:  To do what with Wheeler's conclusions?

14  Wasn't it pretty clear that the intent was that it was going to

15  be publicized at some point through Fox News?

16         MR. TERRY:  You have to ask Mr. Butowsky's counsel,

17  but I believe the intent was to find out what happened and,

18  perhaps, to prove that Seth Rich in fact did communicate with

19  WikiLeaks, but to find out what happened.  And then to

20  disseminate the facts about what happened through media

21  platforms which could be Fox.

22         THE COURT:  It's difficult for me to characterize

23  Butowsky, Zimmerman, and Fox News as strangers --

24         MR. TERRY:  I would agree with that.

25         THE COURT:  -- from the beginning of this, and I don't

1   know what the nature of the relationships were.  But clearly on

2   the surface it doesn't lend itself to an assumption that

3   Butowsky just got up, woke up one day, decided he wanted to

4   hire an investigator for the Riches, did so, then some reporter

5   knocked on his door, or Wheeler's door, who had no relationship

6   or knowledge about that relationship, and decided that they

7   wanted to do a story and then decided that the story was going

8   to be passed onto Fox News, who she didn't have a relationship

9   with.

10           This was a lot more of a cozy relationship between

11   anybody rather than a stranger relationship.

12           MR. TERRY:  I agree with you that if the test was, are

13   they strangers or not, but that's not what the test is.  The

14   test is whether or not Fox exercised control over the

15   activities here of Wheeler and Butowsky, not just that they

16   were acting with a shared goal in mind or a shared purpose,

17   because they all wanted to get the story out there.  But for

18   vicarious liability they have to have control over what they

19   do.

20           THE COURT:  I'm not sure what your argument is that

21   they didn't have control over Zimmerman.

22           MR. TERRY:  I'm not arguing they don't have control

23   over Zimmerman.  My argument is they did not have control over

24   Butowsky and Wheeler.  The complaint actually makes pretty

25   clear that Fox didn't have control over Butowsky and Wheeler.

 1              They explain that Rod Wheeler, the night before

 2    Malia's Zimmerman's story was published, went on a local TV

 3    station, Fox 5, and essentially previewed the story and talked

 4    about his information that a federal investigator had revealed

 5    that Seth Rich had communicated directly with WikiLeaks.  They

 6    alleged that before that, before that interview, Rod Wheeler

 7    had expressed concern that people at Fox would be unhappy with

 8    him if he were to do that interview.

 9              THE COURT:  But my understanding of the Fox/Wheeler

10    relationship is that that was pretty much an established

11    relationship from the beginning.

12              MR. TERRY:  Rod Wheeler was an occasional paid

13    contributor on Fox.

14              THE COURT:  And it was anticipated that he would be so

15    on this issue and it was anticipated that he was going to do

16    further research in furtherance of that relationship on this

17    issue.

18              MR. TERRY:  We don't dispute that for the purposes of

19    this motion at all, but that doesn't address the question of

20    control.

21              THE COURT:  Who has more control over Wheeler than Fox

22    News?

23              MR. TERRY:  They had no control over Wheeler.

24              THE COURT:  Wheeler was at least -- I wouldn't say

25    their employee, but was at least doing work in furtherance of

1   his paid relationship with Fox.

2          MR. TERRY:  His paid agreement with Fox makes clear

3   that he's a contractor, independent contractor.

4          THE COURT:  And he was such a person when he entered

5   into a contract with the Riches.

6          MR. TERRY:  That's true.  He was an independent

7   contractor.  He was paid for his appearances and his off-air

8   assistance in advance of his appearances.

9          THE COURT:  It was pretty clear at that point that he

10   wasn't going to sell his story to the New York Times; that the

11   result of his investigation was going to be supplied to Fox

12   News pursuant to his paid relationship with Fox News.

13          MR. TERRY:  He wasn't paid for any of the work he did

14   in relation to the Seth Rich.

15          THE COURT:  He was paid to be a commentator and the

16   thing he was going to comment about was the Seth Rich.

17          MR. TERRY:  When he did comment on it he was paid for

18   commenting on it.  But being an independent contractor doesn't

19   establish vicarious liability.  For their to be vicarious

20   liability you've got to be an employee or you've got to have

21   sufficient control over his conduct, and they don't allege

22   either one.  They don't allege that Fox controlled how he did

23   his work, what he did, when he did it.  They need to allege all

24   of those things to create vicarious liability for what he did

25   along the way.

1    THE COURT:  That's not completely accurate.  What they

2  have to demonstrate is that they had control over the conduct

3  that constitutes the outrageous conduct.  That's why I started

4  with that basic question.

5    MR. TERRY:  That's right.  Let's take that.

6    THE COURT:  They don't have to have total control over

7  his activities.  They don't have to know when he shows up, who

8  he talks to.  They don't have to have that.

9    We have to focus on what is it that they say is the

10  outrageous conduct, and they may or may not be vicariously

11  liable for his outrageous conduct, depending on how you define

12  that outrageous conduct.

13    MR. TERRY:  I agree.  That's exactly the right

14  question.  Looking at the conduct that they attribute to

15  Wheeler, we have to ask whether or not Fox controlled that

16  conduct, and that conduct basically falls into two buckets.

17  There are the allegations that he somehow misled the Rich

18  family by failing to reveal that he was working with Fox News,

19  and there are the allegations that he made false statements

20  about Seth Rich.  Neither of those, with the exception of the

21  ones that were published on Fox's website --

22    THE COURT:  Those are the ones that are primarily at

23  issue.

24    MR. TERRY:  The Fox 5 conversation, that live

25  interview, is a perfect example of something we didn't control.

1    Malia Zimmerman said, you shouldn't do that, don't do that, you

2    are going to take away our story before I run it, and he went

3    ahead and did it anyway.  Why did he do it?  Because Fox had no

4    control over what he was doing.

5         THE COURT:  Again, it depends on which publication is

6    at issue.  If the publication at issue is Fox News publishing

7    the statements or the opinions or findings of Wheeler, that's

8    not even vicarious liability.  Fox is responsible for what it

9    publishes and it clearly published this story.  I am not sure

10   which part of is really vicarious liability for Fox.

11        MR. TERRY:  Everything is vicarious liability with the

12   exception of Fox's own publication, which would be on its

13   website and Fox News shows.  Let's take Fox 5.  Fox 5 is a

14   different company.  It's a local station.  There is no

15   allegation that Fox News controls Fox 5.  We argue in our

16   motion to dismiss there is no vicarious liability for what Fox

17   5 published, and the plaintiffs ignore that entirely.  They

18   didn't answer it.  We are not liable --

19        THE COURT:  There is not a significant distinction

20   between what was published on Fox News and what was published

21   on Fox 5.

22        MR. TERRY:  I would agree with that.

23        You get to the conduct.  You have got the publication

24   and we have explained, for a host of reasons, why the

25   publication itself is not actionable.  You have the conduct by

1    Rod Wheeler.  And the conduct by Rod Wheeler, which is

2    allegedly outrageous, is talking to Malia Zimmerman and failing

3    to tell the Riches that he was working with Malia Zimmerman

4    when he was conducting the investigation on their behalf.

5         But what Rod Wheeler said to the Riches, when he said

6    it, how he said it, what he revealed, Fox had no control over

7    whatsoever.  They weren't involved in that relationship at all.

8    They had no ability to know what he was saying.

9         THE COURT:  They were involved in the relationship.

10   You made the distinction between the content of the publication

11   and the conduct.  One could argue the other way, too, if they

12   were alleging such a fact, if there is a basis to allege such a

13   fact.  But to say that they didn't have any control over what

14   he told Zimmerman doesn't address the question of whether they

15   have control over whether the information was going to be

16   transferred to Zimmerman to be published on Fox News.

17        MR. TERRY:  The only thing they had control over was

18   what they were going to do with that information.  They didn't

19   have control over whether or not he would give them that

20   information.  They didn't have control --

21        THE COURT:  I don't understand.  I am not sure why

22   that's so.  That's what I say.  Seems to me that that was the

23   original intent, that they were going -- the idea was going to

24   be that this paid commentator for Fox News was going to do an

25   investigation that was going to result in his turning that

1    information over to Fox News to be published.  And if he didn't

2    do that, it would significantly interfere with his

3    relationship, his paid commentator relationship with Fox News.

4              MR. TERRY:  I disagree strongly with that last part.

5    He didn't have any obligation to provide information that he

6    got as a private detective to Malia Zimmerman.

7              THE COURT:  You are saying if they said to him, even

8    if they said to him, we just found out that you were hired by

9    the Riches and you did an investigation and we want you to come

10   on and discuss the results of that investigation, you don't

11   think that they could politely request that he do that pursuant

12   to his commentator relationship with Fox News?

13             MR. TERRY:  They could not.  He has no obligation to

14   appear.

15             THE COURT:  What is his obligation as a commentator on

16   Fox News?

17             MR. TERRY:  None.

18             THE COURT:  It has got to be something.  He is getting

19   paid for something.

20             MR. TERRY:  They call him up.  If he is available and

21   comments, he gets paid.

22             THE COURT:  I don't know.  You think he could have

23   responded to Fox News' request, I refuse to give you this

24   information, I am going to give it to the Washington Post?

25             MR. TERRY:  What he could do is say, I can't give that

16KMRIC0

1    to you because it's confidential.

2           THE COURT:  That's different.  That's not an issue of

3    control.  That's an issue of contractual relationship, as you

4    say.  I'm just trying to address your question of control.  It

5    seems to me that maybe they don't have control, but clearly he

6    has such a relationship with Fox News -- and they knew enough

7    about the nature of his activities that one could argue that

8    they had control over where he was going to disseminate this

9    information and whether he was going to give it to them for

10   publication or even give it to Zimmerman, who was working for

11   them.

12          MR. TERRY:  Of course, none of this is alleged.

13          THE COURT:  You say none of it is alleged, but you are

14   saying that somehow that's the deficiency here, because you are

15   saying they don't have control.  I mean, it may not be alleged

16   that they have control, but it's alleged that we have a

17   reporter who works for Fox News.  We have a consultant who

18   works for Fox News who is doing an investigation.  We have

19   Butowsky, who has also a relationship with Fox News, who is

20   paying Wheeler to do the investigation for the Riches.

21          And they all intend that the result of that

22   investigation is he is going to give that information to

23   Zimmerman and help her write an article for Fox News and get on

24   Fox News in relationship to his role as a commentator and

25   discuss the results of that investigation.

34

1          What have I just said that is incorrect?

2          MR. TERRY:  I don't think we have to dispute any of

3     that for the purposes of our motion because none of that has to

4     do with whether or not Fox had control over the alleged

5     wrongful conduct by Wheeler.  None of that has to do with

6     whether or not Wheeler lied to the Riches at all.  None of that

7     gave Fox control.  If you take everything that is said as

8     accurate, none of that gave Fox control over what Wheeler said

9     to the Rich family, what work Wheeler performed for the Rich

10     family.

11          THE COURT:  You say that's not alleged.  Would you

12     make that same argument if the facts were in fact that Fox News

13     told Wheeler to lie to the Riches?

14          MR. TERRY:  If Fox News told Wheeler to lie to the

15     Riches and they had control over what he did, they would

16     clearly be vicariously liable.

17          THE COURT:  You are giving me two different elements

18     and the second element doesn't make sense.  You say, if they

19     told him and had control.  I am trying to figure out what would

20     demonstrate control.  So it's not an and.  If they told their

21     paid commentator to lie to the Riches, could that itself be a

22     demonstration of control?  That's the question.  Not and had

23     control.  I'm trying to figure out what kind of relationship

24     would minimally constitute that control.

25          MR. TERRY:  Yes.  Control is not demonstrated by your

16KMRIC8

1   ability to tell somebody to do things.  If it were, my life

2   would be a lot different.  There is a difference between intent

3   and control.

4           THE COURT:  If you order one of the firm's associates

5   to do something, why isn't that control?

6           MR. TERRY:  Because I have control over what the firm

7   associates do at work, if I order them to do something at

8   work --

9           THE COURT:  I'm trying to understand how they don't

10   have control over Wheeler.  I don't know of any demonstration

11   here that Wheeler was in a position to make a decision contrary

12   to what Fox News wanted him to do, given his relationship with

13   Fox News, given his contract with the Riches, given his payment

14   for that contractual relationship by Butowsky.  What is it that

15   Rich gets to go off and do on his own?

16           MR. TERRY:  There are three things I want to say in

17   response to that.

18           First of all, my ability to tell somebody to do

19   something, like Fox's ability to tell somebody to do something,

20   only creates vicarious liability if it is accompanied by an

21   ability to make them do that thing or to punish them if they

22   don't.  Those allegations are missing here.  There are no

23   allegations that Fox had the authority to enforce any of that,

24   which is what would create control.

25           Second, your question sort of reverses the burden.

1   It's their burden to allege facts from which control can be

2   inferred, not my burden to show there are contrary facts which

3   would defeat control.  But even if it were, their own

4   allegations established that we didn't have control over Rod

5   Wheeler, and also not over Mr. Butowsky.

6          As for Mr. Wheeler, the entire story about him going

7   on Fox 5, allegedly contrary to the wishes of producers at Fox

8   in New York, contrary to the wishes of Malia Zimmerman, show

9   that we didn't have control over what he was doing.

10          THE COURT:  I understand that.  But you're

11   concentrating only on the control theory.  This is more than

12   just a control theory.  This is also a claim of aiding and

13   abetting, which isn't a control theory, and there's also a

14   claim of conspiracy amongst all of these defendants to commit

15   these acts, which is neither a controlled theory.

16          MR. TERRY:  Correct.  I've just been addressing

17   vicarious liability, which requires control.  For them to

18   proceed under vicarious liability and, therefore, assert a

19   direct claim, as opposed to a concerted action theory, they

20   have to show that control.

21          THE COURT:  Which count do you claim is the control

22   count?

23          MR. TERRY:  That would be through all of their direct

24   claims.

25          THE COURT:  Why?  That's not necessarily so.  They

1    could be directly liable by their own conduct, even though they

2    don't have control.  If they participated in the conduct that's

3    alleged to be tortious conduct, tortious interference conduct

4    and/or intentional infliction of emotional distress, if we sat

5    around in a room, five of us, and decided that we were going to

6    do this, it doesn't matter which one of us is in control.

7         MR. TERRY:  That's true.  If there were facts that

8    would permit a direct claim against Fox, based on its conduct,

9    then they would have a claim.

10        They also allege the direct, not concerted action,

11   claims against us based on the conduct of Wheeler and Butowsky.

12   My point is for Counts One through Three -- I'm sorry.  One

13   through Four.

14        THE COURT:  Are you making this control argument just

15   on behalf of the defendant Fox News network?

16        MR. TERRY:  And defendant Zimmerman.

17        THE COURT:  I don't understand in what way there is

18   even a theory that Zimmerman is vicariously liable because she

19   had control.  I don't read that in any of these paragraphs.

20        MR. TERRY:  Our point is just that neither Fox nor

21   Zimmerman can be directly liable for the actions of Butowsky

22   and Wheeler.

23        THE COURT:  Right.  But they could be directly liable

24   for their own actions acting in concert with others.

25        MR. TERRY:  There are other flaws to the concerted

1    action theories, the aiding and abetting conspiracy.  The

2    conspiracy, the principal flaw is that the touchstone of

3    conspiracy is there has to be an intent to cause the injury

4    that's at issue.  There has to be an agreement to cause that.

5    What they don't allege --

6        THE COURT:  That's true whether it's a conspiracy

7    theory or direct theory.  If there is no such intent, then

8    there is no claim.

9        MR. TERRY:  Because conspiracy is a specific-intent

10    type tort, there is a higher level of intent required.

11        THE COURT:  So is intentional infliction of emotional

12    distress.

13        MR. TERRY:  I would agree with that.

14        THE COURT:  I don't see how you could have one without

15    the other in terms of the level of intent.

16        MR. TERRY:  I agree with that.  You should not have

17    either tort because they both require an intent to harm the

18    Riches, which is completely absent from the allegations in the

19    complaint and, frankly, inconsistent with the allegations in

20    the complaint.

21        The complaint, taking its allegations at their worst,

22    alleged that a conspiracy was to gin up a story accusing Seth

23    Rich of being the source for WikiLeaks, whether the evidence

24    supported it or not.  There is no allegation whatsoever that

25    anyone intended to harm the Rich family, which is what they

 1   would need to have a conspiracy claim for intentional

 2   infliction of emotional distress or tortious interference.

 3   There are no allegations like that at all.

 4              As for the aiding and abetting claim --

 5              THE COURT:  I just don't see that as a separate

 6   argument.  If they have not sufficiently alleged that any

 7   defendant had the requisite intent to inflict emotional

 8   distress on the plaintiffs or -- I guess that's really -- are

 9   you also making this argument with regard to tortious

10   interference?  I am quite sure.

11              MR. TERRY:  I believe the conspiracy claim is just for

12   intentional infliction.

13              THE COURT:  It seems to me that if they don't have

14   intentional infliction of emotional distress as a substantive

15   claim, then they obviously don't have any kind of conspiracy or

16   aiding and abetting or any other vicarious claim.

17              MR. TERRY:  Correct.

18              THE COURT:  I am not sure that there is a separate

19   argument to be made that -- whose intent are you saying is less

20   than someone else's intent?

21              MR. TERRY:  There has got to be an agreement among all

22   three to cause that end for it to be a conspiracy.  It's not

23   just that we possess the intent, Butowsky possess its the

24   intent, Wheeler possesses the intent.  All three of us not only

25   have to possess an intent, but to agree to a course of action

16KMRIC0

1    to cause that harm.  That's what's missing, an agreement to

2    come together to cause the harm that brings the Rich family to

3    court, which is, as they say, intentional infliction of

4    emotional distress on them, and there is no allegation that

5    anyone agreed to inflict emotional distress on them, wanted

6    that to happen or intended that to happen.

7         As for the aiding and abetting claim, the aiding and

8    abetting claim requires substantial assistance for the wrongs

9    at issue.  Our point is simply that as for the particular

10   conduct leading up to the article, there is no allegation that

11   Fox News substantially assisted either Butowsky or Mr. Wheeler

12   in making misrepresentations.

13        I do want to speak very briefly about the issue of

14   vicarious liability regarding Mr. Butowsky.  We spent a lot of

15   time talking about Mr. Wheeler.  There is no allegation that

16   what Mr. Butowsky was doing here in reference to this whole

17   issue was the result of him having a contributor agreement with

18   Fox.  He is not alleged to have a contributor agreement with

19   Fox.  I believe he described it as an occasional unpaid

20   contributor to Fox.  There is no allegation that they had any

21   control whatsoever over anything Butowsky did, and that's

22   particularly true with some of the Tweets and other interviews

23   and communications that Mr. Butowsky made after the Fox News

24   article regarding Seth Rich was published because some of those

25   things are directly contrary to things that Fox News said in

1   its own report.

2          For example, the report, on the same day it's

3   published, is updated with a statement from the family

4   essentially disavowing Rod Wheeler and saying he's not

5   authorized to speak for us.  You should not trust those

6   conclusions.  And there are statements from Butowsky later on,

7   I believe, in a call interview where he is alleged to have

8   suggested that the Rich family agreed with the conclusions set

9   forth by Wheeler.

10         THE COURT:  Except that if they have sufficiently

11   alleged that there was an intent to inflict emotional distress

12   on the Riches and each one of these individuals had such an

13   intent, there isn't really a requirement that you be aware of

14   every single act in furtherance of that.

15         MR. TERRY:  Of a conspiracy, that's true.

16         THE COURT:  Of the conspiracy or any other theory.  I

17   am not sure what the difference is that you made.  If we all

18   agreed we intended to inflict emotional distress and we

19   collectively did 10 things to carry that out, if I do three of

20   those things, I don't necessarily have to be aware of every one

21   of the things that you do.

22         MR. TERRY:  That's true with respect to a conspiracy

23   claim.

24         THE COURT:  No.  What claim do you say that that's not

25   true for?

1          MR. TERRY:  The direct action claims, Counts One and

2    Count Two.  We certainly can't be vicariously liable for

3    conduct that Butowsky engaged in on his own, either before or

4    after the broadcast.  There are no allegations whatsoever that

5    Fox had any means or method of controlling what Butowsky did.

6    They don't say we controlled what he did, when he did it, how

7    he did it.

8          And particularized conduct that they attribute to

9    Butowsky, especially after the report, is conduct that is

10   contrary to what Fox was reporting.  And I am just pointing to

11   that as evidence that we had no control over what Butowsky did,

12   that he is a wholly independent actor and what he does, whether

13   it's tortious or not, does not reflect on Fox and cannot create

14   liability for Fox.

15         THE COURT:  Again, I am not sure that I accept the

16   proposition that this is simply a control issue.  I am not sure

17   that it cannot also simply be a knowledge and intent issue.

18         MR. TERRY:  Knowledge and intent, unless you are

19   talking about a conspiracy claim, is not enough to create a

20   tort.

21         THE COURT:  I am not sure.  If you and I decide that

22   we are going to inflict emotional distress on a certain

23   individual and I say, well, you know what, I am going to do X

24   and then you say to me, OK, well, I am going to do Y, and we

25   both go off and do those things, you can't argue that somehow

1    they can't make out the claim of intentional infliction of

2    emotional distress because I didn't control the thing that I

3    knew you were going to do in furtherance of our intent to

4    inflict emotional distress.

5         MR. TERRY:  There are three ways you can possibly hold

6    me liable for your action.  One would be if I do control you, I

7    guess you are my employee or vice-versa.  No. 2, through a

8    conspiracy theory, that we agreed to cause that end, which is

9    this situation you are describing there.  Or the third would be

10   an aiding and abetting, where I provided you substantial

11   assistance.

12        THE COURT:  Why isn't it aiding and abetting?

13        MR. TERRY:  Because there is no allegation that we

14   substantially assisted in any of that post publication.

15        THE COURT:  That's not true.  If we both agree that we

16   are going to inflict emotional distress by engaging in

17   outrageous conduct, why am I not aiding and abetting that

18   conduct by my going off and doing A and you going off and doing

19   B?  We are both aiding and abetting an intentional infliction

20   of emotional distress.  We don't have to do it, each one of

21   those acts ourselves, and we don't have to make the other

22   person do the act.  But we are both taking actions in

23   furtherance of our intent to inflict emotional distress and

24   with the knowledge that the other person is also going to

25   engage in acts to inflict emotional distress.

I6KMRIC0

1          I am not sure I accept your narrow view or argument

2     that it has got to be somehow controlled to have direct

3     liability for conduct that we all agree that we are going to

4     engage in.  That's like saying, if we decide that we are going

5     to commit an assault, and I decide I am going to hit somebody

6     with a baseball bat and you decide you are going to stab

7     somebody, and we go off and do it, that somehow I am less

8     culpable or there is no theory that I saw because I didn't stab

9     the person.  I only hit him with the baseball bat.

10          MR. TERRY:  Clearly you are liable for whacking him

11     with the bat.  You would also be liable under a conspiracy

12     theory.

13          THE COURT:  Could be liable on an aiding and abetting.

14          MR. TERRY:  Depends on what your aim was.

15          THE COURT:  I agree with you.  That's all I'm

16     concentrating on.  If our intent is to inflict emotional

17     distress, that's what's determinative, not who does the

18     individual act and not who controls the act that the other

19     people do.  If we leave the room saying, your task is to do X,

20     my task is to do Y, so and so's task is to do Z, it doesn't

21     matter that I don't control you.  We all have the same intent

22     and we all engaged in an overt act to further that intent and,

23     in doing so, that either individually or collectively inflicted

24     emotional distress.

25          MR. TERRY:  That's definitely a conspiracy you are

1    describing.  I think for you to have committed substantial

2    assistance such that you could be liable for an aiding and

3    abetting theory, going back to your baseball bat and knife

4    thing, the courts look to that.  They look to the conduct that

5    you are engaged in.  Did I substantially assist your conduct?

6           And the question would be, did I substantially assist

7    you with a knife or the baseball bat in some way, which would

8    be -- maybe my act was that I cornered the guy and let you do

9    it.  Maybe I gave you the knife.  But it has got to be

10   something that substantially assists the conduct because if you

11   have simply an agreement to cause a harm, but no activity in

12   support of that, the only theory of liability that could

13   support it would be a conspiracy theory.

14          I believe the reason why tort law draws that

15   distinction is the conspiracy theory requires the highest level

16   of intent because it doesn't necessarily require conduct by the

17   person who is being held liable associated with it.  For aiding

18   and abetting there is a lower level of intent, but there is

19   actual conduct required in furtherance of the misconduct.  I

20   would have had to have helped you in some way commit the

21   assault with the baseball bat, my independent tort of stabbing

22   the guy.

23          THE COURT:  I am not sure that is true.  I have to

24   help you assault the person.  I can understand your argument.

25   I have to have the intent and I have to do something to help

1  you assault the person.  I don't have to do something to help

2  you stab the person.  I don't think that's the specific

3  requirement.  If I do something that assists in the assault,

4  then I am liable for the assault.  The question isn't whether

5  I'm liable for the stabbing.

6         In this case the question isn't, am I liable for this

7  particular act that is part of the intentional infliction of

8  emotional distress.  The question is, did I assist you in

9  inflicting emotional distress.

10        MR. TERRY:  Again, I think under a conspiracy theory,

11  that would work if there was that specific agreement.  For

12  aiding and abetting you have to look to the conduct where there

13  is no control.  If we control Butowsky, we would be liable for

14  the things he did within the scope of our control.  If we have

15  an agreement with him to reach a certain end, we are liable for

16  what happens to cause that specific harm.

17        If we are talking about an aiding and abetting theory,

18  I think technically I am responsible for my assault with a

19  knife, you are responsible for your assault with the bat.  We

20  may have conspired, in which case there is also conspiracy

21  liability.  But unless I actually help you in some way with the

22  knife, I'm not also liable under an aiding and abetting theory

23  for that because it's two separate assaults.

24        THE COURT:  Suppose I give you the bat.

25        MR. TERRY:  That is clearly substantial assistance.

```
 1              THE COURT:  I understand that you say these
 2    circumstances are not the broader definition of either direct
 3    or vicarious or aiding and abetting and conspiracy liability,
 4    but clearly I don't have to help stab him, under your
 5    definition.  You could say, well, I am going to go stab him,
 6    but I don't have a knife.  And I'll say, here is a knife, go
 7    stab him with it.  I don't have to have control over you to be
 8    liable for the injury that occurs from that stabbing if my
 9    intent is the same intent that you had and my assistance was by
10    giving you the knife.
11              MR. TERRY:  I agree with that under a concerted action
12    theory you could still be liable.  So the question is, first of
13    all, can we be directly liable.
14              THE COURT:  Directly liable or on the concerted
15    action.
16              MR. TERRY:  Or under concerted action.  Concerted
17    action has additional requirements that are different for
18    control.  What I'm saying is, of the three ways which we could
19    potentially be liable, we are liable for none of them because,
20    A --
21              THE COURT:  When you say we, I am not quite sure who
22    you are referring to.
23              MR. TERRY:  We meaning Fox.  And I guess Ms. Zimmerman
24    as well.
25              THE COURT:  What you are addressing is that they have
```

1  not sufficiently, even if they were to have alleged

2  sufficiently a cause of action, I guess -- I am not sure how I

3  would splice Butowsky.

4       MR. TERRY:  At the highest level, take all of the

5  content of the complaint, attribute any of it you want to Fox.

6  None of that comes close to stating a claim for intentional

7  infliction of emotional distress.

8       THE COURT:  Because you are saying that the primary

9  actor is Wheeler.  Because of that?

10       MR. TERRY:  I'm saying, even if you attributed at a

11  high level, set aside vicarious liability and everything.

12       THE COURT:  I understand that.

13       MR. TERRY:  If you took all of the allegations and you

14  said, Fox is somehow liable for everything that anybody did

15  during the course of this scheme, none of that would add up to

16  a tort of intentional infliction of emotional distress.

17       THE COURT:  I understand now.  I just don't understand

18  why I need to be to go beyond that argument.

19       MR. TERRY:  I would be happy to stop at that argument.

20       THE COURT:  What is the theory that if somebody is

21  liable, then somebody else is not.  I am not sure who you want

22  me to --

23       MR. TERRY:  Sure.  My point is that let's look at what

24  Fox is actually alleged to have done.  Even if you were to

25  disagree with my constitutional arguments about why it is not

1    of and concerning the Rich family and therefore precluded, why

2    outrage as a full-on matter would be certified actionable.

3    Let's actually look at the conduct at issue.

4            First of all, all of the conduct added together

5    doesn't add up to intentional infliction.

6            THE COURT:  That argument I understand.

7            MR. TERRY:  Second, if you wanted to parse it and see

8    what Fox actually did as opposed to what we are being accused

9    of being liable for through concerted action or vicarious

10   liability, it is nothing other than routine news gathering.  It

11   is nothing other than publishing the story, talking to a

12   source, helping the source talk to another source, the

13   detective in the D.C. Police Department, and getting

14   information.  That's it.  That's news gathering.  That's not

15   tortious activity.

16           The conduct that they really, I believe, latch onto as

17   being part of the tort is Butowsky misrepresenting things to

18   the family, Wheeler misrepresenting things to the family.

19           My point is, we can't be liable for that.  Fox can't

20   be liable for that because there is neither control nor a

21   conspiracy to harm the Riches, nor is there substantial

22   assistance in those acts of wrongdoing, no substantial

23   assistance in lying to the Riches by either Wheeler or

24   Butowsky.

25           And if you were to think, well, maybe the story is not

1    outrageous, because it is about a matter of public concern and

2    can't be constitutionally found to be outrageous, and it's just

3    not outrageous to allege that somebody was the leaker within

4    the meaning of the New York common law definition of outrage,

5    maybe I should look to see if some of these other comments that

6    happened after by Mr. Butowsky are outrageous.  I don't think

7    they are.  I don't think any of them come close.  Even if they

8    were, none of them could be attributed to Fox.

9         They have a final theory of liability, which is

10   negligent supervision, that we failed to supervise Zimmerman.

11   There is a fundamental defect.  That's something you need in a

12   negligence supervision claim, which is totally lacking in the

13   complaint, which is an allegation that we were on notice that

14   she was likely to engage in this type of behavior.  There is no

15   allegation that Zimmerman has ever published --

16        THE COURT:  She was likely to engage --

17        MR. TERRY:  Tortious activity here, which is, I

18   suppose, writing a false story about somebody is the

19   allegation.  There is no indication she has ever done that.

20   There is no allegation that we should have known she had a

21   propensity for doing that.

22        If the allegation is that she somehow oversaw

23   misrepresentations being made to the Rich family or breaches of

24   the confidentiality agreement, there is no allegation at all

25   that we were on notice that she had a propensity to do that.

I6KMRICO

1          So there really is no theory of liability for which a

2     claim could proceed against Fox, and I think it's particularly

3     dangerous to let this claim proceed, given how New York courts

4     have treated intentional infliction claims in the past, as well

5     as the constitutional issues.

6          This would be the first case that I'm aware of, at

7     least since *Howell*, where a claim has been allowed to proceed

8     in New York courts based upon statements made about another,

9     and this is a particularly poor choice for doing that, given

10    the nature of the allegations and incredibly important public

11    concerns at issue.  Thank you.

12         THE COURT:  Who else wants to be heard?

13         You want to be heard before I hear from plaintiff?

14         MR. HARRISON:  I would.

15         THE COURT:  First we will take a short break.

16         (Recess)

17         THE COURT:  Yes, sir.

18         MR. HARRISON:  Good morning, your Honor, David

19    Harrison on behalf of Mr. Butowsky.  Good afternoon at this

20    point.

21         I don't want to rehash arguments that have already

22    been made by Fox.  Some of them relate to Mr. Butowsky, some of

23    them do not.  To the extent your Honor has any questions or

24    would like to focus the argument in any particular way with

25    respect to some of the substantive claims, please feel free to

I6KMRIC8

1  ask the questions.

2         I would like to focus my argument on jurisdiction for

3  now.  To the extent that your Honor wants to get into any of

4  the other issues, I would be happy to discuss them.

5         First, Mr. Butowsky is not subject to personal

6  jurisdiction of this Court or the intentional infliction of

7  emotional distress of two Nebraska plaintiffs or the tortious

8  interference of a Maryland contract.  Mr. Butowsky is a Texas

9  resident.  It is not clear from the allegations in the

10  complaint whether Mr. Butowsky ever set foot in New York, let

11  alone in connection with these claims.

12         As we noted in our reply, this is not a close case.

13  Plaintiffs' entire personal jurisdiction argument hangs on a

14  single e-mail from Butowsky to employees of Fox.  That lone

15  allegation quoting an e-mail to Fox producers after the article

16  in question was published does not remotely satisfy the

17  requirement of a transaction of business under the New York

18  long-arm statute.

19         Transaction of business under CPLR 302(A)(1) requires

20  plaintiffs to show purposeful conduct.  Mr. Butowsky sought out

21  or initiated contact with New York.  He solicited business in

22  New York.  He established a continuing relationship with New

23  York.  None of those things are present here.

24         They also must show that the transaction of business

25  has substantial connection to the claim itself.  By plaintiffs'

1        own admission, and we may disagree about this point, the

2        publication of the article is only a portion of the claim.

3                That single e-mail connecting Butowsky to New York by

4        way of the employer of its recipients is clearly not enough

5        under the New York long-arm statute.  We don't even know if the

6        people that received that e-mail were in New York at the time

7        that they got it.  We certainly don't know if Mr. Butowsky was

8        in New York at the time that it was sent.  All we know is that

9        Fox News was based in New York or is based in New York and

10       Mr. Butowsky sent an e-mail to employees of Fox News.

11               THE COURT:  It's unclear to me what the nature of the

12       relationship is between Butowsky and Fox News or their

13       connection or their communications with regard to any of the

14       relevant conduct.

15               MR. HARRISON:  Historically, Mr. Butowsky, and this

16       was provided in a declaration by the plaintiffs, had appeared

17       on Fox News over the course of a few years and, for the most

18       part, had been an unpaid contributor sharing knowledge and

19       expertise on certain financial information and the economy.

20               THE COURT:  Was this similar to Wheeler, some sort of

21       paid consultant or commentator?

22               MR. HARRISON:  It is not, no.  He was not a paid

23       consultant or commentator.  There was no agreement between

24       Mr. Butowsky and Fox News.  Any contributions that he had with

25       respect to Fox programming were unpaid and voluntary, many

times not in New York or had any connection to New York whatsoever.

THE COURT: That's why I'm still unclear about what you say the relationship is and what the nature of that contact was. Is there some reason for me to assume that the nature of that activity with Fox News takes place someplace other than New York?

MR. HARRISON: Yes, I think that's right. I do think that many of the appearances Ed Butowsky made on Fox News took place in other locations; for example, Dallas, Texas, where he lives.

THE COURT: As opposed to the studio in New York?

MR. HARRISON: Correct.

THE COURT: What is the nature of the frequency of his appearances? And you say these were uncompensated appearances on Fox News?

MR. HARRISON: That's correct and entirely unrelated to the claims in this case.

If I just might point out, there is no argument in the briefing and certainly not alleged in the complaint that there is a basis for general jurisdiction here. It's not alleged that Mr. Butowsky had any commercial or financial relationship with any New York entities. It's not alleged that he spent any prolonged period of time in New York.

THE COURT: I don't know what that means. Is he in

1   New York on Fox Business once a month, once a year, once a

2   week?

3            MR. HARRISON:  I don't believe he has been on Fox

4   Business or any Fox programming for several months, if not over

5   a year.  But his historical involvement or presence on Fox was

6   sporadic at best.  Over the course of several years he

7   certainly was a contributor.  He provided information regarding

8   his knowledge of the economy.  But he wasn't a permanent

9   Fixture.  He didn't host any shows.  He was an unpaid guest on

10  an occasional basis for certain of Fox News programming.

11           THE COURT:  I'm unclear about what is supposed to be

12  the nature of the relationship and communication with Fox or

13  Zimmerman regarding the Rich issue.

14           MR. HARRISON:  There are no allegations in the

15  complaint, but for one, regarding any communications or

16  involvement between Ed Butowsky and anyone from Fox News in New

17  York.  There are allegations --

18           THE COURT:  I am supposed to take from that what, that

19  they didn't occur?  Because I'm also trying to figure out not

20  only are you going to argue that there is a demonstration of

21  sufficient contacts with jurisdiction, but if not, then the

22  jurisdictional discovery would be appropriate to demonstrate,

23  in fact, that such a relationship exists.

24           MR. HARRISON:  To answer your first question, I think

25  you are to take from that that that didn't occur.  I think the

1    vast majority of the allegations in the complaint relate to

2    interactions with Malia Zimmerman and/or Rod Wheeler.  Malia

3    Zimmerman was a Fox reporter, but she was based in California.

4    There is no allegation in the complaint, as far as I'm aware,

5    that Malia Zimmerman was in New York at all.  Any interaction

6    that Ed Butowsky had that connected him to Fox News were with

7    Malia Zimmerman, but for this one e-mail that occurred after

8    the publication.

9        THE COURT:  Remind me what the e-mail, the substance

10   of the e-mail was.

11       MR. HARRISON:  The substance of the e-mail said

12   something to the effect of, I'm involved in putting this

13   together.  The takeaway of this article is that Seth Rich was

14   involved in the production of e-mails to WikiLeaks, something

15   to that effect.  It was a summary of the article that had

16   already been published, essentially.

17       THE COURT:  I guess the real question is, what am I

18   supposed to conclude with regard to the nature of the contacts

19   and activity other than somehow there was some fortuitous

20   connection between all these folks and entities with regard to

21   the Rich story?

22       MR. HARRISON:  I think the conclusion is that they

23   don't exist.  If I might just point to that very e-mail, Ed

24   Butowsky is making an introduction to people at Fox News.  They

25   claim that these are producers that were in New York.  We don't

1    know if they were in New York at the time they received the

2    e-mail or not, but they were employed by Fox News and Fox News

3    is headquartered there.  But he is introducing the fact that he

4    is involved.  They were not aware of his involvement prior to

5    that e-mail, I think, is the takeaway.

6         His interaction prior to the sending of that e-mail

7    was limited to communications with Malia Zimmerman and, of

8    course, Rod Wheeler.  Malia Zimmerman, who was employed by Fox

9    News as a reporter, she was based in California.  The contacts

10   that Ed Butowsky had with New York are nonexistent.

11        The incidental headquarters of Fox in New York, based

12   on New York law, is insufficient for personal jurisdiction.  We

13   cite cases in our briefing, many cases in New York where courts

14   have found that communications into the forum state are

15   insufficient in and of themselves to confer jurisdiction.

16        THE COURT:  Am I supposed to conclude that the

17   conversations that Butowsky had with the Riches and the

18   conversations that Butowsky had with Wheeler that form this

19   agreement that Wheeler would do an investigation for the Riches

20   that there was no involvement or contact with Zimmerman or Fox

21   News with regard to those issues during that period of time?

22        MR. HARRISON:  I don't think that's my point.  And I'm

23   not --

24        THE COURT:  Isn't that the important point?  When he

25   is engaged in communications with the Riches and makes a

1   decision that he is going to have them enter into an agreement

2   with Wheeler to do an investigation and he is going to fund

3   that investigation, I am trying to figure out what involvement

4   does Fox News and Zimmerman have in that that I should have to

5   assess with regard to his jurisdictional contacts?

6          MR. HARRISON:  I'm not aware of any involvement.  It's

7   certainly not alleged that they were involved in those

8   interactions.

9          My point is, if this lawsuit was in Texas, certainly

10  there would be an argument that Texas courts have personal

11  jurisdiction over Ed Butowsky.  If this lawsuit was in

12  Nebraska, maybe there would be an argument if there was

13  personal jurisdiction in Nebraska.

14         THE COURT:  It is unclear to me what Butowsky's

15  intention was.  What was going to be the end game, as they say?

16  What was this going to conclude once he got the idea that he

17  wanted to contact the Riches and contact Wheeler and put them

18  together and pay for Wheeler to do this investigation?  What

19  was this supposed to culminate into?

20         MR. HARRISON:  The complaint alleges that Mr. Butowsky

21  wanted to further a conspiracy theory.

22         THE COURT:  I know that's what the complaint alleges.

23  I assume that's not what you are representing to me was the

24  purpose.

25         MR. HARRISON:  Even if we were to assume that the

1    purpose was to --

2           THE COURT:  I'm not assuming anything.  I'm asking

3    you.  If you don't want to answer, you can say you don't want

4    to answer.  I am just trying to understand whether there is

5    some basis to further pursue the issue of jurisdiction if

6    further discovery would reveal the true contacts that are

7    somehow different than what is shown to the plaintiffs now and

8    somehow more significant than has been revealed to the Court.

9           MR. HARRISON:  Even if the intent was for there to be

10   ultimately a publication, nothing in the complaint supports

11   there being any contacts with regard to the publication of this

12   news article with New York.  Everything in the complaint

13   relates to communications or meetings and discussions outside

14   of New York, either from Dallas or in Washington, D.C.

15          THE COURT:  Again, you say everything in the

16   complaint.  I'm asking you about facts.

17          MR. HARRISON:  I am not, as I sit here, aware of

18   anything beyond what's in the complaint.  I am not aware of any

19   communications beyond what's alleged.

20          THE COURT:  Do you have an answer to what was supposed

21   to be the end game of the Butowsky putting the Riches together?

22   Did he anticipate that he was going to give that information to

23   Fox News and have Fox News publish it, whether he was going to

24   give it to law enforcement?  I'm not sure what --

25          MR. HARRISON:  I think my point is, even assuming the

16KMRIC0

1   worst, even assuming that his intent was to have this article

2   or an article published by Fox News in New York, at least with

3   respect to jurisdiction, that all happened outside of New York.

4   Any acts in furtherance of that occurring --

5        THE COURT:  I don't know that because I don't know

6   what communications he had with other individuals at Fox News

7   in New York in furtherance of this agreement.

8        MR. HARRISON:  We don't know.  We don't know that

9   question.

10       THE COURT:  I don't know.  Somebody knows.  When

11  lawyers say, I don't know, Judge, I usually say, the person

12  sitting right next to you, your client, knows.  That's what I'm

13  asking.  I'm not asking you.  I'm asking your client.  Your

14  client can't say you don't know.  You may not have asked him

15  the question, and they may not have volunteered that

16  information, but there is an answer out there.  I am just

17  trying --

18       MR. HARRISON:  The courts are clear that they do have

19  to make a *prima facie* case in order to get jurisdictional

20  discovery, and they have not made that case.  They have made

21  one allegation in support of personal jurisdiction, one, and

22  that occurred after the publication and it suggests by the

23  nature of the communication that there had been no prior

24  communications with New York.  There had only been

25  communications with Malia Zimmerman and Rod Wheeler.

1          Based on those facts, we could allow plaintiffs to go

2     on a fishing expedition, which I am sure they would like to do,

3     to try to find out what communications were had.  But they

4     still have to meet a certain standard and they have not met it.

5          THE COURT:  That's fine.  Thank you.

6          I will hear from plaintiff.

7          MS. GAIL:  May it please the Court, hello again.  I'm

8     Lenny Gail.  Along with Arun and Elisha we will be speaking on

9     behalf of the Riches.

10         Arun will respond to the defendants' legal challenges

11    to the specific causes of action for intentional infliction and

12    tortious interference.

13         And in accordance with your Honor's rule encouraging

14    courtroom advocacy by younger lawyers, Elisha is going to

15    address jurisdiction.

16         I will address three areas:  First, the scope of the

17    complaint's factual allegations; second, the very, very, very

18    early posture at which we find ourselves today.  This is a

19    12(b)(6).  This is not summary judgment, let alone JNOV; third,

20    the noncause of action issues in connection with vicarious

21    liability, aiding and abetting, conspiracy, and negligent

22    supervision.

23         First, let's talk about the scope of the allegations.

24    The defendants pretend as if Joel and Mary's complaint

25    singularly alleges the publication of a false article.  Don't

1   believe that for a second.  Don't believe that the complaint's

2   allegations are that narrow.  The complaint alleges far, far

3   more than the publication of a false article.

4         It's certainly true that Joel and Mary allege that Fox

5   intentionally published a false article about their deceased

6   son in May of 2016.  The article falsely stated that Seth had

7   leaked the DNC e-mails.  It made up direct confirmation from an

8   unnamed federal investigator and quoted that fictitious human

9   being and stating, quote, I have seen and read the e-mails

10  between Seth Rich and WikiLeaks.  And the article pretended

11  that this lie, this fiction, was confirmed by an investigator

12  independently conducted at the family's behest and retention,

13  Mr. Wheeler.  All of that is in the complaint.

14        But the complaint alleges far more than just that

15  false publication.  It alleges a multifaceted scheme and

16  conduct that began in at least December 2016, six months before

17  the article's publication, and it continues essentially through

18  today.

19        Your Honor, we have prepared a brief handout we have

20  given to counsel.  May I approach?

21        THE COURT:  Yes.

22        MS. GAIL:  These are four timelines covering different

23  time periods.  They include many of the complaint's

24  allegations.  They are in chronological order and we have given

25  you a citation to the complaint's paragraph.

1          The first page covers all the activity at issue from

2     the beginning until today and, as you can see here, visually,

3     the Riches have alleged a multifaceted scheme hatched and

4     executed by the defendants' conduct for at least a year and a

5     half.  You can see in this first page that the complaint

6     alleges the defendants' scheme began in December 2016, at

7     least.  We don't know what we don't know because we have not

8     had any discovery.  And it continued through the complaint's

9     filing in March of 2018 and even through today, as Fox

10    continues to roll with the lie on its website.

11         If I could ask the Court, please, to turn to the

12    second page, you can see here the early part of the scheme, the

13    early conduct included calculated efforts in December 2016,

14    January, February, and March 2017.  Those lies and deceptions

15    created from nothing a relationship of trust with Joel and

16    Mary, grieving parents of a deceased child.  The defendants'

17    scheme used Wheeler as a tool to manipulate the Riches.  They,

18    through Wheeler, gave access to Fox to law enforcement

19    officials and allowed Fox to confer false legitimacy on their

20    fictitious tale.

21         THE COURT:  Which one of these activities do you

22    characterize as the outrageous conduct?

23         MS. GAIL:  I will give you some examples.  I don't

24    want to be comprehensive because the complaint is long and

25    detailed.

1    THE COURT:  Give me something specific to latch onto

2    because, for example, Joel and Mary executed an agreement to

3    engage Wheeler.  I cannot find, as a matter of law, that that

4    in and of itself constitutes outrageous conduct.

5    MS. GAIL:  If that agreement was entered into through

6    duplicity and lies and with an intent to essentially get

7    information that would later be published, that would

8    constitute intentional infliction of emotional distress.

9    THE COURT:  That's not true because I have got to find

10   the outrageous conduct.  You can't simply say, because I drove

11   to the Riches' house, my driving to their house is part of the

12   outrageous conduct.  That's not the way it works.  You have to

13   tell me what is the specific conduct that I am supposed to rely

14   upon to say, it is clear that one can find that doing X was

15   outrageous.

16   You can't keep going and I can't keep going through

17   this and saying, OK, this item is outrageous if you latch it

18   onto something else.  You have to tell me which one of them

19   that I am latching it onto that makes it outrageous.  That's

20   why I give you the first example you give me.

21   No.  I can't accept, as a matter of law, that

22   executing an agreement to engage Wheeler is outrageous conduct.

23   That is not outrageous conduct.  Something else has got to be

24   outrageous conduct other than signing the agreement.

25   MS. GAIL:  Fair enough.

 1          THE COURT:  Give me -- you don't have to be

 2    exhaustive.  Give me some of the examples and some of the

 3    primary examples that you want me, consistent with the case

 4    law, to say this falls into the category of outrageous conduct.

 5          MS. GAIL:  I will, your Honor.  Let me take your

 6    example of me going somewhere.  You are saying going somewhere

 7    cannot be outrageous conduct.  Asking someone to go somewhere

 8    cannot be outrageous conduct, or at least I heard the Court

 9    implying that.

10          If I said to you that I would like you to go to the

11    temple because we are both people of faith and I want you to go

12    to the temple because I care about you and I want to give you a

13    benefit when you arrive at the temple, I want to help you find

14    your child's murderer.

15          THE COURT:  Why would that be outrageous conduct in

16    and of itself?

17          MS. GAIL:  It is duplicity.  It is a lie.  It is

18    deceit.

19          THE COURT:  Clearly, the case law does not say that a

20    lie and deceit is outrageous conduct.  There is no case that

21    says that.  That doesn't qualify in and of itself as outrageous

22    conduct.  If you say to me, well, they lied to the Riches in

23    invoking their religion in order to establish a relationship

24    with them, that in and of itself is not illegal; it's not in

25    and of itself outrageous conduct.  It may not be a nice thing,

66

16KMRICO

1     but it doesn't qualify by law as being outrageous conduct.

2          I need something more than that because if they did

3     that and then they followed through on everything that they

4     said that they were going to follow through on, then that would

5     be innocuous.  That would be irrelevant.

6          MS. GAIL:  But that wouldn't be this case.

7          THE COURT:  Tell me what makes this case a different

8     case, and it's not the fact that they invoked the synagogue in

9     order to establish the relationship.  I am not even sure what

10    the lie was you say that was in the context of the synagogue.

11         MS. GAIL:  Mr. Butowsky was using religion to curry a

12    relationship anew with people where he basically wanted to

13    develop a relationship to con them into hiring someone for a --

14         THE COURT:  What they wanted to do after that may

15    constitute outrageous conduct.  Invoking religion in order to

16    establish the relationship does not qualify as outrageous

17    conduct.

18         MS. GAIL:  Your Honor, let me just say, with all due

19    respect, if you slice up each thing that was done and

20    identified in isolation, there is always going to be an

21    argument that any one thing in isolation doesn't constitute

22    outrageous conduct.

23         THE COURT:  I understand that.  Also, as I always say

24    to the lawyers, there is another basic theory, that zero times

25    10 is still zero.

I6KMRIC8

1              MS. GAIL:  It's not zero.

2              THE COURT:  You have got to give me something that is

3    evidence of outrageous conduct and not just simply say, well,

4    these 10 things by themselves are not outrageous, but when I

5    put them all together, they become outrageous.  I need a

6    specific -- you say the outrageous conduct is that they did

7    what?

8              MS. GAIL:  They, under false pretenses, inserted a

9    plant into the Riches' lives and gave that person the legal

10   ability to get access to information.

11             THE COURT:  I am not sure what you are referring to.

12   You're talking about Wheeler?

13             MS. GAIL:  Wheeler has planted, essentially, with the

14   Riches.  Butowsky pays for Wheeler.  First, he cultivates them

15   through means that I think a jury is going to find outrageous,

16   given the end that he has in mind.

17             THE COURT:  You can't do that.  You can't define the

18   beginning as the end.  If you want to concentrate on the end,

19   that's one thing.  But currying favor with them, even currying

20   favor with them with a bad intent is not outrageous conduct.

21             What has to come is some outrageous conduct that

22   causes them some injury after that.  You can flavor it with

23   that.  You can say, well, let me tell you the circumstances

24   under which they did this bad thing.  You have to tell me what

25   is the bad thing that you are suing them for and the bad thing

I6KMRIC8

1   that you are suing them for is not in currying favor through

2   their synagogue.  That's not the bad thing that you are suing

3   them for.

4        What did Wheeler, Butowsky, or Zimmerman do that you

5   claim is the outrageous conduct that supports a finding that

6   they intentionally inflicted emotional distress?  Currying

7   favor with them through the synagogue does not inflict

8   emotional distress.  Give me something.  Give me the bad part

9   of that.

10       MS. GAIL:  The bad part is they got an agreement

11  through duplicity that resulted in, and they intended -- that's

12  why I keep going back -- and they intended the outcome of that

13  agreement to be access to information, the most intimate

14  information a family could have.  They appropriated the

15  family's relationship with the detectives in D.C. that never

16  would have talked to them but for the fact that they got --

17       THE COURT:  Why is this outrageous, to get them to

18  talk to the --

19       MS. GAIL:  Because they weren't doing the search for

20  truth.

21       THE COURT:  But the search for truth would have

22  involved them talking to law enforcement.

23       MS. GAIL:  Not a sham person involved talking to law

24  enforcement.  A real bona fide investigator that the Riches

25  never hired because they fell for the scheme.

1      THE COURT:  I'm not worried about, as you characterize

2 it, about the narrowness or the extent of the activities.  I'm

3 concentrating on specificity.  I need you to be very specific

4 as to what conduct you say is outrageous and how that

5 outrageous conduct resulted in their injuries.

6      What did Wheeler do?  Because you say, it all led up

7 to their agreement with Wheeler and that was a bad thing.  From

8 the day that they met them in the synagogue to the day that

9 they signed the agreement with Wheeler, none of that was

10 outrageous conduct, was it?

11     MS. GAIL:  It was outrageous in the sense that it took

12 the family's trust and allowed them to get access to

13 information that they never would have gotten.

14     THE COURT:  But the outrageous conduct would be

15 abusing that trust.

16     MS. GAIL:  Exactly.

17     THE COURT:  You have to tell me.  I understand that

18 argument.  I am not trying to make you give me an argument that

19 you are not trying to make.  I am trying to make you be

20 specific about it.  The outrageous conduct is not signing the

21 agreement.  The outrageous conduct is abusing that trust.  When

22 did the outrageous conduct occur?

23     MS. GAIL:  Using Wheeler's rights and the fact that he

24 represented the family, he and Butowsky and Zimmerman abused

25 the family's trust that they contractually got him to codify.

I6KMRICO

1    They abused it because their investigator wasn't an

2    investigator.  Instead of having someone out trying to find the

3    killer, they had somebody parroting a political agenda.

4         THE COURT:  What do you say Wheeler did that was

5    outrageous or what did they do?  Because I'm trying to figure

6    out -- even if I were to splice it, I understand where the

7    story begins with Butowsky.  But I am not sure how Butowsky's

8    relationship and how the relationship was established with the

9    Riches makes Zimmerman liable.

10        MS. GAIL:  Take a look at the second page.  On January

11   3, the exact same day that Butowsky contacts Joel, following up

12   in December and says, we met through Jeremy from your temple.

13   The very same day Zimmerman e-mails Joel and the Rich family

14   spokesman about Seth's murder.

15        THE COURT:  What's outrageous about that?  What's

16   outrageous about Zimmerman contacting the Riches as opposed to

17   anybody else contacting the Riches at that time about the

18   story?  What is outrageous about it?

19        MS. GAIL:  It's where it was going, Judge.  The whole

20   point --

21        THE COURT:  The outrageousness cannot be where it's

22   going.  The outrageousness has got to be where it is.  Tell me

23   where it got there.  You say where it's going.  When did it

24   turn into something that they did to the Riches that was

25   outrageous that caused them injury?  As of January 3, no one

1    had done anything to the Riches to cause them any injury, as of

2    January 3.

3         MS. GAIL:  The Riches did not know they were being --

4

5         THE COURT:  That's where I am trying to get you focus

6    me.  If you want me to latch onto something, give me something

7    to latch onto.  Because I cannot say, well, it's sort of their

8    intent and they had this in the back of their mind and they

9    were planning to do this.  No.

10        You have to tell me the same kind of examples I gave

11   them.  I'm not particularly interested in when somebody came up

12   with, first, the idea that they might rob a bank.  I want to

13   know when it is that they robbed the bank, and that's the

14   outrageous conduct.  What they had in mind does not constitute

15   outrageous conduct.  What they did would constitute outrageous

16   conduct.  Tell me where it is that they took some action that I

17   can trace to an injury.

18        MS. GAIL:  With all due respect, I think you can trace

19   what's going on in January to an injury.

20        THE COURT:  Wait a minute.  Butowsky contacts Joel by

21   e-mail saying, we met through Jeremy from your temple.  That

22   didn't cause any injury at that point in time.

23        MS. GAIL:  At that point in time, we agree.

24        THE COURT:  Caused no injury.  Zimmerman e-mailing

25   Joel and the Rich family spokesman about Seth's murder did not

1    at that time cause any injury.

2            MS. GAIL:  Exactly.

3            THE COURT:  What is it that happened after that that

4    you say is the outrageousness that caused the injury?

5            MS. GAIL:  Let me try and answer this way, your Honor.

6    The Riches learned they are duped.  The Riches feel emotional

7    distress.

8            THE COURT:  When?

9            MS. GAIL:  When the article is published.

10           THE COURT:  Let me go to that point.  Where is that on

11   your chart?

12           MS. GAIL:  That is on page 4.

13           THE COURT:  That's on page 4.  What date?

14           MS. GAIL:  May 16.

15           THE COURT:  Which one.

16           MS. GAIL:  That is when the Riches learned.

17           THE COURT:  Which one?

18           MS. GAIL:  It's all the stuff at the top.  The article

19   is published on the 16th.  There is allegations about --

20           THE COURT:  I'm sorry.  I have four different May 16

21   on that page.

22           MS. GAIL:  If you look at the very bottom, the yellow,

23   the article was up from the 16th to the 23rd.  They do the

24   retraction, nonretraction on the 23rd.

25           THE COURT:  Was there any injury that you're

I6JMRIC0

1    articulating that occurred before the publication of the

2    article?

3              MS. GAIL:  There was because the investigation was

4    obstructed.

5              THE COURT:  What was the injury that occurred to the

6    Riches prior to the article being published?

7              MS. GAIL:  They had emotional distress because their

8    son's murder was unsolved.

9              THE COURT:  That wasn't their fault.

10             MS. GAIL:  We allege it was.

11             THE COURT:  It is not solved today.

12             MS. GAIL:  One of the reasons it's unresolved today is

13   because there was no investigator that the family hired that

14   was put on it, and all of the leads that were coming in were

15   divided up between this false investigator and the police.

16             THE COURT:  Again, I am not following you.  You say

17   that the emotional distress that they suffered occurred on May

18   16, when Fox published the story.

19             MS. GAIL:  That's when they realized they were injured

20   by the outrageous conduct.  That's when they learned.  Then

21   they put together what had been done to them without their

22   knowing.

23             THE COURT:  The injury is emotional distress.

24             MS. GAIL:  Right.

25             THE COURT:  That's not the date they became aware of

1   the injury.  That has to be, at best, the date that the injury

2   occurred because you cannot have emotional distress and not

3   know it.

4         MS. GAIL:  I understand.

5         THE COURT:  They had no injury prior to May 16.

6         MS. GAIL:  But there was outrageous conduct before the

7   16th and that's where I think the Court and I are disagreeing.

8         THE COURT:  I am not disagreeing.  I am just trying to

9   find it.  You say the outrageous conduct that caused them

10  injury was the publication of the story on May 16.

11        MS. GAIL:  No.

12        THE COURT:  What is the outrageous conduct that caused

13  them injury?

14        MS. GAIL:  The outrageous conduct that led to the

15  article that was published on the 16th, all of that conduct

16  caused injury.

17        THE COURT:  Which one?

18        MS. GAIL:  The duplicity with the family.

19        THE COURT:  Where is that on your chart?  Where is the

20  duplicity?

21        MS. GAIL:  That is getting the agreement in place with

22  Wheeler.  That whole agreement is a sham.  It is entered into

23  under false pretenses and in outrageous terms.  These are

24  grieving parents.  Someone has come to them and said, I will

25  pay to help you find your son's murderer, and that was never

I6KMRICO

1    their agenda.  That is outflippingrageous, and the jury is

2    going to agree if your Honor let's them.

3            THE COURT:  It has got to be two things.  It has got

4    to be outrageous conduct, and I am not sure that there are a

5    lot of cases that simply say lying to somebody is outrageous

6    conduct.

7            MS. GAIL:  This is more than that, Judge.

8            THE COURT:  It has got to be more than that.  Two, it

9    has got to be outrageous conduct that results in injury and

10   that articulable injury, under your theory, must be the

11   suffering of emotional distress.  You say that they felt no

12   emotional distress until the article was published and the

13   article caused them emotional distress.  Why?

14           MS. GAIL:  Among other reasons, it was a fiction about

15   their child's culpability and it invoked them personally.  It

16   invoked them personally because they used Wheeler's

17   confirmation of the fiction and that's --

18           THE COURT:  They printed a false story?

19           MS. GAIL:  In several different ways.  And on top of

20   printing a false story, they kind of put the parents on the

21   hook for it.  They said, and this is even confirmed by the

22   parents' private investigator.  That never happened.

23           THE COURT:  That's part of the argument.

24           MS. GAIL:  Yes.

25           THE COURT:  You say on May 16 publishing what was a

I6JKMRIC0

1    false story about the parents and the son --

2              MS. GAIL:  Sure.

3              THE COURT:  -- is what caused the injury.

4              MS. GAIL:  And the conduct that led up to that caused

5    the injury.

6              THE COURT:  When you say the conduct that led up to

7    that, you can't be that vague.  Give me an example of the

8    conduct that led up to that that you are directly connecting to

9    the --

10             MS. GAIL:  Getting them to hire Wheeler.

11             THE COURT:  Getting them to hire Wheeler is, one, not

12   outrageous conduct; two, they didn't suffer any injury because

13   of that.  If Wheeler had done what they hired Wheeler to do, as

14   you say, there would have never been any injury.

15             MS. GAIL:  Your Honor, what I would like to do, if I

16   can, isolate a few more factual points, talk about these other

17   things, and let Arun deal with this.

18             It's important for us to know that it is conduct that

19   they learn of on the date of the publication, not entirely

20   because the publication is false.  They learn of implicity when

21   they read the publication and they see Wheeler quoted.  That's

22   unrelated to its falsity, though it happens to be contained in

23   a false article.

24             THE COURT:  You are saying their injury was that they

25   found out that they had been duped.

1          MS. GAIL:  That is one of the sources of their

2     horrible emotional distress, yes.

3          THE COURT:  What is the other source?

4          MS. GAIL:  That the story was false, that they had

5     been deprived the right of hiring an investigator to try to

6     solve their son's murder.

7          Let me if, I can, talk about the posture.  As the

8     Court well knows, we are on a 12(b)(6) here.  All of the

9     complaint's allegations are to be taken as true and reasonable

10    inferences drawn in our favor.

11         If you listen closely to what Mr. Terry was doing, a

12    lot of what he was doing was drawing inferences in Fox's favor,

13    and that is impermissible on a 12(b)(6).

14         Because the complaint contains details on certain

15    matters, it's easy for the Court to forget that it's this early

16    posture.  It's easy for us to forget the entirety of what Joel

17    and Mary do not know and cannot show at this stage and that's

18    because the evidence will demonstrate that the full nature and

19    extent of the defendants' scheme and conduct is within their

20    control.  The vast majority of the evidence is in their

21    custody, in their documents, in their text messages, and in

22    their testimony under oath.  We have not even begun the process

23    of getting that information, of learning all the conduct, of

24    learning the communications and coordination that went on.

25         THE COURT:  Your obligation is pretty straightforward.

1    You have got to allege conduct that caused them emotional

2    distress.  That's no secret.  That's not in their control.

3    That's what you know because you know what caused them

4    emotional distress.

5              MS. GAIL:  That's true.

6              THE COURT:  More so than they know what caused them

7    emotional distress.  The question is, which paragraphs of your

8    complaint support the outrageous conduct that you claim that

9    when that conduct was engaged in, you can see the direct line

10   of suffering by the plaintiffs.

11             MS. GAIL:  We have it and Arun will give you the exact

12   paragraph numbers that do that.

13             THE COURT:  I agree with you.  You are right.  The

14   burden is not to be shifted.  This isn't like you have a claim

15   that depends on something that they know about that you don't

16   know about.  Your claim is that your client suffered emotional

17   distress and they can only suffer emotional distress from

18   something that they know about.  You have to articulate that

19   when I found out X, I suffered emotional distress.  That's all

20   I'm looking for.  That's all I want to concentrate on.

21             MS. GAIL:  I'll give you an example and then we will

22   proceed with that in a few minutes.

23             One example of what caused the client's emotional

24   distress is that Fox said they were underdoing an investigation

25   of what editorial policies were violated.  We have no idea

16KMRico

 1   whether they did anything.  It appears they did nothing.  They

 2   published nothing.  That's just one example.

 3         THE COURT:  How did that cause them emotional distress

 4   and how is that outrageous conduct?

 5         MS. GAIL:  It's outrageous for you to say, look, oops,

 6   I am going to do an investigation and not actually fulfill what

 7   you said you were going to do.

 8         THE COURT:  I am not sure I know any case that puts

 9   that on the level of outrageous conduct.  What you are saying

10   is, it's outrageous conduct to be lied to.  It has got to be

11   more than that.  You agree?

12         MS. GAIL:  It has to be more than being lied to.  I

13   think the difficulty, with all due respect, you're slicing each

14   individual aspect of what Fox did or didn't do.

15         THE COURT:  I am not.  But I am not going to let you

16   simply say, well, I just want to throw in a whole bunch of

17   stuff in a suit and call it outrageous conduct.

18         MS. GAIL:  I understand that.

19         THE COURT:  You can't do that.  You have to be able to

20   be specific about it because the outrageous conduct has got to

21   be what they reacted to.

22         MS. GAIL:  What caused the emotional distress.

23         THE COURT:  What caused the emotional distress.  It

24   can't be that what caused the emotional distress is that they

25   had some secret meeting 10 months ago in which they said they

1    are going to do the Riches, because they didn't know about

2    that.  They didn't find out about that.

3            Even now you say you want to find out about that

4    discovery.  But you can find out about that in terms of

5    establishing evidence to further their intent, but it can't

6    cause emotional distress if they don't know about it.

7            MS. GAIL:  Your Honor, I am saying there are other

8    aspects of the conduct that address things like agency or

9    vicarious liability and conspiracy in aiding and abetting that

10   discovery will give us.  That's all I'm saying.  I agree with

11   the Court, and I am going to turn it over to Arun now to just

12   answer these questions.

13           THE COURT:  Let me just ask you one more question

14   because we might be able to save time.  Why isn't your other

15   causes of action under your theory of aiding and abetting and

16   conspiracy, why aren't they duplicative of your intentional

17   infliction of emotional distress, first cause of action?  How

18   is that different?

19           MS. GAIL:  They are unnecessary if we prove Fox's

20   liability directly, as the Court was making clear.

21           In the unlikely event that the Court thinks otherwise,

22   we also can put Fox on the hook for having substantially

23   assisted through aiding and abetting and through conspiring

24   with Butowsky and Wheeler and for negligently supervising --

25           THE COURT:  You think there is some theory on these

1    facts where you can fail on Count One and prevail on Count Two

2    or Three?

3         MS. GAIL:  I think it's unlikely, Judge, but we are

4    before we have done any discovery, so I don't know whether they

5    are going to take the position that someone was outside of

6    scope of their employment, or something like that.

7         THE COURT:  I just don't understand the different

8    theory of how Zimmerman could possibly not be liable for Count

9    One but, instead, be liable for Count Two or Count Three.

10        MS. GAIL:  We can agree with that.  If Zimmerman is

11   liable for Count One, the other ones are necessary.

12        THE COURT:  If Zimmerman is not liable for Count One,

13   how is Zimmerman going to believe liable for Count Two or

14   Three?

15        MS. GAIL:  Because she could have aided and abetted

16   other people's direct violations.  She could have substantially

17   assisted something --

18        THE COURT:  Why isn't that subsumed under Count One?

19        MS. GAIL:  Because there is an added element of -- she

20   doesn't have to have done the act.  The person in the

21   conspiracy to rob the bank doesn't have to be the shooter.

22        THE COURT:  That's true.  But they still are guilty of

23   bank robbery.

24        MS. GAIL:  Not if they were at home and weren't

25   involved in the actual robbery.  They just bought the getaway

1   car and then delivered it.  If you could prove that they bought

2   the getaway car to do it, you would have a substantial

3   assistance or aiding and abetting.

4            THE COURT:  Give me an example of what a theory would

5   be that Zimmerman -- let me put the easiest one to rest.  What

6   possible theory could you have against Fox News as an entity

7   that would make a distinction between Fox News as an entity not

8   being liable under Count One, but being liable under Two or

9   Three.

10           MS. GAIL:  It's what I alluded to.  If Fox took the

11  position, which I hope they don't, that Zimmerman was somehow

12  acting outside the scope of her responsibility --

13           THE COURT:  That's Zimmerman's liability.  That's not

14  Fox's independent liability.  You have Fox as directly liable

15  under Count One.

16           MS. GAIL:  We have pleaded it and we will prove that.

17  What I'm saying is, you can envision a world where having

18  proven that Fox's liability is because of its employee, because

19  of Zimmerman, Fox takes the position, we are not responsible

20  for Zimmerman's actions because she was outside the scope of

21  her employment.  And in that world we can get Fox's culpability

22  for Zimmerman's acts through aiding and abetting, through

23  conspiracy, and through negligent supervision.  That's

24  literally what we are after, your Honor.

25           THE COURT:  What is your conspiracy theory?  What is

I6JXMRIC0

1    the conspiracy between Zimmerman and Fox that you're alleging?

2         MS. GAIL:  We don't believe --

3         THE COURT:  What is your factual allegations to

4    support a conspiracy?

5         MS. GAIL:  She coordinated with her Fox --

6         THE COURT:  With who?

7         MS. GAIL:  We don't have any names.

8         THE COURT:  What basis do you have to say she

9    coordinated with someone if you don't know that she coordinated

10   with a person?

11        MS. GAIL:  She references what her Fox producers know

12   about or are interested in.  She tells Wheeler, for example, my

13   Fox producers are going to be disappointed if you do X.  That

14   is an inference that she has coordinated or following the

15   directions of her producers, that they know what she is doing.

16        THE COURT:  Why wouldn't that make them liable under

17   Count One?

18        MS. GAIL:  I think it would, Judge.

19        THE COURT:  I am just trying to understand.  It's

20   difficult for me to understand how on these facts they can be

21   found not liable on Count One under your theory but liable on

22   Count Two.

23        MS. GAIL:  I think it is horribly unlikely.  I have

24   given you the one scenario that I know I had in mind.

25        THE COURT:  I have a board of judges meeting at 1:00,

1    so we are going to have to continue this afternoon.  Let's

2    start, we will go a few minutes, and we will continue at 2:15.

3    I'll give you a full opportunity.

4         MR. SUBRAMANIAN:  Your Honor, I want to start with the

5    question you had on the facts.  I agree with Mr. Gail that a

6    lot of the questions that we have been raising today are

7    factual questions in the absence of a full record.

8         But I do want to go to your point, where are the

9    allegations, because you make a good point.  You say, look,

10   intentional infliction of emotional distress.  When is that

11   emotional distress suffered?  At what point does that start?

12   You are absolutely right.  It's when the whole scheme is

13   revealed to the Riches.

14        That happens when the articles are published because

15   in those articles they are premised on the fact that Rod

16   Wheeler is a Fox contributor, but also was serving as the

17   Rich's private investigator.

18        That's when the Riches understand that the guy that

19   they hired that Ed Butowsky brought to them saying, hey, we are

20   both Jewish, you should trust me, I am trying to help you find

21   closure by actually pushing someone forward to investigate and

22   find the murderer that that was all a lie.

23        When Mr. Gail said it's the whole course of conduct,

24   just to put a fine point on it, the injury is suffered in May

25   of 2017, but that's when they realized all of these things that

16KMRIC8

happened in the preceding months, it was all a sham.  Your

Honor, it's something that I would regard as outrageous, I

believe a member of the jury can find to be outrageous, but we

are not even at that stage.  We are at the complaint stage.

So in terms of the injury, you are right, it starts in

May of 2017, because that's when the articles were published,

that's when they realized what happened.  But doesn't mean you

blind yourself to the conduct --

THE COURT:  They realized what happened.  What did

they realize?  How do you articulate --

MR. SUBRAMANIAN:  I know you have that long timeline.

Let's be a little bit concise about it.

In December of 2016, that's when Ed Butowsky first

reaches out to Joel Rich, to say, hey, we are members of the

Jewish community.  We should talk.

It is coincidental that the agreement, the Fox

contributor agreement with Mr. Wheeler that is in the record,

it's Exhibit 11 to the Terry declaration, is dated December

2016.  I think that the discovery is going to show in this case

that that is when the scheme was hatched.  Rod Wheeler was

going to be planted within the Rich family to turn fiction into

fact for this story.  That's the first kind of concrete, if you

want to kind of say, here is a point in time.  December 2016.

Then fast forward to February of 2017.  That's when

Butowsky, on the same day as having a meeting with Malia

16KMRICO

1 Zimmerman and Rod Wheeler, so they are all just sitting there

2 talking.  That's the conspiracy, that's the aiding and

3 abetting.  That's the genesis of this scheme.

4       THE COURT:  I'm sorry.  Who was involved in this

5 conspiracy at this point?

6       MR. SUBRAMANIAN:  Butowsky, Zimmerman, and Wheeler are

7 meeting in February of 2017.  That's alleged in our complaint.

8 It's at paragraph --

9       THE COURT:  Which date is that on your timeline?

10       MR. SUBRAMANIAN:  It should be February 2017.  I can

11 give you the particular paragraph numbers.

12       THE COURT:  Do you have a date?

13       MR. SUBRAMANIAN:  February 23, 2017.

14       THE COURT:  2017.

15       What page is that on?

16       MR. SUBRAMANIAN:  Paragraph 34 of the complaint.

17 That's when Butowsky sends Wheeler a text message and says, I'm

18 working on this article and says I'm working with Malia

19 Zimmerman at Fox News on an article regarding Seth -- that's

20 the following paragraph, 35 -- and that he wants to enlist

21 Wheeler to conduct an investigation into Seth's murder.

22       THE COURT:  Again, you are not saying that that's

23 outrageous conduct.  You are saying that that evidences some

24 outrageous conduct.

25       MR. SUBRAMANIAN:  I want to connect this to the case

16KMRIC0

1    law because your Honor asked about the case law.  And what the

2    cases say is you look at the totality of the circumstances and

3    many of the cases where IIED liability is found say, is there a

4    campaign at work.  Was there a campaign that was targeted

5    against the plaintiffs in the case?  And if you can show that

6    there was a campaign, that can rise to the level of outrageous

7    conduct.

8            When you were engaging in the colloquy about whether,

9    well, if you just lie to someone, would that be outrageous

10   conduct, you are probably right that that by itself wouldn't be

11   outrageous conduct.  If that's all we had in this case, we

12   probably would not be here.

13           THE COURT:  Summarize for me or point me in the

14   complaint where the outrageous conduct is articulated.  What do

15   you claim is the outrageous conduct?

16           MR. SUBRAMANIAN:  I can give you by dates first and

17   then --

18           THE COURT:  I need you to summarize it in a sentence.

19           MR. SUBRAMANIAN:  In a sentence, it is planting Rod

20   Wheeler as a fictitious private investigator to work for the

21   Riches when he is a Fox contributor whose only purpose is to

22   manufacture a story that Mary and Joel Rich's son, Seth Rich,

23   who just recently died, was responsible for treason.

24           THE COURT:  Is there a place in this complaint where

25   it is articulated that way?

```
1              MR. SUBRAMANIAN:  I believe so.

2              THE COURT:  Is there a paragraph that articulates it?

3              MR. SUBRAMANIAN:  I believe so.  I think the initial

4    introductory paragraphs, if you look at paragraphs 1 through 6

5    of the complaint, that gives the overview summary of what we

6    believe to be the outrageous conduct.

7              THE COURT:  Can you quote a line that will sound

8    outrageous?

9              MR. SUBRAMANIAN:  Sure.

10             THE COURT:  Which paragraph?

11             MR. SUBRAMANIAN:  Paragraph 3.

12             THE COURT:  Which language?

13             MR. SUBRAMANIAN:  If you look at paragraph 2,

14   paragraph 2 says:  The defendants induced Joel and Mary, Seth

15   Rich's parents, to hire Rod Wheeler, a purportedly independent

16   investigator, to help quote/unquote solve your son's murder.

17             THE COURT:  You say paragraph 2.

18             MR. SUBRAMANIAN:  Paragraph 3.  I'm sorry.

19             THE COURT:  Which sentence?

20             MR. SUBRAMANIAN:  Sentence 2 in paragraph 3.

21             THE COURT:  Read that for me one more time.

22             MR. SUBRAMANIAN:  Defendants induced Joel and Mary,

23   Seth Rich's parents.

24             THE COURT:  Do you have an amended complaint or

25   complaint?
```

1            MR. SUBRAMANIAN:  There is only one complaint.

2            THE COURT:  I don't see the paragraph 3.

3            MR. SUBRAMANIAN:  Your Honor, may I approach.  I can

4    hand you a copy.

5            THE COURT:  I'll show you what I have and then we will

6    take a break.

7            Am I looking at the right document?

8            MR. SUBRAMANIAN:  That's the right one.

9            THE COURT:  Just mark where you read from.  Which

10   paragraph are you marking?

11           MR. SUBRAMANIAN:  Paragraph 3 for the record.

12           THE COURT:  Hand me that back again and just read that

13   back to me again, and then let's take a break.

14           MR. SUBRAMANIAN:  Your Honor, just for the record --

15           THE COURT:  I think you were paraphrasing it.

16           MR. SUBRAMANIAN:  I inserted words, just for clarity.

17           THE COURT:  Read it word for word.

18           MR. SUBRAMANIAN:  Paragraph 3, sentence 2.  They

19   induced Joel and Mary, his parents, to hire Rod Wheeler, a

20   purportedly independent investigator.

21           Moving to the second page, help solve their son's

22   murder.  Defendants worked with Wheeler to pursue and develop a

23   fiction that Seth had leaked thousands of DNC e-mails to

24   WikiLeaks and they published, republished, and publicized the

25   sham story which they knew would be covered again and again and

6KMRico

 1   republished here and around the world, painting Joel and Mary's

 2   son as a criminal and a traitor to the United States.

 3          THE COURT:  Let's take a lunch break.  Let's say 2:20

 4   and we will continue at that time.

 5          (Luncheon recess)

 6          MR. SUBRAMANIAN:  Good afternoon, your Honor.

 7          THE COURT:  Good afternoon.

 8          MR. SUBRAMANIAN:  May I proceed with argument?

 9          THE COURT:  Sure.

10          MR. SUBRAMANIAN:  Where we last left we were talking

11   about some particular allegations of the complaint that you can

12   look at to really nail down what the outrageous conduct was.

13          I have pointed to paragraph 3 of the complaint.  I

14   just wanted to give you two additional paragraphs to look at,

15   which are paragraph 4, which is a paragraph right after 3, that

16   says:  Defendants also intentionally made it appear that Joel

17   and Mary were involved in and confirmed the substance of this

18   smear campaign.

19          THE COURT:  And what activity or conduct is that

20   referring to?

21          MR. SUBRAMANIAN:  For that we turn to paragraph 136,

22   which puts a finer point on it.  This is a list of the things

23   that we believe are outrageous, but I want to focus the Court

24   on paragraph C.  And paragraph C says:  Butowsky and Wheeler

25   induced Joel and Mary, by false and misleading statements, and

I6KMRIC0

1    by omissions, to unwittingly participate in the defendants'

2    scheme by contracting with Wheeler to help solve their son's

3    murder and to implicate themselves as parents who had

4    commissioned Wheeler, inferring that they were involved in

5    establishing the fictitious facts of defendants' scheme and

6    sham story.

7         THE COURT:  I am not sure I understand what that

8    means.  If I hire someone to build a house and the house falls

9    down, how am I complicit in building a bad house.

10        MR. SUBRAMANIAN:  I think that's a different example.

11   What happens here is that the defendants in this case, all of

12   them, not just one particular one, have to do some alchemy.

13   They have to turn a conspiracy theory, fiction, into fact.  And

14   the way they decide they want to do this is by planting an

15   investigator with the Riches who, by virtue of his position as

16   a spokesman and representative of the family, has insider

17   access.  And that's why in the three articles that they publish

18   they say Rod Wheeler, an investigator for the family, confirms

19   that Seth Rich sent these e-mails.

20        THE COURT:  I don't understand how that implicates the

21   Riches.  The Riches hired him to do an investigation.  They

22   didn't do the investigation personally.  They have no idea

23   whether the investigation is conducted appropriately or not.

24   They have just hired this person who has come up with results.

25        MR. SUBRAMANIAN:  Because the way that it's actually

1  portrayed is that well, look, the parents' own investigator has

2  said this, so it must be true.

3      THE COURT:  No.  I don't understand that.  Why would

4  that be so?  It's just the opposite.  What you are saying is

5  the parents hired this person thinking this person was going to

6  do a good job, and the person duped them.  In what way does one

7  assume that they hired someone to do a fake story to defame

8  their son?  That doesn't make any sense.  They would never

9  participate in that.  No one would assume that they would do

10  that.

11      MR. SUBRAMANIAN:  Your Honor, I couldn't agree more

12  that no one would ever do that.

13      THE COURT:  How is that the outrageous conduct that

14  they did something to imply that the Riches gave their good

15  housekeeping seal of approval to the conclusions of Wheeler

16  simply because they hired Wheeler?  You say that they hired

17  Wheeler and they were duped.

18      The conclusion you want to draw in that regard is the

19  least likely conclusion, that the Riches would hire somebody

20  who is going to do a fake story that is going to be damaging to

21  them and going to defame their son.  That's not a logical

22  conclusion.  Isn't that what that paragraph says?

23      MR. SUBRAMANIAN:  What that paragraph says, this is

24  what the defendants were trying to do.  The way that they were

25  portraying Rod Wheeler in the stories was that he was a

I6KMRIC0

1    representative of the family.  He was their investigator.

2          THE COURT:  But that's true.  That's true.  They did

3    hire him and he was their representative.  It's just that you

4    claim he didn't do what he was hired to do.

5          MR. SUBRAMANIAN:  He was planted there to manufacture

6    the story.  If you assume --

7          THE COURT:  How could the damage be damage that you

8    attribute to somehow they were damaged by the public believing

9    that they set themselves up?  I don't understand that theory.

10          MR. SUBRAMANIAN:  I think the question to ask is,

11    would it be outrageous to use the grieving parents of someone

12    who has been killed as the pawns, as the instruments in

13    implicating their son of a high crime?

14          THE COURT:  I understand that theory in general, but

15    that's not the language you just read to me.  The language you

16    just read to me, you are saying, what they did that was

17    outrageous is to make people think that somehow the Riches were

18    complicit in their own demise, right?  That's not a reasonable

19    conclusion for anybody to draw, that they would be complicit in

20    trying to make themselves and their own son look bad.  That

21    couldn't be the outrageous conduct that caused their injury.

22          MR. SUBRAMANIAN:  No one could ever believe that.

23          THE COURT:  Isn't that what you say?

24          MR. SUBRAMANIAN:  Because no parent would ever say

25    that.

                          16KMRICO

 1              THE COURT:  But you say that that's what occurred.

 2              MR. SUBRAMANIAN:  That's one of the things that's

 3     here.

 4              THE COURT:  I am just saying, as one of the things

 5     that's here, that doesn't make any sense as a factual or a

 6     reasonable consequence of their claim.

 7              MR. SUBRAMANIAN:  Your Honor, I hear you on that.  I

 8     think just feeding off what you said, you had indicated I get

 9     you the fact that they were using the parents as pawns or

10     instruments of what they were doing, that I could understand,

11     and that's what's alleged if look up two paragraphs in 136A.

12              THE COURT:  That's a different allegation.  That's a

13     different allegation.  The allegation that you just read to me,

14     the most reasonable conclusion to draw is they were duped by an

15     unscrupulous investigator, not that they were complicit in the

16     story that they claim is not true, and they claim they had no

17     idea that he was going to say those things, and no one would

18     reasonably believe that they would be part of a scheme to put

19     out this story about their son simply because they hired

20     Wheeler.  At worst, they were foolish, as they say, if there is

21     going to be some bad consequence or some public scorn with

22     regard to their involvement.  It wouldn't be that they

23     intentionally tried to get him to write a bad story about them

24     and their family member, but they were in fact duped.

25              MR. SUBRAMANIAN:  I understand that and I don't want

16KMRIC0

1    to fight what your Honor is saying.  I think that that's right.

2    I think that that underscores the outrageousness.  But as we

3    point out, the point about using the parents as pawns and

4    instruments, I think a reasonable juror could find that to be

5    outrageous.

6            THE COURT:  They would use these pawns because --

7            MR. SUBRAMANIAN:  Because, again, the only reason that

8    this story gets published, just to be clear about it, there

9    have been -- and the defendants actually make this point.  The

10   Seth Rich conspiracy theory was out there, but Fox needed to

11   turn fiction into fact.  They needed a way to say that not only

12   is this a conspiracy theory, it's true, and that's why they do

13   this.  That is why, starting in December of 2016, they engage

14   in this scheme to have Wheeler hired by the Riches.  And hell

15   or high water, Rod Wheeler was going to deliver quotes for

16   articles that would say, I have found the evidence that Seth

17   Rich sent these e-mails.

18           THE COURT:  I am still trying to understand whether or

19   not what you claim is the outrageous conduct that caused their

20   injury was the hiring of Wheeler or the content of the

21   published article.

22           MR. SUBRAMANIAN:  It is both, but it's primarily what

23   happens before the article because that is the reason why the

24   article is published at all.

25           Just to be very clear, your Honor, imagine another

I6JMRIC9

1    world, the alternative world where all we have is an article

2    about Seth Rich, that that's all that the defendants did, that

3    there was no scheme before the article.  There is no Rod

4    Wheeler, who says he's an investigator for the family.  There

5    is just an article about Seth Rich.  I don't think we are here

6    in front of you, your Honor.

7         THE COURT:  Regardless of what that article said.

8         MR. SUBRAMANIAN:  Right.

9         THE COURT:  How can that be the basis, an alternative

10   basis for your lawsuit?

11        MR. SUBRAMANIAN:  It's not an alternative basis.

12        THE COURT:  You just said that if somebody else who

13   wasn't hired by the Riches had made these same statements you

14   wouldn't have a claim.

15        MR. SUBRAMANIAN:  It goes straight to what the law

16   says.  The law says, and I want to turn to the law because we

17   have been talking a lot about the facts without actually

18   discussing what the cases have said about intentional

19   infliction of emotional distress.

20        What they say is, speech alone may be one basis for a

21   claim, but you have to look at the totality of the

22   circumstances.  You can't take out the actual article from what

23   we are talking about because the conduct of the defendants that

24   preceded that article is what caused the article to be printed.

25        You can't say, well, look, if I just think about what

1    happened on one day and then forget about everything else, even

2    if it was a coordinated campaign, then I don't think that's

3    outrageous, so I am just going to X it out and then move on to

4    the next day.  That's not how the analysis works in these

5    cases.  It's precisely why this is a fact-based question that

6    really should go to summary judgment when we have all the facts

7    in the record.

8            But what the courts do is to look at the totality of

9    the facts.

10           THE COURT:  What point does it become outrageous

11   conduct?  What takes it from the area of bad behavior,

12   negligent behavior, common behavior?  When it gets to this

13   point all of it becomes outrageous conduct.  What on your

14   chart?  At what point does it become outrageous conduct?

15           MR. SUBRAMANIAN:  Do you mean in terms of the facts of

16   this case or in terms of the law?

17           THE COURT:  In terms of the facts of this case.

18           MR. SUBRAMANIAN:  I think that at the point that the

19   defendants conspired to have Wheeler hired for the purpose of

20   the article, that renders their conduct outrageous, at the very

21   least, and we have obviously alleged more than that.

22           But I think that, your Honor, what I directed you to

23   in paragraphs 3 and 4, if you look at those two paragraphs

24   together and you think about the idea that they were using the

25   parents as pawns --

1          THE COURT:  What's the most representative paragraph

2     that lays that out?

3          MR. SUBRAMANIAN:  I told you about paragraphs 3 and 4.

4     The portion of the complaint that actually walks through what

5     we believe to be outrageous conduct is paragraph 136 and there

6     are several itemized subheadings there that walk through the

7     conduct.  I know your Honor was looking for one sentence as

8     opposed to kind of a list of items.  I want to get to the law

9     because I think that, in fairness, what the law requires the

10    Court to do is to actually look at the totality of the facts.

11         THE COURT:  You don't cite me a case, nor do I know of

12    a case that has a list of 20 items that they say constitute

13    collectively the outrageous conduct.  Most cases can clearly

14    specifically articulate what kind of and what actual conduct by

15    the defendant is the outrageous conduct.

16         MR. SUBRAMANIAN:  Absolutely.

17         THE COURT:  I usually don't have to add up 20 things

18    to figure out if the first 10 are the outrageous conduct or it

19    has got to be 19 of the 20 or it's got to be all 20.

20         MR. SUBRAMANIAN:  Your Honor, we think that the

21    defendants failed a lot here, but you don't have to add up all

22    of those allegations in this case.  I can make it really easy

23    for you because it's in paragraph 3 and 4.  The defendants

24    conspired to have Wheeler planted with the Riches so that he

25    could be a mouthpiece for this false story, which is

1    subsequently published, and falsely accuses Seth Rich of being

2    the source of the WikiLeaks.  It's that sentence, your Honor.

3              THE COURT:  Is there any allegation in this complaint

4    or any reason to conclude that Zimmerman and Butowsky had a

5    conversation about the Riches hiring Wheeler before Wheeler was

6    hired?

7              MR. SUBRAMANIAN:  Yes, your Honor.

8              THE COURT:  What is that information and belief?

9    Because I'm not aware of a particular fact in this whole

10   scenario that puts Zimmerman and Butowsky together prior to the

11   Riches hiring Wheeler.

12             MR. SUBRAMANIAN:  That's not true, your Honor.

13             THE COURT:  That's what I'm asking.

14             MR. SUBRAMANIAN:  Absolutely.  I will help you with

15   that.

16             THE COURT:  Is there such an allegation in this

17   complaint?

18             MR. SUBRAMANIAN:  Yes, your Honor.  If we turn to page

19   5 of the complaint, because the complaint is told in a kind of

20   chronological format.  Part 4 is entitled Butowsky and Fox's

21   Zimmerman seek out Joel and Mary to mainstream the sham story.

22             THE COURT:  Where does it say that Zimmerman had

23   something to do with it?

24             MR. SUBRAMANIAN:  If you turn into page 7, that's the

25   right section.  If you looked at that section after the

1    hearing, you would see kind of all the allegations.

2           Turn to page 7.  Then you see at paragraph 35 that on

3    February 23, 2017, we know that date because of the preceding

4    paragraph, Wheeler has described that he called Butowsky and

5    that Butowsky stated that he was working with Zimmerman at Fox

6    News on an article regarding Seth and that he wanted to enlist

7    Wheeler to conduct an investigation into Seth's murder.

8           You see the next paragraph, 36.  On information and

9    belief, Butowsky, Fox's Zimmerman, and Fox News sought to

10   engage Wheeler to help advance and further publicize the sham

11   story that Seth was responsible for giving the DNC e-mails to

12   WikiLeaks.

13          THE COURT:  Except that that group pleading is an

14   insufficient pleading with regard to any individual defendant.

15   That's the same as saying defendants.  You don't tell me who

16   did what.

17          MR. SUBRAMANIAN:  It goes on.  Paragraph 37.

18          THE COURT:  It may go on, but I am not sure what 36 is

19   supposed to be referring to.  Is 36 only referring to 37 or is

20   there some of that activity that you are trying --

21          MR. SUBRAMANIAN:  I am going to give you

22   individualized noninformation and belief paragraphs.

23          THE COURT:  I am trying to figure out what you are

24   referring to and who you are referring to in 36.

25          MR. SUBRAMANIAN:  36 says that Butowsky Fox's

1    Zimmerman and Fox News sought to engage Wheeler.

2              THE COURT:  What does that mean?

3              MR. SUBRAMANIAN:  That they conspired.  They were

4    talking together to engage Wheeler.

5              THE COURT:  What facts are you referring to to base

6    that conclusion on?

7              MR. SUBRAMANIAN:  I think at this stage we don't have

8    discovery.

9              THE COURT:  I am not asking about discovery.  Are you

10   saying that you think that there was a meeting?  How do you

11   seek to engage Wheeler?  Who did what to seek to engage

12   Wheeler?  That's all I'm asking.

13             MR. SUBRAMANIAN:  I want to get off this paragraph.

14             THE COURT:  You took me to that paragraph, so I want

15   to understand it.

16             MR. SUBRAMANIAN:  I think before we have discovery,

17   the rule in the Second Circuit is very clear that you can plead

18   on information and belief allegations --

19             THE COURT:  If you have a basis for the information

20   and belief, and you can't group plead.  If you want to say, on

21   information and belief, a little birdie told me they had a

22   meeting downtown, that's one thing, but that's not what this

23   says.  This is the most conclusory group pleading as you can

24   possibly have in a paragraph.  It basically says that the

25   defendants sought to engage Wheeler.  What does that mean?

 1    Sought to engage Wheeler is not a fact, right?

 2              MR. SUBRAMANIAN:  Let me get onto the next paragraph.

 3    I don't want to linger on that.  I will give you the basis for

 4    the information and belief.  Paragraph 37 says:  Wheeler

 5    confirms that on February 28, 2017, right after Butowsky told

 6    Wheeler that he was working with Zimmerman, Wheeler met with

 7    Butowsky and Fox's Zimmerman at a restaurant on Capitol Hill in

 8    Washington, D.C.  Next paragraph, 38:  Wheeler also confirms

 9    that Butowsky advised Wheeler that Zimmerman was an

10    investigative journalist.

11              THE COURT:  I'm sorry.  What paragraph?

12              MR. SUBRAMANIAN:  38.

13              THE COURT:  Wheeler also confirms.  Go ahead.

14              MR. SUBRAMANIAN:  Here is the kind of climax here.  If

15    you turn the page to paragraph 41, on the very same day that

16    Wheeler met with Butowsky and Fox's Zimmerman at the Capitol

17    Hill restaurant, Butowsky sent an e-mail to Joel Rich offering

18    to hire Wheeler, who he portrayed as an independent private

19    investigator, on Joel and Mary's behalf.

20              Paragraph 42:  According to Wheeler, Butowsky told

21    Wheeler that in talking to Joel and Mary, he should make sure

22    to play down Fox News.  Don't mention you know Zimmerman.

23              THE COURT:  I am not quite sure why that's in

24    brackets.

25              MR. SUBRAMANIAN:  I think because her is probably her,

1    and we changed it to Zimmerman for clarity.

2          Your Honor, this complaint is subject to 8(a) notice

3    pleadings standards.  Even if this complaint were subject to

4    the heightened requirements of Rule 9(b), it would pass muster

5    on the point that your Honor just raised.

6          THE COURT:  Are you alleging there is any involvement

7    as a representative of Fox News other than Zimmerman or

8    Butowsky?

9          MR. SUBRAMANIAN:  Meaning are we alleging that Fox

10   News itself had an involvement in these initial acts?

11         THE COURT:  You are alleging that.

12         MR. SUBRAMANIAN:  Absolutely.

13         THE COURT:  I am trying to figure out, are you

14   alleging that through which individuals?  Just Zimmerman and

15   Butowsky, or are you trying to say that you think -- let's put

16   it this way.  If Zimmerman is the representative of Fox, she

17   can't conspire with herself.  So I'm trying to understand who

18   you say that is involved in this conspiracy.  Which

19   individuals?  Butowsky, Zimmerman, and who?

20         MR. SUBRAMANIAN:  Let's be very clear about it.  The

21   particularized allegations that I just pointed the Court to

22   involve Zimmerman, Butowsky, and Wheeler.

23         THE COURT:  In what way do you say Fox News is liable,

24   through Zimmerman's conduct or through some other third

25   person's conduct?

1          MR. SUBRAMANIAN:  On two bases.  First of all, Fox

2     News is not disputing that Malia Zimmerman is their agent.

3          THE COURT:  I am trying to understand your theory.

4          MR. SUBRAMANIAN:  That's one basis.

5          THE COURT:  It is Zimmerman, not some third party.

6          MR. SUBRAMANIAN:  That is one basis --

7          THE COURT:  Slow down.  I'm not asking you whether

8     it's one basis.  You're either alleging that Zimmerman

9     conspired with Butowsky and Wheeler or you are alleging that

10    Zimmerman conspired with Butowsky, Wheeler, and some other Fox

11    News agent.  Which is it?

12         MR. SUBRAMANIAN:  Maybe I'm not understanding the

13    question.

14         THE COURT:  Who is Fox News?  That's all I'm asking.

15    Who do you claim is Fox News?  Do you claim that's just

16    Zimmerman or you claim that that's some third representative?

17         MR. SUBRAMANIAN:  No, your Honor.  That's what I was

18    getting to.  If I can kind of walk through this.

19         THE COURT:  You can answer that first.  That's a

20    simple question.  You don't have to walk me through anything.

21    Are you saying that there is a third person that they are

22    conspiring with, or when you say Fox News, you're referencing

23    Zimmerman?

24         MR. SUBRAMANIAN:  Both.

25         THE COURT:  Can't be both.  It can't be both.  It's

1    one or the other.

2         MR. SUBRAMANIAN:  It can be both.

3         THE COURT:  It can't be both.  Are you alleging that

4    there is another person who is conspiring with Zimmerman that

5    is a Fox representative, yes or no?

6         MR. SUBRAMANIAN:  The complaint does not identify

7    another person.

8         THE COURT:  I didn't ask you whether you identified a

9    person.  You are not listening to my question.  The question is

10   not a trick question.  I am just trying to get some information

11   from you.

12        Are you alleging that Zimmerman is conspiring with

13   some other individual, unnamed individual, unknown individual

14   at Fox News?

15        MR. SUBRAMANIAN:  Yes, your Honor.

16        THE COURT:  What is that person's role?

17        MR. SUBRAMANIAN:  Our allegation, our understanding at

18   this time and our expectation of what discovery is going to

19   show is that Fox News, the company, was involved in this

20   preceding conduct, the development of this article.

21        THE COURT:  But the company is a fiction.  The company

22   doesn't talk.  It doesn't act.  Someone acts on behalf of the

23   company, and I'm trying to understand whether you are saying

24   that there is some unknown person out there that you claim is

25   Fox News and is acting on Fox News' behalf or you're

1   attributing those to Zimmerman as being that sole person.

2          MR. SUBRAMANIAN:  Right.  Your Honor, I want to make

3   sure to directly answer your question.  In terms of who the

4   other person might be, that would be something that would be

5   revealed in discovery.

6          THE COURT:  But you claim there is another person?  Is

7   that your theory?

8          MR. SUBRAMANIAN:  At the very least, your Honor.  As I

9   mentioned earlier in my argument, in Exhibit 11 to the Terry

10  declaration, we have the Fox contributor agreement.  The Fox

11  contributor agreement is dated December 2016, at the beginning

12  of my timeline.  That's where Fox actually signed an agreement

13  with Rod Wheeler that says, you can only talk to us.  You can

14  only deal with us.  That agreement is signed by the copresident

15  of Fox News Network.  I am not sure.  There is no name here,

16  but it is signed by that person.  So there is at least one

17  other person that we would want to get discovery on to further

18  understand the facts.  That's just the factual question.

19         THE COURT:  But you don't allege that that person is

20  at this point a person that you claim is part of this

21  conspiracy?

22         MR. SUBRAMANIAN:  We do not identify that person by

23  name in the complaint, no.  That would be something that I

24  think discovery would show the full extent of this conspiracy.

25         THE COURT:  Regardless of who this person might be, do

16KMRIGO

1   you have any evidence that there is another living human being

2   who is responsible on behalf of Fox News for the claims that

3   you allege?

4               MR. SUBRAMANIAN:  I believe that the person who signed

5   this --

6               THE COURT:  That's what I'm asking.  That's the

7   theory --

8               MR. SUBRAMANIAN:  The copresident of Fox News who in

9   December 2016 signed up Rod Wheeler.

10              THE COURT:  You are saying that person had what

11  knowledge and intent.

12              MR. SUBRAMANIAN:  I believe that discovery will show

13  that that person had the intent that Rod Wheeler would be the

14  kind of person who would feed into the story.

15              In addition to that, the complaint actually alleges

16  that around the time of the article -- so the article comes out

17  on May 15, 2017.  There certainly were Fox producers who were

18  involved in the decision as to what Rod Wheeler should or

19  shouldn't do and whether to go forward with the story and

20  that's something that is alleged in our complaint.  We don't

21  have the names of those people in our complaint --

22              THE COURT:  What's in the complaint?  What paragraph

23  are you referring to?

24              MR. SUBRAMANIAN:  Your Honor, if you turn to paragraph

25  74.  Paragraph 74 says:  According to Wheeler, on May 15, 2017,

1   Fox's Zimmerman called Wheeler and told him, the bosses at Fox

2   want her to go with the Zimmerman Fox article the next day, and

3   Butowsky left Wheeler a voice mail telling him to close this

4   deal, whatever you got to do.  And when the local Fox affiliate

5   tries to go forward with a story to sort of preempt the Fox

6   News story.  What Wheeler says is, wait, I need to check with

7   Fox News producers in New York.  That's in paragraph 76, if you

8   look at That.

9           Then, on paragraph 77, it says --

10          THE COURT:  Your position is that the people who he is

11  referencing here are coconspirators in the intentional

12  infliction of emotional distress.

13          MR. SUBRAMANIAN:  Absolutely.  I believe they

14  absolutely could be.

15          Your Honor, you asked me if I had evidence.  Again, we

16  are at the pleading stage.  I don't have any discovery from

17  Fox.  In fact, this Court has stayed discovery, pending this

18  hearing.

19          THE COURT:  Discovery and evidence are two different

20  things.

21          MR. SUBRAMANIAN:  Discovery is where you get the

22  evidence from.

23          THE COURT:  No.  You have to have some evidence to

24  file a complaint.  You can't just make it up.  You have to have

25  facts.  That's all I'm asking you about.

1          MR. SUBRAMANIAN:  I guess my point is, when you are

2    asking me what the allegations are, I am trying to be candid

3    with the Court, but I want the Court to understand that the

4    full dimensions of this conspiracy are going to be filled out

5    during discovery because that's when we are going to get the

6    actual documents from Fox, from Malia Zimmerman, the texts

7    between them that actually show what they were doing, and the

8    discovery is going to show how high up at Fox this went and how

9    early on.  People at Fox were thinking, I've got an idea, how

10   do we turn this fictional story into fact?  Let's go after the

11   parents.

12          If your Honor has further questions about this, I'm

13   happy to answer.

14          THE COURT:  I'm not clear on what you say their intent

15   was with regard to the Riches.  You are not arguing that they

16   did it to just hurt the Riches.

17          MR. SUBRAMANIAN:  They had a motive to publish the

18   story.

19          THE COURT:  The motive was not to hurt the Riches.

20          MR. SUBRAMANIAN:  They understood that that would be

21   an effect.

22          I want to start talking about the law because I have

23   not been able to talk about what the actual cases say.  I think

24   talking about the cases will actually reveal why the

25   defendants' arguments kind of don't hold up here.

1          Turning to the question of intent that you have

2     raised, the standards for an intentional infliction of

3     emotional distress claim is not just where you have the sole

4     intent to harm the plaintiff because, of course, people do a

5     lot of outrageous things when they have their own motives to do

6     so.  But they often do that knowing that it's going to injure

7     somebody.  That's what the law says.  Either you have the

8     intent to harm somebody or you disregard the risk that your

9     conduct will cause someone harm, and the cases are very clear

10    about that.

11         Given that that's the standard, I think the fairest,

12    what we know now is that, at the very least, there was a

13    disregard of the risk that the defendants' conduct would harm

14    Joel and Mary Rich.  That's just on the question of intent.

15         THE COURT:  It's more than negligence.

16         MR. SUBRAMANIAN:  It's more than negligence.  This is

17    not negligence, by any stretch.  Assuming the allegations in

18    the complaint as true and taking every inference in our favor,

19    there is no way you can call this negligence.  I think that

20    this is outrageous.  When you think about what happened, doing

21    what they did to the parents of a child who just died, using

22    them as pawns to put forward a false narrative that their son

23    was responsible for this crime, I think that's outrageous and

24    it's far beyond many of the cases where intentional infliction

25    of emotional distress claim have been sustained, including

1    after the Court of Appeals decision in *Howell*.  If I can move

2    to those cases.

3         THE COURT:  Just so we can put that aside, I found no

4    case that would sustain an intentional infliction of emotional

5    distress based on defamatory statements about the deceased.

6         MR. SUBRAMANIAN:  I don't think that's true.

7         THE COURT:  You have such a case?

8         MR. SUBRAMANIAN:  Absolutely.

9         THE COURT:  Which case?

10         MR. SUBRAMANIAN:  In the *Holloway* case that we cite in

11    our complaint, which is decided under Alabama law, but the same

12    standard that is applicable in New York, the issue there was

13    Natalee Holloway, she went missing in Aruba, I think, and no

14    one knows what happened to her.  Her mother sued the National

15    Inquirer for printing stories about her death and where her

16    remains were buried.

17         The Court looked at those allegations and said, this

18    is enough at this stage of the case to move forward, and that's

19    much less severe than what we are talking about here because in

20    *Holloway* the only conduct -- when you asked me what the conduct

21    was, the only conduct in that case was the speech.  It was a

22    pure speech case.  There was no allegation the National

23    Inquirer had tried to dupe the mother into kind of saying like,

24    my daughter is very good.  There was none of that.  It was just

25    about the article.  The Court there sustained the intentional

1    infliction of emotional distress claim.  That case is cited in

2    our brief.

3         Let me give you some more examples.  The *Roach v.*

4    *Stern* case.  That case that was a appellate decision that

5    postdates the Court of Appeals' decision in *Howell*.  In that

6    case there is no long-term campaign.  There is no like history

7    of conduct that we are talking about here.

8         It's the Howard Stern show and they received the

9    cremated remains of the plaintiffs' sister, I believe, and they

10   have a segment where they sort of talk about kind of

11   mistreating the remains and stuff that's nasty, but I think is

12   less severe than what we are talking about in this case.  And

13   there the Court says, intentional infliction of emotional

14   distress claim is sustained.

15        There is the *Esposito-Hilder* case.  That's another New

16   York appellate case that postdates the Court of Appeals

17   decision in *Howell*.  In that case it's a radio segment where

18   the radio guys pull up a newspaper and then they look at the

19   bridal announcements, and they basically talk about how ugly

20   the brides are.  That's literally what the case is about.  And

21   they identify one particular person who is a competitor and

22   they say, they identify her by name.  They really go into depth

23   on it, and the Court says you have an intentional infliction of

24   emotional distress claim there.

25        And because in their reply brief Fox said, well, there

1    is not really a lot of cases in New York after *Howell* that are

2    kind of comparable to this case, I did some searching last

3    night just to see if I could find something.  And what I found

4    was a 2004 First Department case called *164 Mulberry Street*

5    *Corp. v. Columbia University*, and the citation is 4 A.D. 3d 49.

6            Your Honor, if I could approach just to hand up a copy

7    of this case.

8            THE COURT:  Yes.

9            MR. SUBRAMANIAN:  Your Honor, in this case, which was

10   decided on a motion to dismiss, the conduct at issue -- your

11   Honor was talking about the outrageous conduct -- the defendant

12   in the case was a researcher with Columbia and he wanted to put

13   together a study that said, what do restaurants do when you

14   send them letters saying that you got food poisoning?  What is

15   their response usually?  He sends out these letters and he

16   says, I am not going to contact any governmental parties, but I

17   got food poisoning at your restaurant.  I hope you respond

18   appropriately.

19           That's pretty much the end all of what the defendant

20   did.  And the Court says, well, that's enough at this

21   motion-to-dismiss stage of the case, and the Court points to

22   the fact that his letters, even though they were sent to

23   different people, different possible plaintiffs, that

24   constituted a campaign of harassment.  And because that was a

25   campaign, the court said, that makes it more like an

1        intentional infliction of emotional distress case.

2              Here we have a campaign that's directed just against

3        the plaintiffs in this case.  Now, importantly, what the Court

4        in the *Mulberry Street* case said is, look, this is a motion to

5        dismiss.  We don't have all the facts in the record.  Let's let

6        this case proceed to the summary judgment stage.

7              I think the *Mulberry Street* case is informative

8        because it shows that conduct much less severe than is at issue

9        here has been let to go past the motion to dismiss stage.

10             I would also note one additional thing, which is,

11       after the letters were sent to these restaurants, the

12       researcher actually followed up and said, actually, I was

13       lying.  I'm sorry.  I'm a researcher.  I thought this that this

14       would be a good idea for a study.  It's not.  I am not going to

15       do it.  And then the business school apologized as well.  The

16       Court in its opinion even recognized that there was no malice

17       against the restaurants because he was just doing a study.

18       There is no malice against the plaintiffs, as there is in this

19       case, but the Court said, the defendant should have realized

20       that his actions would have caused harm, and that's why the

21       case was allowed to get through.

22             Let's keep it going because this is such an important

23       issue in this case.  What is the standard for outrageousness?

24       Again, after the Court of Appeals' decision in *Howell*, the

25       Third Department, in a case called *Gill Farms v. Darrow*, that's

1    256 A.D.2d 995.

2              Your Honor, may I approach just to hand up this case?

3              THE COURT:  Yes.

4              MR. SUBRAMANIAN:  Your Honor, this case has to do with

5    defendants' complaints to public agencies about the plaintiff's

6    use of pesticides.  That was found outrageous enough to sustain

7    a claim, at least at this stage of the lawsuit.

8              THE COURT:  Those aren't comparable facts.

9              MR. SUBRAMANIAN:  I agree they are not comparable only

10   because they are so --

11             THE COURT:  They intentionally engaged in a course of

12   conduct making false complaints to government entities designed

13   to interrupt the operations of plaintiff's business.  That's

14   not the circumstance that's comparable here.  You may think

15   it's worse, but it's not the same.  It's not the same kind of

16   conduct.

17             MR. SUBRAMANIAN:  Your Honor is correct and I think

18   that this case is worse.

19             THE COURT:  Why is it worse?  These people made false

20   complaints to government entities to interrupt the business of

21   the plaintiff.  It says they clearly did it in order to cause

22   them financial damage and made false complaints to government

23   agencies.

24             I don't mean to clearly make light of the Riches'

25   circumstance, but you are talking about a circumstance where

1     there is direct financial consequences as opposed to people's

2     feelings being hurt.  I understand the seriousness of this

3     effect that it would have on them, but I don't know why that

4     this case -- nothing in this case necessarily tells me that the

5     circumstance that you are talking about is better or worse.

6            MR. SUBRAMANIAN:  Your Honor, I believe it's less

7     severe.  I believe that the interruption of life is more severe

8     than the interruption of business.

9            THE COURT:  You say interruption of life.  Those are

10     general characterizations.  There is not an interruption of

11     life.  Nobody shut down their business.  They didn't do

12     anything that prevented them from doing something else.  As you

13     say, they inflicted emotional distress because of their

14     feelings.  You are saying their feelings have value and I

15     understand that.

16            MR. SUBRAMANIAN:  Your Honor, that is not an accurate

17     characterization.

18            THE COURT:  What is the financial loss?  How do you

19     calculate that other than their feelings?

20            MR. SUBRAMANIAN:  First of all, the only way that you

21     can survive under an emotional distress claim is by showing

22     emotional distress.  In all of these cases, the touchstone of

23     the injury is emotional distress.

24            THE COURT:  I understand that.  I don't understand how

25     the facts of this case make me say that, oh, if they did it in

1   this case you should have to --

2           MR. SUBRAMANIAN:  That's not what I'm saying.  I think

3   I identified at least five cases in addition to the many that

4   we cited in our briefing, which are either comparable or less

5   severe, such as the Natalee Holloway case, in which claims were

6   allowed to proceed.

7           THE COURT:  I am not sure how this is necessarily

8   comparable --

9           MR. SUBRAMANIAN:  Your Honor, if you are not moved on

10  that case, I don't want to linger on it.

11          THE COURT:  They have a clear articulable basis on

12  what they say the defendant did and in what way it had caused

13  financial loss to the plaintiff.

14          MR. SUBRAMANIAN:  We do as well.  When your Honor

15  asked the question --

16          THE COURT:  You do as well, but you don't do it in the

17  same manner.  Your loss is an emotional loss and that should be

18  valued.  I understand that.

19          MR. SUBRAMANIAN:  Your Honor, I'm really sorry, but

20  that is not what the complaint alleges.

21          THE COURT:  What does the complaint allege with regard

22  to infliction of emotional distress?

23          MR. SUBRAMANIAN:  It's not hurt feelings, your Honor.

24          THE COURT:  So what it?  What was the consequence, the

25  direct causation, the consequence of the infliction of

1    emotional distress in this case?

2          MR. SUBRAMANIAN:  Let's go to the complaint and let's

3    go to paragraph 129.  The complaint alleges a series of

4    concrete injuries that were sustained by the plaintiffs as a

5    result of the defendants' course of conduct.  It's not hurt

6    feelings.  We wouldn't be here for just hurt feelings.

7          THE COURT:  What is it other than their emotional

8    response?

9          MR. SUBRAMANIAN:  It's an emotional distress claim,

10   your Honor.

11         THE COURT:  I understand that.  That's all I'm saying.

12   I'm not debating this with you.  The damages that you say they

13   suffered are emotional damages.  I understand that.

14         MR. SUBRAMANIAN:  Paragraph 129 refers to

15   posttraumatic stress disorder, which is what our troops in

16   service often experience, debilitating injuries.

17         THE COURT:  I will expand it to emotional and

18   psychological damage.

19         MR. SUBRAMANIAN:  Absolutely.

20         THE COURT:  I understand that.

21         MR. SUBRAMANIAN:  Let's move to paragraph 130.  It

22   talks about obsessive compulsive disorder.

23         THE COURT:  That's the same characterization, right,

24   emotional and psychological damage.

25         MR. SUBRAMANIAN:  Absolutely.  These can have not only

1    emotional consequences, but also financial consequences.

2              THE COURT:  Where does it say that?

3              MR. SUBRAMANIAN:  Let's turn to paragraph 133.  Just

4    one example.

5              THE COURT:  I don't understand that example.

6              MR. SUBRAMANIAN:  Which part of it?

7              THE COURT:  What is the direct financial loss other

8    than the financial loss that you say resulted as a result -- I

9    am not quite sure what you are saying in this paragraph.  They

10   lost what?

11             MR. SUBRAMANIAN:  One of the financial consequences of

12   the conduct was that Mary Rich, who was going to take another

13   job that she wanted to take, and she was unable to take it

14   because of the emotional distress caused by the defendants'

15   conduct, and this is alleged.  Defendants will have the

16   opportunity in discovery to probe into these issues.  But it

17   seems like I am standing up here and I feel like at the

18   complaint stage --

19             THE COURT:  That's what I'm trying to understand.  You

20   are trying to say there was a particular job offer that she got

21   that she turned down because emotionally she couldn't handle

22   the job.

23             MR. SUBRAMANIAN:  That's precisely what this paragraph

24   alleges.

25             THE COURT:  Where does it say that?

1      MR. SUBRAMANIAN:  Starts in the eighth line and it

2   says:  Mary became distraught as a result of the article and

3   subsequent related coverage and was unable to accept the job.

4      That is at least one financial consequence that is a

5   result of the defendants' conduct.  It's much more severe than

6   the letters that were sent to restaurants saying that I got

7   food poisoning.  It's much more significant than the ugly bride

8   case or in the Howard Stern documentary.  This is a campaign

9   that lasted months and months and months.

10      Your Honor, with respect, the question here is whether

11   a reasonable juror could conclude that the conduct here was

12   outrageous.  We don't even have full discovery on the case.

13   That's the question.  Is there at least grounds at this stage

14   for there to be factual development of the record?  Your Honor,

15   we would submit that there is.

16      Your Honor, I am going to now kind of move back to

17   some of the constitutional issues, unless you have other

18   questions on this particular point.

19      THE COURT:  No.  Go ahead.

20      MR. SUBRAMANIAN:  Kind of moving back to the beginning

21   of Fox's argument, they started with this position that -- I

22   guess, as I understand their position, even if we were engaged

23   in this conduct that was targeted at the plaintiffs, we get a

24   get-out-of-jail-free card if the article in question was not of

25   and concerning the plaintiff, and there isn't one case in

1    America that involves both conduct and speech in the way that

2    defendants' conduct did here that applies that type of of and

3    concerning requirement.

4         Here is what I mean by that.  The defendants point to

5    the *Hustler* case and they say in *Hustler* the court said that

6    the falsity and actual malice requirements for defamation

7    claims also apply to a claim of intentional infliction of

8    emotional distress.

9         And what's notable is that *Hustler*, like many of the

10   other cases that the defendants rely on, was a speech-only

11   case.  It was an attempt by the plaintiff, absent any conduct

12   outside the four corners of the article that was at issue, to

13   try to pin liability on intentional infliction of emotional

14   distress grounds.  That's not this case, as we have been

15   discussing.

16        THE COURT:  You try to argue that that's partially

17   this case.  You try to argue that you could sustain this case

18   based on the defamatory content of the article.

19        MR. SUBRAMANIAN:  I don't think so.

20        THE COURT:  We can take that out of your case as part

21   of your claims?

22        MR. SUBRAMANIAN:  Absolutely not.  When I say our case

23   is outside of the four corners of the article, that's true.

24   Our case is outside --

25        THE COURT:  To the extent that it's outside the four

16KMRIGO

1    corners of the article, there is a separate argument to be

2    made.  To the extent that it's within the four corners of the

3    article, then their argument does apply, doesn't it?  To the

4    extent that you are arguing that they inflicted emotional

5    distress by publishing a defamatory article about their son,

6    how is that not the circumstance in which they are arguing that

7    they have protection?

8         MR. SUBRAMANIAN:  I think for a number of reasons this

9    presents a different situation, different in kind, one that you

10   can't just kind of slice apart.  Because by virtue of the

11   conduct that preceded the article, that is the only way that

12   the article actually ever gets produced.  The article is a

13   product of what came before it.  It's not some sort of

14   freestanding defamation against the plaintiffs or their son.

15        Remember what I said at the outset.  If the article

16   were the only thing that was at issue and Rod Wheeler was never

17   identified as an investigator for the Riches, we might not be

18   here.  It's a different case entirely.  You can't dissect one

19   piece of this case from another.  Just to be clear --

20        THE COURT:  I can and the jury may have to if the jury

21   is being asked to determine whether or not this is outrageous

22   conduct that caused the injury and whether or not you are going

23   to argue to that jury that part of the outrageous conduct or

24   even if they don't find that what they did was outrageous, what

25   they said was outrageous.  If your argument is what they said

 1   was outrageous, then these issues are --

 2             MR. SUBRAMANIAN:  I don't believe that's the case.

 3             THE COURT:  You don't believe what's the case?

 4             MR. SUBRAMANIAN:  When you say that if our argument is

 5   what they said is outrageous, then these issues would arise.

 6             THE COURT:  Isn't that what the case law they cite is

 7   dealing with, whether or not you can sue someone over the

 8   content of the defamatory statement and its effect?

 9             MR. SUBRAMANIAN:  If I can move to the cases that show

10   that that's wrong, then it will be made more clear.  In cases

11   like *Howell* -- you have *Howell*, which is a New York Court of

12   Appeals case, and in that case the Court says, well, this

13   photograph that you took, publishing that photograph, that

14   might be a privileged matter.  And the defendants want us to

15   stop there and say, you can't have any kind of other

16   intentional tort.  We are not going to do that because the law

17   has always been that if you abuse the privilege and if you

18   commit a tort a crime in the course of news gathering, that is

19   not protected, and that principle has been in place in the

20   Second Circuit, in the Supreme Court and elsewhere for decades.

21             You don't get a get-out-of-jail-free card, which is

22   what the defendants want by virtue of the fact that there is

23   speech at issue.  Because the speech is just one component of

24   the defendants' course of conduct, and they have not cited to

25   any case that involved this kind of scenario where there is

16KMRIGO

1    actually conduct outside of the article where the Court says,

2    oh, we are going to give the defendants kind of a freebie here,

3    a mulligan, because there is First Amendment concerns.  They

4    just don't come up.

5           On the contrary, in cases that arguably involve

6    conduct plus speech, the courts have sustained IIED claims,

7    intentional infliction claims.  One good example of that is

8    *Roach v. Stern*.  In that instance, speech is obviously an

9    issue.  The source of the emotional distress is the Howard

10   Stern show, where they are talking about these remains and bad

11   things about the plaintiff's sibling or family member.  That is

12   the source of the injury.

13          What the Court says is, we are going to sustain the

14   intentional infliction claim here for, among other reasons,

15   because they went forward with the segment against the family's

16   wishes.  There was actually some preceding connection between

17   the plaintiff and the defendant.  I believe that the brother in

18   the case had actually had given the remains to one of the

19   people who worked with the show, so they had sort of misused

20   those remains.

21          To be perfectly clear, the injury was a result of the

22   speech in that case.  The court finds intentional infliction of

23   emotional distress.  Same thing in the Natalee Holloway case

24   that I mentioned before.  That's a pure speech case.  And the

25   Court says, we are not going to apply this of and concerning

1   requirement in this situation.

2       Why?  Because the injury claimed here is different

3   than in a normal defamation setting.  I would look very

4   closely, your Honor, at the *Holloway* case because it's the kind

5   of most reasoning you get on this type of question in a case

6   that only involves speech.  No conduct in that case.

7       I know that defendants raised the case *Snyder v.*

8   *Phelps.*  This is the case about picketers at a funeral and

9   whether their conduct was protected by the First Amendment, and

10  it was decided by the Supreme court and the defendants pointed

11  to that case and relied on it pretty heavily.  I think that

12  case helps us and shows your Honor why the type of First

13  Amendment arguments that they are making in this case don't

14  hold up.

15      First of all, at issue in that case was an intentional

16  infliction claim that was brought by the father of the person

17  who the speech was directed against because the protesters were

18  protesting the son who had died because of their antigay views,

19  and that is who that speech was directed towards.

20      The Supreme Court did not say, well, because it wasn't

21  of and concerning the plaintiff, you have got no claim.  It's

22  out the window.  They didn't say that.  They addressed the

23  question of whether in that particular case the speech was

24  protected under the First Amendment.

25      What did they say?  What did the Supreme Court say in

1    that case?  What they said was, in this particular situation,

2    because the only thing that plaintiff is attacking is the

3    viewpoint of the publication, for that reason we are saying the

4    First Amendment applies.

5         And the Court is very clear about that in its opinion.

6    It says it's narrow, it makes clear that the picketers were

7    complying with all other rules and regulations.  In fact, you

8    couldn't even see the picketers from the funeral and it's not

9    clear that the father actually saw anything other than the tops

10   of the pickets because of how far away they were from the

11   grounds.

12        And the Court emphasized that in the opinion and said,

13   in this narrow context, this type of speech, this type of

14   claim, where you are equating outrage with viewpoint, that is

15   protected by the First Amendment.  That's far afield from what

16   we are talking about in this case, which involves the conduct

17   that we have talked about that is outside of the four corners

18   of the article and which leads to the article's publishing.

19   That is a different case than what we are talking about here.

20        I'll give you another couple of examples just because

21   they were raised by the defendants.  The *Sylvester* case, that's

22   a case where the Court said, well, there is speech about a

23   family member.  That alone might not lead to an intentional

24   infliction of emotional distress claim.  Then in the very next

25   paragraph, the Court looks at other conduct and other speech

1    that was compelled and says, this will give rise to a claim.

2         Let me even give you a further example, and these

3    cases are cited in our brief.  The *Flynn* case, which comes out

4    of California, that's a case where the defendants say, well,

5    look, the Court in that case says you have to satisfy the of

6    and concerning requirement.  But what they leave out is that

7    the Court, again, said very clearly, this case involves a claim

8    based on speech alone.  And if you had a different situation,

9    we might come out differently.

10        And the Court specifically cites to a prior case, the

11   Langnese case, that did not involve speech alone as a

12   counterfactual situation to what was presented in *Flynn*.

13        Even in defendants' cases, they sort of recognize this

14   principle that we are not saving you from liability where the

15   speech is a component of a larger course of action that's

16   targeted against the plaintiffs.

17        And why is that?  And the Court in *Holloway* addresses

18   this.  The Court says, look, the reason why we have these rules

19   is to prevent a chilling of speech and broad liability for

20   people who are out in the public space publishing.  You don't

21   have to worry about that in the intentional infliction of

22   emotional distress case because there are these other elements

23   of the claim that make sure that it can only be asserted by

24   certain types of people.

25        As your Honor has pointed out, you can't just like do

1    anything and have liability arise.  You have to do something

2    with at least disregard that it is going to have an impact on

3    the plaintiff.  That's the standing for the type of of and

4    concerning rule that the defendants would have us superimpose

5    from the First Amendment over into intentional infliction of

6    emotional distress.  I don't think there is a basis for doing

7    that.

8            I am going to talk a little bit, your Honor, about

9    tortious interference, unless you have other questions on

10   intentional infliction.

11           THE COURT:  Go ahead.

12           MR. SUBRAMANIAN:  Very briefly, first, Fox had argued

13   that for tortious interference there is no allegation that

14   Malia Zimmerman knew that the plaintiffs had failed to give

15   Wheeler permission about disclosing the information.  So a

16   couple of arguments there.  Certainly, the complaint alleges

17   that Malia Zimmerman knew about the terms of the agreement and

18   intentionally procured a breach of the contract that's alleged.

19           THE COURT:  The problem I have with that is that you

20   have two inconsistent theories.  She could not have tortiously

21   interfered with a contract that you say was a fraud from the

22   beginning that she was a part of in setting up and falsely

23   claiming to the Riches that they were going to do an

24   investigation.  You can't have it both ways.  You can't

25   tortiously interfere with the scheme that you had all along

16KMR1GO

1   that you were never going to perform.

2          MR. SUBRAMANIAN:  I disagree, your Honor.  There is no

3   greater case of tortious interference than if you intentionally

4   manufacture a contractual relationship with the intent to have

5   it breached.

6          THE COURT:  No.  There is no such law.  There is no

7   such law.  You can say it as emphatically as you want, but you

8   cannot tortiously interfere with something that is not a valid

9   contract.  There is no case that stands for that proposition.

10  You said that they got together and falsely promised, falsely

11  represented to the Riches that they would do an investigation,

12  there would be a valid investigation.  And when they did so,

13  they all fully were engaged in this and none of them ever

14  intended to carry out that promise.  You cannot tortiously

15  interfere with a promise that Wheeler never intended to

16  perform.

17         MR. SUBRAMANIAN:  Your Honor, we have a contract in

18  writing.  There has been no argument --

19         THE COURT:  You just said it's not a valid contract.

20  Also, the act of tortiously interfering cannot be a theory that

21  Zimmerman now says to Rich, OK, it's time to pull the plug and

22  do what you claim they already schemed to do.  If they had

23  already had an agreement that they were never going to perform

24  this contract, even before the contract was formed, then what

25  contract do you claim that she interfered with and in what way

1   did she interfere with the contract if they had already agreed

2   that they would never perform this contract?

3          MR. SUBRAMANIAN:  Your Honor, I guess I don't

4   understand exactly the question.

5          THE COURT:  I can simplify it for you.  Because I want

6   you to understand the question.  The question is, in order to

7   tortiously interfere with the contract, first of all, you have

8   to be a stranger to that contract.  That's the first

9   requirement.  The second requirement is that there has got to

10  be a valid enforceable contract that the parties are otherwise

11  performing and would have performed had it not been for the

12  interference of the third party who was attached to that

13  contract.

14          That is not the factual scenario that you've alleged.

15  You have alleged a factual scenario where Zimmerman is not a

16  stranger to this contract.  Zimmerman is part of the scheme to

17  falsely pretend that there is a contract, which was never

18  formed because Wheeler had already agreed with Zimmerman that

19  they were going to write a false story and that they were going

20  to publish this false story and they were going to inflict

21  emotional distress on the plaintiffs.

22          That's like saying, you and I plan to rob the bank and

23  then when we go into the bank then you have another theory that

24  I made you rob the bank while I was in the bank.  No.  We

25  already agreed what we were going to do.  I can't tortiously

1    interfere with something you never intended to do that I

2    already agreed with you that you wouldn't do it, no matter

3    what, that you were going to falsely make them think you were

4    going to do it, but you were never going to do it.  How does my

5    subsequent action tortiously interfere with something that I

6    already agreed with you that I wasn't going to do?

7          MR. SUBRAMANIAN:  Because you are not a party to the

8    contract.

9          THE COURT:  I am a party to the agreement.  There is

10   no contract.  You said this was a scheme.  You are not arguing

11   that this is a contract.  You are arguing this is a scheme.

12   You are arguing that Wheeler had already agreed with Zimmerman

13   that they were going to take these acts.  There is no such case

14   that stands for the proposition that if I agree with you that

15   you go ahead and sign the contract with X and we agree that you

16   are never really going to perform that contract, but you are

17   going to pretend like you are going to perform that contract,

18   and then I say to you, OK, it's time for us to pull the plug on

19   this and take the money, that is not a separate act to

20   tortiously interfere.

21         I am not a stranger.  You say I'm a coconspirator.

22   How can be I a stranger?  I'm not a stranger.  I am the one

23   that told you to go ahead and pretend like you were going to

24   perform the contract.  I don't understand that theory.

25         I don't understand how you can say that there is no

```
 1    such case that stands for the proposition that you and I
 2    conspired to enter into a contract that we never intended to
 3    perform, but I tortiously interfered with the contract after
 4    you falsely said to the other party that you were going to
 5    perform the contract.  There is no such case.  You can't have
 6    it both ways.  You can't say, we never intended to enter into
 7    the contract, we were defrauding them, and then say later on,
 8    I'm a stranger to the event, and I stopped you from performing
 9    the contract that you were otherwise going to perform, because
10    by definition I was otherwise not going to perform.  I didn't
11    perform because you tortiously interfered.  I performed because
12    I agreed with you I wasn't going to perform even before we
13    signed on the dotted line.  Where do you get this theory that
14    you could have it both ways?  I don't understand that.
15              MR. SUBRAMANIAN:  I don't think we are trying to have
16    it both ways.  Just to be clear, Exhibit 4 to the Terry
17    declaration is the signed and dated contract between the
18    Riches, who were not a party to anything.  They sign a contract
19    with Rod Wheeler.
20              THE COURT:  And Wheeler had already agreed with
21    Zimmerman that he was never going to perform that contract,
22    right?
23              MR. SUBRAMANIAN:  Right.  The question on a tortious
24    interference claim is whether you procure the breach of the
25    contract.
```

16KMR1GO

 1           THE COURT:  Exactly.  How did Zimmerman procure the

 2   breach of the contract if Wheeler already never intended to

 3   perform the contract.

 4           MR. SUBRAMANIAN:  Because Wheeler would never have

 5   been hired by the Riches in the first instance.

 6           THE COURT:  It has to do with whether or not Wheeler

 7   was ever going to perform that contract had it not been for the

 8   tortious interference, and you've given me a scenario that

 9   Wheeler was never going to perform that contract, whether

10   Zimmerman did anything later on to interfere with that

11   contract.

12           MR. SUBRAMANIAN:  Your Honor, I want to respond with

13   the elements of the claim just to show you why it's a valid

14   claim.  Because the tortious interference requires the

15   contract.  We have got that.

16           THE COURT:  No, you don't have a valid contract.

17           MR. SUBRAMANIAN:  There has been no argument here that

18   the contract is invalid.

19           THE COURT:  Yes, there is.  It's an invalid contract

20   if Wheeler already decided he wasn't going to perform it.

21           MR. SUBRAMANIAN:  It would be the height of injustice.

22           THE COURT:  You said that was a fraud.  You didn't say

23   that was a contract.  You said he committed a fraud.

24           MR. SUBRAMANIAN:  It would be the height of injustice

25   to charge the Riches with the scheme perpetrated by the

1    defendants.

2             THE COURT:  That is not the issue.  The issue is not

3    charging them with that.  The issue is what kind of claim it

4    constitutes.  And it cannot constitute at the same time a

5    scheme to defraud that was already agreed to prior to the

6    contract in which Wheeler already agreed that he was not going

7    to perform the contract and then later on try to define that as

8    a valid contract that was going to be performed but for

9    Zimmerman's interference.  That's the element.  The element has

10   got to be that there was a contract that Wheeler intended to

11   perform, but for the interference of Zimmerman.  You don't have

12   that.  These facts are not that.  These facts are, you had a

13   contract that Wheeler never intended to perform.  So even if

14   Zimmerman had died the day after the scheme, Wheeler was still

15   not going to perform that contract.  It wasn't Zimmerman coming

16   in after the contract.  And what did Zimmerman do after the

17   contract that made Wheeler not perform the contract, where he

18   would have otherwise performed the contract?

19            MR. SUBRAMANIAN:  Your Honor, just to take a step

20   back, there are a few questions there.  First of all, you

21   absolutely can plead in the alternative.

22            THE COURT:  Are you pleading in the alternative?

23            MR. SUBRAMANIAN:  I don't agree --

24            THE COURT:  Don't give me an alternative argument --

25   wait.  One of us talks at once and if I'm talking, you are not.

1    That's the way the rules work.  I'll give you full opportunity

2    to be heard.

3           Look.  As I always say to the lawyers, you can have

4    alternative theories, legal theories, but you can't have

5    alternative facts.  You gave me a set of facts.  There is no

6    alternative facts.  Either you say the facts are that they got

7    together before they even met the Riches and they all schemed

8    to defraud the Riches by doing these outrageous things and they

9    planned the issue of this phony story and never to perform the

10   contract by really doing the job that the contract requires.

11   They had already agreed to do that, and Wheeler had already

12   made up his mind.  Under your scenario, under your facts, isn't

13   it true that before Wheeler met the Riches, Wheeler had already

14   made up his mind, he wasn't going to perform the contract?

15   Right?

16          MR. SUBRAMANIAN:  I don't know what's in Rod Wheeler's

17   mind.

18          THE COURT:  Yes, you do.  Because you allege it in the

19   complaint.  You quoted me the paragraph.  You say they got

20   together and they intentionally made it appear that Joel and

21   Mary were involved -- that's not the paragraph.  Go back to

22   your paragraph 3.  Fox News reporter Zimmerman, Fox News

23   contributor and political operative Butowsky thought much could

24   be made of the fact that Seth was a DNC employee.  They induced

25   Joel and Mary, his parents, to hire Rod Wheeler -- this was

16KMRIGO

 1   before any contract was formed -- a purported independent

 2   investigator to help solve their son's murder.  Defendants

 3   worked with Wheeler to pursue and develop a fiction that Seth

 4   had leaked thousands of DNC e-mails to WikiLeaks and they

 5   published, republished, and publicized the sham story which

 6   they knew would be covered again and again, and republished

 7   here and around the world painting Joel and Mary's son as a

 8   criminal and a traitor to the United States.  That is not

 9   language of a valid contract.  That's not language.

10         You can't have it both ways.  You can't say that he

11   schemed to falsely induce them into thinking they had a

12   contract and that he was going to live up to the contract and

13   that he agreed with Zimmerman to do that, even before they

14   entered into the contract.  But somehow there is a factual

15   scenario that Wheeler would have perform this contracted had it

16   not been for something that Zimmerman subsequently did.  What

17   do you say that Zimmerman subsequently did that interfered with

18   the contract that Wheeler intended to perform?

19         MR. SUBRAMANIAN:  First of all, this is not an

20   argument that's been raised on this motion to dismiss.  There

21   is not a case in America that I'm aware of that says that a

22   third party and a party to a contract can conspire with the

23   intent to breach the contract and that somehow immunizes it

24   from a tortious interference claim.  That argument hasn't been

25   raised.

1          THE COURT:  That's not true.  The scenario that you

2     are giving me is inconsistent with the elements of tortious

3     interference.

4          MR. SUBRAMANIAN:  I was going through --

5          THE COURT:  Isn't an element of a tortious

6     interference claim that if it hadn't been for the interference,

7     the act of interfering, that the party would have performed the

8     contract?  Isn't that an element?

9          MR. SUBRAMANIAN:  There is an element of but-for

10    causation and there is no question that Wheeler wouldn't have

11    even been hired on this contract if it wasn't --

12         THE COURT:  Hiring is not the question.

13         MR. SUBRAMANIAN:  It is the question.

14         THE COURT:  No, it is not.  Performance is the

15    question.

16         MR. SUBRAMANIAN:  That's not true.

17         THE COURT:  Tortious interference has nothing to do

18    with hiring.  Tortious interference.  You have to already have

19    a contract for there to be tortious interference.  Was there a

20    valid contract or was there not a valid contract?

21         MR. SUBRAMANIAN:  Absolutely.  The contract was valid.

22         THE COURT:  Was Wheeler ever going to perform that

23    contract?

24         MR. SUBRAMANIAN:  I guess we will find out.

25         THE COURT:  Your allegation is that he was never going

1   to perform that contract, that they conspired together to make

2   sure he wasn't going to perform that contract.  You can't say

3   that.  Don't be disingenuous about your answer.  I am not

4   saying it's determinative.

5          MR. SUBRAMANIAN:  I'm not really being afforded, your

6   Honor, with respect, a chance to finish my answer.  I would

7   love to do so.

8          What I was going to say is, the question or the

9   doctrine that you're pointing to, the independent causation

10  requirement, has to do with independently breaching the

11  contract, independent of the defendants on the tortious

12  interference --

13         THE COURT:  You still haven't explained how I could

14  independently interfere with a contract that was never going to

15  be performed by the contracting party.

16         MR. SUBRAMANIAN:  Whether or not the contract was

17  entered into as a result of the defendants' scheme, it's a

18  valid contract.

19         THE COURT:  No.

20         MR. SUBRAMANIAN:  At time one.

21         THE COURT:  No.  You keep avoiding the central issue.

22  The central issue is the but-for causation.  The central issue

23  has to be that Zimmerman did something to make Wheeler not

24  perform the contract that he otherwise intended to perform.

25  What about tortious interference have I just misstated?

I6KMRIGO

1          MR. SUBRAMANIAN:  First of all, you seem to have this

2     idea, your Honor, that there is a principle that if you have

3     engage in a contract, somehow that nullifies a tortious

4     interference --

5          THE COURT:  No.  I gave you the element.  What do you

6     say are the elements?  Give me the three or four or however you

7     want to characterize elements of tortious interference.  And

8     clearly one of those elements has got to be that I interfered

9     with the contract and the only way I can interfere with the

10    contract is that if I caused you not to perform the contract

11    that you otherwise intended to perform.

12         MR. SUBRAMANIAN:  Which the defendants were doing

13    throughout the pendency after the contract was signed.  It's

14    not like they stopped doing it.

15         THE COURT:  No.  If I've already agreed before the

16    contract is signed that I'm not going to perform the contract,

17    you can't say that something else was -- after that was the

18    cause of me not performing the contract if I never intended to

19    perform the contract.

20         MR. SUBRAMANIAN:  We are mixing a few different

21    issues.  The question of whether you procured the breach of the

22    contract, you don't get a get-out-of-jail-free card just

23    because you were procuring it all the way from time one.

24         THE COURT:  You can't procure the breach of a contract

25    before there is a contract.

1          MR. SUBRAMANIAN:  That's why we are saying --

2          THE COURT:  You say that's what happened in this case.

3    You said they agreed they were never going to perform this

4    contract.

5          MR. SUBRAMANIAN:  Zimmerman and Butowsky continued

6    after the contract is in place to perform the breach of that

7    contract.

8          THE COURT:  No.

9          MR. SUBRAMANIAN:  That's absolutely what they did.

10   Your Honor, since this issue has not been raised --

11         THE COURT:  That's fine.  I think I understand what

12   you are saying, but what you are saying is legally wrong.  It

13   is wrong.  Once I decide that I'm not going to perform the

14   contract, I cannot procure the breach of the contract 10 times

15   after that.  If I've already made up my mind, I am not going to

16   perform the contract.  Nothing that anybody subsequently does

17   procures the breach of the contract because I have already

18   decided I am not going to perform the contract.

19         There is no such theory that if I decide that I am not

20   going to perform the contract, unless you say that there is

21   some evidence that I changed my mind and that I was going to

22   perform the contract, maybe you talked me out of it, if I

23   decided I am not going to perform the contract, there is

24   nothing that you could do to procure its breach if I've already

25   decided to breach it.  There is no such theory of tortious

1    interference of a contract that I already decided, one, that I

2    am not going to perform; two, that the promises I made were

3    false; three, that I made up my mind that I'm really trying to

4    defraud the other party rather than perform the contract.

5              To simply say that somebody 10 months later said to

6    me, you know what, why don't you breach the contract, if I

7    already decided to breach the contract, that cannot be the

8    cause of my not performing the contract.  I don't understand

9    why you don't understand that part of it.

10             MR. SUBRAMANIAN:  I understand what you are saying,

11   your Honor.  In this case the facts are a little bit different

12   than what you are talking about.  The only reason for the rule

13   that you are talking about, you are talking about but-for

14   causation.  If the breaching party, independent of anything

15   that you have done, would have breached the contract anyway,

16   then that becomes an issue in the case.

17             THE COURT:  How does that become an issue in the case?

18   That doesn't become an issue in the case.

19             MR. SUBRAMANIAN:  That's the theory.  We are talking

20   about Butowsky and the defendants planting Wheeler in the

21   contract.  And when they continued --

22             THE COURT:  You said they never intended to perform

23   the --

24             MR. SUBRAMANIAN:  I'm not aware of one single case

25   that addresses anything close to the facts here and says the

1   defendants are fine because they kind of conspired --

2           THE COURT:  They are not fine.  They may have a

3   fraudulent inducement.  They may have some other claim.  Who do

4   you claim is the perpetrator?  Who do you claim that this count

5   is against, Zimmerman alone or --

6           MR. SUBRAMANIAN:  Zimmerman, Butowsky, and Fox.

7           THE COURT:  What did Butowsky do after the contract

8   was formed to tortiously interfere with the contract?

9           MR. SUBRAMANIAN:  Absolutely.  He is telling Wheeler.

10          THE COURT:  When?

11          MR. SUBRAMANIAN:  After the contract is in place.  He

12  is saying, you are in place, give me what you got.  He knows

13  that there is a confidentiality provision in the contract.  He

14  is the one that drafted it.

15          THE COURT:  You are saying that's what caused Wheeler

16  to do that?

17          MR. SUBRAMANIAN:  An element --

18          THE COURT:  You said Wheeler already made up his mind

19  that he was going to do that.

20          MR. SUBRAMANIAN:  Based on Butowsky's prior conduct.

21  This was a continuing course of conduct.

22          THE COURT:  There is no such thing as continuing

23  course of conduct.  On this claim there is no such thing as

24  continuing course of conduct.  You either induced the breach

25  and when the breach occurs, it's over.  It's not a continuing

1  breach.  You can only breach once.  You can't breach more than

2  once.  He can't be induced to breach if he already intends to

3  breach.  You would agree with that?  He can't be induced to

4  breach if he's already intends to breach.

5       MR. SUBRAMANIAN:  That's not the standard under the

6  claim.

7       THE COURT:  You don't think that's a true legal

8  statement.

9       MR. SUBRAMANIAN:  Tortious interference requires

10  procurement of the breach, not inducement of the breach.

11  That's not just --

12       THE COURT:  You can't procure the breach if I already

13  intend to breach, can you?

14       MR. SUBRAMANIAN:  I believe you can.

15       THE COURT:  How?

16       MR. SUBRAMANIAN:  Because if the only reason why you

17  intend to breach is because I have already procured your

18  breach --

19       THE COURT:  What is the act that you say procures the

20  breach?

21       MR. SUBRAMANIAN:  It's Butowsky's communications with

22  Wheeler.

23       THE COURT:  When?  Tell me when you claim that they

24  induced a breach.

25       MR. SUBRAMANIAN:  The procurement of the breach --

L6KMRIGO

1           THE COURT:  As of what date?

2           MR. SUBRAMANIAN:  After March 14, 2017, which is the

3    date of the contract.

4           THE COURT:  When?

5           MR. SUBRAMANIAN:  We believe that from March 2017

6    through to the date of the articles in question that Butowsky

7    and Zimmerman -- it was after the contract is in place -- that

8    Zimmerman and Butowsky were in contact with Wheeler constantly,

9    told him to give them information that he had.

10          THE COURT:  But you say that that was already

11   established.  You say they intended to do that even before they

12   signed the contract.

13          MR. SUBRAMANIAN:  That's where I think we have a

14   difference in terms of what the law requires.  This issue

15   wasn't briefed, the one that you're talking about.  There is no

16   case that the defendants have cited, not a single case, and it

17   hasn't even been raised as an argument that somehow because of

18   your preceding agreement to engage in a breach of contract that

19   that immunizes you from a tortious interference --

20          THE COURT:  It doesn't have anything to do with

21   immunizing.

22          MR. SUBRAMANIAN:  That is in fact what you're saying.

23          THE COURT:  No, that is not what I'm saying.  You tell

24   me what the elements are and I want to know how these facts

25   meet those elements.  If the element is, you have to have an

1   existing contract, would you agree with that?  For this claim

2   you have to have an existing contract.

3              MR. SUBRAMANIAN:  Absolutely.

4              THE COURT:  For this claim you have to have an

5   existing contract that both sides intend to perform.

6              MR. SUBRAMANIAN:  If it's an existing contract --

7              THE COURT:  That both sides intend to perform, right?

8              MR. SUBRAMANIAN:  If the rules -- if there is not --

9              THE COURT:  It's not an if.  Do you have to have an

10  existing contract that the contracting party intends to

11  perform, yes or no?

12             MR. SUBRAMANIAN:  I am not trying to avoid the

13  question.

14             THE COURT:  You are trying to avoid the question.

15             MR. SUBRAMANIAN:  No, I'm not.  Because in the case

16  where you have the Riches, who believe it's a valid contract,

17  sign their names on it where Rod Wheeler has as well, where

18  it's an enforceable contract, the issue -- I think what your

19  Honor is getting to is, was this contract actually enforceable

20  and to what extent does that bear on the question --

21             THE COURT:  No, that's not what I'm getting at.  I'm

22  getting at whether or not it was Zimmerman's act, some act by

23  Zimmerman or Butowsky after March, or whatever date you gave

24  me, of 2017, is that what made Wheeler breach the contract that

25  he otherwise would not have breached had it not been for the

1  inducement?

2      MR. SUBRAMANIAN:  I believe it is and let me give you

3  an example of why.  At least this.  Let's say that Wheeler --

4  they had these prior discussions, whenever they might be, and

5  they get into this contract.  After it's in place, Malia

6  Zimmerman and Butowsky realize how outrageous and crazy this

7  whole scheme is and they say, Rod Wheeler, we don't want you to

8  do this.  Let's say one of them does it and Wheeler says, I

9  changed my mind, too.  I don't think it's a good idea.  But

10  then later in time they go forward and they induce him to

11  breach later because --

12      THE COURT:  I totally agree because at the time of the

13  inducement, Wheeler intended to perform the contract and if it

14  hadn't been for Zimmerman inducing Wheeler to breach the

15  contract, he would have performed the contract at that time.

16  That is not the scenario that you have laid out in this

17  complaint.  You give me a scenario where Wheeler even long

18  before the contract was even entered into signed a contract

19  that he never intended to perform.  He didn't not perform this

20  because Zimmerman said, in April of 2017, don't perform this

21  contract that you were getting ready to perform.  They knew

22  before the contract was ever signed that he was never going to

23  perform this contract.

24      Zimmerman is not a stranger to this contract.

25  Zimmerman is the one that helped set up this contract and

1    agreed with Wheeler that Wheeler was never going to perform and

2    that was before the contract was signed.  So nothing Zimmerman

3    did after the contract was signed on the facts that you have

4    given me that made Wheeler change his mind and decide, I am not

5    going to perform the contract that I otherwise was going to

6    perform if it hadn't been for Zimmerman talking me out of it.

7            MR. SUBRAMANIAN:  Your Honor, you are raising a lot of

8    factual questions.  Not to cut this short, but I disagree on

9    the legal kind of framework that you are discussing.  This is

10   not an issue that has been briefed in this case.  What I would

11   suggest is, if your Honor is thinking hard about this, why

12   don't we maybe submit a posthearing brief.

13           THE COURT:  That's fine.  I am trying to figure out

14   the limit and extent of your argument.  Your argument on this

15   point is not grounded in law.  You cannot argue the scenario is

16   that you must have a valid contract that the party was prepared

17   to perform, a stranger to that contract came in and induced

18   that party not to perform the contract that they otherwise had

19   an obligation to and intended to perform.  That is not the

20   scenario that you have laid out in this complaint.

21           The scenario you laid out in this complaint is that it

22   was a sham contract.  You called it a sham contract.  This was

23   a fraud that Wheeler never intended to do what the Riches

24   wanted him to do, and even before he signed on the dotted line

25   he made up his mind and never changed that intent to basically

1  defraud them and to basically, as you say, intentionally

2  inflict emotional distress on them.  That was his intent.  His

3  intent wasn't ever to perform this contract.

4       If the person says to me, well, I know I signed the

5  contract, but I am never going to perform that, there is

6  nothing that I can do after that that's going to be the cause

7  of them not performing the contract.  It's impossible.  It's

8  legally impossible unless I change my mind and at the time I

9  say I am going to perform the contract, and you can demonstrate

10  to a jury why, but for my interference into the relationship

11  between the two, after they form the contract that the contract

12  would have otherwise been performed.  In this case the contract

13  would not have otherwise been performed because Wheeler had

14  already made up his mind he wouldn't sign the contract that he

15  wasn't going to perform, you say.

16       MR. SUBRAMANIAN:  Based on the interference by the

17  parties.

18       THE COURT:  It wasn't interference.  You can only

19  interfere by being a stranger.  You say this was a scheme,

20  conspiracy that was engaged in by these parties to defraud the

21  Riches long before they even met the Riches.  It can't be that

22  they are somehow stranger to this contract.

23       MR. SUBRAMANIAN:  Your Honor, I hear you.  If it

24  pleases the Court, what we would do is submit a brief, no

25  longer than five pages, by next week on this issue.

1      THE COURT:  As I say, the most effective advocacy is

2  to be consistently reasonable.  I want you to look at the law

3  and I want you to tell me that there is some ground on which

4  you can say that a contract that already intended not to

5  perform, that someone else can be liable for tortious

6  interference if I already intended not to perform the contract.

7      MR. SUBRAMANIAN:  Absolutely.  We will have that

8  briefing submitted to your Honor.  Thank you.  We want to be

9  responsive to the Court's concerns.

10      The last thing I'll say, and if it pleases the Court

11  I'll turn it over to Ms. Baron to talk about the personal

12  jurisdiction issue, but the last thing is just that a lot of

13  the issues, even with respect to this that we are talking

14  about, I think would be aided by development of the facts.

15  When your Honor is considering these issues as fact intensive

16  as they are, given the stage of the case that we are at, the

17  easiest way to find of resolve these issues would be to say,

18  look, let's get some development of the facts and then revisit

19  these fact-intensive issues.

20      THE COURT:  Everyone makes that argument.

21      MR. SUBRAMANIAN:  I know, your Honor.  But in this

22  particular setting where we are talking about things like

23  intent, knowledge, and outrageousness, I think it really makes

24  a huge impact.  That's raised in every case.  I have said it a

25  hundred times.  I think it really does make a big impact in

1     this case.

2          THE COURT:  That's dependent on whether you made the

3     threshold showing in the complaint.

4          MR. SUBRAMANIAN:  I think that's right.  That kind of

5     bears it out because in what we are talking about now is

6     looking at the pleadings, giving us every inference favorable

7     in our direction, which I don't think is how the defendants

8     have been viewing the case.

9          THE COURT:  Let's take a short break and we will deal

10    with jurisdiction.

11         (Recess)

12         THE COURT:  Yes, ma'am.  I have some tough questions

13    for you, too.

14         MS. BARRON:  I have seen what you have with my

15    colleague, so I'm very excited.

16         My name is Elisha Barron.  I am going to address

17    jurisdiction.

18         First, Mr. Butowsky states the wrong standard for what

19    plaintiffs need to meet prior to jurisdictional discovery.

20    Perhaps, more importantly, he ignores the allegations that

21    you've identified several times today that Fox was the

22    epicenter of this case and because he's end game with the

23    publication of the article on Fox News in New York.  I will

24    just quickly address the standard and then I'll go into the

25    facts.

```
 1              This is from *In Re Magnetic Antitrust Litigation*.  It

 2     is a Second Circuit case from 2003.  It's cited in

 3     Mr. Butowsky's brief.  It says:  Prior to discovery, a motion

 4     to dismiss may be defeated based on legally sufficient

 5     allegations of jurisdiction.  You resolve all the ambiguities

 6     in favor of the plaintiffs.  It was only after plaintiff has

 7     engaged in jurisdictional discovery that we must include an

 8     averment of facts that, if credited, would suffice to establish

 9     jurisdiction.

10              If we do not meet that standard, you can deny this

11     motion flat out.  But at the very least we are entitled to

12     jurisdictional discovery, which we have had none of.

13              On the facts, New York was the center of gravity of

14     this case.  The tie between all of the defendants is Fox News,

15     the end goal with the publication of the article by Fox News in

16     New York.  Paragraph 8 of our complaint:  Fox News acted with

17     the assistance of Fox's employees and agents Zimmerman and

18     Butowsky in New York.  Most, if not all of Fox News' decisions

19     were also made in New York and communicated from the state.

20              THE COURT:  Isn't the case law that in order to

21     establish jurisdiction over Butowsky, you can't rely on the

22     contacts of other defendants.  You have to rely on the contacts

23     of Butowsky.  What is the New York-related conduct by Butowsky

24     that makes it sufficient for us to say that Butowsky is here?

25     You can't simply say because the codefendant is in New York.
```

1    You have to tell me what his engagement was and his conduct was

2    with regard to this activity that is sufficient to make it

3    reasonable to haul him from Texas to New York if there is not

4    an allegation that he was in New York in relationship to this

5    activity.

6          MS. BARRON:  Completely agree, your Honor.  Under

7    302(a)(1), which is the section we are invoking, first of all,

8    he doesn't have to be in New York.  We know that.  He can be

9    injecting himself into New York from outside New York, which is

10   what we allege.  Mr. Butowsky's counsel says the only thing is

11   this one e-mail.  That's not right at all.

12         THE COURT:  Give me the list of things that you say

13   are the basis for jurisdiction over him.  You say the e-mail.

14         MS. BARRON:  Let me start chronologically.  This is

15   what we know now with no jurisdictional discovery at all.

16         Paragraph 34.  In Butowsky's own words, he says to

17   Wheeler -- this is how he first meets Wheeler.  It's through

18   Fox.  He says:  Although I'm not a paid Fox contributor, I do

19   appear frequently on the news channel as well as the business

20   channel.  Behind the scenes I do a lot of work unpaid helping

21   to uncover certain stories.  I'm looking for some assistance.

22         Already he has explained what his relationship to Fox

23   is.  This is what he does.  He's outside of New York working

24   with Fox News inside of New York to uncover stories.

25         THE COURT:  That would be a basis to argue that there

1   is some general jurisdiction, but that doesn't say that he has

2   any connection to the acts and occurrences with regard to this

3   lawsuit in New York.

4         MS. BARRON:  You are looking at the totality of the

5   circumstances and the fact that his standard relationship with

6   Fox News is to be outside of New York transacting with Fox

7   News, and I will walk through the allegations showing that he

8   did that here.  I am trying --

9         THE COURT:  You are not arguing that we have general

10  jurisdiction over him.

11        MS. BARRON:  No.  This goes to specific jurisdiction.

12        We then have the e-mail where he says:  I'm actually

13  the one who has been putting this together, but, as you know, I

14  keep my name out of things because I have no credibility.

15        THE COURT:  What paragraph are you reading?

16        MS. BARRON:  82.  He sends this to Fox News producers

17  and on-air talent in New York.  That is the allegation.  Do we

18  know for certain that they were all sitting together in New

19  York at the time?

20        THE COURT:  It doesn't matter.

21        MS. BARRON:  Exactly.

22        THE COURT:  Let me ask you the first question.  Do you

23  think that that e-mail alone would be sufficient to assert

24  jurisdiction over him in this lawsuit?

25        MS. BARRON:  I think it would certainly be sufficient

1   to get discovery.  There are cases that say that a single

2   communication from outside of the state where it is evidence

3   that somebody is -- let me get the language exactly right --

4   seeking out and initiating contact with New York and

5   establishing a continuing relationship, that that alone can

6   establish jurisdiction.

7           So yes is the answer to your question.  That is not

8   all we allege, but that would be enough.

9           THE COURT:  Because I know cases that say a single

10  e-mail is not enough.  I know of no cases that say that a

11  single e-mail is enough.

12          MS. BARRON:  Maybe I could point you to the case that

13  Mr. Butowsky cites in his reply brief.  It is *Carlson v.*

14  *Cuevas*, 933 F.Supp. 76, and that case draws an important

15  distinction.  This is about telephone calls, but

16  communications.  It says:  Telephone calls are significant only

17  if they are used by the defendant to actively participate in

18  business transactions in New York.

19          Paragraph 82 is Mr. Butowsky actively participating in

20  the transaction at issue, which is the publication of this

21  article.

22          THE COURT:  The language you just quoted from the

23  case, is that a case where the Court said that one phone call

24  to New York was sufficient to assert jurisdiction?

25          MS. BARRON:  It cites to the case where a call to New

16KMRIGO

1    York is sufficient for jurisdiction, which is the *Park-Bernet*

2    *Galleries, Inc. v. Franklyn*.  I have that case here.  I can

3    hand it up.  In that case it says -- the Court quotes it as

4    saying:  Using a phone to link a representative actively

5    participating in a New York auction with the out-of-state

6    defendant, the defendant subjects himself to New York

7    jurisdiction.

8              THE COURT:  That's a little different, though, because

9    it's the auction itself that's taking place over the phone.  If

10   there is a lawsuit about the auction, I can understand that.

11             MS. BARRON:  In that case an auction is happening in

12   New York and this defendant --

13             THE COURT:  Is participating in that auction from

14   someplace else by phone.  They are participating in that

15   auction by phone, and I'm assuming that this lawsuit has to do

16   with that activity over the phone.

17             MS. BARRON:  Yes.  May I analogize it to this case?

18             THE COURT:  Yes.

19             MS. BARRON:  Here, Mr. Butowsky is exercising

20   significant influence over when and how and what is published

21   in this article, and he is doing it from outside of New York,

22   we think.  He may have come to New York.  But rather than being

23   in that Fox News office looking over someone's shoulder and

24   saying, here is how we have to play this, he is sending an

25   e-mail.  He also exchanges drafts with Ms. Zimmerman and

16KMRIGO

1  presumably --

2          THE COURT:  Zimmerman is in California.

3          MS. BARRON:  Zimmerman is in California, but the

4  article that is being vetted for publication in New York.

5          THE COURT:  Again, I am trying to concentrate on

6  Butowsky's conduct.  Again, you can't sort of, with specific

7  jurisdiction, say well, he's communicating with Zimmerman and

8  Zimmerman is communicating with New York, so, therefore,

9  Zimmerman's communication with New York is a basis to assert

10  jurisdiction over Butowsky.

11          MS. BARRON:  He's inserting himself and exercising

12  influence over a publication that is going to happen in New

13  York.

14          THE COURT:  When you say it's going to happen in New

15  York --

16          MS. BARRON:  Fox News is in New York and the

17  publication is going to happen in New York at Fox News and that

18  was intentional.  They didn't want it published in Fox D.C.

19  Butowsky wanted it published in Fox News in New York so that it

20  could get the largest amount of publicity.  Here he's

21  specifically taking advantage of this platform that Fox News

22  New York offers and that was a conscious decision.  We don't

23  know all of the steps he took to ensure that that happened.  We

24  have one communication and the reason we have even that

25  communication is because of Mr. Wheeler's lawsuit.  At the very

1   least we need discovery into what more there was.

2            THE COURT:  What do you think you are going to fish

3   for in discovery?

4            MS. BARRON:  Evidence that he visited New York, other

5   e-mails with Fox producers.  We have one.  There is no reason

6   to believe that that was the only e-mail.

7            THE COURT:  I don't know.  There is no reason to

8   believe that there were a hundred e-mails.

9            MS. BARRON:  That is that the facts necessary to

10  establish jurisdiction lie within Butowsky and Fox's exclusive

11  knowledge and that is where discovery is authorized.

12           THE COURT:  His individual conduct so far, conduct

13  itself, is the e-mail.

14           MS. BARRON:  Directly into New York, that is the only

15  conduct that we know of.

16           THE COURT:  And you say that what else should be

17  considered other than his conduct and his personal contact with

18  New York?  I'll put it that way.

19           MS. BARRON:  The fact that he invoked his relationship

20  with Fox News New York to get Wheeler into this scheme and

21  says, this is what I do.  I'm a guy with Fox News.  I uncover

22  stories.  So that's paragraph 34.  He is taking advantage of

23  Fox News in New York to carry out this scheme and that is what

24  302(a)(1) requires.  That's the transacting business.  The

25  fact --

L6KMRIGO

```
 1              THE COURT:  What part of this scheme, other than the
 2   ultimate publication, if that's the case?  I don't know if
 3   that's the case.  We are assuming that Zimmerman sent her
 4   article to New York and New York published the article.  I am
 5   not sure how that happened.  I forget now.  Are we talking
 6   about -- the article was published in what form?
 7              MS. BARRON:  It was on the Internet, among other
 8   things.
 9              THE COURT:  It was on the Internet.
10              MS. BARRON:  If I could just point you to --
11              THE COURT:  That's not a New York publication.
12              MS. BARRON:  It was a New York publication.
13              THE COURT:  The Internet.
14              MS. BARRON:  I don't know all the different media on
15   which it went out, but it went out from New York, Fox News in
16   New York, Zimmerman repeatedly said.  When Mr. Wheeler is going
17   to talk to D.C., Zimmerman says, New York won't be happy.  This
18   was a New York -- when Mr. Butowsky e-mails people, he e-mails
19   people in New York.  So New York was the epicenter and you are
20   right that the ultimate end game was the publication of this
21   article and that happened in New York.
22              THE COURT:  Except Butowsky didn't publish the
23   article.
24              MS. BARRON:  No.  But he exercised significant
25   influence over the publication and dissemination.
```

```
 1              THE COURT:  It wasn't his determination as to where
 2   the article was going to be published.  Fox News could have
 3   published it in China if they wanted to.  He didn't have any
 4   control over that.  He didn't direct this to be published in
 5   New York.
 6              MS. BARRON:  If Fox News was based in China, then I
 7   agree with you that New York would not be the proper place for
 8   this lawsuit.
 9              THE COURT:  That's not necessarily so.  There are a
10   lot of news agencies that are headquartered in certain places
11   and they may or may not issue their stories in certain
12   locations for certain audiences.  That doesn't determine what
13   jurisdiction you have over people who might have helped put
14   together the article.
15              MS. BARRON:  That is not this case.  In this case they
16   did it in New York.  Fox News was in New York.  The defendants
17   referred to it as New York.  Mr. Butowsky tells Wheeler, I'm
18   doing this, I'm doing it with Fox News.  He is inserting
19   himself into New York.  The relevant transaction is the
20   publication of the article and the later further publication on
21   TV, news shows, by New York-based Fox people.
22              THE COURT:  You don't claim that there is any other
23   activity at this point by Butowsky in New York or in
24   communication with people in New York?
25              MS. BARRON:  We do allege that there are additional
```

1    communications.

2              THE COURT:  Like what?

3              MS. BARRON:  In paragraph 8.

4              THE COURT:  8?

5              MS. BARRON:  8, yes.  Fox News asked acted with the

6    assistance of Fox's employees and agents.  Defendant Zimmerman

7    and Butowsky in New York, most if not all --

8              THE COURT:  I'm sorry.  I am not sure what that means

9    because it can't mean defendants Zimmerman and Butowsky were in

10   New York.  That's not what you mean to say.

11             MS. BARRON:  Fox News was acting in New York.

12             THE COURT:  You are saying Fox News also acted with

13   the assistance -- Fox News also acted in New York.  That's the

14   way it's supposed to read.

15             MS. BARRON:  Fox News was acting in New York.

16             THE COURT:  You don't mean that sentence to stand for

17   the proposition that defendants Zimmerman and Butowsky were

18   active in New York.

19             MS. BARRON:  If I could echo Mr. Harrison, we don't

20   know.

21             THE COURT:  That's not what you're alleging here or is

22   that what you're alleging?  Are you alleging?

23             MS. BARRON:  We are not alleging.

24             THE COURT:  That Butowsky acted in New York.

25             MS. BARRON:  We don't know where Butowsky acted.

1    THE COURT:  So that's not this representation.  You

2    don't mean to represent by this statement that he acted in New

3    York.  That was not your intent when you wrote that sentence.

4        MS. BARRON:  Yes.  We believe he was acting in New

5    York.

6        THE COURT:  That's what I'm asking.  What are you

7    referencing then?  What did he do in New York?  That's what I

8    want to ask.  You say he acted in New York.  What were you

9    referring to?

10       MS. BARRON:  Whether or not he was physically present

11   in New York, which we don't know, he was exercising influence

12   over an article that was being published in New York and was

13   going to be disseminated in New York.

14       THE COURT:  By this statement you are not trying to

15   say that he committed an act while he was in New York.

16       MS. BARRON:  Other than the e-mail, we don't have any

17   concrete knowledge, and that is why we need discovery.  We

18   couldn't possibly have that knowledge.

19       THE COURT:  You could.  Anything is possible.

20       MS. BARRON:  Yes.  That was a misstatement.

21       THE COURT:  You don't have it.

22       MS. BARRON:  He could have admitted that he came to

23   New York.  But instead --

24       THE COURT:  He has admitted he's been to New York

25   several times.  He just said he wasn't in New York in regards

1    to this.

2            MS. BARRON:  We shouldn't be required to credit his

3    counsel's assertions that he hasn't been in New York with this,

4    particularly since he also made the assertion that we don't

5    know if he's ever been to New York.  We do know that he's been

6    to New York, as you just said.  We can't credit what

7    Mr. Butowsky's counsel says he doesn't know.  We are entitled

8    to discovery.

9            THE COURT:  That is your discovery argument.  Are you

10   abandoning your argument that this is really enough?

11           MS. BARRON:  Absolutely not.  His purposeful availment

12   of New York through this single e-mail, where he is very firmly

13   directing people at Fox News about how and when this article is

14   to be published and how it should be disseminated on TV is not

15   enough.  That is not an e-mail saying, hey --

16           THE COURT:  Which paragraph?

17           MS. BARRON:  It's paragraph 82.  It's not an e-mail

18   saying I'm very interested in this article.  It's not a

19   casual -- I am the one who has been putting this together and

20   one of the big conclusions we -- that's Mr. Butowsky and Fox

21   News -- need to draw from this is that the Russians did not

22   hack our computer systems.

23           And what follows from that, this is paragraph 104:  On

24   the day the Fox article was published, Steve Doocy, cohost of

25   Fox & Friends and one of the individuals in New York who was

1    e-mailed, says:  For a long time on the Internet and elsewhere,

2    he has been rumored to have been the one who gave WikiLeaks the

3    DNC e-mails.  So if that is true, and we don't know yet, it

4    looks likes Russia didn't give it to WikiLeaks.

5            THE COURT:  Where are you reading from?

6            MS. BARRON:  Paragraph 104 of the complaint.

7            THE COURT:  But I have bullet points.  What bullet

8    points?  I don't see that language.

9            MS. BARRON:  It's the third bullet point.

10           THE COURT:  Read that language again.

11           MS. BARRON:  On the day that the Zimmerman Fox article

12   was published, Steve Doocy, cohost of Fox & Friends -- and this

13   is me, not the quote.  He is one of the people who was e-mailed

14   in New York -- says:  For a long time, on the Internet and

15   elsewhere, he, that's Seth Rich, has been rumored to have been

16   the one who gave WikiLeaks the DNC e-mails.

17           So if that is true, and we don't know yet, it looks

18   like Russia didn't give it to WikiLeaks.  He is implementing

19   the instruction on Fox & Friends in New York that Mr. Butowsky

20   e-mailed the day before saying here is what you need to do with

21   this article that I've been putting together.

22           I can't think of a more clear case of inserting --

23           THE COURT:  I don't see where he says what to do with

24   it.

25           MS. BARRON:  He says, one of the big conclusions we

1    need to draw from this is that the Russians did not hack our

2    computer systems.  And then Doocy says, it looks like Russia

3    didn't give it to WikiLeaks.

4              THE COURT:  I understand.

5              MS. BARRON:  There is law that you don't need to be in

6    New York and that a single communication can satisfy 302(a)(1)

7    under certain circumstances.  This is about the clearest

8    circumstance of someone inserting themself into business in a

9    different state.  I can't think of a more clearer case.

10             THE COURT:  I would hesitate to characterize it that

11   way.  I have seen a lot more clearer cases.

12             MS. BARRON:  Of a single communication.

13             THE COURT:  Yes.  This single communication is not

14   like, here, I'm in Texas, let me give you directions.  Drive to

15   New York or New Jersey and put this on a New York station.  He

16   doesn't even mention New York.  No.  This isn't the clearest.

17   This is one e-mail saying that we ought to publish that and say

18   he had nothing to do with WikiLeaks.  That statement could have

19   been made from anywhere to anywhere.  That's not a real

20   specific direction that anticipates that New York is critical

21   to this delivery.

22             MS. BARRON:  I will walk back my statement that it was

23   the clearest case, but you don't need to say, hey, you guys in

24   New York, and he is inserting himself into it.

25             THE COURT:  What makes me hesitate on that alone is

1    that that one line out of one e-mail to be the sole basis of

2    asserting jurisdiction over someone who is down south in Texas,

3    who was not in New York at the time he sent the e-mail.  There

4    are not a series of e-mails, that is not a direction that would

5    give some indication that he's putting himself, exposing

6    himself to legal liability in New York and should anticipate

7    it's going to be reasonable that he is going to be hauled into

8    court in New York based simply on one e-mail that he sent to

9    somebody in New York.  If that is the case, it would be the

10   opposite of most of the cases that I'm aware of because if

11   someone that I sent an e-mail to happens to be in California,

12   then it's reasonable for them to haul me into court in

13   California based simply on the fact that I communicated by

14   e-mail with that person.

15            MS. BARRON:  If someone is secretly behind the

16   publication of an article, knowing and intending that that

17   article be published in New York, I do think it is entirely

18   reasonable that they should expect to be hauled into court

19   there.

20            THE COURT:  I don't know.  It is reasonable to think

21   that it may be published in New York, but that's not what's

22   critical to the scheme?

23            MS. BARRON:  Your Honor, I disagree.

24            THE COURT:  It's not critical to your claim.  The

25   activities, most of the activities that you complain about that

1  you say are outrageous conduct for the infliction of emotional

2  distress or you say is -- I'm not even sure -- I'm not quite

3  sure on what you say is the basis for suing Mr. Butowsky in New

4  York on tortious interference.  What activity in New York is

5  related to tortious interference?

6          MS. BARRON:  The purpose of that contract was

7  ultimately the publication of this article.  It was not an

8  accident that the publication would be in New York.  It was not

9  a coincidence.

10          THE COURT:  I know.  But that's not the claim.  That's

11 not the tortious interference claim.  The tortious interference

12 claim is they induced a breach of the contract.  The contract,

13 as far as I know, wasn't signed in New York.  The contract, as

14 far as I know, wasn't to be executed in New York.  The

15 contract, as far as I know, wasn't reached in New York.  The

16 contract, as far as I know, wasn't induced to be breached in

17 New York.

18          Where is the specific jurisdiction with regard to a

19 tortious interference with contract for suing Butowsky in New

20 York for tortious interference?

21          MS. BARRON:  The elements that you just recited are

22 what courts look at when they are looking at a breach of

23 contract case to decide whether there is specific jurisdiction.

24          Tortious interference is a tort and the question is

25 whether the transaction of business is connected to that claim.

1   We allege that the reason that the contract was tortiously

2   interfered with was in furtherance of the publication in New

3   York of this article.

4          THE COURT:  But that's not related to the claim.  The

5   claim is that there was a contract entered into and that the

6   contract was breached.  That would be like saying if Wheeler

7   decided that while he was in Milwaukee that he got a call and--

8   while he was in Milwaukee he decided he wasn't going to perform

9   the contract that somehow the contract is now -- there is some

10  jurisdiction in Milwaukee for him to assert jurisdiction over

11  somebody else.  The claim itself has to be related to New York,

12  not some aspect of the activity.  The claim has to have a

13  relationship to New York.  The breach of the contract or the

14  tortious interference, no part of the claim occurred in New

15  York, did it?

16         MS. BARRON:  This hasn't been briefed or anything,

17  but, yes.  Mr. Wheeler provided information for an article to

18  be published in New York.  The main breach that we allege was

19  the inclusion of his statements in the article that was

20  published by Fox News in New York, and Mr. Butowsky

21  intentionally procured that breach for the purpose of his

22  business transaction in New York, which was to exercise

23  influence and ultimately disseminate this article from the New

24  York platform.

25         THE COURT:  That wasn't my understanding of what was

1   the claim or the main part of the claim.  My understanding, as

2   it was argued, is that the breach that was procured was in

3   convincing Wheeler to breach the confidentiality of the

4   agreement by giving information to Zimmerman.

5           MS. BARRON:  Correct.

6           THE COURT:  That doesn't have anything to do with New

7   York.  She was in California.  My understanding, Wheeler wasn't

8   in New York when he breached.  She wasn't in New York when she

9   procured the breach.  And if it was the divulging of the breach

10  of the confidential of the agreement, that didn't occur in New

11  York, wasn't related to New York, was done even before the

12  article was published.  The contract was already breached when

13  the article was published by that scenario.

14          MS. BARRON:  It was breached days before by

15  Mr. Wheeler disclosing this information --

16          THE COURT:  What does that have to do with New York?

17          MS. BARRON:  Mr. Wheeler is a Fox News contributor.

18  He has a contract with Fox News.  He then, having failed to

19  disclose that to the Riches, breaches the confidentiality

20  agreement that they have to give his employer, for purposes of

21  this, the information that will go into the article that his

22  New York employer is going to publish in New York.  And

23  Mr. Butowsky helped orchestrate that scheme with the end goal

24  of it being published by Fox News in New York.  I don't agree

25  that there is no connection between the tortious interference

1   and New York.

2          THE COURT:  I am not sure what the publication has to

3   do with the tortious interference.

4          MS. BARRON:  The reason for the tortious interference

5   was the publication.

6          THE COURT:  If I robbed a bank, the reason may be

7   because I want money, but that's not the claim.  The contract

8   didn't provide for a publication in New York.  The contract had

9   nothing to do with the publication in New York.  The contract

10  didn't contemplate New York.  By the complaint, the way the

11  complaint is written, it didn't contemplate any particular

12  jurisdiction.  It contemplated that Wheeler was going to

13  respect the confidentiality of the Riches, and he breached

14  that, and clearly he breached that somewhere other than New

15  York, didn't he?

16         MS. BARRON:  We don't allege that Mr. Wheeler was in

17  New York.

18         THE COURT:  You don't allege that Zimmerman was in New

19  York when she got that information?

20         MS. BARRON:  But the Fox News publishers that we do

21  allege were part of this conspiracy and were the ultimate

22  publishers of the article and the ultimate beneficiaries of

23  Mr. Wheeler's providing this information in New York were in

24  New York.  And Mr. Butowsky, who is the only one who disputes

25  jurisdiction, was orchestrating that.  If Mr. Butowsky had been

16KMRIGO

 1   an employee of Fox News, there would be no dispute that there

 2   was jurisdiction.

 3           THE COURT:  I am still not clear what Mr. Butowsky did

 4   to tortiously interfere.  I am not sure why that claim is

 5   against him.

 6           MS. BARRON:  I can give you one example from the

 7   complaint.

 8           THE COURT:  I know that wasn't what you intended to

 9   argue.  I understand at least the theory and the argument in

10   the complaint that Zimmerman sought the information from

11   Wheeler in breach of Wheeler's obligation to keep it

12   confidential, but I don't see any allegation that Butowsky had

13   anything to do with that.

14           MS. BARRON:  It's paragraph 74 of the complaint.

15           THE COURT:  Yes.  I think we did this before.

16           MS. BARRON:  On May 14, 2017, that's two days before

17   the publication, Butowsky informed Wheeler that President

18   Donald Trump had read a draft of the Zimmerman public article

19   and wanted it published immediately.  Then the following day,

20   not only does Zimmerman call Wheeler and tell him that the

21   bosses at Fox, that's Fox News in New York, wanted to go with

22   the article --

23           THE COURT:  Where are you reading from?

24           MS. BARRON:  Still paragraph 74.

25           THE COURT:  But wasn't the contract already breached

I6KMRIGO

1    by then?  He had already given the information to Zimmerman.

2            MS. BARRON:  The breach was giving her the information

3    for the article.

4            THE COURT:  Right.  And that happened when?

5            MS. BARRON:  On May 15, around May 14 or 15, at the

6    exact time that this is happening, where Butowsky --

7            THE COURT:  It had to happen before this happened

8    because it's making reference to that.  He is saying that they

9    are already had the information.  Zimmerman has already written

10   the article.  Wheeler has already breached the agreement before

11   this conversation.

12           MS. BARRON:  The breach that caused the harm was

13   Wheeler going live.

14           THE COURT:  I thought it was Wheeler disclosing the

15   information to Zimmerman and for Zimmerman to put in the

16   article.

17           MS. BARRON:  Correct.  But the harm results from

18   putting it in the article and Butowsky is the one who says

19   close this deal, whatever you have got to do.  It's not correct

20   that only Zimmerman was procuring that breach and benefiting

21   from that breach.  And the breach --

22           THE COURT:  I don't understand.  If you argue that

23   Wheeler had already reached the contract when he gave the

24   information to Zimmerman, then there can't be a second breach

25   of the contract after the contract is already breached by

1    publishing the article.

2            MS. BARRON:  I don't think that you can separate him

3    giving the information for her to publish in the article the

4    next day at the behest of Butowsky and Zimmerman from -- I

5    don't think you can separate that into two separate events.

6    That is the breach.

7            THE COURT:  Are you saying that Butowsky did something

8    personally to procure the breach or are you saying that he is

9    somehow vicariously liable for Zimmerman?

10           MS. BARRON:  This is in paragraph 74.  It says:

11   Butowsky left Wheeler a voice mail telling him to close this

12   deal, whatever you've got to do.  So Butowsky, for whatever

13   reason, thought that he needed to add his influence to get

14   Wheeler to give this information to Fox News in New York.

15           THE COURT:  I guess the other part I should have asked

16   earlier is that doesn't the procuring the breach have to be

17   some sort of wrongful means, some sort of wrongful conduct?

18   I'm not sure that you can argue that if I say close this deal,

19   whatever you got to do, constitutes wrongful conduct for

20   tortious interference.  I can't just simply say, well, why

21   don't you breach your contract and that alone doesn't

22   constitute wrongful means for breach of contract.

23           MS. BARRON:  Tricking someone into signing a

24   contract --

25           THE COURT:  That's different.  Tricking someone might.

1    That could be wrongful means.  But you don't claim Butowsky or

2    Zimmerman tricked Wheeler into breaching the contract.  You

3    just say that they asked him to breach the contract.  Why would

4    that constitute wrongful means for a tortious interference?

5              MS. BARRON:  Mr. Butowsky orchestrated the entire

6    scheme of having the contract entered into in the first place

7    and ultimately procuring its breach, knowing, because he

8    drafted the contract, that there was a confidentiality

9    agreement and that the Riches had very explicitly taken out of

10   that agreement Mr. Wheeler's right to represent them in public

11   and, instead, had put in something saying that you cannot speak

12   to the press under any circumstances without our approval.  It

13   is wrongful conduct for him then to call Wheeler and say, close

14   this deal, breaching everything about that agreement by sending

15   this information to Fox News in New York to be published in New

16   York.

17             Just going to your distinction between tortious

18   interference and IIED, it's all part of the same conduct, all

19   of which was ultimately directed to New York.

20             If you are not convinced that that single e-mail is

21   enough, at the very least, jurisdictional discovery, we think

22   it's enough.  Unless you have other questions, I will leave it

23   at that.

24             THE COURT:  Sure.  That's good.

25             Did you want to quickly respond?

1          MR. SUBRAMANIAN:  Your Honor, before the defendants

2     reply, just on the last point that you raised, just one case

3     that might clear it up.

4          THE COURT:  Sure.

5          MR. SUBRAMANIAN:  Your Honor brings up out of the

6     intent requirement for tortious interference, and Fox in its

7     reply says that for an existing contract the defendant has to

8     have a sole intent to harm the plaintiff, and they say that in

9     their brief and they point to a 1997 case called *Elliott*

10    *Associates* that was raised for the first time in reply.

11         That case is analyzed in a subsequent decision, a 2004

12    decision from the Eastern District of New York, which is called

13    *Flash Electronics v. Universal Music*.  If I can hand up that

14    decision.

15         THE COURT:  Sure.

16         MR. SUBRAMANIAN:  I think it might get us the answer

17    to what your Honor just asked.

18         Your Honor, what the Court in *Flash Electronics* says,

19    on page 18 of the printout, and I've highlighted it.  It's text

20    in the page and also footnote 13.  It says that the 1997 *Elliot*

21    *Associates* case was based on older decisions that had been

22    superseded by the New York Court of Appeals decision in the

23    *Guard-life* case.

24         And if you look in the text, it gets to this wrongful

25    means question that you raised, your Honor, and it makes clear

1    that where there is an actual existing contract, there is no

2    wrongful means requirement.  And what the Court says is:  Where

3    there is an existing enforceable contract and a defendant's

4    deliberate interference results in a breach of that contract, a

5    plaintiff may recover damages for tortious interference with

6    contractual relations even if the defendant was engaged in

7    lawful behavior.

8            Then it goes on to say that there are cases involving

9    prospective relations, tortious interference with prospective

10   relations, and for those situations there is a wrongful means

11   requirement.

12           With that, I'll leave it to our briefing because we do

13   address both standards and how they play out in this case.

14           MR. TERRY:  Your Honor, I'll be brief, in light of the

15   hour.

16           I want to start first with the tortious interference

17   questions since we just talked about that.  I think the

18   questions you were asking Mr. Subramanian get right to the

19   heart of the problem with the claim.

20           If the scheme that they allege was that Wheeler was

21   always going to provide information, no matter what the

22   contract says, then Ms. Zimmerman, Fox, and Mr. Butowsky can't

23   possibly be liable for inducing that breach.

24           One of the cases we cite, which is the *Huggins* case,

25   *Huggins v. Povich*, makes the very point you were making.  It

16KMBIGO

1  concludes:  There was no inducement because "she needed no

2  inducement from defendant to breach the confidentiality

3  agreements.  Her actions were willful and intentional and done

4  with complete and knowing disregard of the confidentiality

5  agreement.  There was an ellipses.  That is the essence of the

6  quote from the Huggins case.

7        And Mr. Butowsky actually makes this argument at pages

8  9 and 10 of his brief that there cannot be tortious

9  interference where a party has a propensity to breach.  Their

10  entire claim is predicated on Wheeler's intent and propensity

11  to breach.  He was not induced.  He is alleged to have been

12  planning that from the very outset.

13        And with regard to whether or not it's a sole purpose

14  standard or some other standard, it's truly irrelevant.  There

15  is no case that plaintiffs have cited to where a reporter

16  asking a source for information, even in violation of a

17  confidentiality agreement, is somehow tortious interference.

18  If that were the case, confidentiality agreements could be used

19  as a means of restricting the media's access to all sorts of

20  information, whether coming from corporations or government

21  agencies.

22        THE COURT:  I read that analysis somewhere, but I am

23  not sure I completely agree with that.  If it's important to my

24  business that I keep certain information confidential, I am not

25  sure that a person with impunity simply decide they want to

1   give it up to a report.

2           MR. TERRY:  I agree with that absolutely.  There is a

3   remedy for that.  That remedy is breach of contract.  And they

4   have not sued Mr. Wheeler for breach of contract.  If they

5   think he breached his contract, they can sue him.  The remedy

6   is not tortious interference because tortious interference,

7   even under their articulation, requires that the action be

8   without justification, and they have not cited and I'm not

9   aware of any cases finding that reporting conduct is without

10  justification.

11          With regard to the intentional interference claim, I

12  think that the plaintiffs' presentation was notable for many

13  things which you did not hear.  You didn't hear any New York

14  cases permitting a claim based upon defamatory statements made

15  about another.  You didn't hear any New York cases allowing

16  such a claim to proceed based upon news reports or news

17  gathering, which is what's alleged here.  You also didn't hear

18  anything about an intent possessed by Fox to harm the Riches,

19  and that's important because a lot of the cases that they cite,

20  including the one that they really rely on, which is the

21  Natalee Holloway case, which is a magistrate judge opinion from

22  the Northern District of Alabama.  That's their key case.  It's

23  relying on Alabama law.  It's not relying on *Howell* or New York

24  law.

25          And it gets around the of and concerning requirement

1    by saying there was a direct and intentional effort to harm the

2    plaintiffs.  It's a footnote in the case and it's critical

3    because that is how the Court gets around the constitutional

4    requirement of of and concerning.  It says:  The conduct at

5    issue here is actionable because the defendants allegedly knew

6    that the plaintiff would suffer great distress and allegedly

7    intended, and the Court italicized the word intended, intended

8    to inflict harm upon her.  That's how they handled the of and

9    concerning requirement by saying this basically is the same

10   thing as the statement it's of and concerning the plaintiff

11   because it was an intentional gatherer of sorts wielded.

12        Those facts aren't alleged here.  There is no

13   allegation that Fox intended to hurt anyone.  To the contrary,

14   as they describe it, they describe themselves as being

15   collateral damage, not as intentional victims of misconduct.

16   That's a direct quote from the complaint.

17        I think it's also notable that when you asked Mr. Gail

18   about what the source of the damage was at the beginning of

19   their presentation, he said, I won't say it was the publication

20   of the article that caused the injury.  Now, the reason he

21   wouldn't say that is because if that is the basis of their

22   claim, it's barred by the of and concerning requirement.  It's

23   also barred by *Snyder* and it's barred by New York common law.

24        Unfortunately for them, their complaint is replete

25   with allegations that the damage comes from the publication

1   itself.  I can point you to the particular paragraphs.  But we

2   have talked about them.  It's paragraphs 133, 132E, C, 118,

3   119.  They say it is the publication of this information about

4   Seth Rich which is what caused the damage.

5          Now, they note there are a number of cases where

6   intentional infliction claims have been permitted or discussed

7   as possibly being amenable to proceeding based on conduct as

8   opposed to statements in the publication itself.  I think a key

9   distinction with those cases are that the conduct itself was

10  alleged to have been an independent tort, and that goes back to

11  the *Onassis* cases, which is one of the critical cases they rely

12  on, which is a New York case, the only case where anything

13  approaching news gathering is held to be actionable, and it is

14  where paparazzi are chasing the Kennedy family around,

15  physically endangering them, assaulting them, and battering

16  them, which was found by the Court, and they allowed an

17  intentional infliction claim to proceed because that conduct by

18  itself was tortious.

19         That's exactly like the concurrence by Justice Breyer

20  from *Snyder* that they discussed where there is an independent

21  tort committed by itself in the action of news gathering.  That

22  could be actionable.  That could be actionable as assault or

23  battery or intentional infliction of emotional distress.  It's

24  not a get-out-of-jail-free card just because you're a reporter.

25         What's different about that instance and the cases

I6KMRIGO

1    they rely on is their independent torts without reference to

2    the publication.  I would defy anyone to try and read that

3    complaint and think about how it could possibly allege an

4    injury without any reference to the publication.  The injury is

5    specifically alleged to have come from the publication.

6         Imagine a world in which everything happened up until

7    the point of publication.  And Malia Zimmerman said, you know

8    what, I don't want to go with this article.  There would be no

9    tort.  There would be no alleged damages.

10        All of their damages stem from the act of publication.

11   They don't cite a single case that comes anywhere close to the

12   activities actually alleged here.  There is no case that's

13   found activity like this to be considered outrageous.  When

14   they attempt to articulate what happened, it's an act of

15   deception.  Your Honor had a colloquy with them about that.

16        New York courts have found that acts of deception

17   alone are not enough to state a cause of action, even when it

18   causes intention emotional distress.  The *Doe* case, rape

19   victims were lied to about whether their identity would be

20   protected.  They were lied to repeatedly and the Court said

21   that's not enough to state a claim for intentional infliction

22   of emotional distress.

23        There is another case where someone was lied to about

24   whether or not he would be on the air and the nature of the

25   interview, and then the tapes were edited in a misleading way,

16KMRIGO

 1    in a way that made him look bad.  So it wasn't just the

 2    content.  It was the activity.  And what the Court said was,

 3    you are talking about activity, but your claim stems from the

 4    final broadcast because that's where the impact, the injury

 5    happened to you.  And because it's based on the broadcast and

 6    its effect on you, that's really a defamation claim, and you

 7    can't get around that by rephrasing it as a claim for

 8    intentional infliction of emotional distress.

 9            I have not looked for very long at the cases that the

10    plaintiffs just handed up today, but I would note in at least

11    one of them, the *Gill* case, there was an allegation, like in

12    the *Holloway* case, that something was done intentionally to

13    harm a business competitor and it was directed at them for the

14    purpose of causing that harm.  There are no allegations

15    anywhere close to that in this case.

16            I would also note that the cases that the plaintiffs

17    rely on don't involve one of the critical questions here, which

18    is a communication on an issue of public concern.  The New York

19    cases they rely on, like the Howard Stern case and the *Esposito*

20    case, aren't public concern cases.  They are shock jocks.

21            The *Esposito* case, like in the *Holloway* case, the

22    Court relied on the fact that there was an intent to harm that

23    person and it was directed at that person for the purpose of

24    committing that harm.

25            The Howard Stern case, the facts were gruesome.  The

16KMRIGO

1  person on the air was actually chewing on human remains and

2  that was found to be an intentional infliction of emotional

3  distress.

4       One thing we didn't talk about or didn't hear the

5  plaintiffs talk too much about is what the intentional

6  infliction standard actually is.  It's not just outrage by

7  itself.  It has got to be conduct that is utterly unacceptable

8  in civilized society.

9       I would submit that the Howard Stern case is a pretty

10  good example of where courts find that that has crossed the

11  line.  The *Doe* case, even lying to rape victims about whether

12  they will be on the air, is not enough.  The facts alleged in

13  this case are not nearly enough, and I think that's

14  particularly evident and I'll finish by mentioning this.

15       The plaintiffs' chart of what Ms. Zimmerman actually

16  did, if you take a look, it's handily color coded so you can

17  see exactly what different parties are alleged to have done.

18  Ms. Zimmerman is in red.

19       She is alleged to have met with Wheeler and told him

20  that she had been investigating Seth's murder for months.

21  That's January 28.

22       February 5, she e-mails Joel Rich for information to

23  bring further attention to Seth Rich's case, which was

24  certainly true.

25       January 3, 2017, she e-mails Joel and the Rich family

1    spokesman about Seth's murder.

2          April 23, she sends Wheeler numerous e-mails with

3    research about Detective Della Camera and the Metropolitan

4    Police Department's investigation of Seth Rich.

5          She sends Wheeler a draft of the article and tells

6    Joel that much of our information came from Wheeler, which I

7    thought is what we were being sued for on the tortious

8    interference claim.  I am not sure how they can allege that's

9    false when they say we tortiously got information from Wheeler.

10   And she says that she admits to Wheeler that that's the e-mail

11   that Fox asked me to send to Joel.

12         None of that comes close to the type of outrageous

13   behavior that was alleged in these cases.  All of that activity

14   that they say, that's news-gathering activity.  That's not

15   activity that's utterly unacceptable in civilized society.  It

16   doesn't come close to meeting the standard.

17         We don't need more facts or more discovery to answer

18   that question.  The facts of what caused outrage, if it's truly

19   outrageous, they should know because that conduct must have

20   caused them some emotional harm.

21         The only conduct that is alleged to have caused them

22   emotional harm is the publication of that article and that's

23   protected by the First Amendment and it doesn't come close to

24   being unacceptable in civilized society.

25         THE COURT:  Did you have anything?

1              MR. HARRISON:  Two quick points.

2              Counsel had raised the issue of whether communications

3    in the forum state were sufficient for jurisdiction, and we

4    cited a number of cases in our briefing that said that it's

5    not.

6              She raised today for the first time one case, Court of

7    Appeals case from 1970.  I just had an opportunity to read it.

8    I think your Honor noted this, but I just wanted to make clear,

9    this was a breach of contract case in which the defendant had

10   been engaged in commercial activity by submitting bids for an

11   auction over the phone.  There was a lawsuit that resulted

12   because that defendant failed to pay for the artwork that he

13   was bidding on.  The Court found that that commercial activity

14   in the course of calling in those bids from a foreign

15   jurisdiction was sufficient to confer jurisdiction in that

16   case.

17             THE COURT:  Thank you.

18             MR. HARRISON:  One other point I wanted to make is

19   that counsel also alluded to the fact that Mr. Butowsky had

20   some control over or where the article was published.  He did

21   not.  She in fact suggested that he could have orchestrated the

22   publication of that article in D.C. or in New York.  It's

23   certainly not alleged.  He certainly didn't have any sort of

24   editorial or control over the publication.  But the fact is

25   that Fox News is based in New York.  That is where it, from

16KMRIGO

1    what I understand, publishes online articles.  The location of

2    Fox News in that context really has nothing to do with the

3    transaction itself.

4             THE COURT:  Thank you.

5             If you want to submit something further, submit me a

6    letter before the end of the month and then a response.  The

7    end of the month is probably the 29th of June.  If you want to

8    respond to it, do so by the 10th of July, which is after 4th of

9    July week, so you can have some time to do that, the Tuesday

10   after.

11            I am going to get the transcript.  This has been

12   helpful.  I will get you a decision as early as possible this

13   summer.

14            Thank you.

15            (Adjourned)

16

17

18

19

20

21

22

23

24

25