**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOEL RICH and MARY RICH,

                     Plaintiffs,

         -against-

FOX NEWS NETWORK, LLC, MALIA
ZIMMERMAN, *in her individual and professional
capacities*, and ED BUTOWSKY, *in his individual
and professional capacities*,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 0 2 2018**

<u>MEMORANDUM DECISION
AND ORDER</u>

18 Civ. 2223 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

       Plaintiffs Joel and Mary Rich bring this action against Defendants Fox News Network, LLC,

Fox News reporter Malia Zimmerman (together with Fox News, the "Fox Defendants"), and Fox

News contributor Ed Butowsky asserting claims for intentional infliction of emotional distress

("IIED") and for aiding and abetting and conspiring to intentionally inflict emotional distress on

Plaintiffs. (Compl., ECF No. 7, ¶¶ 135–71.) Plaintiffs principally allege that Defendants conspired

to cause Plaintiffs severe emotional distress by publishing a news article reporting that their son, Seth

Rich, a former Democratic National Committee ("DNC") employee, was murdered for leaking

sensitive, private emails from DNC servers to WikiLeaks. (*See id.*) Plaintiffs also assert a claim

against all Defendants for tortious interference with Plaintiffs' contract with Fox News contributor

and private investigator Rod Wheeler, as well as a claim against Fox News for its negligent

supervision and/or retention of Zimmerman and Wheeler.[1]  (*Id.* ¶¶ 172–84.)  Defendants move to

---

[1] Before Plaintiffs brought this suit, Rod Wheeler filed an action pending before this Court in which he asserts
claims for defamation and libel against Fox News, Zimmerman, and Butowsky arising out of Fox News's
coverage of Wheeler's investigation into Seth Rich's murder. (Am. Compl., *Wheeler v. Twenty-First Century*

dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] (*See* ECF Nos. 35, 51.)

Defendants' motions to dismiss for failure to state a claim are GRANTED.

## I.    FACTUAL BACKGROUND

Plaintiffs are the parents of Seth Rich, a Democratic National Committee ("DNC") employee who was murdered on July 10, 2016. (Compl. ¶¶ 2, 13, 16.) Although the murder is still being investigated by the Washington D.C. Metropolitan Police Department ("MPDC") and remains unresolved, the MPDC's investigation supports the conclusion that Seth Rich's murder was the result of a botched robbery. (*Id.* ¶ 17.) According to Plaintiffs, however, Defendants have publicized a different and patently fictitious story about the circumstances of their son's murder.

On July 22, 2016, more than 44,000 private emails from the DNC were published on a website maintained by the organization known as WikiLeaks. (*Id.* ¶ 19.) According to Plaintiffs, a conspiracy theory developed among some political groups that Seth Rich was murdered because he provided the DNC emails to WikiLeaks. (*Id.* ¶¶ 3, 22.) On August 22, 2016, Plaintiffs issued a response to the conspiracy theory, which stated, in part:

> [S]ome are attempting to politicize this horrible tragedy, and in their attempts to do so, are actually causing more harm than good and impeding . . . the ability of law enforcement to properly do their job. For the sake of finding Seth's killer, and for the sake of giving the family the space they need at this terrible time, they are asking for the public to refrain from pushing unproven and harmful theories about Seth's murder.

(*Id.* ¶ 23.)

---

*Fox, Inc.*, No. 17-cv-5807 (S.D.N.Y. Oct. 23, 2017), ECF No. 56.) The defendants in that case filed motions to dismiss, which are addressed in a separate opinion filed today.

[2] Butowsky also moves to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. However, because Plaintiffs' claims against all Defendants fail on their merits, *see* Section III, *infra*, this Court declines to address Butowsky's jurisdictional arguments.

On or about December 17, 2016, Butowsky made contact with Plaintiffs through a Facebook post indicating that he was "looking to connect with anyone Jewish in Omaha[,] Nebraska." (Compl. ¶ 25.)  Butowsky spoke with Plaintiffs by phone and informed them that he had heard WikiLeaks received the DNC emails from Seth Rich. (*Id.* ¶¶ 25–26.)  Plaintiffs, however, denied that their son had done so. (*Id.* ¶ 26.)  On January 3, 2017, Butowsky sent Joel Rich a follow-up email with the subject line, "Please call ed [sic] Butowsky.  We met through Jeremy from your temple." (*Id.* ¶ 27.)

That same day, Zimmerman emailed Brad Bauman, who was handling press inquiries on Plaintiffs' behalf, asking for information about Seth Rich's murder. (*Id.* ¶ 28.)  When Bauman responded, Zimmerman wrote back that she "would want to get the information directly from [Joel Rich] or law enforcement to ensure its accuracy." (*Id.*)  Accordingly, on January 5, 2017, Zimmerman emailed Joel Rich requesting information about Seth for stories she was writing, claiming that she wanted to "bring further attention to his case." (*Id.* ¶ 30.)  Joel Rich responded by sending Zimmerman information about Seth as well as photographs of him. (*Id.*)

On January 20, 2017, Butowsky called Joel Rich and encouraged him to look at Seth's bank account to see if there were any payments posted from WikiLeaks.  Plaintiffs, however, again assured Butowsky that rumors about Seth Rich and WikiLeaks were "baseless." (*Id.* ¶¶ 31–32.)

On February 23, 2017, Butowsky sent a text message to Rod Wheeler stating that he was "looking for some assistance on something that happened in Washington" and asking him to call. (*Id.* ¶ 34.)  Wheeler, a former MPDC homicide detective turned private investigator, was then under contract with Fox News to appear as an on-air contributor, as well as to provide "off-air assistance, as requested by Fox."[3] (*Id.* ¶ 33.)  When Wheeler called, Butowsky stated that he was working with

---

[3] Plaintiffs have not named Wheeler as a Defendant in this lawsuit.

Zimmerman at Fox News on an article about Seth Rich and wanted Wheeler to conduct an investigation into his murder. (*Id.* ¶ 35.)

On February 28, 2017, Wheeler met with Butowsky and Zimmerman. (*Id.* ¶ 37.) Plaintiffs allege that Butowsky, Zimmerman, and Fox News "sought to have Wheeler plausibly corroborate the sham story . . . that Seth gave the DNC emails to WikiLeaks." (*Id.* ¶ 39.) That same day, Butowsky sent an email to Plaintiffs offering to hire Wheeler on their behalf to investigate their son's murder. (*Id.* ¶ 41.) Wheeler also spoke with Plaintiffs directly about the prospective investigation, though he did not mention that he had met with Zimmerman. (*Id.* ¶ 43.)

On March 3, 2017, Butowsky sent Joel Rich a draft of an engagement agreement between Plaintiffs and Wheeler, which stated that Wheeler would provide "media representation" for the Rich family and that he would "[i]nterview, investigate, and represent" Seth's family members "in any and all media contacts and with regards to the official police investigation surrounding the death of Seth Rich." (*Id.* ¶ 45.) Plaintiffs, however, told Butowsky and Wheeler that they would not allow Wheeler to serve as their media representative unless Plaintiffs would have complete control over the comments Wheeler made publicly on their behalf. (*Id.* ¶¶ 46–47.) Butowsky told Plaintiffs that he would accept Plaintiffs' condition. (*Id.* ¶ 47.)

On March 5, 2017, Butowsky followed up and urged Plaintiffs to allow him to hire and pay for Wheeler's services on their behalf, appealing to their "need to get closure, as a family." (*Id.* ¶ 49.) Butowsky assured Plaintiffs that his motivation in offering to pay Wheeler on Plaintiffs' behalf was purely altruistic, and that he was concerned about the rumors circulating about Seth. (*Id.* ¶ 50.) Butowsky further assured Plaintiffs that he would not be involved any longer and that Wheeler would take his directions from, and provide all information directly to, Plaintiffs. (*Id.* ¶ 51.) Butowsky told Plaintiffs that they would "never see me ever talk about this anywhere." (*Id.*) In a phone call with

Joel Rich on March 13, 2017, Butowsky reiterated that he would respect Wheeler's obligation not to speak about his investigation to anyone but Plaintiffs.  (*Id.* ¶ 54.)

On March 14, 2017, Plaintiffs executed a contract with Wheeler's private investigation firm, Capitol Investigations, LLC.  (*Id.* ¶ 56.)  The contract stated, among other things, that "[t]he representation shall not include media representation, unless otherwise permitted by [Plaintiffs] in writing." (*Id.* ¶ 57.) The contract also stated, "Capitol Investigations shall not release any information regarding the investigation, including but not limited to findings, working theories or path [sic] forward to any third party without prior authorization by [Plaintiffs] unless that third party is an investigating agency, i.e. Metropolitan Police Department and the FBI." (*Id.*)

On April 9, 2017, Wheeler sent a text message to Zimmerman stating, "I'm ready to say Seths [sic] Death [sic] was not a botched robbery." (*Id.* ¶ 60.) On April 18, 2017, Butowsky sent Wheeler a text message stating that he would be "meeting [White House Press Secretary] Sean Spicer and want you with me." (*Id.* ¶ 61.) Wheeler and Butowsky met with Spicer two days later and provided Spicer with written materials relating to Wheeler's investigation. (*Id.* ¶ 63.) Neither Wheeler nor Butowsky asked Plaintiffs for permission prior to meeting with Spicer, nor had they informed Plaintiffs of the meeting. (*Id.* ¶ 65.)

On April 24, 2017, and with Plaintiffs' approval, Wheeler obtained an interview with MPDC Detective Della-Camera, the lead homicide detective investigating Seth Rich's murder. (*Id.* ¶ 66.) The night before the interview, Butowsky sent an email to Wheeler stating, "Della camera [sic] is either helping us or we will go after him as part of the coverup [sic]." (*Id.* ¶ 67.) Zimmerman then sent Wheeler several emails, some of which were copied to Butowsky, with information about Detective Della-Camera and the MPDC's investigation into Seth Rich's murder. (*Id.* ¶ 68.)

On May 10, 2017, Butowsky and Zimmerman advised Wheeler that an FBI source had confirmed that emails were exchanged between Seth and WikiLeaks. (*Id.* ¶ 69.) Butowsky and Zimmerman also told Wheeler that they would be meeting with the source and would provide Wheeler with details from the meeting. (*Id.*) However, Plaintiffs allege that, in fact, Zimmerman and Butowsky did not have such a source. (*Id.* ¶ 79.) The next day, Zimmerman sent Wheeler a copy of an article she had drafted for publication by Fox News (the "Zimmerman/Fox Article"), reporting on Seth Rich's alleged disclosure of DNC emails to WikiLeaks. (*Id.* ¶¶ 70, 72.) Zimmerman worked on and exchanged multiple drafts of the Zimmerman/Fox Article with Butowsky. (*Id.* ¶ 71.)

On May 15, 2017, Zimmerman told Wheeler that the "bosses at Fox" wanted the Zimmerman/Fox Article published the next day, while Butowsky left Wheeler a voicemail telling him to "close this deal, whatever you got to do." (*Id.* ¶ 74.) That same day, Zimmerman also contacted Plaintiffs to request their comment on a FBI report showing that Seth Rich had disclosed the DNC emails to WikiLeaks. (*Id.* ¶ 78.) Also on May 15, 2017, Wheeler spoke with Joel Rich about the Zimmerman/Fox Article, which Rich maintained was false. (*Id.* ¶ 80.)

Nevertheless, on May 16, 2017, Fox News published the Zimmerman/Fox Article. (*Id.* ¶ 87.) The article contained a quote from an unnamed federal investigator stating, "I have seen and read the emails between Seth Rich and WikiLeaks." (*Id.*) The article also noted that the federal investigator's "revelation" was "consistent with the findings of Rod Wheeler, a former DC homicide detective and Fox News contributor whose private investigation firm was hired by Rich's family to probe the case." (*Id.* ¶ 88.) In addition, the article quoted Wheeler as stating, "[m]y investigation up to this point shows there was some degree of email exchange between Seth Rich and WikiLeaks." (*Id.* ¶ 89.) Plaintiffs allege that the quotes attributed to the federal investigator and Wheeler were false. (*Id.* ¶¶ 87, 91.)

Later that day, Fox News published a second article that stated, among other things, "Rod Wheeler, a retired Washington [D.C.] homicide detective and Fox News contributor investigating the case on behalf of the Rich Family, made the WikiLeaks claim, which was corroborated by a federal investigator who spoke to Fox News." (*Id.* ¶ 90.) The second article also stated that "a spokesman for Rich's family on Tuesday said Wheeler was not authorized to speak for the family. . . ." (*Id.*)

Over the next several days following the publication of both articles, Seth Rich's murder and the Zimmerman/Fox Article were covered on various Fox News programs and in other media sources. (*Id.* ¶ 104.) In addition, on May 22, 2017, Wheeler issued a public media release indicating that he was "of the personal opinion that the information/article reported by Fox News Channel was essentially correct and worthy of further investigation." (*Id.* ¶ 105.) However, the next day, Fox News issued a retraction of the Zimmerman/Fox Article, explaining that the article "was not initially subjected to the high degree of editorial scrutiny we require for all our reporting[]" and that "[u]pon appropriate review, [it] was found not to meet those standards and has since been removed." (*Id.* ¶¶ 106–07.)

Even after the Zimmerman/Fox Article was retracted, various Fox News programs continued to discuss Seth Rich's murder. (*Id.* ¶ 108.) Plaintiffs allege that this coverage was designed to "exploit the sham story" that was the subject of the Zimmerman/Fox Article in order to boost Fox News's ratings. (*Id.* ¶ 109.) Plaintiffs further allege that Butowsky continued to publicly discuss the Zimmerman/Fox Article, including on Twitter. One Tweet, for example, suggested that Plaintiffs had confirmed that Aaron Rich, Seth's brother, received money from WikiLeaks in his personal bank account. (*Id.* ¶ 113.) In addition, on August 16, 2017, Butowsky told National Public Radio that "every word" of the Zimmerman/Fox Article was true. (*Id.* ¶ 114.)

After the retraction of the Zimmerman/Fox Article, Butowsky remained in contact with Plaintiffs. On May 25, 2017, for instance, Butowsky sent Joel Rich a text message stating, in part, "I kept thinking at some point you would explain the things written about me were not true but you never did. . . . The idea that I conspired to do something which I have no idea what that could've been is complete hogwash made up by . . . Bauman." (*Id.* ¶ 111.) The text message stated further, "You should call Malia Zimmerman. She found the person and the gun that was used to shoot your son. . . . When you find out who did it you are going to be very very emotional." (*Id.*) Plaintiffs allege that Butowsky continued calling, texting, and leaving voicemails for Joel Rich. (*Id.* ¶ 117.)

Plaintiffs further allege that the Zimmerman/Fox Article, together with the Defendants' overall conduct, has caused them "intense distress." (*Id.* ¶ 128.) Plaintiffs allege that they both now exhibit symptoms consistent with post-traumatic stress disorder and obsessive-compulsive behavior and that Mary Rich experiences symptoms consistent with social anxiety disorder. (*Id.* ¶¶ 130–31.) Plaintiffs further allege that they experience feelings of anxiety, and have developed a "hypersensitivity to potentially being harassed, threatened, and harmed." (*Id.* ¶¶ 132(A)–(B).) As a result, they claim they have installed three video cameras outside their home to detect unwanted visitors. (*Id.* ¶ 132(B).)

In addition, Plaintiffs allege that Mary Rich was laid off shortly before her son's death, but that she had received a job offer on the same night that the Zimmerman/Fox Article was published. (*Id.* ¶ 133.) Plaintiffs allege that as a result of the publication of the Zimmerman/Fox Article and subsequent media coverage, she became distraught and was unable to accept the job. (*Id.*) Plaintiffs further allege that although Mary Rich had a "preexisting neurological condition, which was being managed with regular treatment," her condition has become aggravated such that she has been unable to return to work. (*Id.*)

## II.   LEGAL STANDARDS

"A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in a complaint." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 119–20 (S.D.N.Y. 2015).  To survive such a motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a Rule 12(b)(6) motion, a court "accept[s] all factual allegations in the complaint as true . . . and draw[s] all reasonable inferences" in favor of the plaintiff.  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  A court is "not, however, 'bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## III.   THE COMPLAINT FAILS TO STATE A CLAIM

Plaintiffs assert several state law claims against Fox News, Zimmerman, and Butowsky for IIED, as well as conspiring to commit and aiding and abetting IIED, and tortious interference with contract.  (*See id.* ¶¶ 136–44, 146–56, 158–71, 173–77.)   Plaintiffs also assert a claim against Fox News for the negligent supervision and/or retention of Zimmerman and Wheeler. (*Id.* ¶¶ 179–84.) However, each of Plaintiffs' claims fail to adequately allege essential elements of the causes of action asserted.  Accordingly, Plaintiffs' complaint is dismissed in its entirety.

### A. Intentional Infliction of Emotional Distress

To state a claim for IIED under New York law, a plaintiff must adequately allege: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between

the conduct and the injury, and (4) severe emotional distress."[4] *Friedman v. Self Help Cmty. Servs.,*

*Inc.,* 647 F. App'x 44, 47 (2d Cir. 2016).   To form the basis of an IIED claim, the conduct must be

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious, and utterly intolerable in a civilized society." *Howell v. New York*

*Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1999)).

This "standard . . . is 'rigorous, and difficult to satisfy.'" *Conboy v. AT&T Corp.,* 241 F.3d

242, 258 (2d Cir. 2001) (quoting *Howell,* 612 N.E.2d at 702); *see also DiRuzza v. Lanza,* 685 F.

App'x 34, 36 (2d Cir. 2017) ("A claim for [IIED] must satisfy an 'exceedingly high legal standard'"

and is available "only as a last resort").   "Actions 'likely [to] be considered reprehensible by most

people' are not sufficient." *DiRuzza,* 685 F. App'x at 37 (citation omitted); *see also Ponticelli v.*

*Zurich Am. Ins. Grp.,* 16 F. Supp. 2d 414, 441 (S.D.N.Y. 1998) ("[C]onduct [that is] undoubtedly

unprofessional, distasteful, and improper, does not rise to the level of extreme and outrageous

behavior required for an IIED claim in New York.")   Indeed, of all the IIED claims the New York

Court of Appeals has considered, "every one has failed because the alleged conduct was not

sufficiently outrageous.'" *DiRuzza,* 685 F. App'x at 37 (quoting *Chanko v. Am. Broad. Cos.,* 49

N.E.3d 1171, 1179 (N.Y. 2016)) (alterations and omission in original).

As courts have observed, defamatory statements to news outlets "fall well short of meeting

the high standard for extreme and outrageous conduct." *Cruz v. Marchetto,* No. 11 Civ. 8378 (RWS),

2012 WL 4513484, at *5 (S.D.N.Y. Oct. 1, 2012) (collecting cases); *see also Restis v. Am. Coal.*

---

[4] Where, as here, a federal court's "subject matter jurisdiction is grounded on the diversity statute, and . . . the [d]istrict [c]ourt . . . sits in New York," a court "determine[s] the body of law that applies . . . with reference to New York's choice of law rules." *Booking v. Gen. Star Mgmt. Co.,* 254 F.3d 414, 419 (2d Cir. 2001). Under those rules, "the first step . . . is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Id.* "If there is no actual conflict, then the choice of law question is inconsequential and the forum state" may "appl[y] its own law." *Johnson v. Nextel Commc'ns, Inc.,* 660 F.3d 131, 138 (2d Cir. 2011). Because the parties rely on New York law and they have not identified an actual conflict between the relevant laws of New York and Nebraska, this Court applies New York law as the law of the forum.

*Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) ("[C]ourts in this Circuit have

recognized[] [that] defamatory statements generally cannot constitute the extreme and outrageous

behavior required for an [IIED] claim."). Moreover, "it is well established that where the crux of [a]

complaint sounds in defamation, court[s] will refuse to allow a cause of action for emotional distress,"

because a plaintiff cannot "circumvent[] the restrictions on defamation claims" by styling his claim

as one for IIED. *Croskey v. Med. & Tech. Servs., Inc.*, No. 05 Civ. 6641 (LMM), 2006 WL 2347816,

at *3 (S.D.N.Y. Aug. 10, 2006) (citing *Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 490

N.Y.S.2d 553, 555 (App. Div. 2d Dep't 1985)). Similarly, "courts have held that false statements or

misrepresentations—even if intentionally made—do not rise to the level of extreme and outrageous

conduct." *Baraliu v. Vinya Capital, L.P.*, No. 07 Civ. 4626 (MHD), 2009 WL 959578, at *12

(S.D.N.Y. Mar. 31, 2009) (citations omitted). Allegations that the false statements "would

have . . . an [emotionally distressing] effect because [plaintiff] is a religious [person]" do not render

the statements sufficiently outrageous to form the basis for an IIED claim. *Lawson v. N.Y. Billiards

Corp.*, 331 F. Supp. 2d 121, 133 (E.D.N.Y. 2004).

   In addition, "[c]ourts are reluctant to allow recovery under the banner of [IIED] absent a

deliberate and malicious campaign of harassment or intimidation." *Margrabe v. Sexter & Warmflash,

P.C.*, 353 F. App'x 547, 550 (2d Cir. 2009) (quoting *Cohn-Frankel v. United Synagogue of

Conservative Judaism*, 667 N.Y.S.2d 360, 362 (App. Div. 1st Dep't 1998)). To find such a campaign

exists, "New York courts appear to require that plaintiffs allege either an unrelenting campaign of

day in, day out harassment or that the harassment was accompanied by physical threats[.]" *Lawson*,

331 F. Supp. 2d at 133 (quoting *Nunez v. A-T Fin. Info., Inc.*, 957 F. Supp. 438, 442 (S.D.N.Y. 1997));

*see also Fleming v. Hymes-Esposito*, No. 12 Civ. 1154 (JPO), 2013 WL 1285431, at *9 (S.D.N.Y.

Mar. 29, 2013) (dismissing an IIED claim based on "defamation, . . . numerous phone calls,

and . . . unannounced visits . . . and [defendant's] refusal to leave after one particular visit"). When the alleged campaign is "based on 'abuse by defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests . . . liability usually has rested on a prolonged course of hounding by a variety of extreme methods.'" *Fiorito v. Ramos-Kelly*, No. 10 Civ. 4645 (LAP), 2010 WL 4967976, at *3 (S.D.N.Y. Dec. 2, 2010) (quoting *Lopez v. City of N.Y.*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995)).

Where a plaintiff asserts an IIED claim against multiple defendants, as here the "[p]laintiff cannot rest his [IIED] claim merely on defendants' alleged agreement to collaborate against him . . . . Instead, he must set forth, clearly and concisely, allegations of specific instances of each individual's conduct that rise to the level of 'extreme and outrageous' conduct." *Jones v. Trump*, 971 F. Supp. 783, 787 (S.D.N.Y. 1997). Absent such allegations, a plaintiff cannot recover for IIED even though the defendant may have acted with a tortious or criminal intent, or "his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); *see also Cusimano v. United Health Servs. Hosps., Inc.*, 937 N.Y.S.2d 413, 416, 418 (App. Div. 3d Dep't 2012) (finding plaintiff who alleged defendants "harbored ill will towards her" failed to state an IIED claim because the defendants' alleged conduct was not "outrageous").

Plaintiffs' allegations fall short of stating a claim for IIED. Plaintiffs allege that Butowsky and Zimmerman, acting in concert with Fox News, deceived Plaintiffs and capitalized on their vulnerability in the wake of their son's murder to develop a fake story that Fox News could report.[5]

---

[5] Plaintiffs and the Fox Defendants argue about whether the First Amendment would permit a claim for IIED based solely on speech. (*See* Pls. Consolidated Mem. in Opp'n to Defs.' Mots. to Dismiss ("Opp'n"), ECF No. 56, at 16, 19–22; Fox Defs. Mem. at 10–12). However, because the parties agree that Plaintiffs' IIED

(Compl. ¶ 136(A).)  It is understandable that Plaintiffs might feel that their grief and personal loss were taken advantage of, and that the tragic death of their son was exploited for political purposes. However, a general allegation that Defendants had an "agreement to collaborate against" Plaintiffs cannot form the basis for an IIED claim; rather, "specific instances of each individual's conduct" are required. *Jones*, 971 F. Supp. at 787.

Plaintiffs allege that the Zimmerman/Fox Article was false because it inaccurately stated that Seth Rich had leaked the DNC emails to WikiLeaks. (*Id.* ¶ 70.) Plaintiffs also allege that Zimmerman falsely told Plaintiffs about an FBI report that she claims showed Seth Rich had disclosed the DNC emails to WikiLeaks. (Compl. ¶¶ 78–79.)  However, even though Zimmerman's statements in the Zimmerman/Fox Article and to Plaintiffs about the FBI report were false, such "false statements or misrepresentations—even if intentionally made—do not rise to the level of extreme and outrageous conduct." *Baraliu*, 2009 WL 959578, at *12.

Plaintiffs also alleges that Butowsky used Plaintiffs' Jewish heritage and community ties to gain a favorable introduction to them by posting on his Facebook page that he was "looking to connect with anyone Jewish in Omaha[,] Nebraska." (Compl. ¶ 25.)  Yet, merely posting a false statement on Facebook is not "outrageous" conduct, and the fact that the post relates to Plaintiffs' religion does not make it so. *Lawson*, 331 F. Supp. 2d at 133.  Plaintiffs further allege that Butowsky made false statements to Plaintiffs concerning his motivations for paying for Wheeler's services, the degree of control Plaintiffs would have over Wheeler's and Butowsky's statements to the media, and Wheeler's independence and impartiality. (Compl. ¶¶ 41, 47–48, 50–52, 54–55.)  As noted above, however, making false statements does not constitute "extreme and outrageous conduct." *Baraliu*, 2009 WL 959578, at *12.

---

claim is based on a course of conduct that involves more than just speech, (*see* Opp'n at 3, 11, 18; Fox Defs. Mem. at 13–15; Butowsky Mem. at 10, 13), this Court need not reach that question.

Additionally, Plaintiffs allege that after the Zimmerman/Fox Article was published, Butowsky was quoted in several news reports as falsely stating that Plaintiffs had confirmed that Seth Rich leaked the DNC emails to WikiLeaks.[6] (Compl. ¶¶ 115–16.) However, such statements, even if false and defamatory, do not constitute extreme and outrageous conduct. *Cruz*, 2012 WL 4513484, at *5. Plaintiffs also allege that after the publication of the Zimmerman/Fox Article, Butowsky sent a text message to Joel Rich designed to "exploit Joel's emotions," posted tweets about the Zimmerman/Fox Article, and sent Joel Rich additional text messages and voicemails. (Compl. ¶¶ 111, 117, 136(I), 139.) Although such conduct may be "unprofessional, distasteful, and improper," it "does not rise to the level of extreme and outrageous behavior." *Ponticelli*, 16 F. Supp. 2d at 441.

As to Fox News, Plaintiffs allege generally that Fox News participated in a scheme with and directed Zimmerman's and Butowsky's activities. (Compl. ¶ 8; *see also id.* ¶¶ 165, 167–68.) However, the only conduct that Plaintiffs specifically attribute to Fox News relates to its publication of articles and news reports containing allegedly false statements.[7] (*See* Compl. ¶ 8; *see also id.* ¶¶ 136(E)–(F), 138.) Thus, the "crux" of the conduct Plaintiffs attribute to Fox News is defamation. However, Plaintiffs cannot "circumvent[] the restrictions on defamation claims" by styling their defamation claim as one for IIED. *Croskey*, 2006 WL 2347816, at *3. Moreover, the statements Plaintiffs identify concern Seth Rich, *not* Plaintiffs, (*See* Compl. ¶¶ 70, 87–89, 96), and it is well

---

[6] The Complaint also alleges that Butowsky sent an email to individuals at Fox News stating that he was "the one who's been putting this [Zimmerman/Fox Article] together," and that Zimmerman sent drafts of the Zimmerman/Fox Article to Butowsky. (Compl. ¶¶ 71, 82.) However, the complaint does not identify any specific actions Butowsky took relating to the Zimmerman/Fox Article.

[7] Plaintiffs also allege that Fox News "exploit[ed] the sham story" claiming Seth Rich had communicated with WikiLeaks "because it was good for ratings." (Compl. ¶ 109; *see also id.* ¶ 136(H).) But the statements Plaintiffs identify as "propagat[ing]" the story were made by third parties, not by Fox News. (*Id.* ¶ 108.) Moreover, even if those third parties could be considered to have been acting as agents of Fox News, a decision by a news network to publicize a false and defamatory story to increase its ratings, while perhaps "considered reprehensible by most people," *DiRuzza*, 685 F. App'x at 37, does not rise to the level of extreme or outrageous conduct.

settled that under New York law, "libel or slander upon . . . a deceased person which makes no direct reflection upon his relatives gives them no cause of action for defamation." *Infante v. Dignan*, 782 F. Supp. 2d 32, 37 (W.D.N.Y. 2011) (quoting *Rose v. Daily Mirror*, 31 N.E.2d 182, 182 (N.Y. 1940)).

Plaintiffs allege that the Zimmerman/Fox Article "implicated Joel and Mary" because readers would "infer[] that they were involved in establishing the (fictitious) facts" of the Zimmerman/Fox Article. (Compl. ¶ 136(C).) Yet, the Zimmerman/Fox Article expressly noted that "[Seth] Rich's father, Joel Rich, could not be reached for comment" and that Joel Rich had "told Fox News in January that he did not believe his son would leak the emails." [8] (Declaration of Joseph M. Terry dated May 7, 2018 ("Terry Decl."), Ex. 1, ECF No. 37-1, at 5.) Nonetheless, Plaintiffs assert, because the article states that Wheeler was hired by Plaintiffs, a reasonable reader could understand the Zimmerman/Fox Article as implying that Plaintiffs believed "what their own investigator found." (Opp'n at 14–15; *see also* Compl. ¶ 136(F).) However, Fox News published a second article stating that, according to a spokesperson for the Rich family, Wheeler had not been authorized to speak for Plaintiffs. (Compl. ¶ 90.) The second article further stated that the family viewed the Zimmerman/Fox Article's statements concerning Seth Rich's disclosure of the DNC emails to WikiLeaks as "unsubstantiated." (*See* Terry Decl., Ex. 3, ECF No. 37-3, at 2.)

Plaintiffs also allege that Fox News is vicariously liable for the conduct of Zimmerman and Wheeler because they were "employees and agents" of Fox News. (Compl. ¶ 142.) However, even assuming that Zimmerman and Wheeler were acting within the scope of their employment with Fox News when they engaged in the conduct alleged, their conduct is neither sufficiently extreme or nor outrageous to state a claim for IIED. Moreover, as with Zimmerman, Plaintiffs have failed to show

---

[8] Though neither the Zimmerman/Fox Article, nor the second article published by Fox News is attached to Plaintiffs' complaint, this Court may consider both articles because they are "incorporated into the complaint by reference, . . . and documents possessed by or known to the [P]laintiff[s] and upon which [they] relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

that Wheeler's conduct meets the "exceedingly high legal standard" of "extreme and outrageous" conduct needed to state an IIED claim. *DiRuzza*, 685 F. App'x at 36.

Plaintiffs allege that Wheeler failed to disclose to Plaintiffs that he met with Zimmerman and Butowsky. Plaintiffs also allege that Wheeler falsely represented to them that he would not speak to the press about his investigation without Plaintiffs' approval, and that he made false statements to the news media about Seth. (Compl. ¶¶ 43–44, 59, 63, 65, 75, 91, 93–94.) As explained above, false or defamatory statements, whether made to Plaintiffs or the news media, do not constitute extreme and outrageous conduct. *Cruz*, 2012 WL 4513484, at *5; *Baraliu*, 2009 WL 959578, at *12. Moreover, to the extent Plaintiffs assert Wheeler violated the confidentiality provisions in his agreement with Plaintiffs, such a claim may implicate a breach of contract by Wheeler, not IIED by Defendants. Because IIED may only be employed as a "last resort," the existence of such an alternative remedy precludes Plaintiffs from relying on these allegations as the basis for an IIED claim. *DiRuzza*, 685 F. App'x at 36. Thus, even assuming Zimmerman and Wheeler were acting as employees or agents of Fox News, Plaintiffs' allegations fail to state an IIED claim against Fox News.

Plaintiffs' characterization of Defendants' and Wheeler's actions as a "campaign" does not save their IIED claim. (Compl. ¶ 4; Opp'n at 36.) Plaintiffs do not allege that Defendants' actions occurred "day in" and "day out," or that Defendants made any physical threats. *Lawson*, 331 F. Supp. 2d at 133. Though Plaintiffs allege that Butowsky and Zimmerman pursued them to gain their trust and that Butowsky "deliberately and successfully cultivated Joel's trust," (Compl. ¶¶ 29, 50), Plaintiffs' allegations regarding Zimmerman and Butowsky do not amount to "hounding by . . . extreme methods." *Fiorito*, 2010 WL 4967976, at *3.

Plaintiffs also assert claims against all Defendants for conspiring to commit, and aiding and abetting the commission of, an IIED. (Compl. ¶¶ 145–71.) Because "[c]onspiracy allegations merely

serve to 'connect the actions of separate defendants with an otherwise actionable tort' . . . , allegations of an underlying tort are an essential component of a sufficiently pleaded claim of civil conspiracy." *Anthes v. N.Y. Univ.*, No. 17 Civ. 2511 (ALC), 2018 WL 1737540, at *11 (S.D.N.Y. Mar. 12, 2018) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986)); *see also Wilson v. Dantas*, 746 F.3d 530, 537 n.4 (2d Cir. 2014) ("As [plaintiff] has not alleged any actionable torts, his claim for civil conspiracy . . . also fails.") (citing *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 873 N.Y.S.2d 679, 685 (App. Div. 2d Dep't 2009). A claim for aiding and abetting also requires, among other things, "the existence of a[n underlying tort]." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)) (alteration in original). Because Plaintiffs have not adequately pled their IIED claim, their conspiracy and aiding and abetting claims must also be dismissed.

## B. Tortious Interference with Contract

To state a claim under New York law for tortious interference with contract, a plaintiff must allege: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). In addition, the plaintiff must show that "'but for' the activities of the defendant, there would have been no breach of the contract." *Int'l Minerals & Res., S.A. v. Bomar Res., Inc.*, 5 F. App'x 5, 8 (2d Cir. 2001) (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)). If the "plaintiff alleges facts . . . establishing that the breaching party was predisposed toward breaching its agreement, the claim for tortious interference must be dismissed for failure to plead 'but for' causation." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 293–94 (S.D.N.Y.

1998); *see also N. Shipping Funds I, LLC v. Icon Capital Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013) (dismissing tortious interference claim where plaintiff "allege[d] . . . that [the breaching party] 'lacked a good faith intention to carry out its material obligations in the . . . [a]greement'").

Plaintiffs' claim for tortious of interference with contract fails because the facts alleged in the complaint establish that Wheeler "was predisposed toward breaching" his agreement with Plaintiffs. *Granite Partners*, 17 F. Supp. 2d at 293–94. Indeed, the complaint itself alleges that Wheeler treated Butowsky, Zimmerman, and Fox News as his clients, rather than Plaintiffs, as he had promised them. (Compl. ¶ 136(D).) Plaintiffs assert that Defendants were the "but for" cause of Wheeler's breach because Defendants "orchestrat[ed] the relationship between Wheeler and Joel and Mary." (Opp'n at 32.) However, Plaintiffs do not allege that Wheeler entered into the relationship intending to honor his obligations to them and that Defendants then induced Wheeler to breach the contract. Rather, Plaintiffs allege that Wheeler was "recruited" by Defendants to help them in their scheme to "develop [a] sham story." (Compl. ¶ 136(B).) Thus, from the very beginning of his relationship with Plaintiffs, Wheeler "lacked a good faith intention to carry out [his] material obligations" in his agreement with them.[9] *N. Shipping Funds*, 2013 WL 1500333, at *6. Accordingly, Plaintiffs' tortious interference claim must be dismissed.

---

[9] Plaintiffs' tortious interference claim fails for the additional reason that they have not suffered damages as a result of Wheeler's breach. Plaintiffs' conclusory assertion that they "suffered significant damage as a result of th[e] interference with their contract with Rod Wheeler," (Compl. ¶ 176), is insufficient to plead damages resulting from Defendants' alleged tortious interference. *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011). Although Plaintiffs assert that the "[c]omplaint alleges a wide range of economic damages," Plaintiffs characterize these damages as the "result of Wheeler's breach of contract *and* cooperation with Defendants to publish the [Zimmerman/]Fox Article." (Opp'n at 32 (emphasis added).) Thus, Plaintiffs have not specifically identified damages that are attributable to Defendants' interference with Wheeler's contract, rather than the reputational and emotional injury caused by the publication of the Zimmerman/Fox Article.

## C. Negligent Supervision and/or Retention

"A claim for negligent supervision or retention arises when an employer places an employee in a position to cause foreseeable harm, . . . which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." *Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (citation omitted). To state such a claim under New York law, a plaintiff must show, in addition to the standard elements of negligence, that: (1) "the tort-feasor and the defendant were in an employee-employer relationship;" (2) "the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence;" and (3) "the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted).

Plaintiffs allege that Fox News is liable for its negligent supervision and/or retention of Zimmerman and Wheeler. (Compl. ¶ 183.) They allege that Zimmerman and Wheeler both have employer-employee relationships with Fox News, that "Fox News knew or should have known of the tortious propensities of Zimmerman and Wheeler prior to their tortious conduct that inflicted emotional distress on Joel and Mary [Rich,]" and that "Zimmerman and Wheeler engaged in tortious conduct against Joel and Mary [Rich] on Fox News's premises and/or using property of Fox News." (*Id.* ¶¶ 179–82.) However, Plaintiffs allege no specific facts plausibly showing that Fox News knew or had reason to know of Zimmerman and Wheeler's alleged "propensity" to commit an IIED. Nor do Plaintiffs allege credible facts showing that Zimmerman and Wheeler committed tortious conduct on, or using, Fox News's property. Plaintiffs' negligent supervision and/or retention claim therefore fails. *See Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."); *see also Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) ("Conclusory

allegations of negligent supervision are insufficient to overcome a motion to dismiss.") (citation omitted).

Plaintiffs' reliance on *Hwang v. Grace Road Church*, No. 14 Civ. 7187 (KAM) (RML), 2016 WL 1060247 (S.D.N.Y. Mar. 14, 2016), (Opp'n at 35–36), is misplaced. There, the plaintiff alleged that members of the defendant church forcibly prevented him from taking antipsychotic medication and then, two weeks later, forcibly restrained him in a manner that caused him to develop gangrene in his leg. *Hwang*, 2016 WL 1060247, at *1–2. The court found that the church was placed on notice of its members' tortious propensities from when they prevented plaintiff from taking his medication such that the later conduct could be attributed to the church's negligent failure to supervise. *Id.* at *15. In so finding, the court noted that the deprivation of the medication "would likely state a claim for [IIED]." *Id.* at *15 n.13. Here, by contrast, Zimmerman's, Butowsky's, and Wheeler's interactions with Plaintiffs neither form the basis of an IIED claim, nor were they otherwise tortious.

Plaintiffs' claim for negligent supervision and/or retention is dismissed.

## IV.   CONCLUSION

Defendants' motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (ECF Nos. 35, 51), are GRANTED.

Dated: New York, New York
     August 2, 2018

                         SO ORDERED.

                         *George B. Daniels*
                         GEORGE B. DANIELS
                         United States District Judge