N.Y.S.D. Case #
18-cv-2223(GBD)

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

**MANDATE**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 13th day of September, two thousand and nineteen.

Before:     Guido Calabresi,
            Christopher F. Droney,
            *Circuit Judges,*
            Stefan D. Underhill,
            *District Judge.*\*

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 04 2019

Joel Rich, Mary Rich,

        Plaintiffs - Appellants,

v.

Fox News Network, LLC., Malia Zimmerman, in her individual and professional capacity, Ed Butowsky, in his individual and professional capacity,

        Defendants - Appellees.

_____

**JUDGMENT**

Docket No. 18-2321

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this Court's opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

*[signature: Catherine O'Hagan Wolfe]*

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

*[signature: Catherine O'Hagan Wolfe]*

_____
\*Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

18-2321-cv
*Rich v. Fox News Network, LLC*

IN THE

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2018

ARGUED: FEBRUARY 4, 2019
DECIDED: SEPTEMBER 13, 2019

No. 18-2321-cv

JOEL RICH and MARY RICH,

*Plaintiffs-Appellants,*

*v.*

FOX NEWS NETWORK, LLC,
MALIA ZIMMERMAN, *in her individual and professional capacities,*
and ED BUTOWSKY, *in his individual and professional capacities,*

*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 18-cv-2223 – George B. Daniels, *District Judge.*

————

Before: CALABRESI and DRONEY, *Circuit Judges,* and UNDERHILL, *District Judge.**

————

* Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

————

Plaintiffs-Appellants Joel Rich and Mary Rich appeal from a judgment of the United States District Court for the Southern District of New York (Daniels, *J.*) dismissing their state torts claims against Defendants-Appellees Fox News Network, Malia Zimmerman, and Ed Butowsky. Plaintiffs-Appellants filed a complaint based on diversity jurisdiction alleging intentional infliction of emotional distress, tortious interference with contract, and negligent supervision or retention. On *de novo* review, we hold that the complaint pleads sufficient facts to survive a Rule 12(b)(6) motion to dismiss on the first two counts, and an amendment could cure any defect in the third claim. Accordingly, we VACATE and REMAND the District Court's order dismissing the complaint.

————————

ARUN SUBRAMANIAN (Elisha Barron, Susman Godfrey LLP, New York, NY; Leonard A. Gail, Eli Kay-Oliphant, Suyash Agrawal, Massey & Gail LLP, Chicago, IL, *on the brief*), Susman Godfrey LLP, New York, NY, *in support of Plaintiffs-Appellants*.

JOSEPH M. TERRY (Kevin T. Baine, Katherine Moran Meeks, Katherine A. Petti, Williams & Connolly LLP, Washington, DC; David H. Stern, Katherine M. Wyman, Dechert LLP, Los Angeles, CA, *on the brief*), Williams & Connolly LLP, Washington, DC, *in support of Defendants-Appellees Fox News Network and Malia Zimmerman*.[1]

————————

---

[1] On the brief, Defendant-Appellee Ed Butowsky was represented by David B. Harrison and Jason C. Spiro of Spiro Harrison, Short Hills, NJ. On January 31, 2019, this Court granted Butowsky's motion to be relieved of counsel.

18-2321-cv
*Rich v. Fox News Network, LLC*

CALABRESI, *Circuit Judge*:

Three years ago, Seth Rich was murdered during a botched robbery. He was a 27-year-old staffer for the Democratic National Committee ("DNC"). Soon after Seth's murder, uncorroborated theories—contradicted by official U.S. intelligence reports—surfaced on the web. Seth had leaked thousands of DNC emails to WikiLeaks, the theories asserted, and that is why he had been assassinated.

Malia Zimmerman (a Fox News reporter) and Ed Butowsky (a Fox News commentator) allegedly set out "to take the conspiracy theory from the fringe to the front pages and screens of the mainstream media." Compl. ¶ 24. Over the course of several months, Zimmerman and Butowsky recruited a Fox News contributor, Rod Wheeler, to help them infiltrate the Rich family. They convinced the Plaintiffs, Seth's parents, to hire Wheeler as a private investigator to look into the circumstances of Seth's death. And they then exploited Wheeler's connection to the Riches to give credence to what Zimmerman and Butowsky knew were false accusations against Seth—which Zimmerman and Butowsky widely disseminated through Fox News. They did this, it is claimed, with full knowledge of the harm it would do to Seth's parents.

We conclude that these allegations plausibly state claims for intentional infliction of emotional distress and tortious interference with contract, and that they are capable of supporting claims of negligent supervision. Accordingly, we **VACATE** the district court's judgment dismissing the complaint and **REMAND** the case for further proceedings consistent with this opinion.

Case 18-2321, Document 124-2, 10/04/2019, 2670739, Page 4 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 4 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

# BACKGROUND[2]

## *A. Factual Background*

On July 10, 2016, Seth Rich—a 27-year-old DNC staffer—was shot and killed a few hundred feet from his home in Washington, D.C. The Metropolitan Police Department determined, and continues to believe, that his unsolved murder stemmed from a botched robbery.

Soon after Seth's death, a "conspiracy theory" emerged among "fringe" political groups. The theory was that "Seth had leaked thousands of DNC emails to WikiLeaks" and was murdered as a result. Compl. ¶¶ 3, 22.[3] Seth's parents, the Riches, objected to this theory and issued a statement asking the public to "refrain from pushing unproven and harmful theories about Seth's murder." *Id.* ¶ 23. Despite this statement, the Appellees in the case before us set out "to take the conspiracy theory from the fringe [and move it] to the front pages and screens of the mainstream media." *Id*. ¶ 24.[4] To do this, they allegedly orchestrated a plan to

---

[2] The following facts are taken from the Riches' complaint. Because we are reviewing a Rule 12(b)(6) motion, we "accept[] all factual allegations in the [Riches'] complaint as true, and draw[] all reasonable inferences in [their] favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[3] The leak of DNC emails, to which the conspiracy theory sought to tie Seth's murder, purported to show how DNC officials had tipped the party's presidential nomination process in favor of Hillary Clinton to the detriment of Bernie Sanders. *See, e.g.*, J.A. 89.

[4] Findings of the U.S. intelligence community contradicted the conspiracy theorists' account of Seth Rich's death. *See, e.g.*, DHS Press Office, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, Dep't Homeland Sec. (Oct. 7, 2016), https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national.

turn the Riches into unwitting collaborators in their scheme. Over the course of six months, between December 2016 and May 2017, the Appellees succeeded.

Specifically, in December 2016, Ed Butowsky, a guest commentator on Fox News, contacted Seth's parents, Joel and Mary Rich. Butowsky "posted on Facebook that he was 'looking to connect with anyone Jewish in Omaha Nebraska.'" *Id*. ¶ 25. Through that religious connection, he befriended the Riches and asked them about Seth and WikiLeaks. Malia Zimmerman, a Fox News investigative reporter in close communication with Butowsky, also made purportedly independent contacts with the family.

In early 2017, after these initial conversations with the Riches, Zimmerman and Butowsky planted a source inside the family. Rod Wheeler, a former detective turned private investigator, had just signed a contract with Fox News as a paid contributor, for both on-air appearances and "off-air assistance, as requested by Fox." *Id*. ¶ 33. Butowsky, explaining how he did a lot of work for Fox News, contacted Wheeler on February 23, 2017, saying that he was "looking for some assistance on something that happened in Washington." *Id*. ¶ 34. Then, over the course of multiple phone calls and at least one in-person meeting, Butowsky and Zimmerman asked for Wheeler's help, as the complaint alleges, to "advance and further publicize the sham story that Seth was responsible for giving the DNC emails to WikiLeaks." *Id*. ¶ 36.

On the same day as his meeting with Wheeler and Zimmerman, Butowsky emailed the Riches offering to hire an "independent private investigator" on the family's behalf. *Id*. ¶ 41. Butowsky then set up an introductory meeting between Wheeler and the Riches. He instructed Wheeler to "make sure to play down Fox News, [and] don't mention [Wheeler] know[s] Zimmerman." *Id*. ¶ 42. Wheeler met with Joel and Mary, in early March, and behaved as instructed. Butowsky then proposed to the Riches that they sign a draft engagement agreement for Wheeler's

Case 1:18-cv-02223-GBD   Document 73-12   Filed 10/04/19   Page 6 of 28
Case 18-2321, Document 124-2, 10/24/2019, 2697329, Page6 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

investigative services. The draft gave Wheeler authority to speak to the media on behalf of the family. The Riches declined.

Playing on the Riches' need to "to get closure, as a family," Butowsky urged them to allow him to pay for Wheeler's services. *Id.* ¶ 49. Butowsky falsely assured the Riches that, "although he would finance Joel and Mary's retention of Wheeler, Butowsky would respect Wheeler's legal obligation not to speak to him [] or anyone other than Joel and Mary about the investigation." *Id.* ¶ 54. In the end, Joel and Mary were persuaded. Significantly, though, the final agreement that the family signed with Wheeler expressly prohibited "media representation, unless otherwise permitted by the [Riches] in writing," and stated that Wheeler "shall not release any information regarding the investigation . . . without prior authorization." *Id.* ¶ 57. The Appellees allegedly knew these terms, precisely.

Notwithstanding his contract with the Riches, Wheeler continued to work with Butowsky and Zimmerman in furthering the false Seth-WikiLeaks story. In April 2017, Wheeler and Butowsky met with the White House Press Secretary. They shared materials related to the investigation and promised to keep the White House informed. Moreover, with the help of Zimmerman and relying on information provided by her, Wheeler met with the lead detective on Seth's case, who—as Butowsky told Wheeler—would either "help[] us or we will go after him as being part of the coverup." *Id.* ¶ 67.

On May 10, in order to bring the untrue story to publication, Butowsky and Zimmerman called Wheeler "to falsely inform him that they had developed an FBI source supposedly confirming" that Seth had been in contact with WikiLeaks. *Id.* ¶ 69. Then Zimmerman and Butowsky began to put pressure on Wheeler to go on the record as a named source for the Seth-WikiLeaks story. On May 14, Zimmerman informed Wheeler that President Trump wanted her article published "immediately." *Id.* ¶ 73. The next day, Zimmerman told Wheeler that

Case 18-2321, Document 124-2, 10/24/2019, 2670729, Page7 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 7 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

"bosses at Fox want her to go" with the story on May 16, and Butowsky encouraged Wheeler to "close this deal, whatever you got to do." *Id.* ¶ 74. That same day, Zimmerman also sent a text to Wheeler, asking if he was with Butowsky, because Butowsky was "supposed to get more info on Seth [R]ich today," and "if [Butowsky] does we need to figure out what [Wheeler] can say on the record." *Id.* ¶ 81.

Soon after, Wheeler became the named source in the Fox News articles about Seth's murder. Thus, on May 16, Fox News published two pieces—both penned by Zimmerman.

The first article was titled: "Slain DNC Staffer Had Contact with WikiLeaks Say Multiple Sources." *Id.* ¶ 87. The article attributed a quote to an anonymous federal investigator: "I have seen and read the emails between Seth Rich and WikiLeaks." *Id.* The article continued: "The revelation is consistent with the findings of Rod Wheeler, former DC homicide detective and Fox News contributor and whose private investigation firm was *hired by Rich's family* to probe the case." *Id.* ¶ 88 (emphasis in original). The article closed: "Rich's father, Joel Rich, could not be reached for comment, but told Fox News in January that he didn't believe his son would leak the emails. However, he said above all, his son 'wanted to make a difference in the world.'" J.A. 92.

The second article was titled: "Family of slain DNC staffer Seth Rich blasts detective over report of WikiLeaks link." *Id.* at 101. It read: "Rod Wheeler, a retired Washington homicide detective and Fox News contributor investigating the case *on behalf of the Rich Family*, made the WikiLeaks claim, which was corroborated by a federal investigator who spoke to Fox News." Compl. ¶ 90 (emphasis added). The article clarified that, although Wheeler was paid by a third party, the Riches were Wheeler's clients and Joel had signed the contract for Wheeler's services. It

also added: "[A] spokesman for Rich's family on Tuesday said Wheeler was not authorized to speak for the family." *Id.*

Allegedly, Fox News was aware of the scheme all along. Specifically, Butowsky had represented to Fox News that he was one of the key players behind the story. It is alleged that, on the eve of publication, Butowsky wrote an email to Fox News producers stating: "If you have any questions about the story or more information is needed, call me" because "I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility." *Id.* ¶ 82. Furthermore, when Wheeler reached out to a local D.C. Fox affiliate channel reporter on the eve of publication and told them that there was breaking news regarding Seth that would air the next day on Fox News, Zimmerman sent a text to Wheeler saying: "New York won't be happy. . . . This could be really bad if the Fox News channel thinks you fed an exclusive we invested a lot of time and money into to a local channel just hours before we were going to publish." *Id.* ¶¶ 84–85.

The day after publication, Wheeler told *Newsweek* that his "information" from the unnamed "federal investigator" was only a repetition of what Butowsky and Zimmerman had told him. *Id.* ¶ 93. Yet, Fox News instructed Zimmerman to keep those false statements in the article. Moreover, over the following week, various Fox News reporters, by leveraging Wheeler's connection to the Riches, frequently commented on the story and spread it widely.

On May 18, the Riches formally asked Fox to retract the story. Zimmerman replied that "much of our information came from a private investigator, Rod Wheeler." *Id.* ¶ 100. When confronted by Wheeler, Zimmerman explained: "that's the email that Fox asked me to send . . . . They wrote it for me and they told me to send it to [Joel]." *Id.* ¶ 101. Five days later, Fox retracted the story because "[t]he article was not initially subjected to [a] high degree of editorial scrutiny." *Id.* ¶ 107.

Fox News guests, however, continued to reference the retracted article for months. And to this day, Fox News makes available online at least two videos repeating, almost verbatim, the content of the Zimmerman story. *See*, *e.g.*, *Rod Wheeler on His Investigation into DNC Staffer's Murder*, Fox News (May 16, 2017) (accessed on Sept. 12, 2019), https://video.foxnews.com/v/5437207289001 ("HANNITY: [F]ormer D.C. homicide detective, Rod Wheeler, *who was hired by a third party to investigate the murder on behalf of the family*, says Mr. Rich was communicating with WikiLeaks before he was killed. Now, Seth's family has been pushing back today . . . . I have known you a long time, Rod, you are a man of honor and integrity, so tell us who hired you. WHEELER: Well, actually, *I was hired by the family*, Joel and Mary Rich. They signed the contract." (emphases added)).

Butowsky continued both to contact the Riches and to exploit publicly their connection to Wheeler. On May 25, he wrote to Joel: "You should call Malia Zimmerman. She found the person and the gun that was used to shoot your son. That is what you wanted, correct? . . . When you find out who did it you are going to be very very emotional." Compl. ¶ 111 (emphasis omitted). In addition, at least up until the filing of the Riches' complaint, Butowsky continued to leave voicemails and send texts to Joel. At the same time, he kept on exploiting the Riches' name to fuel the conspiracy theory on Twitter and other news outlets. For instance, in March 2018, Butowsky told the *Washington Times* that Joel and Mary had "confirmed that their son transmitted the DNC emails to Wiki[L]eaks." *Id.* ¶ 115.

As a result of this scheme, the Riches are exhibiting symptoms of post-traumatic stress disorder and social anxiety disorder. In particular, Mary no longer feels comfortable in public for fear of being asked about WikiLeaks. And, although on the same day of the Zimmerman article Mary received a job offer, she could not accept it because these events aggravated a preexisting neurological condition.

Case 18-2321, Document 124-2, 10/04/2019, 2670720, Page10 of 28
Case 1:18-cv-02223-GBD    Document 73-1    Filed 10/04/19    Page 10 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

### B. *Procedural Background*

On March 13, 2018, Joel and Mary filed a complaint in federal court based on diversity jurisdiction against Zimmerman, Butowsky, and Fox News. The complaint alleged: (1) intentional infliction of emotional distress; (2) tortious interference with contract; and (3) negligent supervision and/or retention against Fox News only. The Defendants moved to dismiss the complaint under Rule 12(b)(6). On August 2, 2018, the District Court (Daniels, *J.*) granted the motion and dismissed all claims with prejudice. *See generally Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487 (S.D.N.Y. 2018).

The District Court first considered the intentional infliction of emotional distress ("IIED") claim. Judge Daniels examined each allegation and concluded that none of them, on their own, pleaded the required extreme and outrageous conduct. *Id.* at 500–03. In explaining its reasoning, the District Court stated that "zero times 10 is still zero. . . . [You can]not just simply say, well, these 10 things by themselves are not outrageous, but when I put them all together, they become outrageous." J.A. 415–16.

The District Court also dismissed the Riches' claim for tortious interference with contract. Because Wheeler had allegedly been in touch with Zimmerman and Butowsky even before signing the contract with the Riches and thus "was predisposed toward breaching," the District Court found no plausible allegation of but-for causation. *Rich*, 322 F. Supp. 3d at 503. In a footnote, the District Court offered an alternative basis for dismissal: the Riches "have not specifically identified damages that are attributable to Defendants' interference with Wheeler's contract, rather than the reputational and emotional injury caused by the publication of the Zimmerman/Fox Article." *Id.* at 503 n.9.

Finally, the District Court dismissed the negligent supervision or retention claim against Fox News on two grounds. *First*, Judge Daniels held, "Plaintiffs allege no specific facts plausibly showing that Fox News knew or had reason to know of Zimmerman and Wheeler's alleged 'propensity' to commit an IIED." *Id.* at 504. *Second*, "Plaintiffs [do not] allege credible facts showing that Zimmerman and Wheeler committed tortious conduct on, or using, Fox News's property." *Id.* The Riches timely appealed.

## DISCUSSION

We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 685 (2d Cir. 2001). To survive a motion to dismiss, plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011). A complaint should not be dismissed if it alleges "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), such that a court could "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

With this standard in mind, there are three questions of New York law before us today:

- *First*, whether the allegations in the complaint suffice to state a claim for intentional or reckless "extreme and outrageous" conduct against the Riches on the part of Appellees. We hold that they do.

- *Second*, whether the complaint plausibly alleges that the Appellees tortiously interfered with the contract between the Riches and Wheeler. We hold that it does.

Case 18-2321, Document 124-2, 10/04/2019, 2679520, Page12 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 12 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

- *Third*, whether the Riches satisfactorily pleaded negligent supervision or retention against Fox News. We do not decide this question, but we hold that—on the facts pleaded—an amended complaint could likely cure any defect.

After addressing each question, we conclude that the District Court's judgment dismissing the Riches' complaint in its entirety under Rule 12(b)(6) should be vacated. We therefore remand the case to the District Court for further proceedings consistent with this opinion.

### A. Intentional Infliction of Emotional Distress

New York has adopted the Restatement (Second) formulation of IIED. *Howell v. N.Y. Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993). "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1) (1965). This broad definition, as Chief Judge Kaye explained, is "both a virtue and a vice." *Howell*, 612 N.E.2d at 702. "The tort is as limitless as the human capacity for cruelty. The price for this flexibility in redressing utterly reprehensible behavior, however, is a tort that, by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful." *Id*. Therefore, IIED "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted).

Under New York law, then, a claim for IIED requires a showing of: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell*, 612 N.E.2d at 702.

Because the parties' disagreement at this time hinges primarily on the first prong, which is "the one most susceptible to determination as a matter of law," *id.*, that is what we focus on.

### i. Extreme and Outrageous Conduct

The Riches argue that we should view the specific allegations in the complaint as a series of acts that, taken together, constitute extreme and outrageous conduct. This is so, they claim, even though each individual allegation alone might not be sufficiently outrageous—because, taken together, these acts might amount to a deliberate and malicious campaign of harassment. Alternatively, the Riches allege that the Appellees knew of their susceptibility to emotional distress, and their conduct became extreme and outrageous when the Appellees chose to proceed with their plan in spite of that knowledge. We agree on both counts. We thus conclude that, under either theory, the Riches sufficiently pleaded extreme and outrageous conduct.[5]

---

[5] The complaint contains few specific factual allegations concerning the pre-publication involvement of individuals at Fox News in addition to Zimmerman, Butowsky, and Wheeler. *See, e.g.*, Compl. ¶ 74 (Zimmerman allegedly told Wheeler that "bosses at Fox want her to go" with the story immediately); *id.* ¶ 81 (Zimmerman allegedly texted Wheeler that Fox News and Zimmerman "need to figure out what [Wheeler] can say on the record."); *id.* ¶82 (Butowsky allegedly emailed Fox News producers about the Seth-WikiLeaks articles on the eve of publication); *id.* ¶¶ 84–85 (Zimmerman allegedly told Wheeler that the Fox News channel and producers in New York would be upset because of Wheeler's interview with a D.C. Fox affiliate channel). These allegations, though, stand next to many specific allegations of involvement on the part of Zimmerman, Butowsky, and Wheeler. Taking the allegations as a whole and drawing all reasonable inferences in favor of the Riches—as we must in this context—we find that the complaint states sufficiently plausible claims against Fox News as an entity to survive a motion to dismiss and warrant discovery into any additional involvement of Fox News in the alleged scheme.

18-2321-cv
*Rich v. Fox News Network, LLC*

### a. Deliberate and Malicious Campaign of Harassment

Under New York law, although "[t]he standard of outrageous conduct is strict, rigorous and difficult to satisfy . . . , that is not the case when there is a deliberate and malicious campaign of harassment or intimidation." *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018) (internal quotations omitted). To be sure, "it is manifestly neither practical nor desirable for the law to provide[] a remedy against any and all activity which an individual might find annoying." *Nader v. Gen. Motors Corp.*, 255 N.E.2d 765, 770 (N.Y. 1970). At the same time, "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation," IIED provides a remedy. *Id.* In other words, under New York law, the proper inquiry is not merely whether each individual act might be outrageous. Rather, the question is whether those actions—under the totality of the circumstances—amounted to a deliberate and malicious campaign.

We have no trouble concluding that—taking their allegations as true—the Riches plausibly alleged what amounted to a campaign of emotional torture. In order to publish a knowingly false article accusing Seth of leaking the DNC emails, Butowsky and Zimmerman needed a reliable source. They settled on a purportedly independent investigator, hired by the Riches. But they had to fabricate that source. So Butowsky—through lies, religious appeals, and financial support—convinced the Riches to hire Wheeler, a Fox News contributor, as their private investigator. Eventually, Butowsky and Zimmerman told Wheeler that an anonymous FBI investigator had seen emails between Seth and WikiLeaks. Wheeler then regurgitated that unsubstantiated information back to Zimmerman, giving her a named source (himself) for her Fox News article. The article emphasized Wheeler's connection to the Riches, thus lending credibility to his statements. And it suggested that Seth may have leaked the emails because—as

Case 18-2321, Document 124-2, 10/24/2019, 2679739, Page 15 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 15 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

his father said—he "wanted to make a difference in the world." J.A. 92. These allegations, taken together, plausibly rise to the level of extreme and outrageous conduct.

### b. Knowledge of Susceptibility

Moreover, knowledge of a plaintiff's susceptibility to emotional distress can, under New York law, transform non-actionable acts into outrageous conduct. According to the Restatement, to which New York adheres, *Howell*, 612 N.E.2d at 702, "there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge," Restatement (Second) of Torts § 46 (comment *j*) (1965). In that case, "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress." *Id.* § 46 (comment *f*).[6]  As a result, otherwise non-actionable conduct "may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge." *Id.*[7]

---

[6]  As the Tenth Circuit aptly noted, "[t]he plaintiff's peculiar susceptibility to emotional distress thus both broadens and narrows the scope of the tort." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1159 (10th Cir. 1981), *cert. denied*, 464 U.S. 824 (1983). On the one hand, "[i]t broadens the scope in that a jury may find the defendant's conduct to be outrageous in light of his knowledge of the plaintiff's peculiar susceptibility where it would not be so without such knowledge." *Id.* On the other hand, "it narrows the scope in that without such knowledge, the defendant is not liable for exaggerated emotional distress." *Id.*

[7]  We have found no New York case specifically addressing comment *f*. But New York has long adopted the Restatement (Second) on IIED. *Howell*, 612 N.E.2d at 701. Moreover, other state courts that similarly follow the Restatement have embraced comment *f. See, e.g., Boyle v. Wenk*, 392 N.E.2d 1053, 1056 (Mass. 1979) ("Though there is no evidence that Wenk knew the precise nature of Mrs. Boyle's physical susceptibility, his knowledge that she had just returned from

18-2321-cv
*Rich v. Fox News Network, LLC*

Zimmerman and Butowsky had enough specific knowledge of the family and the circumstances surrounding Seth's murder to be keenly aware of the Riches' susceptibility to emotional distress in this regard. On August 10, 2016, the family made a public statement, noting how the nascent conspiracy theory was severely hurting them. Zimmerman personally spoke with Joel on at least three occasions—January 3, January 5, and May 15, 2017. Moreover, in March 2017, in the process of deceiving the Riches into hiring Wheeler, Butowsky falsely assured Joel that he only wanted to help them "get closure, as a family." Compl. ¶ 49. And, "[b]y phone on March 13, 2017, Butowsky acknowledged to Joel that 'I know what you've been through.'" *Id.* ¶ 53. The fact that the Appellees proceeded with their plan in the face of this knowledge of the grieving family's susceptibility makes Zimmerman and Butowsky's conduct plausibly extreme and outrageous.

*ii. Appellees' Defenses*

To all of this, Fox News and Zimmerman raise two defenses that are worthy of discussion. *First,* they claim that, under New York law, *knowledge* of a plaintiff's emotional fragility is not sufficient unless defendant also *intended* to inflict emotional distress. *Second*, they assert that this action must fail since it is simply a lawsuit for defamation of a deceased plaintiff disguised as an IIED claim. Both are unavailing.

a. Knowledge

Fox News and Zimmerman argue that the Riches need to allege intent. To support that claim, the two Appellees cite *Howell*. In that case, Chief Judge Kaye

---

the hospital put him on notice that she might be more vulnerable to harassment or verbal abuse."); *see also Drejza v. Vaccaro*, 650 A.2d 1308, 1313–14 (D.C. 1994); *Brandon ex rel. Estate of Brandon v. Cty. of Richardson*, 624 N.W.2d 604, 621 (Neb. 2001).

Case 18-2321, Document 124-2, 10/24/2019, 2672529, Page17 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 17 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

explained that, "even if defendants were aware that publication would cause plaintiff emotional distress, publication—*without more*—could not ordinarily lead to liability for intentional infliction of emotional distress." *Howell*, 612 N.E.2d at 705 (emphasis added). The two Appellees take this statement to mean that specific intent to cause emotional distress is required under New York law.

That is not correct. The cited sections of *Howell* dealt with the scope of the privileged-conduct exception to tort liability. In *Howell*, Chief Judge Kaye explained how "[a] newspaper's publication" may be "an act within the contemplation of the 'privileged-conduct' exception" to IIED liability. *Id*.[8] Because the *Howell* plaintiff had "offer[ed] no basis for concluding that the privilege has been abused," Chief Judge Kaye was careful to note that "we need not explore today what circumstances might overcome the privilege." *Id*. In other words, *Howell* says nothing about specific intent to cause emotional distress being required. And, in fact, the *Howell* opinion leaves no doubt that recklessness—namely, a "disregard of a substantial probability of causing[] severe emotional distress"—can be enough for IIED. *Id*. at 702.

Here, Fox News and Zimmerman do not sufficiently contend that its conduct—although knowingly outrageous—is nonetheless entitled to the "privileged-conduct exception" under New York law. Therefore, we do not need to consider whether the two Appellees abused that hypothetical privilege. Recklessness, as New York courts have held time and again, is sufficient to make

---

[8]   According to the Restatement, "[t]he conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where [the actor] has done no more than to insist upon his [or her] legal rights *in a permissible way*, even though he [or she] is well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts § 46 (comment *g*) (1965) (emphasis added).

a claim for IIED. And knowledge of a peculiar susceptibility to emotional distress, as outlined in comment *f* of the Restatement (Second), aptly describes a particular form of recklessness. The two Appellees' attempt to require specific intent to cause emotional distress fails.

### b. Defamation

Fox News and Zimmerman also argue that the Riches' IIED action is just an attempt to seek liability for defamatory speech against their deceased son. In the eyes of these two Appellees, every allegation put forward by the Riches cannot be disentangled from the slanderous publication itself, and therefore—even if tortious—it is not actionable. Because Seth is dead, no defamation claim can be brought in his name. *See* Restatement (Second) of Torts § 560 (1977) ("One who publishes defamatory matter concerning a deceased person is not liable either to the estate of the person or to his descendants or relatives."); *cf. Rose v. Daily Mirror, Inc.*, 31 N.E.2d 182, 182 (N.Y. 1940) ("[I]t has long been accepted law that a libel or slander upon the memory of a deceased person which makes no direct reflection upon his relatives gives them no cause of action for defamation."). In other words, the two Appellees contend, the family's IIED lawsuit and Seth's defamation claim are one and the same.

But, in fact, IIED of the parents and defamation of the son are two distinct torts claims, as a simple hypothetical demonstrates. Suppose Seth had not died but had instead survived the shooting in a comatose state. If the Appellees acted in the exact same manner and published the exact same articles as has been alleged here, Seth could certainly have brought a defamation suit against them; he would have complained about the false accusations that the Appellees made against him—that is, that he leaked DNC emails to WikiLeaks. But, in this hypothetical scenario, the Riches could also have brought a separate lawsuit—*this* lawsuit—claiming that the

Appellees' actions directed at them were extreme and outrageous enough to constitute IIED.

In the case before us, the Riches are not claiming any injury because of some reputational harm suffered by their son. That hypothetical defamation suit died with Seth, and no one can resurrect it. But the Riches' own cause of action for IIED—arising from the Appellees' speech and conduct specifically targeted at Joel and Mary—continues to be viable. If Butowsky, Zimmerman, and Fox News made knowingly or recklessly false claims (or perpetrated some other tortious acts) targeted at the Riches, they are subject to possible tort liability. As we explained earlier, we have no difficulty concluding that the complaint plausibly alleges precisely such tortious conduct.

At various times, while raising this defense, Fox News and Zimmerman invoke the First Amendment to the U.S. Constitution. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (explaining how the Free Speech Clause of the First Amendment "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress"). Specifically, according to these two Appellees, "a public figure cannot recover on an intentional infliction claim targeting speech unless he first proves the constitutionally required elements of a defamation claim," including that the complained-of speech is "of and concerning" the plaintiff. Fox Br. 18–19.

These arguments are smokescreens. *Cf. Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) (recognizing that "the First Amendment [is not] a wall of immunity protecting newsmen from any liability for their conduct while gathering news"). In *Hustler Magazine, Inc. v. Falwell*, the Supreme Court explained that a public figure suing for IIED (based on speech alone) can do so if the speech was *not* protected—namely, when it "contains a false statement of fact which was made with actual malice, *i.e.*, with knowledge that the statement was false or with

19

reckless disregard as to whether or not it was true." 485 U.S. 46, 56 (1988) (internal quotations omitted). Thus, falsehood and actual malice are the only showings required, and nowhere did the Court take the "of and concerning the plaintiff" requirement that is appropriate to a defamation tort and import it into IIED.[9] Because Fox News and Zimmerman concede in their brief that the pleadings plausibly allege that the Seth-WikiLeaks articles contained false factual statements, and because the Riches sufficiently allege actual malice, nothing more is needed at this stage.

*   *   *

In sum, we hold that the Riches' complaint plausibly alleges enough facts to state a claim for intentional infliction of emotional distress—for extreme and outrageous conduct by the Appellees, directed at the Appellants. "Where reasonable [people] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) of Torts § 46 (comment *h*) (1965). Because we think that the Riches' allegations rise well above

---

[9]   And for good reason. Applying the "of and concerning" requirement to IIED would mean that no IIED claim that involved speech and arose out of harm to a dead person could ever be brought. But New York courts initially recognized the tort of IIED precisely in analogous circumstances. In the early days, these circumstances included the mistreatment or mishandling of corpses. *See, e.g., Gostkowski v. Roman Catholic Church of the Sacred Hearts of Jesus & Mary*, 186 N.E. 798 (N.Y. 1933) (deceased relative's body moved to another cemetery); *Finley v. Atl. Transp. Co.*, 115 N.E. 715 (N.Y. 1917) (burial at sea without notifying relatives). The mishandling of dead bodies was "of and concerning" the decedent and not the suing plaintiffs. Yet, not only were the relatives permitted to sue in IIED, but allowing that lawsuit was the reason why the IIED tort was created. *See* William L. Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 MICH. L. REV. 874, 886 (1939).

18-2321-cv
*Rich v. Fox News Network, LLC*

the Rule 12(b)(6) threshold, and because we are unpersuaded by the Appellees'
defenses, we conclude that the District Court should not have dismissed the
complaint.[10]

## B. Tortious Interference with Contract

Next, we analyze the Riches' claim for tortious interference with contract.
This tort requires: "[1] the existence of a valid contract between the plaintiff and a
third party, [2] defendant's knowledge of that contract, [3] defendant's intentional
procurement of the third-party's breach of the contract without justification, [4]
actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding
Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). Moreover, "a plaintiff
must allege that the contract would not have been breached 'but for' the
defendant's conduct." *Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (1st Dep't 2006).
Recovery is permitted even where "a cause of action for breach of contract existed
in favor of the plaintiff against the other party to the contract." *Hornstein v. Podwitz*,
173 N.E. 674, 676 (N.Y. 1930).

No party denies the existence of a valid contract that was breached: the
signed agreement between Wheeler and the Riches is in the record, and Wheeler's
statements in the Fox News articles were an actual breach of his confidentiality
agreement. And the Appellees do not deny that they had "knowledge of an
existing valid contract." *Associated Flour Haulers & Warehousemen v. Hoffman*, 26

---

[10] The Riches' complaint included two additional causes of action related to the IIED claim
discussed above: (1) aiding and abetting IIED and (2) conspiracy to commit IIED. The District
Court dismissed both claims as a result of its dismissal of the IIED claim. Because we now find
that the Riches have indeed sufficiently alleged an IIED claim against the Appellees, we leave
it to the District Court to decide in the first instance the extent to which these causes of action
may proceed in light of this opinion.

N.E.2d 7, 10 (N.Y. 1940). We therefore focus our analysis on the remaining factors: (i) causation; (ii) damages; and (iii) intentional procurement of breach (iv) without justification. Because the complaint plausibly pleaded each of these factors, we hold that the Rule 12(b)(6) dismissal was erroneous.

### *i. But-For Causation*

The District Court held that the Appellees could not be a but-for cause of the breach of contract. According to the Riches' complaint, *before* the contract with Wheeler was signed, the Appellees successfully secured Wheeler's agreement to act in ways that would breach the contract. To Judge Daniels, that was enough to preclude a finding of causation. *Rich*, 322 F. Supp. 3d at 503. We disagree.

The proper question is whether, in the absence of interference by Fox News, Zimmerman, and Butowsky, the breach would have occurred. If the breach would have occurred "prior to *any* involvement by" the Appellees or apart from their actions, then of course there would be no but-for causation. *KAM Constr. Corp. v. Bergey*, 56 N.Y.S.3d 740, 742 (4th Dep't 2017) (emphasis added); *see also Lana & Samer, Inc. v. Goldfine*, 776 N.Y.S.2d 66, 67 (1st Dep't 2004). The issue before us, then, is whether but-for causation exists when some (but not all) interfering conduct takes place before a contract has been finalized. The Riches' allegation is that Wheeler's *only* reason to breach was Zimmerman's and Butowsky's actions interfering with the contract—an interference that started before the contract with the Riches was signed and continued all the way until the breach became known to the Riches (*i.e.*, when the Fox News articles were published).

We hold that, at least where there allegedly is tortious interference *after* contract formation, the fact that there also was allegedly interfering conduct *before* the agreement was signed doesn't preclude a complaint from stating but-for causation. The allegations here plainly claim that, but for the Appellees' conduct

before *and* after Wheeler and the Riches entered into this agreement, the breach would not have occurred. In the face of these allegations, the degree to which the contract would have been breached anyway is a question properly left for discovery and, perhaps, jury determinations. At this stage, we conclude that the complaint sufficiently pleaded causation.

### *ii. Damages*

In the alternative, the District Court held that the complaint was "insufficient to plead damages resulting from Defendants' alleged tortious interference." *Rich*, 322 F. Supp. 3d at 503 n.9. We disagree with that ground for dismissal as well.

Under New York law, for tortious interference with contract, "the elements of damages, including consequential damages, [are] those recognized under the more liberal rules applicable to tort actions." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 452 n.6 (N.Y. 1980). "One who is liable to another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774A(1) (1979); *see also Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (same).

The Riches' alleged damages—psychological disorders and the loss of employment—flow directly from the Zimmerman articles, and those articles were made possible by Wheeler's breach of contract. Specifically, drawing all inferences in favor of the Riches (as at this stage we must), the complaint claims that, but-for Wheeler's breach, Butowsky and Zimmerman would *not* have been able to enlist the Riches' unwitting help in giving credence to the Seth-WikiLeaks story. The

Appellees had possessed the allegedly false information from the anonymous federal investigator for months, but they needed Wheeler's on-the-record statements corroborating that anonymous source in order to publish the Zimmerman articles. And the only way to obtain those statements was to interfere with Wheeler's confidentiality contract with the Riches. The connection between the breach and the alleged damages is sufficiently strong to preclude dismissal.

### iii. Intentional Procurement of Breach

Fox News and Zimmerman, however, argue that, regardless of whether the District Court erred in dismissing on the basis of causation and damages, the tortious interference claim was properly dismissed anyway. Even assuming that the Appellees knew of the confidentiality clause in Wheeler's contract, that clause would be breached only if Wheeler spoke to the press *without* the Riches' permission. And because the Riches did not allege that Fox News and Zimmerman knew that Wheeler lacked permission to speak to them, the two Appellees contend that the Riches' complaint did not allege intentional procurement of the breach.

This argument is not convincing. The Riches' complaint clearly alleges that the contract was breached, and this necessarily includes an allegation that no permission to speak was given. For had there been permission, there would have been no breach. Additionally, it is alleged that Zimmerman said "we [Fox News] need to figure out what you [Wheeler] can say on the record," Compl. ¶ 81, and that Butowsky falsely told the Riches that he "would respect Wheeler's legal obligation not to speak to him [] or anyone other than Joel and Mary about the investigation." *Id.* ¶ 54. Moreover, the Riches alleged that Zimmerman teamed with Butowsky and, throughout, engaged in many subterfuges in her dealings with the Riches. Such actions are inconsistent with any belief on the Appellees' part that the Riches had authorized Wheeler to speak. *Cf. Rodrigues v. City of New York*, 602 N.Y.S.2d 337, 343 (1st Dep't 1993) (allowing claim to survive motion to

dismiss based on inference of intent in light of alleged motive and personal interest). In other words, taken together, these pleadings constitute a sufficient allegation that the Appellees "kn[ew] that the interference [was] certain or substantially certain to occur as a result of [their] action." Restatement (Second) of Torts § 766 (comment *j*) (1979).

### iv. Without Justification

Finally, we conclude that the Riches' complaint plausibly alleges that Butowsky, Zimmerman, and Fox News had no legally sufficient justification for intentionally procuring Wheeler's breach of contract.

New York courts have recognized that, in limited cases, liability for tortious interference may be cut off if the conduct was justified. To be sure, lawful behavior, by itself, does not suffice to justify tortious interference. *See, e.g.*, *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996) ("[A] plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."). The pursuit of "economic interest" can suffice—"*unless there is a showing of malice or illegality*." *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996) (emphasis added). Like economic interest, news gathering may well be (similarly) protected. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

We, however, need not consider whether New York law would recognize news gathering as a justification for tortious interference with contract. For, even if it did, the Riches unquestionably allege malice sufficient to overcome any such possible justification. The allegations—which we have to take as true—are that Zimmerman and Butowsky (i) intentionally planted a biased investigator to gain the trust of a grieving family; (ii) fed false information to the investigator with the

Case 18-2321, Document 124-2, 10/04/2019, 3679329, Page26 of 28
Case 1:18-cv-02223-GBD   Document 73-1   Filed 10/04/19   Page 26 of 28

18-2321-cv
*Rich v. Fox News Network, LLC*

sole purpose of exploiting that investigator's relationship with the family to give credence to a politically motivated story; and (iii) knew, from the very start, that this story was nothing more than a false conspiracy theory. All that is more than enough to counter any possible justification.

\* \* \*

In sum, we find that the Riches sufficiently pleaded but-for causation, damages, knowledge, and intentional procurement of the breach without justification. Accordingly, the District Court erred in granting the Appellees' motion to dismiss their tortious interference with contract claim.

### C. Negligent Supervision or Retention

Lastly, we turn to the negligent supervision or retention claim the Riches have brought against Fox News. Under New York law, in addition to the negligence elements of such a claim, a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam) (citing *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 654 N.Y.S.2d 791, 793 (2d Dep't 1997); *D'Amico v. Christie*, 518 N.E.2d 896, 901 (N.Y. 1987)).

But "[t]he employee also must not be acting within the scope of his or her employment; [for] in that situation the employer [would] only be liable . . . vicariously under the theory of *respondeat superior*, [and] not for negligent supervision or retention." *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446

(3d Dep't 2011).[11] Under New York law, an employee's tortious acts fall within the scope of his employment if "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979). But "[a]n employer will not be held liable under [*respondeat superior*] . . . for actions which were . . . undertaken by the employee for wholly personal motives." *Galvani v. Nassau Cty. Police Indemnification Review Bd.*, 674 N.Y.S.2d 690, 694 (2d Dep't 1998).

The Riches adequately allege that an employment relationship existed between Fox News and Zimmerman (and Wheeler). Therefore, the issue before us is whether the complaint alleges liability on the part of Fox News for conduct by Zimmerman (and Wheeler) that was *within* or *outside* the scope of their employment. The complaint is not lucid on this point. The Riches may be alleging that Zimmerman (and Wheeler) were acting within the scope of their employment and, therefore, Fox News is vicariously liable. Or they may be alleging that, although their conduct fell outside the scope of their employment, there was negligence on the part of Fox News in hiring and supervising them. Or they may be alleging both, leaving it up to the jury to decide the scope of employment question.

A simple amendment would clarify the issue. The District Court, however, dismissed the complaint with prejudice. To be sure, "no court can be said to have

---

[11] Conversely, all departments of the New York Appellate Division have concluded that it is "[i]n instances where an employer cannot be held vicariously liable for an employee's torts, [that] the employer can still be held liable under theories of negligent hiring and negligent supervision." *State Farm Ins. Co. v. Cent. Parking Sys., Inc.*, 796 N.Y.S.2d 665, 666 (2d Dep't 2005); *see also Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446 (3d Dep't 2011); *Owen v. State*, 76 N.Y.S.3d 330, 332 (4th Dep't 2018); *Scollar v. City of New York*, 74 N.Y.S.3d 173, 179 (1st Dep't 2018).

18-2321-cv
*Rich v. Fox News Network, LLC*

erred in failing to grant a request [to amend] that was not made." *Gallop*, 642 F.3d at 369. At the same time, either theory of liability—negligent supervision or vicarious liability—appears to be one that the complaint, if amended, could readily allege. Since we are remanding for consideration of the Riches' other claims, we believe a clarifying amendment as to the negligence claim should also be permitted. Accordingly, upon remand of the IIED and tortious interference claims, we instruct the District Court to allow the Riches to amend their negligent supervision or retention count.

## CONCLUSION

We **VACATE** the District Court's August 2, 2018, judgment granting the Appellees' motion to dismiss, and we **REMAND** the case for further proceedings consistent with this opinion.