SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

| SUITE 5100 | SUITE 1400 | SUITE 3800 |
|---|---|---|
| 1000 LOUISIANA STREET | 1900 AVENUE OF THE STARS | 1201 THIRD AVENUE |
| HOUSTON, TEXAS 77002-5096 | LOS ANGELES, CALIFORNIA 90067-6029 | SEATTLE, WASHINGTON 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

ELISHA BARRON
DIRECT DIAL (212) 729-2013

E-MAIL EBARRON@SUSMANGODFREY.COM

July 20, 2020

Via E-Mail and ECF

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:     *Rich v. Fox News Network LLC et al.*, No. 18-cv-2223

Dear Judge Netburn:

        In response to the Court's order last week, Fox agreed to produce a subset of the documents Fox withheld, which they now concede are not privileged.[1] Fox also produced a document-by-document log of 615 documents, for which it continues to assert a claim of privilege, in the custodial files for Malia Zimmerman, Adam Housley, and Greg Wilson.

        Plaintiffs appreciate the Court's assistance in obtaining certain documents and a log for three custodians confirming Plaintiffs' allegation that Fox and Butowsky collaborated extensively on a shared political agenda. Plaintiffs at this time seek limited further relief: (1) that Fox either produce, or furnish a document-by-document log for the remaining documents raised by Plaintiffs' letter motion to compel; (2) that Fox produce 16 of the 615 withheld documents because they relate directly to Rich/Wikileaks newsgathering (*see* Ex. A); and (3) that Fox produce documents reflecting Wheeler's appearances on Fox (including 19 documents reflected on Fox's log), because they are highly relevant and not protected newsgathering (*see* Ex. B). This limited relief is fair and necessary to preserve

---

[1] Fox included these documents in a production of over 3,500 documents produced a few hours before the filing of this letter, and declined to segregate or identify the documents relevant to this motion to compel. Therefore, Plaintiffs do not know how many documents there are or any other details about the documents.

July 20, 2020
Page 2

Plaintiffs' right to seek, at the appropriate time, any remedies relating to Fox's improper use of the privilege as a both a sword and a shield.

### A.  The Court Should Order Fox to Produce or Log the Remaining Documents at Issue on Plaintiffs' Motion

Plaintiffs respectfully request that Fox be ordered to produce or log the remainder of the documents it has withheld, and which were presented in Plaintiffs' prior letter motion.[2] Consistent with this Court's ruling, and as Fox's log of the Zimmerman, Housley, and Wilson documents confirms, the documents are relevant because they address Fox's interactions with Wheeler and Butowsky during the precise time period Fox and Butowsky collaborated on the Seth Rich articles. The documents have already been collected based on agreed custodians and agreed search terms; and there are far fewer than 2,000 documents remaining in the set. There is no basis under Rule 26 for Fox not to produce or log the remaining documents. Without a log of these documents, Plaintiffs will be unable to challenge any improperly withheld documents, or to ensure that Fox does not make arguments to which the withheld documents would be relevant.

There is a reason Fox attempted to avoid producing a document-by-document log of even the Zimmerman, Housley, and Wilson documents. Fox's limited log shows what Plaintiffs have always alleged: Reporters and editors at Fox worked extensively with Wheeler and Butowsky to fuel a number of politically motivated conspiracy theories before and during the time Fox published the Seth Rich articles. These include claims that the ███████████████████████████ ███████████████████████████████████████████████████, as well as the Seth Rich/Wikileaks conspiracy.[3] Far from an aberration, this was Fox's *modus operandi*. In fact, as the unredacted document attached to Plaintiffs' June 23, 2020 letter already shows ████████████████████████████████ ███████████████████████ 6/23 Letter, Ex. H (filed under seal). Fox's letter confirms that it will "vigorously dispute" that it worked with Wheeler and Butowsky on "politically motivated" stories, 7/15/20 Fox Letter at 3 (Dkt. 162), but the privilege log itself lays that argument to rest.

These other stories cannot be neatly quarantined from the Seth Rich story. For example, Wheeler testified that at his first in-person meeting with Zimmerman and Butowsky about Seth Rich on February 28, 2017, also present was "a former military guy. I think he had something to do with Benghazi." Wheeler Deposition Tr. 11-18-19 at 73-74 (Ex. C). Fox's redactions of produced documents confirm that Butowsky and Zimmerman worked together extensively in 2016-2017 on an agenda of which Seth Rich was one part. For example, ███████████████████ ███████████████████████████████████████████████████████████

---

[2] These remaining documents hit on the terms "Butowsky" and "Wheeler" in the custody of the agreed custodians other than Zimmerman, Housley, and Wilson.

[3] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

July 20, 2020
Page 3



is another example.

Plaintiffs are mindful of the newsgathering privilege, but remain concerned that Fox intends to improperly use the privilege as both a sword and shield. Fox should not be allowed to raise defenses regarding the legitimacy of its newsgathering or the breadth of its interactions with Wheeler and Butowsky while withholding documents that would rebut these arguments. *See Sharon v. Time, Inc.*, 599 F. Supp. 538, 582 (S.D.N.Y. 1984) ("[S]ection 79–h is a shield, and no more." Witness may not "insulate his reliance on sources from further inquiry merely by claiming that he has often used a source in the past and that the information he received was always reliable."); *Greenberg v. CBS Inc*., 69 A.D.2d 693, 709 (1979) ("At trial, if the defendants opt to rely on their statutory privilege, they should be precluded from any use of those sources and information as proof of verification or evidence of responsibility. On the other hand, if they choose to fully disclose their investigation, no limitation of the defense will occur."). At this time, Plaintiffs simply request production of whatever documents Fox now concedes are not privileged, and a full log of the documents withheld, so Plaintiffs may consider how to address these issues as they arise in the future.

## B. Sixteen Documents Were Improperly Withheld And Are Directly Relevant to the Seth Rich Articles

Plaintiffs seek production of 16 documents (out of 615) that are directly relevant. Fox already agreed to produce documents to Plaintiffs that go to the newsgathering techniques used for the Seth Rich articles. *See* 3/10 Tr. at 6-7 (Fox is producing certain newsgathering materials because it "would expect that [Plaintiffs] would have argument that many of the documents they are seeking are central to the claims."). The 16 documents described below do not relate to *other* news stories at all – they are directly relevant to the sourcing for the Seth Rich articles and Fox's retraction. These documents have already been collected, reviewed, and logged. There is no burden on Fox, and the documents can be produced highly confidential. A list of the bates numbers for these documents is attached as Exhibit A.

**Wikileaks**:



These documents should be produced as they hit on the term Wikileaks as well as Butowsky.

July 20, 2020
Page 4

**Nunes**: Twelve entries on the log reflect correspondence in the relevant timeframe between Zimmerman, Butowsky, and Housley about Congressman Devin Nunes. Documents that have already been produced in this case show the relevance of Nunes, and his staffer Kash Patel (known as D-O), to the Seth Rich articles. On March 13, 2017, for example, Butowsky sent Zimmerman and Wheeler a video that prompted Zimmerman to respond, "That's why Devin Nunes needs to **help us or get his guy to**. . . ." Wheeler0000216 (Ex. F). Butowsky responded, "**I will get very aggressive with Devin over the weekend**." *Id.* Wheeler testified that the discussion was about "the Russian narrative or the hacking narrative." Wheeler Tr. 209–10 (Ex. C).

Plaintiffs requested that Fox include the terms "Nunes," "Kash," "Patel" and "Dee O" in its searches of Zimmerman, Butowsky, and Housley's files. *See* 2/27/20 Letter at 3 (Dkt. 130, Ex. G). Fox initially refused. *See id.* After the Court directed the parties to try to reach agreement, Fox agreed to run these terms in combination with others for ten custodians in a narrow timeframe. *See* Dkt. 136-1 at 3. Then, knowing Plaintiffs' view of Nunes' relevance, and that *Plaintiffs* knew of "D-O's" involvement, Fox **redacted** as a "confidential source" the name "D-O" on documents it produced showing that Patel was scheduled to meet with Wheeler and Detective DellaCamera just 4 days before the Zimmerman article was published.  *Compare* ███████████████████ Wheeler00000577 (Ex. I) (redacted name is "D-O").



Fox should not be allowed to dispute that Nunes is relevant, redact information showing otherwise, and withhold as "unrelated" documents that contradict its position.

**Fox's Knowledge of Butowsky's Role**: Greg Wilson was a Fox editor who worked on the Seth Rich articles and their retraction. Fox argued that it is not responsible for Butowsky's conduct, and asserted that Mr. Wilson, ███████ ████████████████████████████████ and "ignor[ed]" Butowsky's post-retraction outreach. ██████████████████████ ████████████████████████████████████████ directly rebuts Fox's claim that Wilson did not know who Butowsky was. It should be produced as should any other Wilson document relating to Butowsky. ████████████████████████████████████ ████████████ (Ex. K).

July 20, 2020
Page 5

### C. Documents Reflecting Wheeler's Fox Appearances Should Be Produced as Published News Not Subject to the Privilege.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ Plaintiffs have repeatedly requested, including most recently on June 30, 2020, documents sufficient to show Wheeler's appearances of Fox. Fox has refused – stating that it will only provide "total payments per calendar year." Nothing in the log shows that these entries involve newsgathering at all ██████████████████████████████. At the very least, Fox should be required to produce evidence regarding each Rod Wheeler appearance on Fox News, regardless of custodian, so that Plaintiffs may question Mr. Wheeler about those appearances.

<u>Conclusion</u>

Plaintiffs have every reason to be wary that Fox will use the newsgathering privilege as both a shield and a sword. Fox first attempted to avoid wholesale producing or logging 2060 documents, by arguing that even if they were relevant, they were protected by a blanket assertion of newsgathering privilege. Only after the Court held that the documents satisfy Rule 26(b)'s relevance threshold did Fox admit that a subset of these documents are not privileged at all and produce a late-breaking affidavit admitting that Zimmerman relied on Butowsky, who by his own admission "ha[d] no credibility" as a source. FoxNews0006066 (Butowsky: "I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility.") (Ex. L). The log Fox produced confirmed exactly what Plaintiffs claimed: Fox and Butowsky collaborated extensively on "politically motivated" stories including the Seth Rich story. Yet Fox intends to "vigorously contest" this, while withholding the evidence that refutes Fox's position.

At this time, all Plaintiffs seek is a complete picture of what Fox is withholding in the form of a document by document log and production of a handful of specific documents. Based on the positions Fox takes in this case, Plaintiffs respectfully reserve the right to seek production of further documents on Fox's log or move to preclude Fox's defenses relating to these documents.

Respectfully,

Elisha Barron
*Counsel for Joel & Mary Rich*

EXHIBIT A

FILED UNDER SEAL

EXHIBIT B

FILED UNDER SEAL

EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------

AARON RICH                      *

        Plaintiff,           *

v.                              * Case No. Civil Action
                                  1:18-cv-00681-RJL
EDWARD BUTOWSKY,                *
MATTHEW COUCH, and
AMERICA FIRST MEDIA,           *

        Defendants.          *

------------------------------

VIDEOTAPED DEPOSITION OF:

               ROD WHEELER,

taken on Monday, November 18, 2019, at 10:00 a.m.,

held at the offices of Willkie Farr & Gallagher, LLP,

1875 K Street, NW, Washington, D.C. 20006, before

Goldy Gold, a Registered Professional Reporter and a

Notary Public within and for the District of

Columbia.

Reported by:  Goldy Gold, RPR

Job No. 523974



Page 70

1  robbery, one of them are going to know -- somebody is
2  going to know, girlfriend of one of -- somebody is
3  going to know on the street.  That's how you solve
4  cases on the street, but he was upset about that.
5      Q.    Do you understand why Mr. Butowsky was
6  upset about that?
7      A.    Now I do.
8      Q.    Why is that?
9      A.    Well, because I believe he was upset
10 about that because that's not the narrative he wanted
11 -- he wanted.  He wanted me to go down this path of
12 the e-mail thing and tie it into this political thing
13 as far as this Russian hacking, which I have no
14 interest in whatsoever.  That's what wanted me to do.
15      He should have told me that upfront.  If
16 he would have told me that upfront, then I would have
17 had the option at that point to say, Yes, I'm
18 interested or no, I'm not.  He never gave me that
19 option.
20      And I'll tell you why that's
21 significant, Mike, is because I've learned since all
22 of this stuff has been going on, that Butowsky had
23 conversations with people like Ellen Ratner about
24 this whole case in e-mails, and he never shared any
25 of that with me.

Page 71

1      If you had conversations and you got
2  this information -- and this has come out, I'm sure
3  you've seen it -- about Ellen Ratner telling you all
4  this about WikiLeaks, why didn't you tell me that
5  upfront if you know I'm the investigator?  Why would
6  you withhold that information?
7      He said Joel Rich knew about the whole
8  thing with Ellen Ratner.  Joel Rich never mentioned
9  that to me.
10     Q.    So -- just so I'm clear about a couple
11 of things you said there.  If I understand you
12 correctly you, Mr. Butowsky was upset with you
13 because you were trying to identity leads to
14 determine who had shot or murdered Seth Rich; is that
15 correct?
16     A.    That's correct.
17     Q.    You also said Mr. Butowsky told you that
18 Joel Rich knew about the whole thing with
19 Ellen Ratner?
20     A.    No, no.  This was afterwards, like this
21 past year when it all came out in the news --
22     Q.    I see.
23     A.    -- when I learned about that.  That's
24 the first I even heard about Ellen Ratner.
25     Q.    Okay.  So, let me show you one other

Page 72

1  paragraph that is relevant to this, if you turn ahead
2  to page 27 -- no, 25, paragraph 101 in your
3  complaint.
4      You've alleged here:  "At all relevant
5  times, Butowsky intended that Mr. Wheeler's
6  investigation would provide the proof he and
7  Zimmerman had hoped would show that the Russians were
8  not responsible for hacking the DNC e-mails given to
9  WikiLeaks.
10     "Butowsky told Mr. Wheeler that he would
11 be working on the investigation and going through
12 Butowsky in order to provide any information to
13 Zimmerman."
14     Is that accurate?
15     A.    That's correct.
16     Q.    So Ed was running the show here?
17     A.    Yes.
18     Q.    And Mr. Butowsky expected you to come to
19 him first with information?
20     A.    That's correct.
21     Q.    And he -- do I interpret the first
22 sentence here to say that Mr. Butowsky was only
23 interested in you providing one kind of information
24 to him?
25     A.    In my opinion, yes.

Page 73

1      Q.    And what kind of information was that?
2      A.    That was information -- not even
3  providing information, but supporting his belief that
4  the murder had something to do with WikiLeaks.
5      Q.    His theory?
6      A.    His theory or belief, yeah.  That's what
7  he wanted me for, and I know that now.  Hindsight is
8  20/20, but I know that now.
9      Q.    Okay.  If you take a look at
10 paragraph 92 on page 24 of your complaint, there is a
11 description of a meeting that took place with
12 Mr. Butowsky and Ms. Zimmerman on February 28, 2017.
13     Is that paragraph accurate?
14     A.    That's correct.
15     Q.    Do you recall having that meeting with
16 Ms. Zimmerman and Mr. Butowsky?
17     A.    Yes.
18     Q.    Did you know that Ms. Zimmerman was
19 going to be at that meeting before you went to meet
20 Mr. Butowsky?
21     A.    No.  It was Ms. Zimmerman, and there was
22 another guy.
23     Q.    There was someone else besides
24 Ms. Zimmerman with Mr. Butowsky?
25     A.    Yes.



Page 74

```
 1        Q.    Who was -- do you know who that other
 2    person was?
 3        A.    I don't remember the guy's name, but we
 4    are connected on LinkedIn.
 5        Q.    Okay.  Was it someone associated with
 6    Fox?
 7        A.    No.  This was a guy who was a former
 8    military guy.  I think he had something to do with
 9    Benghazi because he never talked much.  The only
10    reason I say we are connected on LinkedIn -- and I'll
11    try to find his name on LinkedIn -- is because after
12    the meeting, he e-mailed me or he connected with me
13    on LinkedIn and said, It was really pleasure of
14    meeting you, let's connect on LinkedIn.  That's the
15    last I ever heard of this guy.
16            But he was -- I think he was like a
17    Hispanic guy, if I recall.  He didn't talk much at
18    the meeting, but he just sat there.  But he had
19    something to do with Benghazi I believe.
20        Q.    Okay.  You understood him to have some
21    connection to the work that Butowsky and
22    Ms. Zimmerman had done --
23        A.    Previously.
24        Q.    -- on Benghazi?  Do you have an
25    understanding of the work that Mr. Butowsky did on
```

Page 75

```
 1    Benghazi?
 2        A.    I don't.
 3        Q.    Do you have any -- any recollection of
 4    Mr. Butowsky pursuing a theory about a stand-down
 5    order with respect to Benghazi --
 6        A.    No.
 7        Q.    -- or ever read anything about that or
 8    heard anything about?
 9        A.    No, I never had -- I never had any
10    interest in Benghazi or the Russian hacking case.  I
11    just never had any interest.
12        Q.    Do you know if Mr. Butowsky ever made
13    any business deals or any money off of his work on
14    Benghazi?
15        A.    No.
16        Q.    If you look at the text chain between
17    you and Mr. Butowsky, the page with the Bates number
18    WHEELER640?
19        A.    Yes.
20        Q.    Do you see a discussion there related --
21    with Mr. Butowsky relating to the meeting you were
22    having with him on February 28th?
23        A.    Yes.
24        Q.    Do you see a reference to where the
25    meeting would take place?
```

Page 76

```
 1        A.    Yes.
 2        Q.    Where did the meeting take place?
 3        A.    In the Capitol Hill Club.
 4            (Reporter clarification.)
 5            THE WITNESS:  I'm sorry, the Capital
 6    Hill Club, also known as the Republican club on
 7    Capitol Hill.
 8    BY MR. GOTTLIEB:
 9        Q.    What do you remember about that meeting?
10        A.    We didn't meet there I don't believe.  I
11    don't think it was this time that we met there.  I
12    think it was so crowded that we decided to go up the
13    street to a Mexican restaurant.
14        Q.    Okay.  Let me show you -- take a look
15    back at the complaint in paragraph 92, there's a
16    description of -- of the meeting.
17        A.    Yeah.
18        Q.    I'm less concerned about the physical
19    place you were in.
20        A.    Sure.
21        Q.    I'm more interested in --
22        A.    The content of the meeting.
23        Q.    What -- what did you all discuss when
24    you met with Mr. Butowsky and Ms. Zimmerman and this
25    third gentleman, whoever the third gentleman was?
```

Page 77

```
 1    What did you all discuss?
 2        A.    Well, first of all, Butowsky introduced
 3    me to Malia Zimmerman because I had never met Malia
 4    before, and she told me that she was an investigative
 5    reporter, and, you know, she went through all the
 6    people that she knows for Fox, and basically that was
 7    it.  And then I was going to be investigating -- she
 8    knew I was going to be investigating the case.
 9            And the reason she was involved is
10    because she can help provide the support that I
11    needed with, like, information on people and things
12    like that, using, like, Fox's what they call brain
13    room.
14            So my interpretation of that meeting was
15    that I'm working with this Fox reporter on behalf the
16    family to try to find out who killed Seth Rich.
17        Q.    Okay.
18        A.    That's why I was so surprising when he
19    said, When you talk to Joel, don't bring up Malia and
20    play her name -- don't bring up her name, and I
21    always thought to myself, Why.
22        Q.    Let's just look at that quickly since we
23    we've brought it up again, which is -- I'll direct
24    in the text chain --
25        A.    Right.
```



Page 206

1    Butowsky and Adam Housley about an investigation,
2    apart from the Seth Rich investigation?
3       A.    No.
4       Q.    Let me go to Wheeler 206.
5       [Exhibit 37, e-mail, was marked for
6       identification.]
7    BY MR. GOTTLIEB:
8       Q.    I'm handing you what has been marked as
9    Exhibit 37, a document bearing the Bates number
10   Wheeler 206.  It appears to be a e-mail from Aaron
11   Rich to you on March 30th, 2017, at 3:35 p.m.
12       Do you recognize this document?
13      A.    Yes, I do.
14      Q.    What is this document?
15      A.    This is an e-mail that I received from
16   Aaron Rich.  The subject is "Seth Rich Friend."
17      Q.    And so what is Mr. Rich communicating to
18   you here?
19      A.    I was trying to find out who were some
20   of the people that Seth Rich spoke with the night of
21   his murder, or obviously prior to his murder.  And I
22   cannot get ahold of their cell phones.
23       So I asked Aaron if he would provide to
24   me some of the names of the people that Seth Rich had
25   talked to right before he was murdered, to try to get

Page 207

1    a clue, and he -- this is one name he did provide to
2    me.
3       Q.    Okay.  And so this was at 3:35 p.m. on
4    the 30th?
5       A.    Yes.
6       Q.    Let me show you the next document,
7    Wheeler 209.  And this is a document that's been
8    marked as Exhibit 38, with the Bates number Wheeler
9    209.
10       [Exhibit 38, e-mail, was marked for
11       identification.]
12   BY MR. GOTTLIEB:
13      Q.    It appears to be an e-mail from you to
14   Malia Zimmerman and Mr. Butowsky at 3:45 p.m. on the
15   same day as the document that we looked at in
16   Exhibit 37.
17       Do you recognize this document?
18      A.    It looks like an e-mail conversation
19   between several people on this document.  The top one
20   is from me to Malia.  The subject is "Media Inquiry."
21   And I was trying to find out more about this
22   individual who Aaron had told me about.
23       And recall, I mentioned earlier this
24   morning that Malia says she can use the brain room of
25   Fox.  They can do a lot of this background

Page 208

1    information because they have access to a lot of
2    databases.
3       And that's why I shared the name with
4    her, so she could find out what she could for me
5    about this guy, because I wanted to talk to him.
6       Q.    What -- what resources -- to the best of
7    your understanding, what resources does the Fox brain
8    room have available to it?
9       A.    I don't know specifically what all they
10   have, but I do know that they have access to a lot of
11   databases, because that's how they get a lot of the
12   information that they use for their stories, you
13   know, through their own research and things like that
14   about a lot of cases, not just this case, but a lot
15   of cases.
16       So she -- she could check with the brain
17   room to see what came up regarding this particular
18   guy's name.
19      Q.    And do you recall what, if anything,
20   came up about this lead?
21      A.    I don't believe, to the best of my
22   recollection today, Mike, that anything came out of
23   it.  I never spoke with the guy, I don't think.  I
24   don't think I ever talked to him.  Could I have?  I
25   guess it's possible, but today I don't remember if I

Page 209

1    did or not.
2       Q.    Okay.  Let me show you a document from
3    the next day, Wheeler 216.
4       Handing you what has been marked as
5    Exhibit 39.  It is a document bearing the Bates
6    numbers Wheeler 216.  This appears to be an e-mail
7    from Mr. Butowsky to you and Ms. Zimmerman on
8    March 31st.
9       [Exhibit 39, e-mail, was marked for
10       identification.]
11   BY MR. GOTTLIEB:
12      Q.    Do you recognize this e-mail?
13      A.    Yes, I do.
14      Q.    What is this e-mail?
15      A.    This is an e-mail -- it's -- the
16   subject -- there's no subject.  It's from Ed Butowsky
17   to Malia Zimmerman, and it just basically says, "I
18   agree.  Let's see if Kelsey has something for us, and
19   then I will get very aggressive with Devin over the
20   weekend."
21       And he's referencing Devin Nunes, who he
22   said was a good friend of his that he had been in
23   touch with about this case.
24      Q.    Okay.  And what is Ms. Zimmerman saying
25   in the e-mail immediately below?



Page 210

1      A.    "That's why Devin Nunes needs to help
2   us, or get his guy to.  What we know dispels that
3   whole narrative."
4      Q.    Okay.  Do you have an understanding of
5   what Ms. Zimmerman is referring to here?
6      A.    Obviously, it has something to do with
7   the Russian narrative or the hacking narrative, to
8   some degree.  That's what this was about.
9      Q.    Do you have any understanding of who
10  Ms. Zimmerman is referring to when she says "get his
11  guy"?
12     A.    I don't.
13     Q.    Did you ever have meetings with anyone
14  who worked for Devin Nunes in the course of your
15  investigation?
16     A.    There was one individual who worked for
17  the House intelligence committee.  You probably saw
18  that information in some of the documents.  He went
19  by the name of "Kash."
20     Q.    Was his name Kash Patel?
21     A.    They wouldn't tell me his last name.
22     Q.    Okay.
23     A.    I'm only the investigator.
24     Q.    What did he look like?
25     A.    They wouldn't tell me his last name.  He

Page 211

1   was like a -- he used to be -- he was an attorney out
2   of Florida, because he did tell me that.  He used to
3   be an attorney down in Pensacola, Florida.  I
4   remember him telling me that.
5          But I never could get the guy's last
6   name.  He always said, "Call me 'Kash.'"
7          "All right."  So I always called him
8   "Kash."  Now, I don't know if Kash --
9      Q.    Did he ever tell you how to spell
10  "Kash"?
11     A.    K-a-s-h.
12     Q.    Okay.
13     A.    Now, why was this important to me as an
14  investigator?
15          Because I thought, if they have an
16  investigation going on in Capitol Hill, and he's an
17  investigator, and they're looking at the Russian
18  narrative thing or anything like that --
19          And I'm investigating this murder.  And
20  if there is a link between the two, I was thinking,
21  "The police department here in D.C. should talk to
22  the investigators on the House side to share
23  information, to see if they can come up with
24  something."
25          Remember, we're trying to solve a

Page 212

1   murder.  That's the whole reason why I thought it was
2   important to talk to Kash or somebody in Capitol
3   Hill.  And so I had actually set up a meeting between
4   Kash and Dellacamera.
5          Because I had mentioned it to
6   Dellacamera, and he said, "Yeah, Rod, that's a good
7   idea.  This makes sense to me."
8          And at the last minute, that's when --
9   Dellacamera called me that Monday morning.  We were
10  going to meet right down here on Ninth Street at a
11  little restaurant.
12          But that Monday morning, Joe Dellacamera
13  called me and said, "Rod, I can't meet because I have
14  to do something with my child at his school."  And he
15  said, "I have to get back with you later."
16          Because he was going to bring a
17  sergeant -- or not a sergeant -- from the homicide --
18  I think it was going to be Anthony Hathe, Hathe --
19  from homicide with him, but they backed out at the
20  last minute.
21     Q.    Were you going to meet at a coffee shop
22  in, like, an alley, or Ninth Street?
23     A.    Well, Ninth Street.  Somewhere down on
24  Ninth Street, yeah.  I had never been.
25          Are you familiar with it?

Page 213

1      Q.    Well, what I want to ask you is:  Do you
2   recall who suggested that meeting location?
3      A.    I think it was Kash.
4      Q.    It was Kash?
5      A.    I think he lives over there or
6   something.  He was very family with the northwest
7   side of D.C.
8          Why?  Are you familiar with that
9   location?
10     Q.    Well, let me ask you another question.
11     A.    I've never been there, though.  At some
12  little restaurant.
13     Q.    You never met them, I understand.
14          Did you ever meet with Kash in his
15  office?
16     A.    No.  We met over at the Department of
17  the Interior, I believe it was.  On the sixth floor,
18  they have a little restaurant, like a cafeteria.
19     Q.    Why?  Not why they have it, but why did
20  you meet there?
21     A.    Oh, I don't know.  This is where he
22  wanted to meet.  In other words, if you're asking me,
23  how come I didn't go to his office, I don't have an
24  answer for that.
25          The guy said, "Let's meet in the

EXHIBIT D

FILED UNDER SEAL

EXHIBIT F

**From:** ebutowsky@gmail.com
**To:** Malia Zimmerman <maliamzimmerman@gmail.com>
**Cc:** Rod Wheeler <rod@rodwheeler.com>
**Subject:**
**Date:** March 31, 2017 at 2:08:49 AM EDT

I agree. Let's see if Kelsey has something for us and then I will get very aggressive with Devin over the weekend

On Mar 31, 2017, at 12:19 AM, Malia Zimmerman <maliamzimmerman@gmail.com> wrote:

That's why devin Nunes needs to help us or get his guy to. What we know dispels that whole narative.

On Thu, Mar 30, 2017 at 6:39 PM <ebutowsky@gmail.com> wrote:

Download Attachment
Available until Apr 29, 2017

Click to Download
IMG_1119.MOV
0 bytes

<analyze: MessageHeader 0x799bca89d203 Message-ID: AFS37B50-6DEA-4FFD-8A02-839502E88900@gmail.com Reference: (dPCE11D15-10E2-45EA-94EA-C79305B7B5C0@gmail.com CACCmtSFbJEe-H_-AfVJ1i4D9CbQiD9_x_-xL)wdww4PLbygg7X4c@mail.gmail.com) In-Reply-To: (CAOCmtSF9dKe-H_-AfVJ1i4D9CbQiD9_x_-xL)wdww4PLbygg7X4c@mail.gmail.com) Note: markone: Address 0x99bcaba49Pi askaknasksj@gmail.com a-To: (markone: Address 0x799bca89009ji Rod Wheeler rod@rodwheeler.com) Subject: Re: Katara Smith: askaknasksj@gmail.com a-Content-Type: multipart/alternative; boundary=Apple-Mail-0D115F96-35CF-40S0-A80D-445C521Y1A14 X-Received: by 10.202.12K.205 with SMTP id h194mr6S16b0mh 118.1490045587113; Thu, 30 Mar 2017 23:01:50 -0700 (PDT) X-Cm-Message-Date: AFoCM87baekmMAS51Sqf6n5YweyVYDCb2UOr ipk69eb4CBDJVBeelVpuqSQqkDf6tbm4Kywww X-Newgate-Filter-6KjM3v90ezkyTdsgorzdokn83Xai8ddw4kx J-Oddy09 KytbPO0D GISxQgC2mqGuTS8_QhDoBHB-Sx3KIw X-Gm-Message-State: AFwm1b2DXSJ0gGgS6Gzda8GYb7xc2xnogPdKKq_cLJ3O-8 N-byncw b-Ceka4mHdwj0sdnUOEsdyr-eoCAmiYqdOrbSqHaWEsYyiOo15m0RKLG.4AioCODDa2QG1a50gWb5g1b5sdKTGKqaodahTrtbdo0MX0bkHk96CdAkFqgtxENvdPdahCsxkfgUZi1Ass2HkasBbUgkr9jkbPAYFW8FnyQxoPOTbqAmXQxorhTDrSW Mb9Gi44K93i0S5+hY97m9hmASkPvBxQfaKG_bL2a6RTAMmzfxt-KLfaNIMbMAS9ITr1xaHYwB1-W005mjiYupfdRkQ1iLPdNP Rerecard. typewa 40Cb0 ccaroed by md RR10F1 31 Mar 201716:06:51-5840 Share Version: 1.5 1110 A+Jungle LKJM Singnature: v=1; a=rsa-sha256; c=relaxed/relaxed; d=1-IE.net; s=02161025; k=w-gm-message-state:mime-version:sender:from:in-reply-to:date; in-reply-to:date:cc: content-transfer-encoding; message-id:references:to; b5rvymXAwAw4DOfFEDCsgkyAH5Zbsnd3YbaskTkxsXYbog5PSS0Q2Gl5ZJaGyFCs4tThYooAg.topic-tyng.eCkn kniHd2j76tdWVcqoC72iwwd3ekWHbjQazwKQhwKDSHaZeKgEwdf,vmwwqTQKDL2Z+bKYjDQGWKliqszTBiPaksHER24lpv4PwY9aLdrd.TWbX+aC13kdk0QynYaqxA7wdSecocty tznBkjA17u92JKEr1d53d6km i5b4x0TgbamkfiPAbsgTqhorWw6Ws4tdnQzS)Yoa KKAL.stpw4rhduPi0TdggGhrokaIC3b+ikSlyz-33ljawSvNhjaBZwdt)u32k5BdyS4FSgo4CQu== Email-Archive-Version: 375.100

WHEELER0000216

EXHIBIT G

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

SUITE 5100
1000 LOUISIANA STREET
HOUSTON, TEXAS 77002-5096
(713) 651-9366
FAX (713) 654-6666
WWW.SUSMANGODFREY.COM

_____

SUITE 1400                          SUITE 3800                                    32ND FLOOR
1900 AVENUE OF THE STARS            1201 THIRD AVENUE                  1301 AVENUE OF THE AMERICAS
LOS ANGELES, CALIFORNIA 90067-6029  SEATTLE, WASHINGTON 98101-3000    NEW YORK, NEW YORK 10019-6023
(310) 789-3100                      (206) 516-3880                                (212) 336-8330
_____                                                                              _____

ELISHA BARRON                                              E-MAIL EBARRON@SUSMANGODFREY.COM
DIRECT DIAL (212) 729-2013

February 27, 2020

Via E-mail[1]

The Honorable Sarah Netburn
United States Magistrate Judge
Thurgood Marshall Courthouse
40 Foley Square, Room 430
New York, NY 10007

Re:  *Rich v. Fox News Network LLC et al.*, Civ. No. 18-cv-02223

Dear Judge Netburn:

Plaintiffs Joel and Mary Rich submit this letter identifying outstanding disputes regarding ESI protocol pursuant to the Court's Order (Dkt. 110).

**Disputed Search Terms**

Plaintiffs and Fox engaged in extensive negotiations over search terms, and have agreed to the vast majority of terms. However, there were two requests as to which Fox declined Plaintiffs' proposed terms. Plaintiffs have more than met their burden of showing "any possibility of relevance sufficient to warrant discovery." *Condit v. Dunne,* 225 F.R.D. 100, 106 (S.D.N.Y. 2004). "[O]nce that showing is made, the party resisting discovery bears the burden of demonstrating that, 'despite the broad and liberal construction afforded the federal discovery rules,' the requests are irrelevant, or are overly broad, burdensome, or oppressive." *Am. Fed'n of Musicians of the United States & Canada v. Sony Music Entm't, Inc.*, No. 15-CV-05249 (GBD) (BCM), 2016 WL 2609307, at *3 (S.D.N.Y. Apr. 29, 2016). "Potential relevance" is sufficient to warrant discovery. *Am. Fed'n of Musicians*, 2016 WL 2609307, at *4 (citing Fed. R. Evid. 401). "General and conclusory

---

[1] Plaintiffs do not believe this letter (or the joint letter submitted by the parties) implicates "sensitive or confidential information" such that filing pursuant to this Court's Individual Practice 1.A. is appropriate. However, Plaintiffs have agreed to file this letter pursuant to those procedures in order to enable Fox to make its argument regarding confidentiality to the Court.

February 27, 2020
Page 2

objections as to relevance, overbreadth, or burden," on the other hand, "are insufficient to exclude discovery of requested information." *John Wiley & Sons*, 298 F.R.D. at 186. Fox has made no showing of irrelevance or burden.

Plaintiffs respectfully request that the Court order Fox to run the searches below:

**Search relating to <u>RFP 2</u>: "All documents and/or communications relating or referring to any sources for any Rich/Wikileaks News Item."**

- (Source OR anonymous OR "Federal Investigator" OR "federal agent" OR "fed agent" OR "investigative source!" OR "law enforcement source!" w/30 of
  - o Wikileak! OR (DNC AND (Hack! OR Trump OR Russia)) OR (Rich OR Seth)

To capture documents relevant to RFP 2, Plaintiffs proposed these terms for just ***two custodians***—Malia Zimmerman and Adam Housley—the (known) Fox employees who worked directly on the Rich/Wikileaks news articles. RFP 2 goes to a central issue in the case: Fox's fabrication of a source for its claims that Seth Rich, not Russia, was responsible for the DNC hack. *See* Amended Complaint (Compl.) ¶ 69 ("Butowsky and Fox's Zimmerman called Wheeler from Butowsky's phone to falsely inform him that they had developed an FBI source supposedly confirming that emails were sent between Seth and WikiLeaks."); ¶ 87 ("The article falsely attributed a quote to an unnamed federal investigator as stating: "I have seen and read the emails between Seth Rich and WikiLeaks.").

Plaintiffs' proposed search terms combine two relevant sets of terms: (1) terms for law enforcement sources; and (2) terms relating to the Wikileaks/DNC hack for which Fox is alleged to have fabricated a source. Fox's objection is that the terms may "generate meaningless hits and have a low probability of generating documents not already covered." That there may be *some* irrelevant hits is no bar. That is the purpose of a relevance review.[2] Plaintiffs have already significantly narrowed this proposal, including by limiting it to just two custodians for less than a two-year period. Fox has not even suggested, much less made a showing that the search would return a burdensome number of documents. Plaintiffs therefore respectfully request that the Court order Fox to run Plaintiffs' proposed search.

---

[2] To the extent Fox objects to the "OR (Rich OR Seth), rather than an "AND," there may be relevant discussions that do not expressly reference a member of the Rich family. Indeed, the title of the Zimmerman Article, "Slain DNC Staffer Had Contact with WikiLeaks Say Multiple Sources," does not even reference the Rich name.

February 27, 2020
Page 3

**Search relating to <u>RFP 11</u>: All documents reflecting or referring to communications with any Government Person in connection with the DNC Wikileaks Incident.**

- (Wikileaks AND Russia) OR (DNC w/10 (Hack OR Leak OR Emails) AND Russia)) AND
  - o Trump OR Spicer OR Bannon OR Kash OR Patel OR Nunes OR "Dee O" OR "Intelligence committee" OR (To/From/cc/bcc: ".gov") OR Rohrabacher

Plaintiffs' proposed search terms relating to RFP 11 are the product of significant tailoring, including agreeing to limit these terms to just three custodians: Zimmerman, Housley, and Wilson.

The Amended Complaint alleges that Fox, Zimmerman, Wheeler, and Butowsky worked directly with members of the government to promote a false narrative that Seth was the Wikileaks source for the purpose of taking the spotlight off Russia as the source of the DNC hack and, more specifically, President Trump's connection with Russia. On April 20, 2017, Butowsky and Wheeler met with then-White House Press Secretary Sean Spicer about the planned story. Compl. ¶¶ 61-63. On May 14, 2017, Butowsky informed Wheeler that President Trump had read a draft of the Article and wanted it published "immediately." *Id*. ¶ 73. On May 15, 2017, the day before Zimmerman published the Rich/Wikileaks Articles, Butowsky wrote to a team of "Fox News producers and on-air talent in New York" stating: "One of the big conclusions *we* need to draw from this is that the Russians did not hack our computer systems and ste[a]l emails and there was ***no collusions like trump with the Russians***." *Id.* ¶ 82. Butowsky instructed Wheeler, "If you can, try to highlight this puts the Russian hacking story to rest." *Id.* ¶ 86. On May 21, 2017, paid Fox News correspondent Newt Gingrich stated on Fox & Friends that Seth Rich was the source of the Wikileaks and "what does that tell you about what was going on? Because it turns out, it wasn't the Russians." *Id.* ¶ 104.

Again, Fox has made no showing of burden, as required. *John Wiley*, 298 F.R.D. at 186. Plaintiffs therefore respectfully request that the Court order Fox to run Plaintiffs' proposed search.

<u>**Relevance Review**</u>

At the status conference on February 10, 2020, the Court asked whether the parties would conduct a relevance review or simply produce all documents hitting on the search terms. The parties agree that a relevance review is appropriate, but Fox takes an unduly narrow view of relevance—one that is incompatible with the allegations in the Amended Complaint and the well-established principle that "relevance, for purposes of discovery, is an extremely broad concept." *Condit*, 225 F.R.D. at 105. Fox and Plaintiffs have two central disputes vis-à-vis "relevance":

February 27, 2020
Page 4

*First*, Fox's alleged motive of pinning the Wikileaks/DNC incident on a party other than Russia (rather than simply reporting the news) is relevant to showing that Defendants' conduct toward the Riches was "extreme and outrageous"—an element of the tort of intentional infliction of emotional distress (IIED). *Rich v. Fox News Network, LLC*, 939 F.3d 112, 122 (2d Cir. 2019).

As the allegations cited in support of RFP 11 (above) show, documents reflecting Fox's efforts to find a source for Wikileaks other than Russia—even documents that do not directly implicate Seth Rich—are "potentially relevant" to Plaintiffs' claims. That is enough to warrant discovery. *Am. Fed'n of Musicians*, 2016 WL 2609307, at *4. Fox cannot withhold, on grounds of relevance, documents reflecting discussions of the DNC/Wikileaks incident and Russia's role more broadly.

*Second*, Fox's broader relationship with Butowsky and Wheeler, and their newsgathering and reporting tactics, are relevant to the claims in this case. Fox's broader relationship with Butowsky is relevant to how "extreme and outrageous" a jury may find the allegation that Butowsky and Zimmerman "purportedly acting independent of each other, pursued Joel and Mary to try to gain their trust." Compl. ¶ 29. Plaintiffs have reason to believe that Butowsky and Zimmerman (and Adam Housley) had worked together previously to publish "explosive" stories, using "anonymous" and "extremely dubious sources" with political motivations. *See id.* ¶ 34 ("Butowsky wrote to Wheeler by text: … "Behind the scenes I do a lot of work, (unpaid) helping to uncover certain stories, my biggest work was revealing most of what we know about Benghazi."). Exhibit 1 (November 7, 2016 article reporting on Zimmerman and Housley's article on Benghazi); Exhibit 2 (November 7, 2016 article by Zimmerman on Benghazi). Yet Fox asserts that it is entitled to withhold as *irrelevant* documents that hit on the search terms and relate to Benghazi, rather than the Rich/Wikileaks articles. This is contrary to allegations in the Complaint and the "extremely broad" concept of relevance.

Fox's broader relationship with Wheeler is likewise relevant to Fox's culpability for using Wheeler to infiltrate the Rich Family and spread lies on national television about Joel and Mary's murdered son, in furtherance of Fox's political agenda. If Zimmerman or others at Fox used Wheeler in a similar role in that past, or knew that he was prone to reckless reporting, *see* Compl. ¶ 201, that too is relevant both to how "extreme and outrageous" the conduct was, as well as the claim of negligent supervision. Fox should not be permitted to withhold as irrelevant documents hitting search terms that relate to Wheeler's reporting on other issues.

In arguing for a narrow reading of relevance (contrary to Rule 26), Fox generically invokes "newsgathering privilege." But the newsgathering privilege does not render documents *irrelevant* under Rule 26 or entitle a party to withhold them entirely. If Fox wishes to claim a privilege, it must log those documents and make the requisite showing to allow Plaintiffs to challenge the privilege. *See Matter of*

February 27, 2020
Page 5

*Andrews v. Andreoli,* 92 Misc. 2d 410, 418 (N.Y. Sup. Ct. 1977) (journalist bears the burden of establishing the privilege).

Plaintiffs respectfully request that the Court order Fox not to withhold as irrelevant, documents relating to: (1) Fox's communications about the Wikileaks/DNC incident more broadly, including Russia's role and efforts to find the source; or (2) Butowsky and Wheeler's broader relationship with Fox and its employees.

## Timeframe for Plaintiffs' Search

The parties agree on the search terms Plaintiffs will use to search for and produce responsive documents within their possession, custody, and control. A dispute remains, however, with respect to the timeframe for several of Fox's document requests. *See* Ex. 3. Plaintiffs note first that Fox's insistence in seeking Plaintiffs' documents that postdate the complaint is in direct opposition to its refusal to search and produce responsive post-complaint documents from its own custodians.

Two of the requests (RFPs 1 and 2) seek documents related to Seth Rich's alleged connection to Wikileaks, Seth Rich's death, and the investigation into his death. Plaintiffs have agreed to run broad terms (already yielding several thousand hits) to capture potentially responsive documents from several months before Seth's death until the filing of the complaint. Fox has not explained why documents from at least a year after the publication of its articles would be relevant to Plaintiffs' claims centered around the events leading up to and including that publication, much less relevance that would justify the significant burden in applying these broad terms—seeking documents *generally about Plaintiffs' son's death*—to an ongoing search that stretches into the present.

The remaining requests seek discovery into Plaintiffs' financial, medical, and emotional state. Plaintiffs have agreed to produce tax returns (through FY 2018) and medical records (through the present). Plaintiffs have also agreed to run broad terms—including simply the words "feeling" or "sad"—from January 2015 through March 2018, yielding over ten thousand hits. Again, Fox has given no reason why documents besides medical and financial records that postdate the complaint are sufficiently relevant to justify the burden of expanding these searches another several years into the present, particularly given the personal and intrusive nature of the information sought.

Plaintiffs welcome the opportunity to further brief any of these issues.

Sincerely,

Elisha Barron

EXHIBIT 1

2/26/2020
Fox's Final Election Hail Mary Is A Four Year Old Benghazi Claim Floated By Organization Of Conspiracy Theorists | Media Matters for A…

Case 1:18-cv-02223-GBD-SN Document 167-6 Filed 07/29/20 Page 2 of 20
Case 1:18-cv-02223-GBD-SN Document 150-1 Filed 03/18/20 Page 2 of 9

**MEDIAMATTERS**
FOR AMERICA

# Fox's Final Election Hail Mary Is A Four Year Old Benghazi Claim Floated By Organization Of Conspiracy Theorists

*Fox News Already Reported Speculation That Libya Consulate Guards Turned On U.S. Personnel Four Years Ago*

**WRITTEN BY   ZACHARY PLEAT**

**PUBLISHED   11/07/16 7:00 PM EST**

On the eve of the 2016 presidential election, Fox News pushed a report detailing the "explosive charge" that a security company hired to protect the U.S. diplomatic compound in Benghazi, Libya, was staffed with locals that participated in the September 11, 2012, attack that left four Americans dead, including Ambassador Chris Stevens. Fox actually reported identical speculation more than four years ago; their sources for the charge are an anonymous "independent security specialist, the co-author of a book that stated that there is "no evidence" the guards "were in league with the attackers," and an organization filled with birthers and conspiracy theorists; and the network's previous reporting about the security company featured noted fabulist Dylan Davies.

A week after the September 11, 2012, attack, Fox correspondent Ed Henry reported that "there are reports that security guards" hired by the British security contracting firm Blue Mountain Group " "turned on the ambassador and that led to his death." From a Nexis transcript of the September 18, 2012, edition of Fox News' *Special Report with Bret Baier* (subscription required):

> HENRY: Today, [State Department spokesperson Victoria] Nuland clarified the administration had, in fact, hired a private security company, Blue Mountain Group, to work inside the perimeter.
>
> NULAND: They were hired to provide local Libyan guards who operated inside the gate doing things like operating the security access equipment, screening the cars.
>
> (END VIDEOTAPE)
>
> HENRY (on-camera): Significant, because there are reports that those Libyan security guards turned on the ambassador and that led to his death. Now, late today, Secretary Hillary Clinton said there was no actionable intelligence about an imminent attack in Libya. The keyword being actionable there.

Tonight, a FoxNews.com report by Malia Zimmerman and Adam Housley called similar reports an "explosive charge," and presented them as completely new information:

2/26/2020　Case 1:18-cv-08223-GBD-SN Document 176-1 Filed 07/03/20 Page 10 of 80 — dia Matters for A...

Case 1:18-cv-02225-GBD-SN Document 1301-1 Filed 06/15/20 Page 4 of 8

An obscure private firm hired by the State Department over internal objections to protect U.S. diplomats in Benghazi just months before the American ambassador and three others were killed was staffed with hastily recruited locals with terror ties who helped carry out the attack, multiple sources told Fox News.

The explosive charge against Wales-based Blue Mountain Group comes from several sources, including an independent security specialist who has implemented training programs at U.S. Consulates around the world, including in Benghazi, where he trained a local militia that preceded Blue Mountain. The source, who spoke on condition of anonymity, said Blue Mountain used local newspaper ads to assemble a team of 20 guards, many of

whom had terror ties, after securing a $9.2 million annual contract.

"The guards who were hired were locals who were part of the Ansar al-Sharia and Al Qaeda groups operating in Benghazi," said the source, whose assignment in Benghazi had ended in November 2011. "Whoever approved contracts at the State Department hired Blue Mountain Group and then allowed Blue Mountain Group to hire local Libyans who were not vetted."

[...]

John "Tig" Tiegen, one of the CIA contractors that responded to the Sept. 11, 2012 attack and co-author of "13 Hours: The Inside Account of What Really Happened in Benghazi," confirmed to Fox News that the local Libyans who attacked the consulate that night included guards working for Blue Mountain.

"Many of the local Libyans who attacked the consulate on the night of Sept. 11, 2012, were the actual guards that the State Department under Hillary Clinton hired to protect the Consulate in Benghazi," Tiegen told Fox News. "The guards were unvetted and were locals with basically no background at all in providing security. Most of them never had held a job in security in the past.

"Blue Mountain Libya, at the time of being awarded the contract by our State Department, had no employees so they quickly had to find people to work, regardless of their backgrounds," he said.

One former guard who witnessed the attack, Weeam Mohamed, confirmed in an email sent to the Citizens Commission on Benghazi and obtained by Fox News, that at least four of the guards hired by Blue Mountain took part in the attack after opening doors to allow their confederates in.

> "In the U.S. Mission, there were four people [who] belonged to the battalion February 17," Mohamed wrote to the Commission, an independent body formed with Accuracy in Media to investigate the attack and the administration's handling of it.

Fox's sourcing for the story — which would contradict several reports by congressional committees and a review by the State Department — is extremely dubious. Their lead source is anonymous. Their second source, Tiegan, wrote in his bestseller *13 Hours* that there was "no evidence" the guards helped the attackers. From *13 Hours* (page 84-85):

> Who opened the gate wasn't clear, but responsibility for the entrance rested with the Blue Mountain Libya guards. By some accounts the armed invaders threatened the unarmed guards, who immediately acquiesced. A US government review raised the possibility that the "poorly skilled" local guards left the pedestrian gate open "after initially seeing the attackers and fleeing the vicinity." No evidence has shown that the Blue Mountain guards were in league with the attackers, but maybe they were incompetent. As the report noted, "They had left the gate unlatched before." Further complicating matters, the camera monitor in the guard booth at the front gate was broken, and new surveillance cameras.

The network's third source comes by way of the Citizens Commission on Benghazi, which is staffed by multiple birthers, anti-Muslim activists, and conspiracy theorists who maintained that there was a Benghazi "cover-up."

Fox previously relied upon Blue Mountain Group security contractor Dylan Davies for Benghazi reporting — in fact, Housley himself acknowledged on-air that some of the network's 2012 Benghazi coverage had cited Davies, but they "stopped speaking to him when he asked for money." In 2013, CBS News retracted a report that featured Davies' fabricated claims about having scaled a wall of the Benghazi diplomatic compound while it was under attack and striking a terrorist with his rifle.

It's no surprise that Fox News, whose obsession with finding a way to turn the tragedy in Benghazi into political attacks on President Obama and then-Secretary of State Hillary Clinton, would close the 2016 presidential campaign with a new Benghazi conspiracy.

EXHIBIT 2

2/26/2020

Case 1:18-cv-02223-GBD-SN   Document 167-2   Filed 07/23/20   Page 13 of 20
Case 1:18-cv-02223-GBD-SN   Document 1302   Filed 08/18/20   Page 2 of 6

🖨 Print    ✖ Close



# Benghazi guards turned on US diplomats in 2012 attack, sources say

By Malia Zimmerman, ,

Published November 07, 2016

Fox News

An obscure private firm hired by the State Department over internal objections to protect U.S. diplomats in Benghazi just months before the American ambassador and three others were killed was staffed with hastily recruited locals with terror ties who helped carry out the attack, multiple sources told Fox News.

The explosive charge against Wales-based Blue Mountain Group comes from several sources, including an independent security specialist who has implemented training programs at U.S. Consulates around the world, including in Benghazi, where he trained a local militia that preceded Blue Mountain. The source, who spoke on condition of anonymity, said Blue Mountain used local newspaper ads to assemble a team of 20 guards, many of whom had terror ties, after securing a $9.2 million annual contract.



John "Tig" Tiegen was there and says guards turned on Americans.

"The guards who were hired were locals who were part of the Ansar al-Sharia and Al Qaeda groups operating in Benghazi," said the source, whose assignment in Benghazi had ended in November 2011. "Whoever approved contracts at the State Department hired Blue Mountain Group and then allowed Blue Mountain Group to hire local Libyans who were not vetted."

2/26/2020

Case 1:18-cv-02223-CRC-SDc-Sdn   Document 105-2   Filed 07/23/20   Page 14 of 20
Case 1:18-cv-02223-CRC-SDn   Document 100-2   Filed 06/18/20   Page 3 of 6

**TIMELINE OF CLINTON'S BENGHAZI STATEMENTS**



Stevens, shown in rear wearing black, with several of the guards sources say turned on him. (Special to Fox News)

Many were members of the Libyan government-financed February 17th Martyrs Brigade, an Islamist militia that had previously guarded Americans before being replaced by Blue Mountain.

John "Tig" Tiegen, one of the CIA contractors that responded to the Sept. 11, 2012 attack and co-author of "13 Hours: The Inside Account of What Really Happened in Benghazi," confirmed to Fox News that the local Libyans who attacked the consulate that night included guards working for Blue Mountain.

"Many of the local Libyans who attacked the consulate on the night of Sept. 11, 2012, were the actual guards that the State Department under Hillary Clinton hired to protect the Consulate in Benghazi," Tiegen told Fox News. "The guards were unvetted and were locals with basically no background at all in providing security. Most of them never had held a job in security in the past.

"Blue Mountain Libya, at the time of being awarded the contract by our State Department, had no employees so they quickly had to find people to work, regardless of their backgrounds," he said.

One former guard who witnessed the attack, Weeam Mohamed, confirmed in an email sent to the Citizens Commission on Benghazi and obtained by Fox News, that at least four of the guards hired by Blue Mountain took part in the attack after opening doors to allow their confederates in.

"In the U.S. Mission, there were four people [who] belonged to the battalion February 17," Mohamed wrote to the Commission, an independent body formed with Accuracy in Media to investigate the attack and the administration's handling of it.

"Always armed. And they are free to move anywhere inside a building mission.

"And therefore, they had a chance to do an attack on the mission's headquarters. They have all the details about the place. At the same time they have given the United States a painful blow," Mohamed wrote.

Blue Mountain officials did not return multiple requests for comment. The State Department acknowledged in internal emails obtained by FoxNews.com the local recruits fell short of their duty, but discounted the claim any

took an active role in the attack that resulted in the deaths of Ambassador Christopher Stevens, Foreign Service Information Officer Sean Smith and CIA contractors and former Navy SEALs Tyrone Woods and Glen Doherty.

"While the Accountability Review Board report and other reports were critical of our local guards' performance, we are not aware of any evidence that they participated in the attacks themselves," said State Department spokesman John Kirby.

Blue Mountain was hired in February 2012, following an uprising that ended Col. Muammar Gaddafi's 42-year rule and plunged Libya into violent chaos. Congressional testimony in the wake of the attack on a consular office in Benghazi revealed that Stevens and his staff had made hundreds of requests for security upgrades but had been ignored by officials in Washington.

"We kept asking for additional support, including a 50-caliber mounted machine gun, but the State Department would not give it to us, because they said it would upset the locals," the source told Fox News. "Instead, the State Department hired a company that doesn't have employees, which then hired terrorists."

Clare Lopez, a member of Citizens' Commission on Benghazi, said the Clinton State Department bears blame for the security situation.

"Think about it: Hillary Clinton's State Department actually hired the very people who, along with their jihadist allies in Benghazi, attacked us and killed U.S. Ambassador Chris Stevens and Sean Smith as well as CIA contractors Glen Doherty and Ty Woods," Lopez said.

According to government records obtained by the Washington-based Judicial Watch, the State Department was in a "rush" to hire Blue Mountain UK, and its affiliate, Blue Mountain Libya, which together formed The Blue Mountain Group to secure the Benghazi contract.

"I understand there was a tremendous rush to get the original contract awarded, and the Service level agreement was most likely overlooked in the rush," wrote State Department contracting officer Jan Visintainer, in a June 6, 2012, email. Emails obtained from [missing word] after the attack showed Visintainer urged Blue Mountain officials not to talk to the media.

Blue Mountain UK was formed in 2008 by David Nigel Thomas, a former Special Air Service official. Charles Tiefer, a commissioner at the Commission on Wartime Contracting, told Reuters the company was not well known.

"Blue Mountain was virtually unknown to the circles that studied private security contractors working for the United States, before the events in Benghazi," Tiefer said.

Despite the size of the operation, and having no staff or track record with the State Department, Blue Mountain Group landed the $767,767-per-month contract to protect the Benghazi consular office, beginning on Feb. 17, 2012.

The company solicited applications in local newspapers and on websites, and very little, if any, screening of guards was done, the security specialist told Fox News. The lack of vetting led to several potentially dangerous hires beginning in March of 2012, he said.

"One of those guards hired by Blue Mountain was the younger brother of the leader of Al Qaeda of Benghazi," he said.

In an email obtained by Judicial Watch, Jairo Saravia of the Regional Security office for the U.S. Embassy in Tripoli, told his superiors in Washington that Blue Mountain had held and lost security contracts in Tripoli, with the Corinthian Hotel and Palm City complex.

"The latest information is Blue Mountain is not licensed by the GOL (Government of Libya) to provide security services in Libya," Saravia wrote. "I would advise not to use their services to provide security for any of our

2/26/2020
Case 1:18-cv-02223-GBD-SN Document 67-2 Filed 07/03/20 Page 16 of 20
Case 1:18-cv-02223-GBD-SN Document 230-2 Filed 06/12/20 Page 9 of 6

annexes and/or offices due to the sensitivity this issue has with the current GOL."

Prior to Blue Mountain, security for Americans in Benghazi had been provided by the February 17th Martyrs Brigade under a direct agreement with the State Department. Despite its Islamist orientation, the militia included dozens of locals who had been carefully cultivated and trained by the U.S., according to the source. The majority of the February 17 Militia guards were fired without warning when Blue Mountain was hired, leading some members to turn against the Americans, he said. The State Department kept on at least three February 17 employees for patrol.

Eric Nordstrom, the regional security officer in Libya who has vast, first-hand knowledge of some 600 security requests denied to the U.S. diplomatic mission in Libya, testified on May 8, 2013, before the Congressional Committee On Oversight & Government Reform that he was aware that employees with both February 17 Martyrs Brigade and Blue Mountain had ties to Islamist terrorists.

"I had met with some of my agents and then also with some annex personnel. We discussed that," Nordstrom told lawmakers.

Nordstrom testified that the "ferocity and intensity" of the 13-hour, four-phase attack, on the 11th anniversary of 9/11, was nothing that they had seen in Libya, or that he had seen in his time in the Diplomatic Security Service, with as many as 60 attackers in the consulate.

"I am stunned that the State Department was relying on [locals] with extremist ties to protect American diplomats," U.S. Rep. Blake Farenthold, R-Texas, told Fox News. "That doesn't make any sense. How does that happen?"

Fox News was able to verify through a former Libyan guard the identities of several February 17 employees hired despite terrorist ties, who he said participated in the attack. While their identities have been provided to federal authorizes, none have been prosecuted.

Malia Zimmerman is an award-winning investigative reporter focusing on crime, homeland security, illegal immigration crime, terrorism and political corruption. Follow her on twitter at @MaliaMZimmerman

🖨 Print   ✖ Close

URL

https://www.foxnews.com/world/benghazi-guards-turned-on-us-diplomats-in-2012-attack-sources-say

- Home
- Video
- Politics
- U.S.
- Opinion
- Entertainment
- Tech
- Science
- Health
- Travel
- Lifestyle
- World
- Sports
- Weather

- Privacy
- Terms

This material may not be published, broadcast, rewritten, or redistributed. © FOX News Network, LLC. All rights reserved. All market data delayed 20 minutes. Updated Privacy - Do Not Sell my Personal Information - New Terms of Use - FAQ

EXHIBIT 3

**EXHIBIT 3 – DISPUTED DATE RANGES FOR PLAINTIFFS' SEARCHES**

| Request for Production | Plaintiffs' Proposal | Fox's Proposal |
|---|---|---|
| 1. All communications and other documents referring or relating to WikiLeaks or any individual or entity affiliated with WikiLeaks, including but not limited to, Gavin MacFayden or Julian Assange. | January 1, 2016-March 13, 2018 (filing of the complaint) | January 1, 2016 to the present |
| 2. All communications and other documents referring or relating to the death of Seth Rich or investigation relating to his death. | May 1, 2016-March 13, 2018 | July 9, 2016 to the present |
| 17. All records and other documents relating to any appointments, visits, consultations, and/or care received by you from or with any health care or mental health providers, including but not limited to in the fields of neurology, primary care, internal medicine, psychology, psychiatry, social work, therapy, or any other discipline, since January 1, 2015. | Plaintiffs will agree to provide medical records through the present. Plaintiffs will produce any documents they intend to rely on to prove their damages claim. Plaintiffs will search for and produce other responsive documents from January 1, 2015-March 13, 2018 | January 1, 2015 to the present |
| 18. All communications and other documents sufficient to identify any health care or mental health providers who you have consulted, visited, and/or received care from since January 1, 2015. | Plaintiffs will agree to provide medical records through the present. Plaintiffs will produce any documents they intend to rely on to prove their damages claim. Plaintiffs will search for and produce other responsive documents from January 1, 2015-March 13, 2018 | January 1, 2015 to the present |
| 19. All communications and other documents referring or relating to your emotional state, distress, and/or well-being since January 1, 2015. | Plaintiffs will agree to provide medical records through the present. Plaintiffs will produce any documents they intend to rely on to prove their | January 1, 2015 to the present |

**EXHIBIT 3 – DISPUTED DATE RANGES FOR PLAINTIFFS' SEARCHES**

|  |  |  |
|---|---|---|
|  | damages claim. Plaintiffs will search for and produce other responsive documents from January 1, 2015-March 13, 2018 |  |
| 22. All communications and other documents reflecting wages, other income, or any other moneys received by you since January 1, 2014, including but not limited to, W-2 forms, 1099 forms, paystubs, bitcoin or other cryptocurrency payments, Venmo transmittals, or eBay payments. | Plaintiffs will agree to provide tax returns through the 2018 tax year. Plaintiffs will produce any documents they intend to rely on to prove their damages claim. Plaintiffs will search for and produce other responsive documents from January 1, 2015-March 13, 2018 | January 1, 2015 to the present |
| 23. All job applications completed or obtained by you since January 1, 2015. | Plaintiffs will produce any job applications completed from January 1, 2016, through December 31, 2019. Plaintiffs will search for and produce other responsive documents from May 1, 2016-March 13, 2018. | January 1, 2015 to the present |
| 24. All communications and other documents related to potential job changes by you since January 1, 2015. | January 1, 2016-March 13, 2018 | January 1, 2015 to the present. |

EXHIBIT H

FILED UNDER SEAL

EXHIBIT I

**From:** Rod wheeler <rod@rodwheeler.com>
**To:** Malia Zimmerman <Malia.Zimmerman@FOXNEWS.COM>
**Cc:** Rod wheeler <rod@rodwheeler.com>
**Subject:** Late call from Det. DellaCamera
**Date:** May 12, 2017 at 11:29:26 AM EDT

Hi Malia. Thanks for sharing the draft of the article.

I actually received a call yesterday afternoon late, (after you and I spoke on the phone) from Det. DellaCamera. He is willing to meet with D-O and myself again on Monday. I explained to him that the House Intelligence Investigators may can assist him with the investigation of Seth's death, but he need to be forthright in informing them of what he has regarding case details and especially the emails. He said he will meet with them and me on Monday.

I have reached out to ED and D-O to confirm a time for Monday but I haven't heard back yet from D-O. I think we are on the verge of a breakthrough with getting the specific information we need.

On another note, would you mind if I share with Suzanne at FNC-NY the fact that we are working together on an investigation? (I plan to use Adam as a reference as well……if this is okay with you guys) Im thinking it may help my chance to come aboard permanently with Fox. Let me know if okay.

Just FYI!!

Rod

<mailcore::MessageHeader 0x76e356210 Message-ID: 2EDV3699-CFBA-48D0-B9D9-A4CBEB16BD9F@rodwheeler.com From...mailcore::Address 0x76e3f36f6b0 Malia Zimmerman <Malia.Zimmerman@FOXNEWS.COM>] Cc: [mailcore::Address 0x76e3f36b4f0 Rod wheeler <rod@rodwheeler.com>] Subject: Late call from Det. DellaCamera Content-Type: text/plain; charset=utf-8 Content-Transfer-Encoding...quoted-printable Mime-Version: 1.0 (Mac OS X Mail 10.3 (3273.6.3)) Universally Unique Identifier: 14451CB-B9DB-48F9-9601-5BBCA9F7C294> Email-Archive-Version: 371.100

WHEELER00000577

EXHIBIT J

FILED UNDER SEAL

EXHIBIT K

FILED UNDER SEAL

EXHIBIT L

| | |
|---|---|
| **From**: | ed butowsky [edbutowsky@icloud.com] |
| **Sent**: | 5/16/2017 3:55:54 AM |
| **To**: | lauren petterson [lcpetter@gmail.com]; Petterson, Lauren [Lauren.Petterson@FOXNEWS.COM]; Doocy, Steve [Steve.Doocy@FOXNEWS.COM]; steve doocy [stevedoocy@mac.com]; Gavin Hadden [gavin.hadden@gmail.com]; Hadden, Gavin [Gavin.Hadden@FOXNEWS.COM]; Groman, Sean [sean.groman@FOXNEWS.COM]; Hall, Alan [alan.hall@FOXNEWS.COM]; Kilmeade, Brian [brian.kilmeade@FOXNEWS.COM]; Ainsley Earhardt [ainsleyproctor@gmail.com] |
| **Subject**: | Dnc staffer sent emails to Wikileaks |

The story is or will be up very early tomorrow morning. Rod Wheeler is up and ready to give interviews. There's more to come on the story but for now this is a massive story there's going to be talked about for a long time.

If you have any questions about the story or more information needed, call me at 972-897-0197. I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility.

One of the big conclusions we need to draw from this is that the Russians did not hack into our computer systems and steel emails and there was no collusion like trump with the Russians.
We're gonna have a follow up story which includes Donna Brazil in her role in all of this.

> **From:** "Zimmerman, Malia McLaughlin" <Malia.Zimmerman@FOXNEWS.COM>
> **Date:** May 15, 2017 at 10:41:02 PM CDT
> **To:** "edbutowsky@icloud.com" <edbutowsky@icloud.com>
> **Subject: Dnc staffer sent emails to Wikileaks**

> By Malia Zimmerman

> The Democratic National Committee staffer who was gunned down on July 10 on a Washington, D.C., street last July just steps from his home in the cozy Washington DC's Columbia Heights neighborhood, leaked thousands of highly controversial emails to WikiLeaks that were generated internally between DNC party leaders, Fox News has confirmed after a 10-month investigation.

> A federal investigator who reviewed an FBI forensic report detailing the contents of DNC staffer Seth Rich's computer generated within 96 hours after his murder, said Rich made contact with Wikileaks through Gavin MacFadyen, a famous American investigative reporter, documentary filmmaker, and director of Wikileaks who was living in London.

"I have seen and read the emails between Seth Rich and Wikileaks," the federal investigator told Fox News, confirming the MacFayden connection. He said the whole case was put to rest after the FBI initial audit. FBI agents were told not to investigate further. The emails sit inside the FBI today, said the federal agent, who asked to remain a confidential source.

Rod Wheeler, a former DC homicide police detective who now runs a private detective firm, said he too uncovered substantial evidence and information that led him to believe the connection between Rich and Wikileaks.

"My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks," said Wheeler, who was hired to investigate Rich's murder. "I do believe that the answers to who murdered Seth Rich sits on his computer on a shelf at the DC police or FBI headquarters."

The last of the 44,053 emails and 17,761 attachments between Democratic National Committee leaders, which spanned from January 2015 through late May 2016, were transferred from Rich to Wikileaks before May 21. Fifty days later, Rich was murdered, shot twice in the back and left to die just steps from his home.

On July 22, just 12 days after Rich was killed, Wikileaks published the emails. They showed top DNC officials conspired to stop Sen. Bernie Sanders of Vermont from becoming the party's presidential nominee. That controversy resulted in Debbie Wasserman Schultz resigning as DNC chairperson. A number of Sanders supporters refused to back party nominee, Hillary Clinton, and some subsequently formed groups to work against Clinton and their party.

On August 9, Wikileaks added another mysterious twist to Rich's murder by announcing: "WikiLeaks has decided to issue a US$20k reward for information leading to conviction for the murder of DNC staffer Seth Rich."

While some in the intelligence community and Congress have blamed Russian hackers for stealing and leaking emails from the DNC and Hillary Clinton's campaign to Wikileaks to impact the election in Donald Trump's favor, the emails show, at least in the case of the DNC emails, the emails were forwarded by Rich. Some close to the investigation believe he could have done this to expose the party's bias against Sanders.

The Metropolitan Police Department has no suspects and no substantial leads as to who the killer or killers may be, sources close to the investigation said.

Metropolitan Police, including the police chief, have continuously refused to grant interviews, answer emailed questions, or take phone calls from Fox News about the murder investigation, or about the FBI's findings or initial involvement in the case.

A source close to the investigation said the DC mayor is closely monitoring this case and officers are restricted in terms of what they can say or not say to the family and the media.

"It appears that the investigators are walking on eggshells with regard to the case," the source said.

The FBI's national office has refused to respond to several inquiries about any initial assistance the agency's cyber experts provided in the investigation.

"My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward," Wheeler said. "That is unfortunately. Seth Rich's murder is unsolved as a result of that."

Despite obvious knowledge of Rich's involvement with Wikileaks, DC police have stuck to their initial theory that Rich's murder was the result of a botched robbery.

The botched robbery theory, which police have pursued for nearly a year, isn't panning out, Wheeler said. The dual assailants caught on a grainy video tape from a camera posted outside a grocery mart, shot Rich twice in his back, but did not take his wallet, cell phone, keys, watch or necklace worth about $2,000.

Police detectives typically look at several possible working theories, but Wheeler said that this case appears to be different.

"Something about the email theory has the police tight-lipped," Wheeler said.

Police could look into whether Rich was killed by someone he knew for personal reasons, possibly out of jealously, betrayal or anger. They could also investigate whether he was murdered for political reasons, either out of revenge for him releasing DNC emails to Wikileaks or to prevent him from sending additional files, Wheeler said.

Police should consider all angles, Wheeler said, especially in light of WikiLeaks' founder Julian Assange alluding on August 9 during an interview with a Dutch television reporter that Rich was the source.

"I am suggesting," Assange told the Dutch reporter, "that our sources take risks, and they, they become concerned to see things occurring like that."

On Twitter, Wikileaks announced the reward but said Assange's statement "should not be taken to imply that Seth Rich was a source for WikiLeaks or to imply that his murder is connected to our publications" because Wikileaks has a policy not to release the names of its sources, even after their death.

In subsequent appearances on Fox News Channel, Assange confirmed, "We're interested in anything that might be a threat to alleged WikiLeaks sources."

Assange has not returned a series of recent emails from Fox News about Rich. MacFayden, the director of Wikileaks who initially made contact with Rich, died October 22.

D.C. police announced a $25,000 reward, and Republican lobbyist Jack Burkman issued a $130,000 reward, totaling $175,000 with Wikileaks' reward for information about Rich's killer.

Wheeler said all leads in this case need to be followed to solve Rich's murder including where he went the night he died, who he encountered that night, and who he spoke to on the phone.

Rich had been at Lou's City Bar a couple of miles from his home until about 1:15 am. He walked home, calling several people along the way. He called his father, Joel Rich, who he missed because he had gone to sleep. He talked with a fraternity brother and his girlfriend, Kelsey Mulka.

Around 4:17 a.m., Rich was about a block from his home when Mulka, still on the phone with him, heard voices in the background. Rich reassured her that he was steps away from being at his front door and hung up.

Two minutes later, Rich was shot twice. Police were on the scene within 3 minutes. Rich sustained bruising on his hands and face. He remained conscious, but died at a nearby hospital within 1 hour and 40 minutes.

Police detectives will not say whether Rich provided them with any clues about the identity of his attackers or their motivation, Wheeler said. However, Wheeler believes Rich could have provided information prior to his death of who was responsible for carrying out his murder.

Police also have refused to release security footage from a market on the corner of the crosswalk where Rich was killed. The footage shows two people following Rich across the tiny crosswalk just moments before he was attacked. The camera captured grainy footage of the assailants' legs and Rich as he fell backwards into the street after being shot.

Wheeler said normally police would release the footage to the media. The family also should be privy to the entire case jacket, with all the details of the case, unless they are considered suspects, Wheeler said. However, to date, the family has not received a copy of the tape or most of the details related to their son's murder case. The homicide case remains open, according to a spokesperson for DC police.

Rich's father, Joel Rich, could not be reached for comment, but said in an interview in January that he didnt believe his son would leak the emails. However, he said above all, his son "wanted to make a difference in the world."

LINK http://www.foxnews.com/politics/2017/01/10/slain-dnc-staffers-father-doubts-wikileaks-link-as-cops-seek-answers.html

Malia Zimmerman
Investigative Reporter,
FoxNews.com

2044 Armacost Avenue
Los Angeles, CA 90025

O: 310-571-2042
M: 808-306-3161
E: Malia.Zimmerman@foxnews.com



This message and its attachments may contain legally privileged or confidential information. It is intended solely for the named addressee. If you are not the addressee indicated in this message (or responsible for delivery of the message to the addressee), you may not copy or deliver this message or its attachments to anyone. Rather, you should permanently delete this message and its attachments and kindly notify the sender by reply e-mail. Any content of this message and its attachments that does not relate to the official business of Fox News or Fox Business must not be taken to have been sent or endorsed by either of them. No representation is made that this email or its attachments are without defect.