**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOEL RICH AND MARY RICH,

               Plaintiffs,

v.

FOX NEWS NETWORK, LLC, MALIA
ZIMMERMAN, AND ED BUTOWSKY,

               Defendants.

---

Civil Action No. 1:18-cv-02223 (GBD)

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE**
**HAGUE CONVENTION OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE**
**<u>ABROAD IN CIVIL OR COMMERCIAL MATTERS</u>**

The United States District Court for the Southern District of New York presents its

compliments to the Senior Master of the Royal Courts of Justice, and respectfully requests

international judicial assistance in accordance with the Hague Convention of 18 March 1970 on

the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), as

implemented into English law by the Evidence (Proceedings in Other Jurisdictions) Act 1975

(the "1975 Act"), to obtain evidence in England to be used in the above-captioned judicial

proceeding.  Specifically, this Court requests that the Senior Master, by the proper and usual

process of your Courts, direct Julian Assange, located at Prisoner #A9379AY, HMP Belmarsh,

Western Way, London SE28 0EB, United Kingdom, to appear for testimony.

Based on the pending claims between Plaintiffs Joel and Mary Rich (the "Riches") and

Defendants Fox News Network, LLC ("Fox News"), Malia Zimmerman, and Ed Butowsky, this

Court believes that the testimony of Mr. Julian Assange will be highly relevant to the

adjudication of the above-captioned matter.  This testimony shall serve as Mr. Assange's trial

evidence in that matter.  This request is made with the understanding that it will in no way

require any person to commit any offense, or to undergo a broader form of inquiry than he or she

would if the litigation were conducted in the United Kingdom.  In the proper exercise of its

authority, this Court has determined that the evidence cannot be secured except by the

intervention of the English courts and that assistance from the English courts would serve to

further the international interests of justice and judicial cooperation.

In conformity with Article 3 of the Hague Convention, the undersigned applicant has the

honor to submit the following request.

| | | |
|---|---|---|
| **1.** | ***Sender:*** | Office of the Clerk of the Court<br>United States District Court for the Southern<br>District of New York<br>Daniel Patrick Moynihan U.S. Courthouse<br>500 Pearl Street<br>New York, NY 10007<br>USA |
| **2.** | ***Central Authority of the***<br>***Requested State:*** | The Senior Master<br>For the attention of the Foreign Process Section<br>Room E16<br>Royal Courts of Justice<br>Strand<br>London WC2A 2LL<br>England, United Kingdom |
| **3.** | ***Person to whom the executed***<br>***Request is to be returned:*** | Joseph M. Terry<br>Williams & Connolly LLP<br>725 Twelfth Street, N.W.<br>Washington, DC 20005<br>USA<br>Telephone: (202) 434-5000 |
| **4.** | ***Specification of the date by which***<br>***the requesting authority requires***<br>***receipt of the response to the***<br>***Letter of Request*** | September 1, 2020 |
| **5.** | ***(a) Requesting Judicial Authority:*** | The Honorable Sarah J. Netburn<br>United States Magistrate Judge |

2

United States District Court for the Southern
District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007
USA

*(b) To the Competent Authority*
        *of:*

The Senior Master
For the attention of the Foreign Process Section
Room E16
Royal Courts of Justice
Strand
London WC2A 2LL
England, United Kingdom

*(c) Name of the case and any*
*identifying number*

JOEL RICH AND MARY RICH v.
FOX NEWS NETWORK LLC, MALIA
ZIMMERMAN AND ED BUTOWSKY

Civil Action No. 1:18-cv-02223 (GBD) (the "Main
Action")

6.     *The names and addresses of the parties and their representatives:*

    A.    **Plaintiffs**:

Parties

Joel Rich and Mary Rich
(via the care of their representatives below)

Representatives

MASSEY & GAIL L.L.P.
Leonard A. Gail
Eli J. Kay-Oliphant
Suyash Agrawal
50 East Washington Street, Suite 400
Chicago, IL 60602
Telephone: (312) 283-1590

SUSMAN GODFREY LLP
Arun Subramanian
Elisha Barron
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

B.     **Defendants**:           <u>Parties</u>

Fox News Network, LLC
1211 Avenue of the Americas
New York, New York 10036
(and via the care of its representatives below)

Malia Zimmerman
(via the care of her representatives below)

Ed Butowsky
(via the care of his representative below)

<u>Representatives</u>

WILLIAMS & CONNOLLY LLP
Joseph M. Terry
Stephen J. Fuzesi
Katherine Moran Meeks
Katherine A. Petti
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
(For Fox News Network, LLC)

ALLEN & OVERY LLP
Jonathan Hitchin
Orla Fox
One Bishops Square, London,
E1 6AD, United Kingdom
Telephone: +44 20 3088 0000
(For Fox News Network, LLC, for the purposes of
the above mentioned application)

JOANNE BOX
Brick Court Chambers
(UK counsel for Fox News Network, LLC, for the
purposes of the above mentioned application)

DECHERT LLP
David H. Stern
U.S. Bank Tower
633 West 5th Street
Los Angeles, CA 90071
Telephone: (213) 808-5700

(For Malia Zimmerman)

QUAINTON LAW, PLLC
Eden P. Quainton
1001 Avenue of the Americas, 11th Fl.
New York, NY 10018
Telephone: (212) 813-8389
(For Ed Butowsky)

**7.**   ***Nature and purpose of the proceedings and summary of facts:***

<u>Nature of the proceedings</u>

This case arises from a Fox News publication concerning Seth Rich, a former Democratic

National Committee ("DNC") staffer who was killed in Washington, D.C. on July 10, 2016.

Within weeks of Mr. Rich's death, WikiLeaks (an international organization that publishes news

leaks and classified media by anonymous sources) released a collection of thousands of internal

emails and documents taken from the DNC servers.  The month after Mr. Rich's passing,

WikiLeaks founder Julian Assange referenced Seth Rich and his passing as part of a discussion

of the 2016 DNC email leak during an interview with a Dutch television reporter.  *See, e.g.*

https://www.youtube.com/watch?v=Kp7FkLBRpKg. WikiLeaks also announced a $20,000

reward for information about Mr. Rich's murder on August 9, 2016.  *See*

https://twitter.com/wikileaks/status/763063624579551232.  In January 2017, WikiLeaks tweeted

that there was a $130,000 reward for information leading to Seth Rich's killers.  *See*

https://twitter.com/wikileaks/status/822213093065367553.  WikiLeaks published through

Twitter various other comments as to Mr. Rich's death in late 2016 and 2017.[1]

---

[1] *See, e.g.* https://twitter.com/wikileaks/status/763852003093217280;
https://twitter.com/wikileaks/status/800872140178395136;
https://twitter.com/wikileaks/status/892510925244203008;
https://twitter.com/wikileaks/status/864605358488256514.

On May 16, 2017, nearly a year after Mr. Rich's death, Fox News published an online article by Malia Zimmerman headlined: "Seth Rich, slain DNC staffer, had contact with WikiLeaks, say multiple sources."  The article quoted a confidential, federal investigator source, who was described in the article as having "reviewed an FBI forensic report" of Mr. Rich's computer and was quoted as saying: "I have seen and read the emails between Seth Rich and WikiLeaks."  The article also reported that the federal investigator's account was "consistent with the findings of Rod Wheeler, a former DC homicide detective and Fox News contributor and whose private investigation firm was hired by Rich's family to probe the case."  On May 18, 2017, two days after the article was published, plaintiff Joel Rich wrote to Zimmerman seeking a retraction.  On May 23, 2017, Fox News issued a retraction, explaining: "The article was not initially subject to the high degree of editorial scrutiny we require for all our reporting."

Subsequently, in March 2018, Plaintiffs Joel and Mary Rich—Seth Rich's parents—brought claims for intentional infliction of emotional distress, tortious interference with contract, and negligent supervision relating to Zimmerman's article, as well as prepublication conduct.  To succeed in their claim for intentional interference of emotional distress, Plaintiffs must prove that Fox News and its reporter engaged in "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  Central to Plaintiffs' claims of outrageousness is that Fox's reporting that Mr. Rich had connections with WikiLeaks was false: Plaintiffs contend that Defendants "sought out Joel and Mary . . . to use them as pawns to develop the sham story that Fox News could, in turn, report," and that Defendants "induced Joel and Mary . . . to implicate themselves as parents. . . , inferring that they were involved in establishing the (fictitious) facts of Defendants' scheme and

6

sham story." Am Compl. ¶ 136A, C. Plaintiffs claim the May 2017 article at issue was a

"sham," "fictitious," and "relied upon false and fabricated facts." *See* Amended Complaint ¶¶

136, 155; *see also id.* ¶¶ 3 ("[Defendants] pursue[d] and develop[ed] a fiction that Seth had

leaked thousands of DNC emails to WikiLeaks. And they published, republished, and publicized

the sham story."), 36, 39, 43, 70, 77, 85, 89, 91, 103, 109, 136, 139.

   The Southern District for New York, in August 2018, dismissed Plaintiffs' claims in their

entirety, holding, *inter alia*, that Plaintiffs could not recover for defamatory statements about

their son, and that the allegations of the Complaint did not support a claim for intentional

infliction of emotional distress or inducing a breach of contract. The Second Circuit Court of

Appeals reversed in September 2019, accepting as true the Complaint's allegations of "what

amounted to a campaign of emotional torture" aimed at the Riches. Second Cir. Op. 14. The

Court of Appeals emphasized, however, that Plaintiffs cannot recover damages for the emotional

distress they suffered as a result of the defamation of their son, but only for "speech and conduct

specifically targeted at [them]." *Id*. at 19.

   Fox News and Ms. Zimmerman deny Plaintiffs' allegations. Plaintiffs' claim for

intentional infliction of emotional distress may only succeed if Plaintiffs can show, among other

things, "falsehood." Second Cir. Op. at 19-20;[2] *see also, e.g. Philadelphia Newspapers, Inc. v.

Hepps*, 475 U.S. 767, 776 (1986) (First Amendment places the burden on Plaintiffs to prove

falsity on matter of public concern). Central to Fox's defense as to the truth of the article at issue

is that this article was not a "sham," as repeatedly alleged by Defendants.

---

[2] *See, e.g.*, Second Cir. Op. 19-20 (noting the requirement of "falsehood" under Supreme Court precedent); *id*. at 14 (emphasizing Plaintiffs' allegations that this was a "knowingly false article accusing Seth of leaking the DNC emails").

Thus, evidence regarding the source of the leaked DNC emails and the communications (if any) between Seth Rich and WikiLeaks will be highly material to Fox's contentions that the article was not a "sham" as asserted by Plaintiffs, that the Plaintiffs cannot prove falsity, and highly material to Fox's contention that they were not engaged in any outrageous behavior, against the Riches: Fox was pursuing a story that was substantially true.  Mr. Assange, as founder of WikiLeaks, is exceptionally suited to provide testimony that will be highly relevant to these issues.  Therefore, Fox News, by and through this letter of request issued by the District Court, is formally requesting the testimony of Mr. Assange for use at trial.

The Parties

The Plaintiffs are Joel Rich and Mary Rich, individuals residing in the State of Nebraska, United States.

The Defendants are Fox News Network, LLC, a Delaware corporation with its principal place of business in New York, as well as Malia Zimmerman and Ed Butowsky, individuals residing in California and Texas, respectively.

Status of the proceedings

Fact discovery has commenced and currently is scheduled to close on December 31, 2020.  In accordance with the U.S. rules on evidence gathering, witness evidence, including the evidence sought pursuant to this application, needs to be obtained within the prescribed discovery window, as opposed to during the trial itself.  That evidence, including the testimony sought from Mr. Assange, will be used at the trial for this action, which has not yet been scheduled.

**8.      *Evidence to be obtained or other judicial act to be performed:***

This Request is being made to obtain testimony from Julian Assange for use at trial in the above-captioned matter in relation to the source of the DNC emails and documents released by WikiLeaks in 2016; WikiLeaks' response to Mr. Rich's murder; and WikiLeaks' communications with Mr. Rich and members of Mr. Rich's family.

The requesting authority notes that the English Court has no inherent jurisdiction to act in aid of a foreign court.  It derives its authority from the Hague Convention, as implemented by the 1975 Act, and its powers are therefore limited to actions falling within the scope of that statute. In particular, the English Court's powers to compel the giving of evidence in assistance of foreign proceedings are only as wide as its powers to compel evidence in proceedings before its own courts.

The requesting authority notes that the English Court's approach in relation to the gathering of evidence is more restrictive than the approach of the requesting authority. The requesting authority confirms that the testimony sought from Mr. Assange is directly relevant to the matters in issue in the Main Action and will be used at trial.  The requesting authority understands from Fox News that no questions will be asked of Mr. Assange that could not properly be asked by counsel examining a witness at a trial before the High Court of England and Wales.

**9.**    *Identity and address of any person to be examined:*

Julian Assange
Prisoner #A9379AY
HMP Belmarsh
Western Way
London SE28 0EB
United Kingdom

**10.**    *Questions to be put to the persons to be examined or statement of the subject matter about which they are to be examined:*

Fox News seeks testimony in response to the following specific questions:

1) What was Mr. Assange's role (if any) in the establishment of WikiLeaks?

2) What was Mr. Assange's role (if any) in connection with the activities of WikiLeaks in 2016?

3) In 2016 and 2017, what role (if any) did Mr. Assange have regarding the content of WikiLeaks' Twitter postings?

4) What was Mr. Assange's involvement (if any) in WikiLeaks' July 22, 2016 release of emails and documents from the Democratic National Committee (DNC), as referenced at https://wikileaks.org/dnc-emails/?

5) When were those emails and documents provided to WikiLeaks?

6) How did WikiLeaks obtain the DNC emails and documents?

7) Which individual(s) and/or entit(y/ies) provided the DNC emails and documents to WikiLeaks?

8) Which individual(s) and/or entit(y/ies) obtained those materials from the DNC?

9) Describe any role played by Seth Rich to your knowledge in obtaining those materials and/or providing them to WikiLeaks.

10) To your knowledge, has WikiLeaks ever offered a reward for information related to a murder that occurred in the United States other than in relation to the murder of Seth Rich?  If so, on how many occasions?

11) Why did WikiLeaks provide a reward for information related to the murder of Seth Rich?

12) Has Mr. Assange ever communicated with Seth Rich in any manner?

13) If so, what was the content of the communications?

14) If Mr. Assange himself has not communicated with Seth Rich, is Mr. Assange aware as to whether any person affiliated with WikiLeaks ever communicated with Seth Rich in any manner?

15) If so, (a) who communicated with Seth Rich? And (b) what, to Mr. Assange's knowledge, was the content of such communication(s)?

16) Has Mr. Assange ever communicated in any manner with another member of the Rich family, including (but not limited to) Aaron Rich, Joel Rich, or Mary Rich?

17) If so, what was the content of those communications?

18) To Mr. Assange's knowledge, has any other person affiliated with WikiLeaks ever communicated in any manner with a member of the Rich family?

19) If so, (a) who communicated with the Rich family? And (b) what, to Mr. Assange's knowledge, was the content of such communication(s)?

20) To Mr. Assange's knowledge, did any individual(s) and/or entit(y/ies) affiliated with the Russian Federation (including, but not limited to, the FSB, SVR, GU (or GRU), FSPSI, or any other intelligence service) play any role in obtaining and/or providing to WikiLeaks the 2016 DNC emails released by WikiLeaks?

**11.**   ***Documents or other property to be inspected:***

At present, no documents are requested in addition to the testimony from Mr. Assange.

**12.**   ***Any requirement that the evidence be given on oath or affirmation and any special form to be used:***

The examination shall be conducted in accordance with the local rules and procedure in relation to the taking of evidence.  The testimony shall be given under oath or affirmation pursuant to the laws of England and Wales as set out in the Schedule to this Letter of Request.

**13.**   ***Special methods or procedure to be followed:***

In light of the COVID-19 pandemic and the restrictions and social distancing measures in place both in the U.K. and the U.S., the requesting authority respectfully requests that the examination of Mr. Assange take place by video link and that the English Court grant permission for the same.  The requesting authority understands that Fox News will seek from the English Court permission to examine Mr. Assange by video link in accordance with the usual arrangements that would apply to evidence taken by video link at a trial before the High Court of England and Wales in accordance with the English Civil Procedure Rules.

The requesting authority further respectfully requests that this letter of request be executed expeditiously.

14.     ***Request for notification of the time and place for the execution of the Request and
identity and address of any person to be notified:***

The requesting authority respectfully asks that notice of the time when, and the place

where, the proceedings will take place be provided to:

> Joseph M. Terry
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, DC 20005

15.     ***The fees and costs incurred which are reimbursable under the second paragraph of
Article 14 or under Article 26 of the Convention will be borne by:***

> Fox News Network, LLC, c/o
> Joseph M. Terry
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, DC 20005

---

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

Dated:     August 5, 2020
           New York, New York

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOEL RICH and MARY RICH,                     :

                        Plaintiffs,          :

        -against-                            :

                                             :
FOX NEWS NETWORK, LLC, MALIA                 :
ZIMMERMAN, *in her individual and professional* :
*capacities*, and ED BUTOWSKY, *in his individual* :
*and professional capacities*,               :

                                             :
                        Defendants.          :

                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: AUG 0 2 2018

MEMORANDUM DECISION
AND ORDER

18 Civ. 2223 (GBD)

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Joel and Mary Rich bring this action against Defendants Fox News Network, LLC,

Fox News reporter Malia Zimmerman (together with Fox News, the "Fox Defendants"), and Fox

News contributor Ed Butowsky asserting claims for intentional infliction of emotional distress

("IIED") and for aiding and abetting and conspiring to intentionally inflict emotional distress on

Plaintiffs. (Compl., ECF No. 7, ¶¶ 135–71.) Plaintiffs principally allege that Defendants conspired

to cause Plaintiffs severe emotional distress by publishing a news article reporting that their son, Seth

Rich, a former Democratic National Committee ("DNC") employee, was murdered for leaking

sensitive, private emails from DNC servers to WikiLeaks. (*See id.*) Plaintiffs also assert a claim

against all Defendants for tortious interference with Plaintiffs' contract with Fox News contributor

and private investigator Rod Wheeler, as well as a claim against Fox News for its negligent

supervision and/or retention of Zimmerman and Wheeler.[1] (*Id.* ¶¶ 172–84.) Defendants move to

---

[1] Before Plaintiffs brought this suit, Rod Wheeler filed an action pending before this Court in which he asserts
claims for defamation and libel against Fox News, Zimmerman, and Butowsky arising out of Fox News's
coverage of Wheeler's investigation into Seth Rich's murder. (Am. Compl., *Wheeler v. Twenty-First Century*

dismiss the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]   (*See* ECF Nos. 35, 51.)

Defendants' motions to dismiss for failure to state a claim are GRANTED.

## I.   FACTUAL BACKGROUND

Plaintiffs are the parents of Seth Rich, a Democratic National Committee ("DNC") employee who was murdered on July 10, 2016.  (Compl. ¶¶ 2, 13, 16.)  Although the murder is still being investigated by the Washington D.C. Metropolitan Police Department ("MPDC") and remains unresolved, the MPDC's investigation supports the conclusion that Seth Rich's murder was the result of a botched robbery.  (*Id.* ¶ 17.)  According to Plaintiffs, however, Defendants have publicized a different and patently fictitious story about the circumstances of their son's murder.

On July 22, 2016, more than 44,000 private emails from the DNC were published on a website maintained by the organization known as WikiLeaks.  (*Id.* ¶ 19.)  According to Plaintiffs, a conspiracy theory developed among some political groups that Seth Rich was murdered because he provided the DNC emails to WikiLeaks.  (*Id.* ¶¶ 3, 22.)  On August 22, 2016, Plaintiffs issued a response to the conspiracy theory, which stated, in part:

> [S]ome are attempting to politicize this horrible tragedy, and in their attempts to do so, are actually causing more harm than good and impeding . . . the ability of law enforcement to properly do their job. For the sake of finding Seth's killer, and for the sake of giving the family the space they need at this terrible time, they are asking for the public to refrain from pushing unproven and harmful theories about Seth's murder.

(*Id.* ¶ 23.)

---

*Fox, Inc.*, No. 17-cv-5807 (S.D.N.Y. Oct. 23, 2017), ECF No. 56.)  The defendants in that case filed motions to dismiss, which are addressed in a separate opinion filed today.

[2] Butowsky also moves to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  However, because Plaintiffs' claims against all Defendants fail on their merits, *see* Section III, *infra*, this Court declines to address Butowsky's jurisdictional arguments.

On or about December 17, 2016, Butowsky made contact with Plaintiffs through a Facebook post indicating that he was "looking to connect with anyone Jewish in Omaha[,] Nebraska." (Compl. ¶ 25.) Butowsky spoke with Plaintiffs by phone and informed them that he had heard WikiLeaks received the DNC emails from Seth Rich. (*Id.* ¶¶ 25–26.) Plaintiffs, however, denied that their son had done so. (*Id.* ¶ 26.) On January 3, 2017, Butowsky sent Joel Rich a follow-up email with the subject line, "Please call ed [sic] Butowsky. We met through Jeremy from your temple." (*Id.* ¶ 27.)

That same day, Zimmerman emailed Brad Bauman, who was handling press inquiries on Plaintiffs' behalf, asking for information about Seth Rich's murder. (*Id.* ¶ 28.) When Bauman responded, Zimmerman wrote back that she "would want to get the information directly from [Joel Rich] or law enforcement to ensure its accuracy." (*Id.*) Accordingly, on January 5, 2017, Zimmerman emailed Joel Rich requesting information about Seth for stories she was writing, claiming that she wanted to "bring further attention to his case." (*Id.* ¶ 30.) Joel Rich responded by sending Zimmerman information about Seth as well as photographs of him. (*Id.*)

On January 20, 2017, Butowsky called Joel Rich and encouraged him to look at Seth's bank account to see if there were any payments posted from WikiLeaks. Plaintiffs, however, again assured Butowsky that rumors about Seth Rich and WikiLeaks were "baseless." (*Id.* ¶¶ 31–32.)

On February 23, 2017, Butowsky sent a text message to Rod Wheeler stating that he was "looking for some assistance on something that happened in Washington" and asking him to call. (*Id.* ¶ 34.) Wheeler, a former MPDC homicide detective turned private investigator, was then under contract with Fox News to appear as an on-air contributor, as well as to provide "off-air assistance, as requested by Fox."[3] (*Id.* ¶ 33.) When Wheeler called, Butowsky stated that he was working with

---

[3] Plaintiffs have not named Wheeler as a Defendant in this lawsuit.

Zimmerman at Fox News on an article about Seth Rich and wanted Wheeler to conduct an investigation into his murder. (*Id.* ¶ 35.)

On February 28, 2017, Wheeler met with Butowsky and Zimmerman. (*Id.* ¶ 37.) Plaintiffs allege that Butowsky, Zimmerman, and Fox News "sought to have Wheeler plausibly corroborate the sham story . . . that Seth gave the DNC emails to WikiLeaks." (*Id.* ¶ 39.) That same day, Butowsky sent an email to Plaintiffs offering to hire Wheeler on their behalf to investigate their son's murder. (*Id.* ¶ 41.) Wheeler also spoke with Plaintiffs directly about the prospective investigation, though he did not mention that he had met with Zimmerman. (*Id.* ¶ 43.)

On March 3, 2017, Butowsky sent Joel Rich a draft of an engagement agreement between Plaintiffs and Wheeler, which stated that Wheeler would provide "media representation" for the Rich family and that he would "[i]nterview, investigate, and represent" Seth's family members "in any and all media contacts and with regards to the official police investigation surrounding the death of Seth Rich." (*Id.* ¶ 45.) Plaintiffs, however, told Butowsky and Wheeler that they would not allow Wheeler to serve as their media representative unless Plaintiffs would have complete control over the comments Wheeler made publicly on their behalf. (*Id.* ¶¶ 46–47.) Butowsky told Plaintiffs that he would accept Plaintiffs' condition. (*Id.* ¶ 47.)

On March 5, 2017, Butowsky followed up and urged Plaintiffs to allow him to hire and pay for Wheeler's services on their behalf, appealing to their "need to get closure, as a family." (*Id.* ¶ 49.) Butowsky assured Plaintiffs that his motivation in offering to pay Wheeler on Plaintiffs' behalf was purely altruistic, and that he was concerned about the rumors circulating about Seth. (*Id.* ¶ 50.) Butowsky further assured Plaintiffs that he would not be involved any longer and that Wheeler would take his directions from, and provide all information directly to, Plaintiffs. (*Id.* ¶ 51.) Butowsky told Plaintiffs that they would "never see me ever talk about this anywhere." (*Id.*) In a phone call with

4

Joel Rich on March 13, 2017, Butowsky reiterated that he would respect Wheeler's obligation not to speak about his investigation to anyone but Plaintiffs. (*Id.* ¶ 54.)

On March 14, 2017, Plaintiffs executed a contract with Wheeler's private investigation firm, Capitol Investigations, LLC. (*Id.* ¶ 56.) The contract stated, among other things, that "[t]he representation shall not include media representation, unless otherwise permitted by [Plaintiffs] in writing." (*Id.* ¶ 57.) The contract also stated, "Capitol Investigations shall not release any information regarding the investigation, including but not limited to findings, working theories or path [sic] forward to any third party without prior authorization by [Plaintiffs] unless that third party is an investigating agency, i.e. Metropolitan Police Department and the FBI." (*Id.*)

On April 9, 2017, Wheeler sent a text message to Zimmerman stating, "I'm ready to say Seths [sic] Death [sic] was not a botched robbery." (*Id.* ¶ 60.) On April 18, 2017, Butowsky sent Wheeler a text message stating that he would be "meeting [White House Press Secretary] Sean Spicer and want you with me." (*Id.* ¶ 61.) Wheeler and Butowsky met with Spicer two days later and provided Spicer with written materials relating to Wheeler's investigation. (*Id.* ¶ 63.) Neither Wheeler nor Butowsky asked Plaintiffs for permission prior to meeting with Spicer, nor had they informed Plaintiffs of the meeting. (*Id.* ¶ 65.)

On April 24, 2017, and with Plaintiffs' approval, Wheeler obtained an interview with MPDC Detective Della-Camera, the lead homicide detective investigating Seth Rich's murder. (*Id.* ¶ 66.) The night before the interview, Butowsky sent an email to Wheeler stating, "Della camera [sic] is either helping us or we will go after him as part of the coverup [sic]." (*Id.* ¶ 67.) Zimmerman then sent Wheeler several emails, some of which were copied to Butowsky, with information about Detective Della-Camera and the MPDC's investigation into Seth Rich's murder. (*Id.* ¶ 68.)

On May 10, 2017, Butowsky and Zimmerman advised Wheeler that an FBI source had confirmed that emails were exchanged between Seth and WikiLeaks. (*Id.* ¶ 69.) Butowsky and Zimmerman also told Wheeler that they would be meeting with the source and would provide Wheeler with details from the meeting. (*Id.*) However, Plaintiffs allege that, in fact, Zimmerman and Butowsky did not have such a source. (*Id.* ¶ 79.) The next day, Zimmerman sent Wheeler a copy of an article she had drafted for publication by Fox News (the "Zimmerman/Fox Article"), reporting on Seth Rich's alleged disclosure of DNC emails to WikiLeaks. (*Id.* ¶¶ 70, 72.) Zimmerman worked on and exchanged multiple drafts of the Zimmerman/Fox Article with Butowsky. (*Id.* ¶ 71.)

On May 15, 2017, Zimmerman told Wheeler that the "bosses at Fox" wanted the Zimmerman/Fox Article published the next day, while Butowsky left Wheeler a voicemail telling him to "close this deal, whatever you got to do." (*Id.* ¶ 74.) That same day, Zimmerman also contacted Plaintiffs to request their comment on a FBI report showing that Seth Rich had disclosed the DNC emails to WikiLeaks. (*Id.* ¶ 78.) Also on May 15, 2017, Wheeler spoke with Joel Rich about the Zimmerman/Fox Article, which Rich maintained was false. (*Id.* ¶ 80.)

Nevertheless, on May 16, 2017, Fox News published the Zimmerman/Fox Article. (*Id.* ¶ 87.) The article contained a quote from an unnamed federal investigator stating, "I have seen and read the emails between Seth Rich and WikiLeaks." (*Id.*) The article also noted that the federal investigator's "revelation" was "consistent with the findings of Rod Wheeler, a former DC homicide detective and Fox News contributor whose private investigation firm was hired by Rich's family to probe the case." (*Id.* ¶ 88.) In addition, the article quoted Wheeler as stating, "[m]y investigation up to this point shows there was some degree of email exchange between Seth Rich and WikiLeaks." (*Id.* ¶ 89.) Plaintiffs allege that the quotes attributed to the federal investigator and Wheeler were false. (*Id.* ¶¶ 87, 91.)

Later that day, Fox News published a second article that stated, among other things, "Rod Wheeler, a retired Washington [D.C.] homicide detective and Fox News contributor investigating the case on behalf of the Rich Family, made the WikiLeaks claim, which was corroborated by a federal investigator who spoke to Fox News." (*Id.* ¶ 90.) The second article also stated that "a spokesman for Rich's family on Tuesday said Wheeler was not authorized to speak for the family. . . ." (*Id.*)

Over the next several days following the publication of both articles, Seth Rich's murder and the Zimmerman/Fox Article were covered on various Fox News programs and in other media sources. (*Id.* ¶ 104.) In addition, on May 22, 2017, Wheeler issued a public media release indicating that he was "of the personal opinion that the information/article reported by Fox News Channel was essentially correct and worthy of further investigation." (*Id.* ¶ 105.) However, the next day, Fox News issued a retraction of the Zimmerman/Fox Article, explaining that the article "was not initially subjected to the high degree of editorial scrutiny we require for all our reporting[]" and that "[u]pon appropriate review, [it] was found not to meet those standards and has since been removed." (*Id.* ¶¶ 106–07.)

Even after the Zimmerman/Fox Article was retracted, various Fox News programs continued to discuss Seth Rich's murder. (*Id.* ¶ 108.) Plaintiffs allege that this coverage was designed to "exploit the sham story" that was the subject of the Zimmerman/Fox Article in order to boost Fox News's ratings. (*Id.* ¶ 109.) Plaintiffs further allege that Butowsky continued to publicly discuss the Zimmerman/Fox Article, including on Twitter. One Tweet, for example, suggested that Plaintiffs had confirmed that Aaron Rich, Seth's brother, received money from WikiLeaks in his personal bank account. (*Id.* ¶ 113.) In addition, on August 16, 2017, Butowsky told National Public Radio that "every word" of the Zimmerman/Fox Article was true. (*Id.* ¶ 114.)

7

After the retraction of the Zimmerman/Fox Article, Butowsky remained in contact with Plaintiffs. On May 25, 2017, for instance, Butowsky sent Joel Rich a text message stating, in part, "I kept thinking at some point you would explain the things written about me were not true but you never did. . . . The idea that I conspired to do something which I have no idea what that could've been is complete hogwash made up by . . . Bauman." (*Id.* ¶ 111.) The text message stated further, "You should call Malia Zimmerman. She found the person and the gun that was used to shoot your son. . . . When you find out who did it you are going to be very very emotional." (*Id.*) Plaintiffs allege that Butowsky continued calling, texting, and leaving voicemails for Joel Rich. (*Id.* ¶ 117.)

Plaintiffs further allege that the Zimmerman/Fox Article, together with the Defendants' overall conduct, has caused them "intense distress." (*Id.* ¶ 128.) Plaintiffs allege that they both now exhibit symptoms consistent with post-traumatic stress disorder and obsessive-compulsive behavior and that Mary Rich experiences symptoms consistent with social anxiety disorder. (*Id.* ¶¶ 130–31.) Plaintiffs further allege that they experience feelings of anxiety, and have developed a "hypersensitivity to potentially being harassed, threatened, and harmed." (*Id.* ¶¶ 132(A)–(B).) As a result, they claim they have installed three video cameras outside their home to detect unwanted visitors. (*Id.* ¶ 132(B).)

In addition, Plaintiffs allege that Mary Rich was laid off shortly before her son's death, but that she had received a job offer on the same night that the Zimmerman/Fox Article was published. (*Id.* ¶ 133.) Plaintiffs allege that as a result of the publication of the Zimmerman/Fox Article and subsequent media coverage, she became distraught and was unable to accept the job. (*Id.*) Plaintiffs further allege that although Mary Rich had a "preexisting neurological condition, which was being managed with regular treatment," her condition has become aggravated such that she has been unable to return to work. (*Id.*)

## II.   LEGAL STANDARDS

"A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in a complaint." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 119–20 (S.D.N.Y. 2015). To survive such a motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a Rule 12(b)(6) motion, a court "accept[s] all factual allegations in the complaint as true . . . and draw[s] all reasonable inferences" in favor of the plaintiff. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). A court is "not, however, 'bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

## III.   THE COMPLAINT FAILS TO STATE A CLAIM

Plaintiffs assert several state law claims against Fox News, Zimmerman, and Butowsky for IIED, as well as conspiring to commit and aiding and abetting IIED, and tortious interference with contract. (*See id.* ¶¶ 136–44, 146–56, 158–71, 173–77.) Plaintiffs also assert a claim against Fox News for the negligent supervision and/or retention of Zimmerman and Wheeler. (*Id.* ¶¶ 179–84.) However, each of Plaintiffs' claims fail to adequately allege essential elements of the causes of action asserted. Accordingly, Plaintiffs' complaint is dismissed in its entirety.

### A.  Intentional Infliction of Emotional Distress

To state a claim for IIED under New York law, a plaintiff must adequately allege: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between

the conduct and the injury, and (4) severe emotional distress."[4] *Friedman v. Self Help Cmty. Servs., Inc.*, 647 F. App'x 44, 47 (2d Cir. 2016).  To form the basis of an IIED claim, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1999)).

This "standard . . . is 'rigorous, and difficult to satisfy.'" *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Howell*, 612 N.E.2d at 702); *see also DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d Cir. 2017) ("A claim for [IIED] must satisfy an 'exceedingly high legal standard'" and is available "only as a last resort").  "Actions 'likely [to] be considered reprehensible by most people' are not sufficient." *DiRuzza*, 685 F. App'x at 37 (citation omitted); *see also Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 441 (S.D.N.Y. 1998) ("[C]onduct [that is] undoubtedly unprofessional, distasteful, and improper, does not rise to the level of extreme and outrageous behavior required for an IIED claim in New York.")  Indeed, of all the IIED claims the New York Court of Appeals has considered, "every one has failed because the alleged conduct was not sufficiently outrageous.'" *DiRuzza*, 685 F. App'x at 37 (quoting *Chanko v. Am. Broad. Cos.*, 49 N.E.3d 1171, 1179 (N.Y. 2016)) (alterations and omission in original).

As courts have observed, defamatory statements to news outlets "fall well short of meeting the high standard for extreme and outrageous conduct." *Cruz v. Marchetto*, No. 11 Civ. 8378 (RWS), 2012 WL 4513484, at *5 (S.D.N.Y. Oct. 1, 2012) (collecting cases); *see also Restis v. Am. Coal.*

---

[4] Where, as here, a federal court's "subject matter jurisdiction is grounded on the diversity statute, and . . . the [d]istrict [c]ourt . . . sits in New York," a court "determine[s] the body of law that applies . . . with reference to New York's choice of law rules." *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001).  Under those rules, "the first step . . . is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Id.*  "If there is no actual conflict, then the choice of law question is inconsequential and the forum state" may "appl[y] its own law." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).  Because the parties rely on New York law and they have not identified an actual conflict between the relevant laws of New York and Nebraska, this Court applies New York law as the law of the forum.

*Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) ("[C]ourts in this Circuit have

recognized[] [that] defamatory statements generally cannot constitute the extreme and outrageous

behavior required for an [IIED] claim."). Moreover, "it is well established that where the crux of [a]

complaint sounds in defamation, court[s] will refuse to allow a cause of action for emotional distress,"

because a plaintiff cannot "circumvent[] the restrictions on defamation claims" by styling his claim

as one for IIED. *Croskey v. Med. & Tech. Servs., Inc.*, No. 05 Civ. 6641 (LMM), 2006 WL 2347816,

at *3 (S.D.N.Y. Aug. 10, 2006) (citing *Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 490

N.Y.S.2d 553, 555 (App. Div. 2d Dep't 1985)). Similarly, "courts have held that false statements or

misrepresentations—even if intentionally made—do not rise to the level of extreme and outrageous

conduct." *Baraliu v. Vinya Capital, L.P.*, No. 07 Civ. 4626 (MHD), 2009 WL 959578, at *12

(S.D.N.Y. Mar. 31, 2009) (citations omitted). Allegations that the false statements "would

have . . . an [emotionally distressing] effect because [plaintiff] is a religious [person]" do not render

the statements sufficiently outrageous to form the basis for an IIED claim. *Lawson v. N.Y. Billiards

Corp.*, 331 F. Supp. 2d 121, 133 (E.D.N.Y. 2004).

In addition, "[c]ourts are reluctant to allow recovery under the banner of [IIED] absent a

deliberate and malicious campaign of harassment or intimidation." *Margrabe v. Sexter & Warmflash,

P.C.*, 353 F. App'x 547, 550 (2d Cir. 2009) (quoting *Cohn-Frankel v. United Synagogue of

Conservative Judaism*, 667 N.Y.S.2d 360, 362 (App. Div. 1st Dep't 1998)). To find such a campaign

exists, "New York courts appear to require that plaintiffs allege either an unrelenting campaign of

day in, day out harassment or that the harassment was accompanied by physical threats[.]" *Lawson*,

331 F. Supp. 2d at 133 (quoting *Nunez v. A-T Fin. Info., Inc.*, 957 F. Supp. 438, 442 (S.D.N.Y. 1997));

*see also Fleming v. Hymes-Esposito*, No. 12 Civ. 1154 (JPO), 2013 WL 1285431, at *9 (S.D.N.Y.

Mar. 29, 2013) (dismissing an IIED claim based on "defamation, . . . numerous phone calls,

and . . . unannounced visits . . . and [defendant's] refusal to leave after one particular visit"). When the alleged campaign is "based on 'abuse by defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests . . . liability usually has rested on a prolonged course of hounding by a variety of extreme methods.'" *Fiorito v. Ramos-Kelly*, No. 10 Civ. 4645 (LAP), 2010 WL 4967976, at *3 (S.D.N.Y. Dec. 2, 2010) (quoting *Lopez v. City of N.Y.*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995)).

Where a plaintiff asserts an IIED claim against multiple defendants, as here the "[p]laintiff cannot rest his [IIED] claim merely on defendants' alleged agreement to collaborate against him . . . . Instead, he must set forth, clearly and concisely, allegations of specific instances of each individual's conduct that rise to the level of 'extreme and outrageous' conduct." *Jones v. Trump*, 971 F. Supp. 783, 787 (S.D.N.Y. 1997). Absent such allegations, a plaintiff cannot recover for IIED even though the defendant may have acted with a tortious or criminal intent, or "his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)); *see also Cusimano v. United Health Servs. Hosps., Inc.*, 937 N.Y.S.2d 413, 416, 418 (App. Div. 3d Dep't 2012) (finding plaintiff who alleged defendants "harbored ill will towards her" failed to state an IIED claim because the defendants' alleged conduct was not "outrageous").

Plaintiffs' allegations fall short of stating a claim for IIED. Plaintiffs allege that Butowsky and Zimmerman, acting in concert with Fox News, deceived Plaintiffs and capitalized on their vulnerability in the wake of their son's murder to develop a fake story that Fox News could report.[5]

---

[5] Plaintiffs and the Fox Defendants argue about whether the First Amendment would permit a claim for IIED based solely on speech. (*See* Pls. Consolidated Mem. in Opp'n to Defs.' Mots. to Dismiss ("Opp'n"), ECF No. 56, at 16, 19–22; Fox Defs. Mem. at 10–12). However, because the parties agree that Plaintiffs' IIED

(Compl. ¶ 136(A).)  It is understandable that Plaintiffs might feel that their grief and personal loss were taken advantage of, and that the tragic death of their son was exploited for political purposes. However, a general allegation that Defendants had an "agreement to collaborate against" Plaintiffs cannot form the basis for an IIED claim; rather, "specific instances of each individual's conduct" are required. *Jones*, 971 F. Supp. at 787.

Plaintiffs allege that the Zimmerman/Fox Article was false because it inaccurately stated that Seth Rich had leaked the DNC emails to WikiLeaks. (*Id.* ¶ 70.) Plaintiffs also allege that Zimmerman falsely told Plaintiffs about an FBI report that she claims showed Seth Rich had disclosed the DNC emails to WikiLeaks.  (Compl. ¶¶ 78–79.)  However, even though Zimmerman's statements in the Zimmerman/Fox Article and to Plaintiffs about the FBI report were false, such "false statements or misrepresentations—even if intentionally made—do not rise to the level of extreme and outrageous conduct." *Baraliu*, 2009 WL 959578, at *12.

Plaintiffs also alleges that Butowsky used Plaintiffs' Jewish heritage and community ties to gain a favorable introduction to them by posting on his Facebook page that he was "looking to connect with anyone Jewish in Omaha[,] Nebraska." (Compl. ¶ 25.)  Yet, merely posting a false statement on Facebook is not "outrageous" conduct, and the fact that the post relates to Plaintiffs' religion does not make it so. *Lawson*, 331 F. Supp. 2d at 133.  Plaintiffs further allege that Butowsky made false statements to Plaintiffs concerning his motivations for paying for Wheeler's services, the degree of control Plaintiffs would have over Wheeler's and Butowsky's statements to the media, and Wheeler's independence and impartiality.  (Compl. ¶¶ 41, 47–48, 50–52, 54–55.)  As noted above, however, making false statements does not constitute "extreme and outrageous conduct." *Baraliu*, 2009 WL 959578, at *12.

---

claim is based on a course of conduct that involves more than just speech, (*see* Opp'n at 3, 11, 18; Fox Defs. Mem. at 13–15; Butowsky Mem. at 10, 13), this Court need not reach that question.

Additionally, Plaintiffs allege that after the Zimmerman/Fox Article was published, Butowsky was quoted in several news reports as falsely stating that Plaintiffs had confirmed that Seth Rich leaked the DNC emails to WikiLeaks.[6] (Compl. ¶¶ 115–16.) However, such statements, even if false and defamatory, do not constitute extreme and outrageous conduct. *Cruz*, 2012 WL 4513484, at *5. Plaintiffs also allege that after the publication of the Zimmerman/Fox Article, Butowsky sent a text message to Joel Rich designed to "exploit Joel's emotions," posted tweets about the Zimmerman/Fox Article, and sent Joel Rich additional text messages and voicemails. (Compl. ¶¶ 111, 117, 136(I), 139.) Although such conduct may be "unprofessional, distasteful, and improper," it "does not rise to the level of extreme and outrageous behavior." *Ponticelli*, 16 F. Supp. 2d at 441.

As to Fox News, Plaintiffs allege generally that Fox News participated in a scheme with and directed Zimmerman's and Butowsky's activities. (Compl. ¶ 8; *see also id.* ¶¶ 165, 167–68.) However, the only conduct that Plaintiffs specifically attribute to Fox News relates to its publication of articles and news reports containing allegedly false statements.[7] (*See* Compl. ¶ 8; *see also id.* ¶¶ 136(E)–(F), 138.) Thus, the "crux" of the conduct Plaintiffs attribute to Fox News is defamation. However, Plaintiffs cannot "circumvent[] the restrictions on defamation claims" by styling their defamation claim as one for IIED. *Croskey*, 2006 WL 2347816, at *3. Moreover, the statements Plaintiffs identify concern Seth Rich, *not* Plaintiffs, (*See* Compl. ¶¶ 70, 87–89, 96), and it is well

---

[6] The Complaint also alleges that Butowsky sent an email to individuals at Fox News stating that he was "the one who's been putting this [Zimmerman/Fox Article] together," and that Zimmerman sent drafts of the Zimmerman/Fox Article to Butowsky. (Compl. ¶¶ 71, 82.) However, the complaint does not identify any specific actions Butowsky took relating to the Zimmerman/Fox Article.

[7] Plaintiffs also allege that Fox News "exploit[ed] the sham story" claiming Seth Rich had communicated with WikiLeaks "because it was good for ratings." (Compl. ¶ 109; *see also id.* ¶ 136(H).) But the statements Plaintiffs identify as "propagat[ing]" the story were made by third parties, not by Fox News. (*Id.* ¶ 108.) Moreover, even if those third parties could be considered to have been acting as agents of Fox News, a decision by a news network to publicize a false and defamatory story to increase its ratings, while perhaps "considered reprehensible by most people," *DiRuzza*, 685 F. App'x at 37, does not rise to the level of extreme or outrageous conduct.

14

settled that under New York law, "libel or slander upon . . . a deceased person which makes no direct reflection upon his relatives gives them no cause of action for defamation." *Infante v. Dignan*, 782 F. Supp. 2d 32, 37 (W.D.N.Y. 2011) (quoting *Rose v. Daily Mirror*, 31 N.E.2d 182, 182 (N.Y. 1940)).

Plaintiffs allege that the Zimmerman/Fox Article "implicated Joel and Mary" because readers would "infer[] that they were involved in establishing the (fictitious) facts" of the Zimmerman/Fox Article.   (Compl. ¶ 136(C).)   Yet, the Zimmerman/Fox Article expressly noted that "[Seth] Rich's father, Joel Rich, could not be reached for comment" and that Joel Rich had "told Fox News in January that he did not believe his son would leak the emails." [8]   (Declaration of Joseph M. Terry dated May 7, 2018 ("Terry Decl."), Ex. 1, ECF No. 37-1, at 5.)   Nonetheless, Plaintiffs assert, because the article states that Wheeler was hired by Plaintiffs, a reasonable reader could understand the Zimmerman/Fox Article as implying that Plaintiffs believed "what their own investigator found."   (Opp'n at 14–15; *see also* Compl. ¶ 136(F).)   However, Fox News published a second article stating that, according to a spokesperson for the Rich family, Wheeler had not been authorized to speak for Plaintiffs.   (Compl. ¶ 90.)   The second article further stated that the family viewed the Zimmerman/Fox Article's statements concerning Seth Rich's disclosure of the DNC emails to WikiLeaks as "unsubstantiated." (*See* Terry Decl., Ex. 3, ECF No. 37-3, at 2.)

Plaintiffs also allege that Fox News is vicariously liable for the conduct of Zimmerman and Wheeler because they were "employees and agents" of Fox News.   (Compl. ¶ 142.)   However, even assuming that Zimmerman and Wheeler were acting within the scope of their employment with Fox News when they engaged in the conduct alleged, their conduct is neither sufficiently extreme or nor outrageous to state a claim for IIED.   Moreover, as with Zimmerman, Plaintiffs have failed to show

---

[8] Though neither the Zimmerman/Fox Article, nor the second article published by Fox News is attached to Plaintiffs' complaint, this Court may consider both articles because they are "incorporated into the complaint by reference, . . . and documents possessed by or known to the [P]laintiff[s] and upon which [they] relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

that Wheeler's conduct meets the "exceedingly high legal standard" of "extreme and outrageous" conduct needed to state an IIED claim. *DiRuzza*, 685 F. App'x at 36.

Plaintiffs allege that Wheeler failed to disclose to Plaintiffs that he met with Zimmerman and Butowsky. Plaintiffs also allege that Wheeler falsely represented to them that he would not speak to the press about his investigation without Plaintiffs' approval, and that he made false statements to the news media about Seth. (Compl. ¶¶ 43–44, 59, 63, 65, 75, 91, 93–94.) As explained above, false or defamatory statements, whether made to Plaintiffs or the news media, do not constitute extreme and outrageous conduct. *Cruz*, 2012 WL 4513484, at *5; *Baraliu*, 2009 WL 959578, at *12. Moreover, to the extent Plaintiffs assert Wheeler violated the confidentiality provisions in his agreement with Plaintiffs, such a claim may implicate a breach of contract by Wheeler, not IIED by Defendants. Because IIED may only be employed as a "last resort," the existence of such an alternative remedy precludes Plaintiffs from relying on these allegations as the basis for an IIED claim. *DiRuzza*, 685 F. App'x at 36. Thus, even assuming Zimmerman and Wheeler were acting as employees or agents of Fox News, Plaintiffs' allegations fail to state an IIED claim against Fox News.

Plaintiffs' characterization of Defendants' and Wheeler's actions as a "campaign" does not save their IIED claim. (Compl. ¶ 4; Opp'n at 36.) Plaintiffs do not allege that Defendants' actions occurred "day in" and "day out," or that Defendants made any physical threats. *Lawson*, 331 F. Supp. 2d at 133. Though Plaintiffs allege that Butowsky and Zimmerman pursued them to gain their trust and that Butowsky "deliberately and successfully cultivated Joel's trust," (Compl. ¶¶ 29, 50), Plaintiffs' allegations regarding Zimmerman and Butowsky do not amount to "hounding by . . . extreme methods." *Fiorito*, 2010 WL 4967976, at *3.

Plaintiffs also assert claims against all Defendants for conspiring to commit, and aiding and abetting the commission of, an IIED. (Compl. ¶¶ 145–71.) Because "[c]onspiracy allegations merely

serve to 'connect the actions of separate defendants with an otherwise actionable tort' . . . , allegations of an underlying tort are an essential component of a sufficiently pleaded claim of civil conspiracy." *Anthes v. N.Y. Univ.*, No. 17 Civ. 2511 (ALC), 2018 WL 1737540, at \*11 (S.D.N.Y. Mar. 12, 2018) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 503 N.E.2d 102, 103 (N.Y. 1986)); *see also Wilson v. Dantas*, 746 F.3d 530, 537 n.4 (2d Cir. 2014) ("As [plaintiff] has not alleged any actionable torts, his claim for civil conspiracy . . . also fails.") (citing *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 873 N.Y.S.2d 679, 685 (App. Div. 2d Dep't 2009). A claim for aiding and abetting also requires, among other things, "the existence of a[n underlying tort]." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)) (alteration in original). Because Plaintiffs have not adequately pled their IIED claim, their conspiracy and aiding and abetting claims must also be dismissed.

**B. Tortious Interference with Contract**

To state a claim under New York law for tortious interference with contract, a plaintiff must allege: "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)). In addition, the plaintiff must show that "'but for' the activities of the defendant, there would have been no breach of the contract." *Int'l Minerals & Res., S.A. v. Bomar Res., Inc.*, 5 F. App'x 5, 8 (2d Cir. 2001) (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990)). If the "plaintiff alleges facts . . . establishing that the breaching party was predisposed toward breaching its agreement, the claim for tortious interference must be dismissed for failure to plead 'but for' causation." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 293–94 (S.D.N.Y.

1998); *see also N. Shipping Funds I, LLC v. Icon Capital Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013) (dismissing tortious interference claim where plaintiff "allege[d] . . . that [the breaching party] 'lacked a good faith intention to carry out its material obligations in the . . . [a]greement'").

Plaintiffs' claim for tortious of interference with contract fails because the facts alleged in the complaint establish that Wheeler "was predisposed toward breaching" his agreement with Plaintiffs. *Granite Partners*, 17 F. Supp. 2d at 293–94. Indeed, the complaint itself alleges that Wheeler treated Butowsky, Zimmerman, and Fox News as his clients, rather than Plaintiffs, as he had promised them. (Compl. ¶ 136(D).) Plaintiffs assert that Defendants were the "but for" cause of Wheeler's breach because Defendants "orchestrat[ed] the relationship between Wheeler and Joel and Mary." (Opp'n at 32.) However, Plaintiffs do not allege that Wheeler entered into the relationship intending to honor his obligations to them and that Defendants then induced Wheeler to breach the contract. Rather, Plaintiffs allege that Wheeler was "recruited" by Defendants to help them in their scheme to "develop [a] sham story." (Compl. ¶ 136(B).) Thus, from the very beginning of his relationship with Plaintiffs, Wheeler "lacked a good faith intention to carry out [his] material obligations" in his agreement with them.[9] *N. Shipping Funds*, 2013 WL 1500333, at *6. Accordingly, Plaintiffs' tortious interference claim must be dismissed.

---

[9] Plaintiffs' tortious interference claim fails for the additional reason that they have not suffered damages as a result of Wheeler's breach. Plaintiffs' conclusory assertion that they "suffered significant damage as a result of th[e] interference with their contract with Rod Wheeler," (Compl. ¶ 176), is insufficient to plead damages resulting from Defendants' alleged tortious interference. *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 520 (S.D.N.Y. 2011). Although Plaintiffs assert that the "[c]omplaint alleges a wide range of economic damages," Plaintiffs characterize these damages as the "result of Wheeler's breach of contract *and* cooperation with Defendants to publish the [Zimmerman/]Fox Article." (Opp'n at 32 (emphasis added).) Thus, Plaintiffs have not specifically identified damages that are attributable to Defendants' interference with Wheeler's contract, rather than the reputational and emotional injury caused by the publication of the Zimmerman/Fox Article.

## C. Negligent Supervision and/or Retention

"A claim for negligent supervision or retention arises when an employer places an employee in a position to cause foreseeable harm, . . . which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." *Bouchard v. N.Y. Archdiocese*, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (citation omitted). To state such a claim under New York law, a plaintiff must show, in addition to the standard elements of negligence, that: (1) "the tort-feasor and the defendant were in an employee-employer relationship;" (2) "the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence;" and (3) "the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal quotation marks and citations omitted).

Plaintiffs allege that Fox News is liable for its negligent supervision and/or retention of Zimmerman and Wheeler. (Compl. ¶ 183.) They allege that Zimmerman and Wheeler both have employer-employee relationships with Fox News, that "Fox News knew or should have known of the tortious propensities of Zimmerman and Wheeler prior to their tortious conduct that inflicted emotional distress on Joel and Mary [Rich,]" and that "Zimmerman and Wheeler engaged in tortious conduct against Joel and Mary [Rich] on Fox News's premises and/or using property of Fox News." (*Id.* ¶¶ 179–82.) However, Plaintiffs allege no specific facts plausibly showing that Fox News knew or had reason to know of Zimmerman and Wheeler's alleged "propensity" to commit an IIED. Nor do Plaintiffs allege credible facts showing that Zimmerman and Wheeler committed tortious conduct on, or using, Fox News's property. Plaintiffs' negligent supervision and/or retention claim therefore fails. *See Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."); *see also Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) ("Conclusory

allegations of negligent supervision are insufficient to overcome a motion to dismiss.") (citation omitted).

Plaintiffs' reliance on *Hwang v. Grace Road Church*, No. 14 Civ. 7187 (KAM) (RML), 2016 WL 1060247 (S.D.N.Y. Mar. 14, 2016), (Opp'n at 35–36), is misplaced. There, the plaintiff alleged that members of the defendant church forcibly prevented him from taking antipsychotic medication and then, two weeks later, forcibly restrained him in a manner that caused him to develop gangrene in his leg. *Hwang*, 2016 WL 1060247, at *1–2. The court found that the church was placed on notice of its members' tortious propensities from when they prevented plaintiff from taking his medication such that the later conduct could be attributed to the church's negligent failure to supervise. *Id.* at *15. In so finding, the court noted that the deprivation of the medication "would likely state a claim for [IIED]." *Id.* at *15 n.13. Here, by contrast, Zimmerman's, Butowsky's, and Wheeler's interactions with Plaintiffs neither form the basis of an IIED claim, nor were they otherwise tortious.

Plaintiffs' claim for negligent supervision and/or retention is dismissed.

## IV.  CONCLUSION

Defendants' motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (ECF Nos. 35, 51), are GRANTED.


Dated: New York, New York
     August 2, 2018

                            SO ORDERED.

                            GEORGE B. DANIELS
                            United States District Judge

IN THE

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2018

ARGUED: FEBRUARY 4, 2019
DECIDED: SEPTEMBER 13, 2019

No. 18-2321-cv

JOEL RICH and MARY RICH,

*Plaintiffs-Appellants,*

*v.*

FOX NEWS NETWORK, LLC,

MALIA ZIMMERMAN, *in her individual and professional capacities,*
and ED BUTOWSKY, *in his individual and professional capacities,*

*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Southern District of New York.
No. 18-cv-2223 – George B. Daniels, *District Judge.*

————

Before: CALABRESI and DRONEY, *Circuit Judges,* and UNDERHILL, *District Judge.**

————

* Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 13 2019

CERTIFIED COPY ISSUED ON 09/13/2019

————

Plaintiffs-Appellants Joel Rich and Mary Rich appeal from a judgment of the United States District Court for the Southern District of New York (Daniels, *J.*) dismissing their state torts claims against Defendants-Appellees Fox News Network, Malia Zimmerman, and Ed Butowsky. Plaintiffs-Appellants filed a complaint based on diversity jurisdiction alleging intentional infliction of emotional distress, tortious interference with contract, and negligent supervision or retention. On *de novo* review, we hold that the complaint pleads sufficient facts to survive a Rule 12(b)(6) motion to dismiss on the first two counts, and an amendment could cure any defect in the third claim. Accordingly, we VACATE and REMAND the District Court's order dismissing the complaint.

————————

ARUN SUBRAMANIAN (Elisha Barron, Susman Godfrey LLP, New York, NY; Leonard A. Gail, Eli Kay-Oliphant, Suyash Agrawal, Massey & Gail LLP, Chicago, IL, *on the brief*), Susman Godfrey LLP, New York, NY, *in support of Plaintiffs-Appellants*.

JOSEPH M. TERRY (Kevin T. Baine, Katherine Moran Meeks, Katherine A. Petti, Williams & Connolly LLP, Washington, DC; David H. Stern, Katherine M. Wyman, Dechert LLP, Los Angeles, CA, *on the brief*), Williams & Connolly LLP, Washington, DC, *in support of Defendants-Appellees Fox News Network and Malia Zimmerman*.[1]

————————

---

[1] On the brief, Defendant-Appellee Ed Butowsky was represented by David B. Harrison and Jason C. Spiro of Spiro Harrison, Short Hills, NJ. On January 31, 2019, this Court granted Butowsky's motion to be relieved of counsel.

C‍ALABRESI, *Circuit Judge*:

Three years ago, Seth Rich was murdered during a botched robbery. He was a 27-year-old staffer for the Democratic National Committee ("DNC"). Soon after Seth's murder, uncorroborated theories—contradicted by official U.S. intelligence reports—surfaced on the web. Seth had leaked thousands of DNC emails to WikiLeaks, the theories asserted, and that is why he had been assassinated.

Malia Zimmerman (a Fox News reporter) and Ed Butowsky (a Fox News commentator) allegedly set out "to take the conspiracy theory from the fringe to the front pages and screens of the mainstream media." Compl. ¶ 24. Over the course of several months, Zimmerman and Butowsky recruited a Fox News contributor, Rod Wheeler, to help them infiltrate the Rich family. They convinced the Plaintiffs, Seth's parents, to hire Wheeler as a private investigator to look into the circumstances of Seth's death. And they then exploited Wheeler's connection to the Riches to give credence to what Zimmerman and Butowsky knew were false accusations against Seth—which Zimmerman and Butowsky widely disseminated through Fox News. They did this, it is claimed, with full knowledge of the harm it would do to Seth's parents.

We conclude that these allegations plausibly state claims for intentional infliction of emotional distress and tortious interference with contract, and that they are capable of supporting claims of negligent supervision. Accordingly, we **VACATE** the district court's judgment dismissing the complaint and **REMAND** the case for further proceedings consistent with this opinion.

*Rich v. Fox News Network, LLC*

# BACKGROUND[2]

## A. Factual Background

On July 10, 2016, Seth Rich—a 27-year-old DNC staffer—was shot and killed a few hundred feet from his home in Washington, D.C. The Metropolitan Police Department determined, and continues to believe, that his unsolved murder stemmed from a botched robbery.

Soon after Seth's death, a "conspiracy theory" emerged among "fringe" political groups. The theory was that "Seth had leaked thousands of DNC emails to WikiLeaks" and was murdered as a result. Compl. ¶¶ 3, 22.[3] Seth's parents, the Riches, objected to this theory and issued a statement asking the public to "refrain from pushing unproven and harmful theories about Seth's murder." *Id.* ¶ 23. Despite this statement, the Appellees in the case before us set out "to take the conspiracy theory from the fringe [and move it] to the front pages and screens of the mainstream media." *Id.* ¶ 24.[4] To do this, they allegedly orchestrated a plan to

---

[2] The following facts are taken from the Riches' complaint. Because we are reviewing a Rule 12(b)(6) motion, we "accept[] all factual allegations in the [Riches'] complaint as true, and draw[] all reasonable inferences in [their] favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

[3] The leak of DNC emails, to which the conspiracy theory sought to tie Seth's murder, purported to show how DNC officials had tipped the party's presidential nomination process in favor of Hillary Clinton to the detriment of Bernie Sanders. *See, e.g.*, J.A. 89.

[4] Findings of the U.S. intelligence community contradicted the conspiracy theorists' account of Seth Rich's death. *See, e.g.*, DHS Press Office, *Joint Statement from the Department of Homeland Security and Office of the Director of National Intelligence on Election Security*, Dep't Homeland Sec. (Oct. 7, 2016), https://www.dhs.gov/news/2016/10/07/joint-statement-department-homeland-security-and-office-director-national.

turn the Riches into unwitting collaborators in their scheme. Over the course of six months, between December 2016 and May 2017, the Appellees succeeded.

Specifically, in December 2016, Ed Butowsky, a guest commentator on Fox News, contacted Seth's parents, Joel and Mary Rich. Butowsky "posted on Facebook that he was 'looking to connect with anyone Jewish in Omaha Nebraska.'" *Id*. ¶ 25. Through that religious connection, he befriended the Riches and asked them about Seth and WikiLeaks. Malia Zimmerman, a Fox News investigative reporter in close communication with Butowsky, also made purportedly independent contacts with the family.

In early 2017, after these initial conversations with the Riches, Zimmerman and Butowsky planted a source inside the family. Rod Wheeler, a former detective turned private investigator, had just signed a contract with Fox News as a paid contributor, for both on-air appearances and "off-air assistance, as requested by Fox." *Id*. ¶ 33. Butowsky, explaining how he did a lot of work for Fox News, contacted Wheeler on February 23, 2017, saying that he was "looking for some assistance on something that happened in Washington." *Id*. ¶ 34. Then, over the course of multiple phone calls and at least one in-person meeting, Butowsky and Zimmerman asked for Wheeler's help, as the complaint alleges, to "advance and further publicize the sham story that Seth was responsible for giving the DNC emails to WikiLeaks." *Id*. ¶ 36.

On the same day as his meeting with Wheeler and Zimmerman, Butowsky emailed the Riches offering to hire an "independent private investigator" on the family's behalf. *Id*. ¶ 41. Butowsky then set up an introductory meeting between Wheeler and the Riches. He instructed Wheeler to "make sure to play down Fox News, [and] don't mention [Wheeler] know[s] Zimmerman." *Id*. ¶ 42. Wheeler met with Joel and Mary, in early March, and behaved as instructed. Butowsky then proposed to the Riches that they sign a draft engagement agreement for Wheeler's

investigative services. The draft gave Wheeler authority to speak to the media on behalf of the family. The Riches declined.

Playing on the Riches' need to "to get closure, as a family," Butowsky urged them to allow him to pay for Wheeler's services. *Id.* ¶ 49. Butowsky falsely assured the Riches that, "although he would finance Joel and Mary's retention of Wheeler, Butowsky would respect Wheeler's legal obligation not to speak to him [] or anyone other than Joel and Mary about the investigation." *Id.* ¶ 54. In the end, Joel and Mary were persuaded. Significantly, though, the final agreement that the family signed with Wheeler expressly prohibited "media representation, unless otherwise permitted by the [Riches] in writing," and stated that Wheeler "shall not release any information regarding the investigation . . . without prior authorization." *Id.* ¶ 57. The Appellees allegedly knew these terms, precisely.

Notwithstanding his contract with the Riches, Wheeler continued to work with Butowsky and Zimmerman in furthering the false Seth-WikiLeaks story. In April 2017, Wheeler and Butowsky met with the White House Press Secretary. They shared materials related to the investigation and promised to keep the White House informed. Moreover, with the help of Zimmerman and relying on information provided by her, Wheeler met with the lead detective on Seth's case, who—as Butowsky told Wheeler—would either "help[] us or we will go after him as being part of the coverup." *Id.* ¶ 67.

On May 10, in order to bring the untrue story to publication, Butowsky and Zimmerman called Wheeler "to falsely inform him that they had developed an FBI source supposedly confirming" that Seth had been in contact with WikiLeaks. *Id.* ¶ 69. Then Zimmerman and Butowsky began to put pressure on Wheeler to go on the record as a named source for the Seth-WikiLeaks story. On May 14, Zimmerman informed Wheeler that President Trump wanted her article published "immediately." *Id.* ¶ 73. The next day, Zimmerman told Wheeler that

Case: 23-1273, 04/29/2024, DktEntry: 74.1, Page 39 of 60
Case 1:18-cv-02223-GBD Document 72 Filed 08/15/19 Page 39 of 60

18-2321-cv
*Rich v. Fox News Network, LLC*

"bosses at Fox want her to go" with the story on May 16, and Butowsky encouraged Wheeler to "close this deal, whatever you got to do." *Id.* ¶ 74. That same day, Zimmerman also sent a text to Wheeler, asking if he was with Butowsky, because Butowsky was "supposed to get more info on Seth [R]ich today," and "if [Butowsky] does we need to figure out what [Wheeler] can say on the record." *Id.* ¶ 81.

Soon after, Wheeler became the named source in the Fox News articles about Seth's murder. Thus, on May 16, Fox News published two pieces—both penned by Zimmerman.

The first article was titled: "Slain DNC Staffer Had Contact with WikiLeaks Say Multiple Sources." *Id.* ¶ 87. The article attributed a quote to an anonymous federal investigator: "I have seen and read the emails between Seth Rich and WikiLeaks." *Id.* The article continued: "The revelation is consistent with the findings of Rod Wheeler, former DC homicide detective and Fox News contributor and whose private investigation firm was *hired by Rich's family* to probe the case." *Id.* ¶ 88 (emphasis in original). The article closed: "Rich's father, Joel Rich, could not be reached for comment, but told Fox News in January that he didn't believe his son would leak the emails. However, he said above all, his son 'wanted to make a difference in the world.'" J.A. 92.

The second article was titled: "Family of slain DNC staffer Seth Rich blasts detective over report of WikiLeaks link." *Id.* at 101. It read: "Rod Wheeler, a retired Washington homicide detective and Fox News contributor investigating the case *on behalf of the Rich Family*, made the WikiLeaks claim, which was corroborated by a federal investigator who spoke to Fox News." Compl. ¶ 90 (emphasis added). The article clarified that, although Wheeler was paid by a third party, the Riches were Wheeler's clients and Joel had signed the contract for Wheeler's services. It

also added: "[A] spokesman for Rich's family on Tuesday said Wheeler was not authorized to speak for the family." *Id.*

Allegedly, Fox News was aware of the scheme all along. Specifically, Butowsky had represented to Fox News that he was one of the key players behind the story. It is alleged that, on the eve of publication, Butowsky wrote an email to Fox News producers stating: "If you have any questions about the story or more information is needed, call me" because "I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility." *Id.* ¶ 82. Furthermore, when Wheeler reached out to a local D.C. Fox affiliate channel reporter on the eve of publication and told them that there was breaking news regarding Seth that would air the next day on Fox News, Zimmerman sent a text to Wheeler saying: "New York won't be happy. . . . This could be really bad if the Fox News channel thinks you fed an exclusive we invested a lot of time and money into to a local channel just hours before we were going to publish." *Id.* ¶¶ 84–85.

The day after publication, Wheeler told *Newsweek* that his "information" from the unnamed "federal investigator" was only a repetition of what Butowsky and Zimmerman had told him. *Id.* ¶ 93. Yet, Fox News instructed Zimmerman to keep those false statements in the article. Moreover, over the following week, various Fox News reporters, by leveraging Wheeler's connection to the Riches, frequently commented on the story and spread it widely.

On May 18, the Riches formally asked Fox to retract the story. Zimmerman replied that "much of our information came from a private investigator, Rod Wheeler." *Id.* ¶ 100. When confronted by Wheeler, Zimmerman explained: "that's the email that Fox asked me to send . . . . They wrote it for me and they told me to send it to [Joel]." *Id.* ¶ 101. Five days later, Fox retracted the story because "[t]he article was not initially subjected to [a] high degree of editorial scrutiny." *Id.* ¶ 107.

*Rich v. Fox News Network, LLC*

Fox News guests, however, continued to reference the retracted article for months. And to this day, Fox News makes available online at least two videos repeating, almost verbatim, the content of the Zimmerman story. *See, e.g., Rod Wheeler on His Investigation into DNC Staffer's Murder*, Fox News (May 16, 2017) (accessed on Sept. 12, 2019), https://video.foxnews.com/v/5437207289001 ("HANNITY: [F]ormer D.C. homicide detective, Rod Wheeler, *who was hired by a third party to investigate the murder on behalf of the family*, says Mr. Rich was communicating with WikiLeaks before he was killed. Now, Seth's family has been pushing back today . . . . I have known you a long time, Rod, you are a man of honor and integrity, so tell us who hired you. WHEELER: Well, actually, *I was hired by the family*, Joel and Mary Rich. They signed the contract." (emphases added)).

Butowsky continued both to contact the Riches and to exploit publicly their connection to Wheeler. On May 25, he wrote to Joel: "You should call Malia Zimmerman. She found the person and the gun that was used to shoot your son. That is what you wanted, correct? . . . When you find out who did it you are going to be very very emotional." Compl. ¶ 111 (emphasis omitted). In addition, at least up until the filing of the Riches' complaint, Butowsky continued to leave voicemails and send texts to Joel. At the same time, he kept on exploiting the Riches' name to fuel the conspiracy theory on Twitter and other news outlets. For instance, in March 2018, Butowsky told the *Washington Times* that Joel and Mary had "confirmed that their son transmitted the DNC emails to Wiki[L]eaks." *Id.* ¶ 115.

As a result of this scheme, the Riches are exhibiting symptoms of post-traumatic stress disorder and social anxiety disorder. In particular, Mary no longer feels comfortable in public for fear of being asked about WikiLeaks. And, although on the same day of the Zimmerman article Mary received a job offer, she could not accept it because these events aggravated a preexisting neurological condition.

### B. *Procedural Background*

On March 13, 2018, Joel and Mary filed a complaint in federal court based on diversity jurisdiction against Zimmerman, Butowsky, and Fox News. The complaint alleged: (1) intentional infliction of emotional distress; (2) tortious interference with contract; and (3) negligent supervision and/or retention against Fox News only. The Defendants moved to dismiss the complaint under Rule 12(b)(6). On August 2, 2018, the District Court (Daniels, *J.*) granted the motion and dismissed all claims with prejudice. *See generally Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487 (S.D.N.Y. 2018).

The District Court first considered the intentional infliction of emotional distress ("IIED") claim. Judge Daniels examined each allegation and concluded that none of them, on their own, pleaded the required extreme and outrageous conduct. *Id.* at 500–03. In explaining its reasoning, the District Court stated that "zero times 10 is still zero. . . . [You can]not just simply say, well, these 10 things by themselves are not outrageous, but when I put them all together, they become outrageous." J.A. 415–16.

The District Court also dismissed the Riches' claim for tortious interference with contract. Because Wheeler had allegedly been in touch with Zimmerman and Butowsky even before signing the contract with the Riches and thus "was predisposed toward breaching," the District Court found no plausible allegation of but-for causation. *Rich*, 322 F. Supp. 3d at 503. In a footnote, the District Court offered an alternative basis for dismissal: the Riches "have not specifically identified damages that are attributable to Defendants' interference with Wheeler's contract, rather than the reputational and emotional injury caused by the publication of the Zimmerman/Fox Article." *Id.* at 503 n.9.

*Rich v. Fox News Network, LLC*

Finally, the District Court dismissed the negligent supervision or retention claim against Fox News on two grounds. *First,* Judge Daniels held, "Plaintiffs allege no specific facts plausibly showing that Fox News knew or had reason to know of Zimmerman and Wheeler's alleged 'propensity' to commit an IIED." *Id.* at 504. *Second*, "Plaintiffs [do not] allege credible facts showing that Zimmerman and Wheeler committed tortious conduct on, or using, Fox News's property." *Id.* The Riches timely appealed.

## DISCUSSION

We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 685 (2d Cir. 2001). To survive a motion to dismiss, plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011). A complaint should not be dismissed if it alleges "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), such that a court could "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

With this standard in mind, there are three questions of New York law before us today:

- *First*, whether the allegations in the complaint suffice to state a claim for intentional or reckless "extreme and outrageous" conduct against the Riches on the part of Appellees. We hold that they do.
- *Second*, whether the complaint plausibly alleges that the Appellees tortiously interfered with the contract between the Riches and Wheeler. We hold that it does.

11

- *Third*, whether the Riches satisfactorily pleaded negligent supervision or retention against Fox News. We do not decide this question, but we hold that—on the facts pleaded—an amended complaint could likely cure any defect.

After addressing each question, we conclude that the District Court's judgment dismissing the Riches' complaint in its entirety under Rule 12(b)(6) should be vacated. We therefore remand the case to the District Court for further proceedings consistent with this opinion.

### A. Intentional Infliction of Emotional Distress

New York has adopted the Restatement (Second) formulation of IIED. *Howell v. N.Y. Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993). "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts § 46(1) (1965). This broad definition, as Chief Judge Kaye explained, is "both a virtue and a vice." *Howell*, 612 N.E.2d at 702. "The tort is as limitless as the human capacity for cruelty. The price for this flexibility in redressing utterly reprehensible behavior, however, is a tort that, by its terms, may overlap other areas of the law, with potential liability for conduct that is otherwise lawful." *Id*. Therefore, IIED "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted).

Under New York law, then, a claim for IIED requires a showing of: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell*, 612 N.E.2d at 702.

Because the parties' disagreement at this time hinges primarily on the first prong, which is "the one most susceptible to determination as a matter of law," *id.*, that is what we focus on.

### *i. Extreme and Outrageous Conduct*

The Riches argue that we should view the specific allegations in the complaint as a series of acts that, taken together, constitute extreme and outrageous conduct. This is so, they claim, even though each individual allegation alone might not be sufficiently outrageous—because, taken together, these acts might amount to a deliberate and malicious campaign of harassment. Alternatively, the Riches allege that the Appellees knew of their susceptibility to emotional distress, and their conduct became extreme and outrageous when the Appellees chose to proceed with their plan in spite of that knowledge. We agree on both counts. We thus conclude that, under either theory, the Riches sufficiently pleaded extreme and outrageous conduct.[5]

---

[5] The complaint contains few specific factual allegations concerning the pre-publication involvement of individuals at Fox News in addition to Zimmerman, Butowsky, and Wheeler. *See, e.g.*, Compl. ¶ 74 (Zimmerman allegedly told Wheeler that "bosses at Fox want her to go" with the story immediately); *id.* ¶ 81 (Zimmerman allegedly texted Wheeler that Fox News and Zimmerman "need to figure out what [Wheeler] can say on the record."); *id.* ¶82 (Butowsky allegedly emailed Fox News producers about the Seth-WikiLeaks articles on the eve of publication); *id.* ¶¶ 84–85 (Zimmerman allegedly told Wheeler that the Fox News channel and producers in New York would be upset because of Wheeler's interview with a D.C. Fox affiliate channel). These allegations, though, stand next to many specific allegations of involvement on the part of Zimmerman, Butowsky, and Wheeler. Taking the allegations as a whole and drawing all reasonable inferences in favor of the Riches—as we must in this context—we find that the complaint states sufficiently plausible claims against Fox News as an entity to survive a motion to dismiss and warrant discovery into any additional involvement of Fox News in the alleged scheme.

### a. Deliberate and Malicious Campaign of Harassment

Under New York law, although "[t]he standard of outrageous conduct is strict, rigorous and difficult to satisfy . . . , that is not the case when there is a deliberate and malicious campaign of harassment or intimidation." *Scollar v. City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018) (internal quotations omitted). To be sure, "it is manifestly neither practical nor desirable for the law to provide[] a remedy against any and all activity which an individual might find annoying." *Nader v. Gen. Motors Corp.*, 255 N.E.2d 765, 770 (N.Y. 1970). At the same time, "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation," IIED provides a remedy. *Id.* In other words, under New York law, the proper inquiry is not merely whether each individual act might be outrageous. Rather, the question is whether those actions—under the totality of the circumstances—amounted to a deliberate and malicious campaign.

We have no trouble concluding that—taking their allegations as true—the Riches plausibly alleged what amounted to a campaign of emotional torture. In order to publish a knowingly false article accusing Seth of leaking the DNC emails, Butowsky and Zimmerman needed a reliable source. They settled on a purportedly independent investigator, hired by the Riches. But they had to fabricate that source. So Butowsky—through lies, religious appeals, and financial support—convinced the Riches to hire Wheeler, a Fox News contributor, as their private investigator. Eventually, Butowsky and Zimmerman told Wheeler that an anonymous FBI investigator had seen emails between Seth and WikiLeaks. Wheeler then regurgitated that unsubstantiated information back to Zimmerman, giving her a named source (himself) for her Fox News article. The article emphasized Wheeler's connection to the Riches, thus lending credibility to his statements. And it suggested that Seth may have leaked the emails because—as

14

his father said—he "wanted to make a difference in the world." J.A. 92. These allegations, taken together, plausibly rise to the level of extreme and outrageous conduct.

### b. Knowledge of Susceptibility

Moreover, knowledge of a plaintiff's susceptibility to emotional distress can, under New York law, transform non-actionable acts into outrageous conduct. According to the Restatement, to which New York adheres, *Howell*, 612 N.E.2d at 702, "there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge," Restatement (Second) of Torts § 46 (comment *j*) (1965). In that case, "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress." *Id.* § 46 (comment *f*).[6] As a result, otherwise non-actionable conduct "may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge." *Id.*[7]

---

[6] As the Tenth Circuit aptly noted, "[t]he plaintiff's peculiar susceptibility to emotional distress thus both broadens and narrows the scope of the tort." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1159 (10th Cir. 1981), *cert. denied*, 464 U.S. 824 (1983). On the one hand, "[i]t broadens the scope in that a jury may find the defendant's conduct to be outrageous in light of his knowledge of the plaintiff's peculiar susceptibility where it would not be so without such knowledge." *Id.* On the other hand, "it narrows the scope in that without such knowledge, the defendant is not liable for exaggerated emotional distress." *Id.*

[7] We have found no New York case specifically addressing comment *f*. But New York has long adopted the Restatement (Second) on IIED. *Howell*, 612 N.E.2d at 701. Moreover, other state courts that similarly follow the Restatement have embraced comment *f*. *See, e.g., Boyle v. Wenk*, 392 N.E.2d 1053, 1056 (Mass. 1979) ("Though there is no evidence that Wenk knew the precise nature of Mrs. Boyle's physical susceptibility, his knowledge that she had just returned from

Zimmerman and Butowsky had enough specific knowledge of the family and the circumstances surrounding Seth's murder to be keenly aware of the Riches' susceptibility to emotional distress in this regard. On August 10, 2016, the family made a public statement, noting how the nascent conspiracy theory was severely hurting them. Zimmerman personally spoke with Joel on at least three occasions—January 3, January 5, and May 15, 2017. Moreover, in March 2017, in the process of deceiving the Riches into hiring Wheeler, Butowsky falsely assured Joel that he only wanted to help them "get closure, as a family." Compl. ¶ 49. And, "[b]y phone on March 13, 2017, Butowsky acknowledged to Joel that 'I know what you've been through.'" *Id.* ¶ 53. The fact that the Appellees proceeded with their plan in the face of this knowledge of the grieving family's susceptibility makes Zimmerman and Butowsky's conduct plausibly extreme and outrageous.

### *ii. Appellees' Defenses*

To all of this, Fox News and Zimmerman raise two defenses that are worthy of discussion. *First,* they claim that, under New York law, *knowledge* of a plaintiff's emotional fragility is not sufficient unless defendant also *intended* to inflict emotional distress. *Second*, they assert that this action must fail since it is simply a lawsuit for defamation of a deceased plaintiff disguised as an IIED claim. Both are unavailing.

### a. Knowledge

Fox News and Zimmerman argue that the Riches need to allege intent. To support that claim, the two Appellees cite *Howell*. In that case, Chief Judge Kaye

---

the hospital put him on notice that she might be more vulnerable to harassment or verbal abuse."); *see also Drejza v. Vaccaro*, 650 A.2d 1308, 1313–14 (D.C. 1994); *Brandon ex rel. Estate of Brandon v. Cty. of Richardson*, 624 N.W.2d 604, 621 (Neb. 2001).

explained that, "even if defendants were aware that publication would cause plaintiff emotional distress, publication—*without more*—could not ordinarily lead to liability for intentional infliction of emotional distress." *Howell*, 612 N.E.2d at 705 (emphasis added). The two Appellees take this statement to mean that specific intent to cause emotional distress is required under New York law.

That is not correct. The cited sections of *Howell* dealt with the scope of the privileged-conduct exception to tort liability. In *Howell*, Chief Judge Kaye explained how "[a] newspaper's publication" may be "an act within the contemplation of the 'privileged-conduct' exception" to IIED liability. *Id*.[8] Because the *Howell* plaintiff had "offer[ed] no basis for concluding that the privilege has been abused," Chief Judge Kaye was careful to note that "we need not explore today what circumstances might overcome the privilege." *Id*. In other words, *Howell* says nothing about specific intent to cause emotional distress being required. And, in fact, the *Howell* opinion leaves no doubt that recklessness— namely, a "disregard of a substantial probability of causing[] severe emotional distress"—can be enough for IIED. *Id*. at 702.

Here, Fox News and Zimmerman do not sufficiently contend that its conduct—although knowingly outrageous—is nonetheless entitled to the "privileged-conduct exception" under New York law. Therefore, we do not need to consider whether the two Appellees abused that hypothetical privilege. Recklessness, as New York courts have held time and again, is sufficient to make

---

[8]   According to the Restatement, "[t]he conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where [the actor] has done no more than to insist upon his [or her] legal rights *in a permissible way*, even though he [or she] is well aware that such insistence is certain to cause emotional distress." Restatement (Second) of Torts § 46 (comment *g*) (1965) (emphasis added).

a claim for IIED. And knowledge of a peculiar susceptibility to emotional distress, as outlined in comment *f* of the Restatement (Second), aptly describes a particular form of recklessness. The two Appellees' attempt to require specific intent to cause emotional distress fails.

### b. Defamation

Fox News and Zimmerman also argue that the Riches' IIED action is just an attempt to seek liability for defamatory speech against their deceased son. In the eyes of these two Appellees, every allegation put forward by the Riches cannot be disentangled from the slanderous publication itself, and therefore—even if tortious—it is not actionable. Because Seth is dead, no defamation claim can be brought in his name. *See* Restatement (Second) of Torts § 560 (1977) ("One who publishes defamatory matter concerning a deceased person is not liable either to the estate of the person or to his descendants or relatives."); *cf. Rose v. Daily Mirror, Inc.*, 31 N.E.2d 182, 182 (N.Y. 1940) ("[I]t has long been accepted law that a libel or slander upon the memory of a deceased person which makes no direct reflection upon his relatives gives them no cause of action for defamation."). In other words, the two Appellees contend, the family's IIED lawsuit and Seth's defamation claim are one and the same.

But, in fact, IIED of the parents and defamation of the son are two distinct torts claims, as a simple hypothetical demonstrates. Suppose Seth had not died but had instead survived the shooting in a comatose state. If the Appellees acted in the exact same manner and published the exact same articles as has been alleged here, Seth could certainly have brought a defamation suit against them; he would have complained about the false accusations that the Appellees made against him—that is, that he leaked DNC emails to WikiLeaks. But, in this hypothetical scenario, the Riches could also have brought a separate lawsuit—*this* lawsuit—claiming that the

Appellees' actions directed at them were extreme and outrageous enough to constitute IIED.

In the case before us, the Riches are not claiming any injury because of some reputational harm suffered by their son. That hypothetical defamation suit died with Seth, and no one can resurrect it. But the Riches' own cause of action for IIED—arising from the Appellees' speech and conduct specifically targeted at Joel and Mary—continues to be viable. If Butowsky, Zimmerman, and Fox News made knowingly or recklessly false claims (or perpetrated some other tortious acts) targeted at the Riches, they are subject to possible tort liability. As we explained earlier, we have no difficulty concluding that the complaint plausibly alleges precisely such tortious conduct.

At various times, while raising this defense, Fox News and Zimmerman invoke the First Amendment to the U.S. Constitution. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (explaining how the Free Speech Clause of the First Amendment "can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress"). Specifically, according to these two Appellees, "a public figure cannot recover on an intentional infliction claim targeting speech unless he first proves the constitutionally required elements of a defamation claim," including that the complained-of speech is "of and concerning" the plaintiff. Fox Br. 18–19.

These arguments are smokescreens. *Cf. Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) (recognizing that "the First Amendment [is not] a wall of immunity protecting newsmen from any liability for their conduct while gathering news"). In *Hustler Magazine, Inc. v. Falwell*, the Supreme Court explained that a public figure suing for IIED (based on speech alone) can do so if the speech was *not* protected—namely, when it "contains a false statement of fact which was made with actual malice, *i.e.*, with knowledge that the statement was false or with

19

reckless disregard as to whether or not it was true." 485 U.S. 46, 56 (1988) (internal quotations omitted). Thus, falsehood and actual malice are the only showings required, and nowhere did the Court take the "of and concerning the plaintiff" requirement that is appropriate to a defamation tort and import it into IIED.[9] Because Fox News and Zimmerman concede in their brief that the pleadings plausibly allege that the Seth-WikiLeaks articles contained false factual statements, and because the Riches sufficiently allege actual malice, nothing more is needed at this stage.

*   *   *

In sum, we hold that the Riches' complaint plausibly alleges enough facts to state a claim for intentional infliction of emotional distress—for extreme and outrageous conduct by the Appellees, directed at the Appellants. "Where reasonable [people] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." Restatement (Second) of Torts § 46 (comment *h*) (1965). Because we think that the Riches' allegations rise well above

---

[9] And for good reason. Applying the "of and concerning" requirement to IIED would mean that no IIED claim that involved speech and arose out of harm to a dead person could ever be brought. But New York courts initially recognized the tort of IIED precisely in analogous circumstances. In the early days, these circumstances included the mistreatment or mishandling of corpses. *See, e.g., Gostkowski v. Roman Catholic Church of the Sacred Hearts of Jesus & Mary*, 186 N.E. 798 (N.Y. 1933) (deceased relative's body moved to another cemetery); *Finley v. Atl. Transp. Co.*, 115 N.E. 715 (N.Y. 1917) (burial at sea without notifying relatives). The mishandling of dead bodies was "of and concerning" the decedent and not the suing plaintiffs. Yet, not only were the relatives permitted to sue in IIED, but allowing that lawsuit was the reason why the IIED tort was created. *See* William L. Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 MICH. L. REV. 874, 886 (1939).

the Rule 12(b)(6) threshold, and because we are unpersuaded by the Appellees' defenses, we conclude that the District Court should not have dismissed the complaint.[10]

### B. Tortious Interference with Contract

Next, we analyze the Riches' claim for tortious interference with contract. This tort requires: "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). Moreover, "a plaintiff must allege that the contract would not have been breached 'but for' the defendant's conduct." *Burrowes v. Combs*, 808 N.Y.S.2d 50, 53 (1st Dep't 2006). Recovery is permitted even where "a cause of action for breach of contract existed in favor of the plaintiff against the other party to the contract." *Hornstein v. Podwitz*, 173 N.E. 674, 676 (N.Y. 1930).

No party denies the existence of a valid contract that was breached: the signed agreement between Wheeler and the Riches is in the record, and Wheeler's statements in the Fox News articles were an actual breach of his confidiality agreement. And the Appellees do not deny that they had "knowledge of an existing valid contract." *Associated Flour Haulers & Warehousemen v. Hoffman*, 26

---

[10] The Riches' complaint included two additional causes of action related to the IIED claim discussed above: (1) aiding and abetting IIED and (2) conspiracy to commit IIED. The District Court dismissed both claims as a result of its dismissal of the IIED claim. Because we now find that the Riches have indeed sufficiently alleged an IIED claim against the Appellees, we leave it to the District Court to decide in the first instance the extent to which these causes of action may proceed in light of this opinion.

N.E.2d 7, 10 (N.Y. 1940). We therefore focus our analysis on the remaining factors: (i) causation; (ii) damages; and (iii) intentional procurement of breach (iv) without justification. Because the complaint plausibly pleaded each of these factors, we hold that the Rule 12(b)(6) dismissal was erroneous.

### i. But-For Causation

The District Court held that the Appellees could not be a but-for cause of the breach of contract. According to the Riches' complaint, *before* the contract with Wheeler was signed, the Appellees successfully secured Wheeler's agreement to act in ways that would breach the contract. To Judge Daniels, that was enough to preclude a finding of causation. *Rich*, 322 F. Supp. 3d at 503. We disagree.

The proper question is whether, in the absence of interference by Fox News, Zimmerman, and Butowsky, the breach would have occurred. If the breach would have occurred "prior to *any* involvement by" the Appellees or apart from their actions, then of course there would be no but-for causation. *KAM Constr. Corp. v. Bergey*, 56 N.Y.S.3d 740, 742 (4th Dep't 2017) (emphasis added); *see also Lana & Samer, Inc. v. Goldfine*, 776 N.Y.S.2d 66, 67 (1st Dep't 2004). The issue before us, then, is whether but-for causation exists when some (but not all) interfering conduct takes place before a contract has been finalized. The Riches' allegation is that Wheeler's *only* reason to breach was Zimmerman's and Butowsky's actions interfering with the contract—an interference that started before the contract with the Riches was signed and continued all the way until the breach became known to the Riches (*i.e.*, when the Fox News articles were published).

We hold that, at least where there allegedly is tortious interference *after* contract formation, the fact that there also was allegedly interfering conduct *before* the agreement was signed doesn't preclude a complaint from stating but-for causation. The allegations here plainly claim that, but for the Appellees' conduct

before *and* after Wheeler and the Riches entered into this agreement, the breach would not have occurred. In the face of these allegations, the degree to which the contract would have been breached anyway is a question properly left for discovery and, perhaps, jury determinations. At this stage, we conclude that the complaint sufficiently pleaded causation.

### ii. Damages

In the alternative, the District Court held that the complaint was "insufficient to plead damages resulting from Defendants' alleged tortious interference." *Rich*, 322 F. Supp. 3d at 503 n.9. We disagree with that ground for dismissal as well.

Under New York law, for tortious interference with contract, "the elements of damages, including consequential damages, [are] those recognized under the more liberal rules applicable to tort actions." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 452 n.6 (N.Y. 1980). "One who is liable to another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774A(1) (1979); *see also Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (same).

The Riches' alleged damages—psychological disorders and the loss of employment—flow directly from the Zimmerman articles, and those articles were made possible by Wheeler's breach of contract. Specifically, drawing all inferences in favor of the Riches (as at this stage we must), the complaint claims that, but-for Wheeler's breach, Butowsky and Zimmerman would *not* have been able to enlist the Riches' unwitting help in giving credence to the Seth-WikiLeaks story. The

Appellees had possessed the allegedly false information from the anonymous federal investigator for months, but they needed Wheeler's on-the-record statements corroborating that anonymous source in order to publish the Zimmerman articles. And the only way to obtain those statements was to interfere with Wheeler's confidentiality contract with the Riches. The connection between the breach and the alleged damages is sufficiently strong to preclude dismissal.

*iii. Intentional Procurement of Breach*

Fox News and Zimmerman, however, argue that, regardless of whether the District Court erred in dismissing on the basis of causation and damages, the tortious interference claim was properly dismissed anyway. Even assuming that the Appellees knew of the confidentiality clause in Wheeler's contract, that clause would be breached only if Wheeler spoke to the press *without* the Riches' permission. And because the Riches did not allege that Fox News and Zimmerman knew that Wheeler lacked permission to speak to them, the two Appellees contend that the Riches' complaint did not allege intentional procurement of the breach.

This argument is not convincing. The Riches' complaint clearly alleges that the contract was breached, and this necessarily includes an allegation that no permission to speak was given. For had there been permission, there would have been no breach. Additionally, it is alleged that Zimmerman said "we [Fox News] need to figure out what you [Wheeler] can say on the record," Compl. ¶ 81, and that Butowsky falsely told the Riches that he "would respect Wheeler's legal obligation not to speak to him [] or anyone other than Joel and Mary about the investigation." *Id.* ¶ 54. Moreover, the Riches alleged that Zimmerman teamed with Butowsky and, throughout, engaged in many subterfuges in her dealings with the Riches. Such actions are inconsistent with any belief on the Appellees' part that the Riches had authorized Wheeler to speak. *Cf. Rodrigues v. City of New York*, 602 N.Y.S.2d 337, 343 (1st Dep't 1993) (allowing claim to survive motion to

dismiss based on inference of intent in light of alleged motive and personal interest). In other words, taken together, these pleadings constitute a sufficient allegation that the Appellees "kn[ew] that the interference [was] certain or substantially certain to occur as a result of [their] action." Restatement (Second) of Torts § 766 (comment *j*) (1979).

### iv. Without Justification

Finally, we conclude that the Riches' complaint plausibly alleges that Butowsky, Zimmerman, and Fox News had no legally sufficient justification for intentionally procuring Wheeler's breach of contract.

New York courts have recognized that, in limited cases, liability for tortious interference may be cut off if the conduct was justified. To be sure, lawful behavior, by itself, does not suffice to justify tortious interference. *See, e.g.*, *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996) ("[A] plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."). The pursuit of "economic interest" can suffice—"*unless there is a showing of malice or illegality.*" *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996) (emphasis added). Like economic interest, news gathering may well be (similarly) protected. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

We, however, need not consider whether New York law would recognize news gathering as a justification for tortious interference with contract. For, even if it did, the Riches unquestionably allege malice sufficient to overcome any such possible justification. The allegations—which we have to take as true—are that Zimmerman and Butowsky (i) intentionally planted a biased investigator to gain the trust of a grieving family; (ii) fed false information to the investigator with the

sole purpose of exploiting that investigator's relationship with the family to give credence to a politically motivated story; and (iii) knew, from the very start, that this story was nothing more than a false conspiracy theory. All that is more than enough to counter any possible justification.

\* \* \*

In sum, we find that the Riches sufficiently pleaded but-for causation, damages, knowledge, and intentional procurement of the breach without justification. Accordingly, the District Court erred in granting the Appellees' motion to dismiss their tortious interference with contract claim.

### C. Negligent Supervision or Retention

Lastly, we turn to the negligent supervision or retention claim the Riches have brought against Fox News. Under New York law, in addition to the negligence elements of such a claim, a plaintiff must show: "(1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam) (citing *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 654 N.Y.S.2d 791, 793 (2d Dep't 1997); *D'Amico v. Christie*, 518 N.E.2d 896, 901 (N.Y. 1987)).

But "[t]he employee also must not be acting within the scope of his or her employment; [for] in that situation the employer [would] only be liable . . . vicariously under the theory of *respondeat superior*, [and] not for negligent supervision or retention." *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446

(3d Dep't 2011).[11] Under New York law, an employee's tortious acts fall within the scope of his employment if "done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979). But "[a]n employer will not be held liable under [*respondeat superior*] . . . for actions which were . . . undertaken by the employee for wholly personal motives." *Galvani v. Nassau Cty. Police Indemnification Review Bd.*, 674 N.Y.S.2d 690, 694 (2d Dep't 1998).

The Riches adequately allege that an employment relationship existed between Fox News and Zimmerman (and Wheeler). Therefore, the issue before us is whether the complaint alleges liability on the part of Fox News for conduct by Zimmerman (and Wheeler) that was *within* or *outside* the scope of their employment. The complaint is not lucid on this point. The Riches may be alleging that Zimmerman (and Wheeler) were acting within the scope of their employment and, therefore, Fox News is vicariously liable. Or they may be alleging that, although their conduct fell outside the scope of their employment, there was negligence on the part of Fox News in hiring and supervising them. Or they may be alleging both, leaving it up to the jury to decide the scope of employment question.

A simple amendment would clarify the issue. The District Court, however, dismissed the complaint with prejudice. To be sure, "no court can be said to have

---

[11] Conversely, all departments of the New York Appellate Division have concluded that it is "[i]n instances where an employer cannot be held vicariously liable for an employee's torts, [that] the employer can still be held liable under theories of negligent hiring and negligent supervision." *State Farm Ins. Co. v. Cent. Parking Sys., Inc.*, 796 N.Y.S.2d 665, 666 (2d Dep't 2005); *see also Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 446 (3d Dep't 2011); *Owen v. State*, 76 N.Y.S.3d 330, 332 (4th Dep't 2018); *Scollar v. City of New York*, 74 N.Y.S.3d 173, 179 (1st Dep't 2018).

Case 19-1890, Document 110-1, 09/30/2021, 3186964, Page60 of 60
Case 1:16-cv-02225-GBD Document 71 Filed 09/18/19 Page 60 of 60

18-2321-cv
*Rich v. Fox News Network, LLC*

erred in failing to grant a request [to amend] that was not made." *Gallop*, 642 F.3d at 369. At the same time, either theory of liability—negligent supervision or vicarious liability—appears to be one that the complaint, if amended, could readily allege. Since we are remanding for consideration of the Riches' other claims, we believe a clarifying amendment as to the negligence claim should also be permitted. Accordingly, upon remand of the IIED and tortious interference claims, we instruct the District Court to allow the Riches to amend their negligent supervision or retention count.

## CONCLUSION

We **VACATE** the District Court's August 2, 2018, judgment granting the Appellees' motion to dismiss, and we **REMAND** the case for further proceedings consistent with this opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit